# Exhibit C

# CR House 3614 Feb. 16 1929

Mr. YON. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. YON. There is one question that I would like to ask of the gentleman. I have been a shoe man—not a manufacturer, but a dealer—and I am sympathetic with the shoe industry. While I was in Boston not long ago one of the big leather men outlined the situation relative to the supply of leather. He said that the supply had decreased from 1920 from 13,000,000 down to less than 2,000,000 of the available supply. The urgent requirement at that time was to use low-cut shoes. They were bringing in substitutes for leather, and at the same time they were asking protection on shoes, all the while knowing that when they asked protection on shoes the producers of hides and leather are entitled to protection on hides.

Mr. CONNERY. If the gentleman will examine the record, he will find that the 1,500,000 pairs of shoes that came in last year from Czechoslovakia paid no tariff at all. There was no duty on them at all.

Mr. YON. I understand that those shoes are made where a great deal of extra work is placed upon them, and those shoes so made carry duty; and the majority of the shoes manufactured are of that general character of manufacture. As I say, I want to do the fair thing and believe in doing the fair thing for the shoe manufacturer.

Mr. CONNERY. I will say to the gentleman that I believe firmly that if Congress does not put a tariff on boots and shoes the shoe industry in my city will be wiped out within the next five years. I am not saying that for effect. I know what I am talking about.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. SCHAFER. In the district that I have the honor to represent we have a great many shoe manufacturers and tanneries. I want to have a tariff which will protect these industries and labor employed therein from unfair competition of foreign products. I will, however, oppose a tariff on shoes if the shoe manufacturers keep up their propaganda for a tariff on shoes and opposition to a tariff on hides and finished leathers.

Mr. CONNERY. Every shoe manufacturer that I have talked with has hardly mentioned the question of hides. If you will ask them about it, you will find they will say to the Committee on Ways and Means when they appear before it next week, "If you see fit to put a duty on hides, all we ask is to have a compensatory tariff placed on shoes." I will say to the gentleman that the propaganda that he mentions certainly does not come from my district.

Mr. MORGAN. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. MORGAN. If we destroy the shoe factories and the tanneries, will not the hide market be wiped out ultimately?

Mr. CONNERY. Yes; because there will be nobody to buy hides.

Mr. McCORMACK. Does the gentleman know where the capital comes from that is put into the manufacture of these shoes in Czechoslovakia?

Mr. CONNERY. I believe that the capital that is behind the Czechoslovakia shoe manufactures comes from the United States. The manufacturers here have put money into business over there, because they say they can not compete here, and with cheap labor costs over there they can, and thereby throw thousands out of employment in the United States. That is admitted by business men in New York.

Mr. LOZIER. Mr. Speaker, will the gentleman yield?

Mr. CONNERY. Yes.

Mr. LOZIER. Is it not a fact that in the last few years millions of dollars of American money have been loaned to countries in Europe in order that European industry may come in competition with domestic products here?

Mr. CONNERY. I understand so.

Mr. MORGAN. Does the gentleman stand on the Democratic platform, where protection is demanded?

Mr. CONNERY. I certainly stand on the Democratic platform, which demands that our industries be protected.

But, of course, the Democratic platform says we should have protection. I have no argument with my distinguished friend from Texas on that point.

Mr. JONES. The occasion for my question was this: I received a printed letter—and I am sure all the Members received it—from the National Boot & Shoe Manufacturers' Association urging a tariff on boots and shoes and urging free hides. Now, it seems to me it is going pretty far to ask the ranchmen and farmers who produce hides to sell their products in a free market and at the same time compel them to buy their supplies in a protected market. Does the gentleman think that is fair?

Mr. CONNERY. No; I do not. And, I repeat, I believe a tariff on hides will only inure to the benefit of the packers, and I am not interested at all in the packers; I am interested in the farmers. I want to see the farmers protected.

Mr. JONES. I want to say in that connection that the farmer sells the whole animal to the packer. The packer in turn sells to others. The packer is an intermediate agent. If he can get more for the hides, he can pay more for the animal. That is elemental.

Mr. CONNERY. And when the packers get the animal they skin him and dispose of the hide.

Mr. JONES. I want to say to my friend that hides can be brought in free from other places. These packers have big plants in other countries—in South America and elsewhere—and they can bring hides in free of duty. The same is true of other concerns which use hides.

The SPEAKER pro tempore. The time of the gentleman from Massachusetts has expired.

### DEPORTATION OF ALIENS

Mr. JOHNSON of Washington. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill S. 5094, with Mr. BACON in the chair.

The Clerk read the title of the bill.

Mr. JOHNSON of Washington. Mr. Chairman, before we proceed with the reading of the bill, I ask unanimous consent that I may be permitted to address the committee for three minutes.

The CHAIRMAN. The gentleman from Washington asks unanimous consent to proceed for three minutes. Is there objection?

There was no objection.

Mr. JOHNSON of Washington. Mr. Chairman and gentlemen, when the committee was about to rise last night an agreement was reached by which we agreed to proceed with Senate bill 5094 to-day in accordance with the rule under which we were operating. As we were about to rise, it was apparent that amendments would be offered to provide for a paragraph which would include violators of certain parts of the liquor laws. They would be alien violators, of course. One or more Members had sent to the Clerk's desk amendments to that effect, and your Committee on Immigration, after surveying the situation and feeling rather of the opinion that an amendment of some kind along that line would be voted, met this morning and perfected an amendment. I think, in fairness to the gentleman from Georgia [Mr. TARVER], who was claiming recognition at the time we made the agreement, that his proposed amendment might as well be read, after which the chairman of the committee will offer the committee amendment as a substitute.

Mr. EDWARDS. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. EDWARDS. Is the proposition the committee has agreed on, in effect, the amendment as offered by the gentleman from Georgia?

Mr. JOHNSON of Washington. I think it is rather more embracing.

Mr. BRIGGS. It relates not only to violations of the prohibition laws but to other violations?

Mr. JOHNSON of Washington. In order to save time I will read the amendment. It will add one more classification, and it will be as follows:

(9) An alien who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term of one year or more, or who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term which, when added to the term or terms to which sentenced under one or more previous convictions of manufacturing, selling, or transporting intoxicating liquor, amounts to one year or more. This subsection shall apply only in the case of offenses committed after the enactment of this act.

Mr. LOZIER. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. LOZIER. In other words, the language makes the terms cumulative; that is, adds one to the other?

Mr. JOHNSON of Washington. Yes; cumulative for liquor violations and separating them from general violations. With that explanation, I will ask that the Clerk read the bill.

Mr. TARVER. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Georgia offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. TARVER: Amend by adding a new paragraph to be numbered "2-A" after line 7, on page 3, as follows:

"2-A. An alien who hereafter violates or conspires to violate any statute of the United States or of the several States by manufacturing or selling intoxicating liquors for beverage purposes, and is convicted of such offense in a court of record when such conviction is for a second offense of the same character."

Mr. TARVER. Mr. Chairman and gentlemen of the committee, the purpose of this amendment, of course, is to authorize the deportation of those who have manufactured or sold intoxicating liquors in violation of the laws of the United States. It does not affect any other class of violators of our prohibition laws. It provides that conviction must be had in a court of record and not only that but it must be a second conviction. It does not have anything to do with the length of the sentence that may be imposed, and I respectfully submit to you that an amendment such as was described by the chairman of the committee, the gentleman from Washington, will not have the effect of authorizing the deportation of a large majority of these alien violators of our prohibition laws, for the reason that in those sections of the country where such violations are most rampant and where there are the largest number of alien violators of the prohibition laws the judges who customarily pass upon such cases do not impose sentences of the length of one year for the offense of selling intoxicating liquors or for the offense of manufacturing intoxicating liquors, in the vast majority of cases.

The penalties imposed by the judges, range from a small fine to a few days in jail. The minimum punishment for a first offense under the law may be as small as one day in jail or a penny fine. For a second offense, it may be as small as 30 days in jail or a fine, I believe, of $200.

Now, I contend that an alien who has engaged in the business of manufacturing or selling intoxicating liquors to the extent that he has been twice caught and twice convicted in a court of record has no right to insist upon his being allowed to remain in this country.

The bill as it is at present, without the amendment of the gentleman from Washington [Mr. JOHNSON], would require not merely one year's sentence but two years, and the amendment changes that condition to some extent, if it should be adopted, but only to the extent of requiring that the aggregate sentences shall be one year; and I submit to you that in those sections of the country, the large cities, where these aliens ply their illegal trade, it would be a long, long time before you would find sentences in very many cases imposed by the judges in those jurisdictions aggregating 12 months.

The question is, Do you consider an alien who engages in the business of violating the Constitution of the United States and the laws enacted in pursuance of the Constitution of the United States, a desirable citizen of the United States? If you do not, then you ought to vote down the committee substitute and adopt this amendment.

Mr. SCHAFER. Will the gentleman yield?

Mr. TARVER. No; I have not time to yield, I am sorry to say to the gentleman. I only have five minutes.

The gentleman from Texas [Mr. BOX] on yesterday made some statement to the effect that the reason for not including a provision of this kind was because it would result in placing in the deportable class such a large number, in addition to those already authorized to be deported, that they might not be properly handled under the appropriations which are now available. The same objection would apply to every other provision of this bill. It is admitted that there are at least several hundred thousand aliens in the United States subject to deportation under our laws who can not be deported for lack of sufficient appropriation. If the gentleman's argument is correct, then why should we add any number to that class?

The CHAIRMAN. The time of the gentleman from Georgia has expired.

Mr. TARVER. Mr. Chairman, I ask unanimous consent to proceed for five minutes.

The CHAIRMAN. The gentleman from Georgia asks unanimous consent to proceed for five additional minutes. Is there objection?

There was no objection.

Mr. TARVER. This bill, gentlemen of the committee, provides that an alien who is guilty—not convicted in a court of record, but who is guilty of any sort of a violation of the laws of the United States against the handling of narcotics—shall be subject to immediate deportation upon order issued by the Commissioner General of Immigration.

Why should there be such a tremendous distinction between the violator, in a small way, of the narcotic laws, who may be deported even without trial or conviction, and the violators of the prohibition laws of the country?

My amendment, as I have said, provides it shall apply only to two classes of cases, those who manufacture and those who sell, and that it shall not apply to them unless there shall have been two convictions for the same offense.

I submit this presents to the committee the sole question of whether or not they believe aliens who have twice violated and been convicted of violating the prohibition laws of the country are desirable residents of the country and ought to be permitted to remain here.

Mr. SCHAFER. Will the gentleman now yield?

Mr. TARVER. I yield to the gentleman.

Mr. SCHAFER. Why not also include those who are found guilty of buying and transporting?

Mr. TARVER. So far as I am concerned, I believe that violators of the prohibition laws of the character indicated by the gentleman should be included, but I have sought to put this amendment in such form as that any man who even pretends to believe in prohibition and in the enforcement of prohibition could give it his support.

I want to say to the House, in explanation of my own position, that I am sincerely an advocate of prohibition. I am offering this amendment as a friend of prohibition. I believe that the eighteenth amendment to the Constitution of the United States is the best legislation enacted by this Congress in the last 50 years, and I do not believe that the wholesale violation of it in certain sections of this country any more calls for its modification or repeal than that the wholesale machine-gun murders which we have been reading about, occurring in the city of Chicago, require the repeal of the laws against murder, and I believe that if you pass this amendment and write it into law, it will go a long way toward effectively enforcing the prohibition statutes of this country, and it will rid the country of some of the foreigners who have been carrying on this illegal business in a wholesale way in certain sections of the country.

If you adopt the amendment of the committee, adopted by the committee since yesterday afternoon in order to prevent your adoption of a more vigorous amendment, you leave the matter almost where it is now, because there will be very few cases in which the aggregate penalties will be as much as 12 months in those sections of the country which stand most in need of legislation of this character. [Applause.]

Mr. JOHNSON of Washington. Mr. Chairman, I desire to be recognized in opposition to the amendment.

Gentlemen, this is quite a serious matter. The gentleman from Georgia has made a very earnest statement. We ought to analyze it. We are dealing with aliens, even though the words of his amendment have been reduced to two or three phases—transporting and manufacturing—the facts remain that if an alien should be fined once $5 for a violation in a court of record, and then again fined $5 you have provided that he must be deported provided the Secretary of Labor thinks him an undesirable citizen.

Mr. TARVER. If the gentleman will yield, the police courts are not courts of record.

Mr. JOHNSON of Washington. Is the gentleman sure? How about the State of California?

Mr. TARVER. I think there is no question but that police courts are not courts of record in any State.

Mr. JOHNSON of Washington. They have a different system in California.

Mr. EVANS of California. If the gentleman will yield, I want to say that the police court in California is not a court of record.

Mr. JOHNSON of Washington. Then I am mistaken. It is agreed, however, that many of these offenses are punished by imprisonment for 30 days or 60 days, and with fines in proportion. You must understand that we are creating one or two additional classes of aliens who commit crimes of a serious nature, and they must be proceeded against by the Secretary of Labor. This amendment which has been proposed would confer so much possibility of a burden in the name of deportation that the Department of Labor would be greatly interfered with and would have to have a third branch of the Government for this phase of prohibition enforcement.

Mr. CRAIL. Will the gentleman yield?

Mr. JOHNSON of Washington. Yes.

Mr. CRAIL. As I understand the amendment, the alien would first have to be determined to be an undesirable citizen——

Mr. JOHNSON of Washington. That would come after he was convicted.

Mr. CRAIL. If he is an undesirable citizen, would it not be better to deport him on a minor offense than to wait until he has committed a felony?

Mr. JOHNSON of Washington. If you carried it out in that detail, the Department of Labor would not be able to function at all. The work and burden on the department would be terrible. I will ask the House to vote down the amendment offered by the gentleman from Georgia and vote up the substitute which I shall offer as a committee amendment.

Mr. GIFFORD. Will the gentleman yield?

Mr. JOHNSON of Washington. I yield.

Mr. GIFFORD. Considering the various paragraphs, when it comes to deportation to Russia, we not having recognized the Government in that country, what is the attitude of the department in that respect?

Mr. JOHNSON of Washington. We would be unable to deport.

Mr. SABATH. Mr. Chairman, the gentleman from Georgia is a prohibitionist and believes in the enforcement of the law, but, unfortunately, he is under the impression that all the violations of the law are committed by aliens. Now, I will say that many aliens are arrested; they have no one to intercede for them; they have no influence, and when they are arrested they are fined. On the other hand, the influential citizens, in the gentleman's State of Georgia, or any other State, do the same thing: they make it; they sell it; they consume it, to a much greater extent than many of the aliens, but they very seldom are convicted or even arrested.

What I want to bring home to you is that we have very stringent provisions in the present deportation act which provides for the deportation of aliens committing any kind of an offense, whether it is violation of the Volstead Act or whether it is larceny, robbery, or any other offense or crime. Now, why should we have a special provision in the act applicable to those who happen to violate the Volstead Act, a thing which has been made illegal only a few years and which up to the time before hysteria had taken possession of our legislative bodies, was recognized to be legal all over the United States. Lo and behold, to-day we must have a special law which must be much stronger than the law which applies to a man guilty of robbery, larceny, or any kind of a real crime against the laws of the States. It is to be regretted that people go or are carried away by blind prejudice to such an extent and can not see the situation as it really should be seen by sane and sensible men.

I feel that the present-day hysteria and intolerance on the part of certain organizations and individuals should cease, and that we should legislate sanely as men and not be overlorded by an organization simply because a few years ago it was powerful, but which now is fast disintegrating. It is to be regretted that its accredited officials still come down here or by a word influence Members of Congress who are elected by the people to believe that they must do as this organization tells them, regardless how vicious, otherwise the organization will bring about their defeat. We ought to be big enough to say to all such organizations and their agents that we are men who are sworn to uphold the Constitution of the United States, and who at the same time have the right and privilege to cast our votes according to the dictates of our conscience and not according to the dictates of these prohibition leaders or people who really do not know what it is all about, and are being misled and used by the professional prohibitionists on one hand, and, on the other, the restrictionists, who are about as narrow-minded and bigoted, and who are forcing the legislation now before us.

Unlike the gentlemen from Georgia, Florida, Washington, or Maine I am frank enough to admit that there are many violations of the prohibition law in my State and in my city.

I exceedingly regret to say that there are many bootleggers, and many killings among these bootleg gangs, something that was unheard of before prohibition, and for which the prohibition law is responsible. This, however, the professional prohibitionist, or the prohibitionists on the floor of this House, dislike to concede, notwithstanding that it is a fact, and is recognized by those who are not blinded with prejudice or who are not crazed on the question of prohibition.

In a measure, I do not blame certain gentlemen in trying to secure a special provision in this act, applicable to aliens guilty of violating the Volstead Act. I take it they want that lucrative business to be solely conducted by and be in the hands of native-born Americans.

In view of the tremendous importation of liquors, it does not affect the price of their native manufactured white mule and moonshine, because the greater importation of these liquors the lesser the price of white mule and moonshine, but surely they can not maintain that aliens are guilty of violating the prohibition law in their respective States, because there are no aliens there, and, notwithstanding that fact, the records will show, that there are as many stills confiscated as there are in any other section in the United States.

I grant that there are not as many arrests made, but we know, and it can not be denied, and, in fact, it has been demonstrated and proven on the floor of this House, that the prohibition law is not being enforced in the South, and that the same southern hospitality of old still prevails.

Mr. LAGUARDIA. Mr. Chairman, I move to strike out the last word. I can understand the attitude of the gentleman from Georgia [Mr. TARVER] in presenting his amendment. After all, in these days of tariff revision and protection of American industry, it is natural and logical that America's greatest and most profitable industry should be reserved to citizens of the United States. [Laughter.] The gentleman states that there are thousands of bootleggers. Of course, we have not had the benefit of the Census Bureau in classifying these bootleggers as to citizens and noncitizens, but again I want to point out to the House and to repeat at the risk of becoming tiresome, that you would not have thousands of bootleggers if you did not have millions of drinkers. It is because of the great demand for liquor that you have this large number of bootleggers. Just how the gentleman from Georgia [Mr. TARVER] is going to differentiate between the alien bootlegger and the native consumer, I do not know. There can be no serious objection to the gentleman's amendment. In fact, I rather welcome it, because it will answer a great many of the charges based upon misinformation, that the bootlegging industry is in the control of aliens. I assure the gentleman from Georgia that in his State, and in many of the States of the Union, business is too good to be left in the hands of aliens.

Mr. TARVER. Mr. Chairman, will the gentleman yield?

Mr. LAGUARDIA. Yes.

Mr. TARVER. The gentleman on previous occasions has made statements of this character concerning my State upon the floor of the House, and I rise to inform the gentleman now that in my district in Georgia the prohibition laws are enforced, and if the gentleman will take the trouble on some occasion to visit my district, as I hope he will, he will discover that to be true. He will find that his charges made against my State at least are not correct.

Mr. LAGUARDIA. I shall permit the records of the gentleman's own State to speak for themselves, and if the gentleman will consult them he will find an alarming increase in violation of both the Federal and the State prohibition laws, and I believe that the conditions in the State of Georgia as to violation of the liquor law is such that this House can take judicial and legislative notice of it.

Mr. McCORMACK. Mr. Chairman, will the gentleman yield?

Mr. LAGUARDIA. Yes.

Mr. McCORMACK. Might I also call to the gentleman's attention the fact that in the report of the provost marshal general to the Secretary of War on the operations of the selected-service system, to December 20, 1918, one of the States mentioned where forcible resistance to the draft existed was the State of Georgia.

Mr. LAGUARDIA. That has nothing to do with this, but I want to say this about the State of Georgia in all fairness, that the State of Georgia in so far as liquor conditions are concerned is no worse than other States of the Union.

Mr. TARVER. May I ask the gentleman a question?

Mr. LAGUARDIA. Certainly.

Mr. TARVER. The statement of the gentleman made with reference to violation of the liquor laws in Georgia was based upon the records, I presume, indicating the number of distilleries seized?

Mr. LAGUARDIA. And the number of arrests and convictions.

Mr. TARVER. The fact that the law is enforced and that violators of the law are arrested is no evidence to sustain the gentleman's charge. The fact that in some sections of the country violators go unpunished and no arrests are made does not sustain the contention that the law is not violated there.

Mr. LAGUARDIA. I refuse to yield further and say as to the gentleman's very clumsy innuendo as to my State, that he will find that in comparison to population, the conditions in the State of New York are better than in his State.

Mr. JOHNSON of Washington. Mr. Chairman, I call for the reading of my amendment, which I offer as a substitute for the amendment offered by the gentleman from Georgia.

The CHAIRMAN. The Clerk will report the substitute.

The Clerk read as follows:

Substitute offered by Mr. JOHNSON of Washington for the amendment offered by Mr. TARVER: Page 4, after line 9, and after subsection (8) already inserted by the committee amendment, insert a new subsection, to read as follows:

"(9) An alien who is convicted of manufacturing, selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term of one years or more; or who is convicted of manufacturing,

selling, or transporting intoxicating liquor, for which he is sentenced to imprisonment for a term which, when added to the term or terms to which sentenced under one or more previous convictions of manufacturing, selling, or transporting intoxicating liquor, amounts to one year or more. This subsection shall apply only in the case of offenses committed after the enactment of this act."

Mr. TARVER. Mr. Chairman, I make the point of order against the amendment when it is offered as a substitute. The amendment which I propose is to page 3 of the bill after line 7, adding a new paragraph to follow subsection 2 of section 1. The amendment proposed by the committee through its chairman is to page 4 of the bill, and an entirely different part of the bill, and can not be properly considered as a substitute for my amendment. There ought to be a vote upon my amendment, and then a vote upon the gentleman's amendment.

The CHAIRMAN. Both the amendment and the substitute are offered to the same section, and the Chair thinks the substitute is clearly germane and overrules the point of order.

Mr. JOHNSON of Washington. I think this matter has been fully debated and the committee has looked as carefully as it could and given consideration to this. I think we should now have a vote and proceed with the reading of the bill.

Mr. EDWARDS. Mr. Chairman, ladies, and gentlemen of the committee, it is unfortunate that in the consideration of matters here we should at any time legislate with respect to what has happened in this State or that State. We should, at least, be broad enough to approach legislative matters in the interest of the whole country. Every once in a while slurs are made at some State. The gentleman from Massachusetts, very unkindly, so far as the statement that Georgia resisted the draft, put it in the RECORD that Georgia resisted the draft. He read and quoted from some War Department report. I do not care where that statement emanates from, it does our great State an injustice. In the name of the great State I have the honor to, in part, represent, I brand it as false. We just as well have this thing out now as later. The statement is not true. There were, perhaps, men in Georgia, as there were men in Massachusetts, as well as other States, who objected to the draft, but the citizens of the great State of Georgia were as loyal to the Stars and Stripes as were those of the great State of Massachusetts. [Applause.]

It is unbecoming a Member of this House to make these nasty digs and mean slurs at any of the States. As a Representative of the State that has thus been insulted, I resent the remarks, and whether they come from the War Department, or wherever they come from, I denounce them as unkind and unfounded. [Applause.] The people of a whole State ought not be indicted by the War Department report because of the attitude of some of its citizens. I claim no superior patriotism for Georgians but they are patriotic, and the State of Georgia is one of the great sovereign States of this Union, and is entitled to proper respect here and elsewhere.

Mr. BLACK of New York. Mr. Chairman, I rise in opposition to the amendment.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section and all amendments thereto close in five minutes.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section and all amendments thereto close in five minutes. The question is on agreeing to that motion.

The motion was agreed to.

The CHAIRMAN. The gentleman from New York is recognized.

Mr. BLACK of New York. Mr. Chairman and gentlemen of the committee, supplementing the remarks of the gentleman from Georgia [Mr. EDWARDS], I want to say that we saw in New York City a great number of men of alien blood march forth to the war and perform nobly, as did those living in other cities and States. When the leaders of the immigration restrictionist movement and the drys get together they can furnish a melting pot that would satisfy a witch burner. This amendment is another tower to hypocrisy in America.

I am surprised that the chairman of this Committee on Immigration and Naturalization has capitulated to the drys. This matter has nothing whatever to do with the immigration bill. The committee refused to have anything to do with it at first, but they are now panic-stricken when the gentleman from Georgia [Mr. TARVER] offers his amendment, so that immigration is going to be tainted with the corruption of prohibition. But I am not much surprised. I think the Labor Department is one of the best departments in Washington; and if there is any gravy in this thing, I think they ought to have some of it. That department will be as much corrupted as any other department with which the prohibition fanatics have come in contact.

Who in this day and generation is going to say that the bootlegger is undesirable? How are you going to get by common sense on this proposition? I am not surprised that the gentleman from Georgia [Mr. TARVER] should offer his amendment. He speaks of violations of the Volstead Act as being on a par with violation of the narcotic act. Quite evidently there is a great difference. Narcotics poison the minds of American people, and the bootleggers are catering to the ordinary appetites of Americans. This amendment can not only affect the violators; it affects their families also. It affects thousands of men because they happen to sell booze a couple of times and get caught. Here is an American citizen buying liquor from an alien bootlegger. The alien bootlegger goes into the business in order to support his family. You give three cheers for the American violator. I suppose this amendment will prevail, although it is nonsense on the face of it. The House was off its feed when by its vote it turned down the $24,000,000 additional appropriation for prohibition enforcement. I congratulate all the dry gentlemen on once more answering "present" when the captains of the drys demand it. [Applause.]

The CHAIRMAN. The question is on the substitute offered by the gentleman from Washington for the amendment offered by the gentleman from Georgia.

The question was taken, and the substitute was agreed to.

The CHAIRMAN. The question now occurs on the amendment as amended.

The question was taken, and the amendment as amended was agreed to.

Mr. SABATH. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will report the amendment offered by the gentleman from Illinois.

The Clerk read as follows:

Amendment offered by Mr. SABATH: Page 3, line 18, after the word "false," strike out the words "or misleading," so that paragraph 5 will read as follows:

"(5) The alien who hereafter willfully enters the United States at any time or place other than as designated by immigration officials, or eludes examination or inspection by immigration officials, or obtains entry to the United States by the willfully false representation or the willful concealment of a material fact."

Mr. SABATH. That is the amendment I submit.

Mr. JOHNSON of Washington. Mr. Chairman, I believe that the debate has closed on all amendments to this section.

The CHAIRMAN. The gentleman from Washington is correct. The question is on the amendment of the gentleman from Illinois.

The question was taken, and the amendment was rejected.

The CHAIRMAN. The Clerk will read.

Mr. HUDSON. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. HUDSON. The House has adopted an amendment of the committee. Would it now be proper to offer an amendment to that amendment adopted by the committee?

The CHAIRMAN. The Chair thinks not.

Mr. HUDSON. It is part of the section, is it not, and would it not be in order to amend it?

The CHAIRMAN. The gentleman should have offered an amendment to the amendment when it was pending. It is too late now. The Clerk will read.

Mr. SABATH. Mr. Chairman, I offer the following amendment: On page 4 strike out the "ten" and substitute "five" for it.

Mr. JOHNSON of Washington. Mr. Chairman, that amendment was offered yesterday and voted down.

Mr. EDWARDS. Mr. Chairman, I make the point of order that there is no amendment pending. The gentleman has not sent it to the desk in writing.

The CHAIRMAN. The point of order is sustained. The Clerk will read.

The Clerk read as follows:

SEC. 2. For the purposes of subsections (6) and (7) of section 1—

(a) No conviction shall serve as a basis for deportation proceedings unless such conviction is in a court of record and the judgment on such conviction has become final;

(b) In the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall be considered the term for which sentenced; and

(c) An offense of which an alien, after conviction, has been unconditionally pardoned, shall not be considered an offense.

Mr. JOHNSON of Washington. Mr. Chairman, I offer a committee amendment.

The CHAIRMAN. The gentleman from Washington offers an amendment, which the Clerk will report.

The Clerk read as follows:

Committee amendment offered by Mr. JOHNSON of Washington: On page 4, line 10, strike out "(6) and (7)" and insert in lieu thereof "(6), (7), (8), and (9)."

The committee amendment was agreed to.
The Clerk read as follows:

SEC. 3. (a) If any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of 60 days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment.

(b) For the purposes of this section any alien ordered deported (whether before or after the enactment of this act) who has left the United States shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

(c) An alien subject to exclusion from admission to the United States under this section who is employed upon a vessel arriving in the United States shall not be entitled to any of the landing privileges allowed by law to seamen.

(d) So much of section 3 of the immigration act of 1917 (U. S. C. title 8, sec. 136(j)) as reads as follows: "persons who have been deported under any of the provisions of this act, and who may again seek admission within one year from the date of such deportation unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission" is amended to read as follows: "persons who have been excluded from admission and deported in pursuance of law, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Secretary of Labor has consented to their reapplying for admission."

(e) So much of section 18 of the immigration act of 1917 (U. S. C. title 8, sec. 154) as reads as follows: "or knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provision of this act, unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission, as required by section 3 hereof" is amended to read as follows: "or knowingly to bring to the United States any alien excluded or arrested and deported under any provision of law until such time as such alien may be lawfully entitled to reapply for admission to the United States." The amendment made by this subsection shall take effect on the expiration of 60 days after the enactment of this act, but the provision amended shall remain in force for the collection of any fine incurred before the effective date of such amendment.

Mr. SABATH. Mr. Chairman, I offer an amendment.
The CHAIRMAN. The gentleman from Illinois offers an amendment, which the Clerk will report.
The Clerk read as follows:

Amendment offered by Mr. SABATH: Page 4, line 24, strike out all after the word "deported," on line 24, all of line 25, and up to and including the word "or," in line 1, page 25, so that provision (a), section 3, will read as follows:

"SEC. 3 (a) If any alien has been arrested and deported after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of 60 days after the enactment of this act, he shall be guilty of a felony, and upon conviction thereof, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment."

Mr. SABATH. Mr. Chairman, I hope the chairman and the members of the committee will agree to this amendment. I feel they are interested in drafting a law that will be upheld by the courts. As this section is now drafted there is no question that it is a retroactive provision, because it provides for the punishment of those who have committed offenses, long before the adoption of this act. My amendment provides for the same deportation but for offenses committed by those who have been deported since the adoption of this law or this act, so as to make it lawful, and make it legal, and so the courts will uphold it.

I do not believe it should be the policy of this House to pass laws that are retroactive or exposte facto, laws which the courts have frequently held are void. For that reason I am hopeful the chairman and the committee will agree to this amendment. It will strengthen the provision; it will make it absolutely legal, and I feel justice requires that we should not enact legislation, as I have stated, which is retroactive.

Mr. BURTNESS. Will the gentleman yield?
Mr. SABATH. Yes.
Mr. BURTNESS. What offense committed in the past does the gentleman claim is punishable by this section?
Mr. SABATH. It provides for deportations which took place before the enactment of this act.
Mr. BURTNESS. But the act which is punishable is the attempt to come in again, is it not?
Mr. SABATH. No; that is not the fact. This is the provision, that if at any time a man has been deported, for instance, for overstaying his leave, we will say, three, four, or five years before this law was enacted, he should not be punished under this act. I say that such a stringent provision should not apply to him in view of the fact that when he was ordered deported, years ago, this was not the law of the land. That is my position.
Mr. BLANTON. Will the gentleman yield?
Mr. SABATH. Yes.
Mr. BLANTON. There are thousands of Mexicans who have come across the line unlawfully and who are now within the United States. Has not the Congress the right to pass a law to deport them?
Mr. SABATH. There is no question about that.
Mr. BLANTON. Is that ex poste facto?
Mr. SABATH. No.
Mr. BLANTON. Can not Congress provide for the deportation of any certain class of people?
Mr. SABATH. Yes.
Mr. BLANTON. It is not ex poste facto if it applies to a whole class.
Mr. SABATH. I agree with the gentleman that there are many of them here in violation of the law and that they should be deported. We have embodied such a provision in this act and that is being taken care of. There is no question about that. Now, I am again going to appeal to the gentlemen of the committee to grant my request for an amendment of paragraph 5 of section 2, which I believe should be eliminated.
The CHAIRMAN. The question is on the amendment offered by the gentleman from Illinois.
The question was taken, and the amendment was rejected.
The Clerk read as follows:

SEC. 6. Proceedings for the deportation of an alien made deportable by this act may be begun at any time after the entry of such alien, without regard to any of the periods prescribed in the immigration act of 1917; but no proceedings based on subsection (6) or (7) of section 1 of this act shall be begun after the expiration of three years after the termination of the imprisonment.

Mr. JOHNSON of Washington. Mr. Chairman, I offer a committee amendment.
The CHAIRMAN. The gentleman from Washington offers an amendment, which the Clerk will report.
The Clerk read as follows:

Committee amendment offered by Mr. Johnson of Washington: Page 7, line 20, strike out "(6) or (7)" and insert in lieu thereof "(6), (7), (8), or (9)."

The committee amendment was agreed to.
Mr. CROSSER. Mr. Chairman, I ask unanimous consent to return to section 5 to offer an amendment striking out the word "of," in line 14, and inserting the word "to."
The CHAIRMAN. The gentleman from Ohio asks unanimous consent to return to section 5, for the purpose of offering an amendment. Is there objection?
Mr. JOHNSON of Washington. Mr. Chairman, I object, pending a statement as to what the amendment is.
Mr. CROSSER. It is for the purpose of correcting the language, changing the word "of," in the last part of line 14, and making it "to." It is not good English as it stands.
Mr. JOHNSON of Washington. I will have to object to that, Mr. Chairman. The last several bills contain that language.
Mr. CROSSER. If they do contain such language in like connection, they were wrongly phrased, and I insist that the English at least should be proper. There is no reason why we should use wrong phraseology or bad grammar merely because there are other matters in dispute.
Mr. JOHNSON of Washington. Let us avoid diction and grammar in this connection.
Mr. CROSSER. But the diction in this case is important.
Mr. JOHNSON of Washington. I object, Mr. Chairman.
Mr. COOPER of Wisconsin. Mr. Chairman, I ask unanimous consent to return to subparagraph (6) of section 1, on page 3, because it seems to me, from a reading of the two or three lines there, that there is a contradiction. It provides that one of the aliens who may be deported is—

An alien who is convicted of any offense (committed after the enactment of this act and at any time after entry).

If this provision were enacted into law to-day, the alien could not be convicted, under the first language, unless the offense was committed after to-day; but the next language provides that he shall not be convicted unless his offense is "committed after the enactment of this act and at any time after entry." Suppose he came in a year ago?

Mr. TILSON. The gentleman will notice that the language is inclusive. Two distinct things must take place. The offense must be committed after the enactment of this act and it must be committed after entry.

Mr. COOPER of Wisconsin. Then say so, and leave out the words "at any time," because his entry may have been a year ago, and "any time after entry" means any time within that year.

Mr. TILSON. It provides "at any time after entry" and something else—"after the enactment of this act."

Mr. COOPER of Wisconsin. It is a direct contradiction in language to say "after enactment of this act and at any time after entry."

The CHAIRMAN. The gentleman from Wisconsin asks unanimous consent to return to subparagraph (6) of section 1, on page 3. Is there objection?

Mr. JOHNSON of Washington. I shall have to object, Mr. Chairman.

The CHAIRMAN. Objection is heard.

Mr. SABATH. Mr. Chairman, I did not have the time to prepare the amendment I desired, so I move to strike out the last word, and I fully recognize it matters not how carefully the amendment might be prepared, it will not receive much consideration to-day. Still, I want to bring it to your attention for just a few moments.

Section 6 provides:

Proceedings for the deportation of an alien made deportable by this act may be begun at any time after the entry of such alien, without regard to any of the periods prescribed in the immigration act of 1917.

The present law provides when these deportations can be had. This proposed law says, regardless of the time that the alien may have resided in the United States, he should be deported. Now, there may be men who have resided here for 12, 15, 18, or 20 years. He may be a married man, and may have three, four, or five children born in the United States, and he may be guilty of making a little home brew at home, yet some neighbor who does not like his looks reports him, and he is convicted, and then is convicted, perhaps, a second time, for taking a drink with a friend. Under this provision of the bill it matters not whether that be ascertained 3, 5, or 10 years hence, or whether it has occurred 10 years ago, he can be apprehended and deported. I just want you to know what you are voting on to-day.

Mr. BLANTON. Mr. Chairman, I rise in opposition to the pro forma amendment. There is one good thing the bill does, and that is that some Mexicans who have come into the United States unlawfully within the last five years may be deported if the department can get enough money to apprehend them. But how about those who came in six, seven, or eight years ago? There were thousands that came across the border unlawfully. You can go up and down the Mexican border in Texas for 10 and 15 miles and you will not see a house, and sometimes you will not see an immigration agent for 40 miles. They can wade across the river in lots of places. They come into Texas by hordes all of the time. If you take the Texas & Pacific Railroad, that runs from Texarkana to El Paso, 900 miles, you will find that practically every section hand is a Mexican. Take the hotels close to the border, and practically all the employees who work in the hotels are Mexicans. Take many of the stores, and the employees are Mexicans because they can get them for a stipend by the month. They are taking away jobs from American citizens. I am surprised that this committee would permit that to exist any longer.

I know that my friend Judge Box has been making a just fight against this situation for years. He gets a little hand-out now and then from the committee, but it does not help him much. Why could not the committee have put a provision in here, and why could not the Appropriations Committee give the department enough to apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there? Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs and many Mexicans are to be without jobs until another cotton crop comes in.

Mr. SABATH. Will the gentleman yield?

Mr. BLANTON. I yield.

Mr. SABATH. Mexicans can come over here by the thousands—they do not come illegally, they come because there is no quota against them; they could come in by the thousands or 5,000 a day. They are not here illegally, because they come under the law and because there is no restriction against them. There is no quota.

Mr. BLANTON. What about the head tax? They do not pay the head tax required by law.

Mr. SCHAFER. Will the gentleman yield?

Mr. BLANTON. I yield to the gentleman from Wisconsin.

Mr. SCHAFER. These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm. Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor.

Mr. BLANTON. Why does not the energetic, enterprising 300-pound Member from Wisconsin put some of his energy into action along that line and stop it?

Mr. SCHAFER. If the gentleman will read the hearings he will see that I appeared before the Immigration Committee in behalf of the Box bill, which would put the nationals of Mexico under the quota restrictions.

Mr. LaGUARDIA. Even the payment of the head tax would not disturb this influx for the reason that the sugar-beet growers and the railroads would pay the head tax in order to get the Mexicans in. You have got to stop it.

Mr. BLANTON. Why does not the committee stop it?

Mr. LaGUARDIA. Because the influence of the sugar-beet growers and the railroads is too strong.

Mr. JOHNSON of Washington. Does the gentleman know why it has not been stopped?

Mr. BLANTON. Yes.

Mr. JOHNSON of Washington. In my opinion, the employment of a quota on both borders and contiguous territory in South America and in Central America is inevitable, but you have not the laws in accord with it that will permit it without several preliminary amendments.

Mr. BLANTON. If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges——

Mr. JOHNSON of Washington. I have been to several of them.

Mr. BLANTON. And stand there, he will see the hordes that come across the bridges with no intention of ever going back, coming across to get jobs of Americans, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it. I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

Mr. LaGUARDIA. And a bringing down of a standard of wages.

Mr. BOX. Mr. Chairman, I move to strike out the last word.

Mr. JOHNSON of Washington. Will the gentleman yield to me for a moment?

Mr. BOX. Yes.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate upon this section and all amendments thereto close in five minutes.

The motion was agreed to.

Mr. BOX. Mr. Chairman and gentlemen of the committee, you have been discussing for a few minutes a matter with which I as one member of the committee have been wrestling for some years. I have not been inclined to inject that question into this debate because it is not the question at issue, but the situation pointed out by gentlemen during this debate exists. It is a very serious condition. It seriously embarrasses the whole purpose of the immigration law. There are conditions created by the incoming of people from Mexico and other American countries which it was and is the purpose of the immigration laws to prevent. The law is poorly enforced, mainly because the appropriations made for the border patrol are not adequate. There are great sections that under present provisions can not be adequately guarded. There are many interested in the importation of these poor peons. They are often imported and left in pitiful condition. They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment now. They are raising a serious race question. During this month a riot occurred at a point in Texas where a crowd of white men who had been superseded by Mexicans, and who, after having notified the Mexicans to leave, fired into the camps of the Mexicans. This Congress ought to have statesmanship enough in it to look over the past and see what grave problems have been injected into our national life by the importation for labor purposes of great numbers of people essentially different

from us in character, in social position, and otherwise. We are breeding another one of those great race questions. We are degrading labor, we are defeating all of the essential purposes of the immigration laws. These facts explain why I have worked so hard in committee and before this House and everywhere else to get this subject adequately dealt with. Seeing this big question, while I have the honor to remain one of you and on this committee, I shall continue to press it on you for attention. We have the opposition of the classes mentioned.

Practically every big beet-sugar manufacturer in the country opposes it, and every Class A railroad except one in the United States appeared before your committee and opposed the passage of this bill because they want their cheap subservient labor. Many other selfish and powerful influences have arrayed themselves against the restriction of this immigration. As against such influences, a few men, thinking only of the public welfare, are not strong enough to get action even when they have justice and patriotic considerations of every kind on their side.

Mr. W. T. FITZGERALD. Mr. Chairman, will the gentleman yield?

Mr. BOX. Yes.

Mr. W. T. FITZGERALD. Another feature I suggest to the gentleman is from a moral standpoint. They are poisoning the American citizen. They are of a class that come across the line which are very undesirable from that standpoint alone.

Mr. BOX. The gentleman from Ohio is correct. I had the privilege of making a statement covering several hours before the committee. And I tried to place before the committee some of the facts that have come to my knowledge. They are badly infected with tuberculosis and other diseases; there are many paupers among them; there are many criminals; they work for lower wages; they are objectionable as immigrants when tried by the tests applied to other aliens. Of course I am not talking about the better class of people of our neighboring countries, but I am talking about the poor unfortunate beings who are poverty stricken and drifting about the country hunting for work at any price. Quite often they are induced to come here by our own people, who employ them for a while and then leave them to drift from one place to another, the victims of all kinds of suffering and mistreatment. We will correct this evil some time, perhaps after it is too late, though I hope we will deal with it in time to remedy the situation before it becomes much worse than it now is.

The CHAIRMAN. The time of the gentleman from Texas has expired. All time has expired, and the Clerk will read.

The Clerk read as follows:

SEC. 7. If any alien is liable to deportation upon any ground specified in any paragraph of this act, he shall be deported whether or not he is liable to deportation upon a ground specified in any other paragraph of this act or in any other law, and any alien who is liable to deportation upon a ground specified in any law other than this act shall be deported whether or not he is liable to deportation upon a ground specified in this act.

Mr. FREE. Mr. Chairman, I move to strike out the last word. Mr. Chairman and members of the committee, a great deal has been said in the last few moments about the situation on the Mexican border. Since we have adopted the quota plan of immigration we have watched the borders on the Pacific coast and on the Atlantic coast very thoroughly, and it is, indeed, difficult for the aliens to get through those borders, but we have not looked after the borders to the north or south. It is not the fault of the Department of Labor. I think we have as fine a lot of men along those borders as we could possibly get, but we have not enough, nor do we provide enough money to enable the department to protect those borders. The question of Mexican immigration has been mentioned here to-day. I would like to see the laws we have at the present time enforced. Mexican immigrants are subject to the following provisions to-day:

That the following classes of aliens shall be excluded from admission into the United States: All idiots, imbeciles, feeble-minded persons, epileptics, insane persons; persons who have had one or more attacks of insanity at any time previously; persons of constitutional psychopathic inferiority; persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a loathsome or dangerous contagious disease; persons not comprehended within any of the foregoing excluded classes who are found to be and are certified by the examining surgeon as being mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living; persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude; polygamists, or persons who practice polygamy or believe in or advocate the practice of polygamy; anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States, or of all forms of law, or who disbelieve in or are opposed to organized government, or who advocate the assassination of public officials, or who advocate or teach the unlawful destruction of property; persons who are members of or affiliated with any organization entertaining and teaching disbelief in or opposition to organized government, or who advocate or teach the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the Government of the United States or of any other organized government, because of his or their official character, or who advocate or teach the unlawful destruction of property, prostitutes, or persons coming into the United States for the purpose of prostitution or for any other immoral purpose; persons who directly or indirectly procure or attempt to procure or import prostitutes or persons for the purpose of prostitution or for any other immoral purpose; persons who are supported by or receive in whole or in part the proceeds of prostitution; persons hereinafter called contract laborers, who have been induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment, whether such offers or promises are true or false, or in consequence of agreements, oral, written, or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled; persons who have come in consequence of advertisements for laborers printed, published, or distributed in a foreign country; persons likely to become a public charge (this clause excluding aliens on the ground likely to become a public charge has been shifted from its position in section 2 of the immigration act of 1907 to its present position in section 3 of this act in order to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons and with a view to overcoming the decision of the Supreme Court in Gegiow v. Uhl, 239 U. S. 3 (S. Rept. 352, 64th Cong., 1st sess.)); persons who have been deported under any of the provisions of this act, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission; persons whose tickets or passage is paid for with the money of another, or who are assisted by others to come, unless it is affirmatively and satisfactorily shown that such persons do not belong to one of the foregoing excluded classes; persons whose ticket or passage is paid for by any corporation, association, society, municipality, or foreign government, either directly or indirectly, stowaways, except that any such stowaway, if otherwise admissible, may be admitted in the discretion of the Secretary of Labor. (See rule 3, subdivision O.)

In addition to the aliens who are by law now excluded from admission into the United States, the following persons shall also be excluded from admission thereto, to wit:

All aliens over 16 years of age, physically capable of reading, who can not read the English language, or some other language or dialect, including Hebrew or Yiddish (see rule 3, subdivision N): *Provided*, That any admissible alien, or any alien heretofore or hereafter legally admitted, or any citizen of the United States, may bring in or send for his father or grandfather over 55 years of age, his wife, his mother, his grandmother, or his unmarried or widowed daughter, if otherwise admissible, whether such relative can read or not; and such relative shall be permitted to enter.

In addition the Mexican is required to pay a head tax of $8. I believe we could keep out most Mexicans to which objection has been made to-day if we simply enforced the laws above mentioned. [Applause.]

Mr. EDWARDS. Will the gentleman yield?

Mr. FREE. I will.

Mr. EDWARDS. Would the passage of the Box Act accomplish what the gentleman has in mind?

Mr. FREE. No sir. Unless we provide the money to enforce it. The reason I took my feet to-day is this. We have a feeling here that by passing a law you will stop immigration. Unless you back it up with the money for enforcement and the protection of your borders it will not mean a thing. We are not enforcing the laws we have to-day on the northern and southern borders of our country.

Mr. EDWARDS. Why not? We have the money.

Mr. FREE. The committee has been criticised because we have not done anything in reference to this situation. We have been appealing to this House for eight years to my personal knowledge for money to protect the borders. We had an increase of a million dollars in the last Congress, but why pass another law when we do not enforce those we already have on our statute books?

Mr. EDWARDS. How much will it take?

Mr. FREE. Several million dollars in addition to what we have at the present time.

Mr. EDWARDS. Why not put it up to the Appropriations Committee?

Mr. NEWTON. Will the gentleman yield?

Mr. FREE. I will.

Mr. NEWTON. What the gentleman has said about the borders is also true of getting rid of undesirables—we ought to have more money to deport them.

Mr. FREE. Absolutely. We have investigated, and there are over 200,000 people in this country who should be deported. We only deport a few and from the places where they can be easily found.

Mr. HUDSON. Will the gentleman yield?

Mr. FREE. I will.

Mr. HUDSON. Does the gentleman not recognize that if we can have a coordination of the enforcement departments that have to do with enforcement laws we might have sufficient money to enforce those laws, but as long as we have a system that puts four different groups of enforcement officers on the borders, each one to do a litle particular thing while allowing the violation of any of the other laws, we will have the very conditions suggested.

Mr. FREE. That would help a great deal. I want to say concerning the men along the border, that they have been cooperating to a remarkable degree, and they are a fine lot of men, and they are doing the job as best they can; but we need more of them and more authority to cooperate.

Mr. HUDSON. I am not complaining about the inefficiency of these gentlemen. I am simply complaining of the fact that from the deviousness of the law their activities are made inefficient. The law makes them inefficient. A man in one department of the service has not a right to arrest a man for doing something that does not come within his jurisdiction. The whole thing is wrong in theory and in practice.

Mr. FREE. I agree with the gentleman.

Mr. SABATH. Mr. Chairman, it is believed from what we hear that we receive a tremendous immigration from Mexico. I have been asked by a number of Members how it is that our present restriction of immigration admits only 165,000, and, notwithstanding that, over 300,000 arrived last year? There is no restriction, no quota, on Mexico, Canada, Central and South America, Cuba, and the West Indies, and for that reason they can come in in as large numbers as they desire. But they should be, and they are, subject to the literacy test and to the provisions of the law of 1917. I agree that if the law is rigidly enforced on the Mexican border hundreds of thousands could not have qualified or have been admitted.

But do not lose sight of this fact: What applies to Mexico in a great measure applies also to Canada. Why, last year alone we received from Canada—though our total immigration from entire Europe was but 165,000—81,506 of which a record is made. So it is not only immigration from Mexico, but also from Canada, because what the gentleman from Massachusetts said a moment ago is true; there are thousands of our own people unemployed in Massachusetts, and why should we permit that tremendous number to come in here without the quota from Canada and Mexico?

I introduced, three times, and advocated unsuccessfully, a bill placing Mexico, South and Central America, Canada, Cuba, and the West Indies under quota as it is applicable to European immigration. We need a few more men on our border line. I know the chairman of the Committee on Immigration and Naturalization has tried to secure larger appropriations, and he did. I have advocated the proposition of the gentleman from Michigan [Mr. HUDSON], who spoke a little while ago on the centralization of our forces and activities along the border line. I do not know why we should have a revenue patrol, and an immigration patrol, and a prohibition patrol on the border, one not cooperating with the other. They can be merged into one, and then we would have efficient control, and that would control not only immigration but also prohibition and revenue violations and other violations that are going on. I hope, therefore, that the chairman will be strong enough to convince the Treasury Department and the Department of Labor and other officials, who have the power, to bring about unification that it be done.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on this section be now closed.

The CHAIRMAN. The gentleman from Washington moves that all debate on this section be now closed. The question is on agreeing to that motion.

The motion was agreed to.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

SEC. 8. Upon the final conviction of any alien of any offense in any court of record of the United States or of any State or Territory it shall be the duty of the clerk of the court to notify the Secretary of Labor, giving the name of the alien convicted, the nature of the offense of which convicted, the sentence imposed, and, if imprisoned, the place of imprisonment, and, if known, the place of birth of such alien, his nationality, and the time when and place where he entered the United States.

Mr. BLACK of New York. Mr. Chairman, I move to strike out the last word.

The CHAIRMAN. The gentleman from New York is recognized.

Mr. BLACK of New York. Mr. Chairman, I want to make a very friendly suggestion to the men from the border States, which I hope will be taken in good part. For about six years you have been passing legislation to regulate conditions in New York City, telling us how to raise a family, what to eat and what to drink, and when to eat with a knife and when to eat with a fork. In the meantime you have been neglecting your own doorsteps. I say, keep you hands off New York for a while and see that you enact a little good, wholesome national legislation for the benefit of your own constituents. [Applause.]

The CHAIRMAN. The Clerk will read.

The Clerk resumed and completed the reading of the bill.

The CHAIRMAN. The question now is on agreeing to the substitute to the Senate bill as amended.

The committee substitute for the Senate bill was agreed to.

The CHAIRMAN. Under the rule, the committee automatically rises and reports the bill to the House.

Accordingly the committee rose; and Mr. TILSON, as Speaker pro tempore, having assumed the chair, Mr. BACON, Chairman of the Committee of the Whole House on the state of the Union, having under consideration the bill (S. 5094) making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, reported that that committee had directed him to report the same back to the House with an amendment, with the recommendation that the amendment be agreed to and that the bill as amended do pass.

The SPEAKER pro tempore. Under the rule, the previous question is ordered, and the question is on agreeing to the amendment.

The amendment was agreed to.

Mr. JOHNSON of Washington. Mr. Speaker, I ask that the title be amended.

The SPEAKER pro tempore. That can be done after the passage of the bill. The question is on the third reading of the Senate bill.

The Senate bill was ordered to be read a third time, and was read the third time.

Mr. LAGUARDIA. Mr. Speaker, I offer a motion to recommit.

The SPEAKER pro tempore. Is the gentleman opposed to the bill?

Mr. LAGUARDIA. I am.

The SPEAKER pro tempore. The gentleman from New York offers a motion to recommit, which the Clerk will report.

The Clerk read as follows:

Mr. LAGUARDIA moves to recommit the bill to the Committee on Immigration with instructions to report back the bill forthwith with the following amendments:

Page 3, line 20, after the word "offense," insert "involving moral turpitude."

On page 4, line 3, after the word "offense," insert "involving moral turpitude."

Mr. JOHNSON of Washington. Mr. Speaker, I move the previous question on the motion to recommit.

The previous question was ordered.

The SPEAKER pro tempore. The question is on agreeing to the motion of the gentleman from New York to recommit the bill with instructions.

The question was taken, and the motion to recommit was rejected.

The SPEAKER pro tempore. The question is on the passage of the bill.

The question was taken, and the bill was passed.

On motion of Mr. JOHNSON of Washington, a motion to reconsider the vote by which the bill was passed was laid on the table.

The SPEAKER pro tempore. Without objection, the title will be amended.

There was no objection.

Mr. SABATH. Mr. Speaker, I ask unanimous consent to extend and revise the remarks I have made from time to time.

The SPEAKER pro tempore. The Chair is informed that all Members have that right for six days.

DRY VALLEY ROAD—CONFERENCE REPORT

Mr. WAINWRIGHT. Mr. Speaker, I present a conference report on the bill (S. 3881) to provide for the paving of the Government road, known as the Dry Valley Road, commencing where said road leaves the La Fayette Road, in the city of Rossville, Ga., and extending to Chickamauga and Chattanooga National Military Park, constituting an approach road to said park, for printing under the rule.