NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar Number 13644
PETER WALKINGSHAW
Assistant United States Attorney
400 South Virginia, Suite 900
Reno, Nevada 89501
775-784-5438
Peter.Walkingshaw@usdoj.gov
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:20-cr-00026-MMD-WGC |
| Plaintiff, | **Government's Response in Opposition to Defendant's Motion to Dismiss [ECF No. 26][1]** |
| v. | |
| GUSTAVO CARRILLO-LOPEZ, | |
| Defendant. | |

## I. Introduction

Defendant Gustavo Carrillo-Lopez moves to dismiss the indictment in this case, challenging Congress's authority to criminalize the reentry of deported aliens. The Court should deny the Motion. The principal thrust of Defendant's argument is that Congress's 1929 enactment of a statute criminalizing illegal reentry was "tainted" by discriminatory motives, and that this original discriminatory intent renders unconstitutional any subsequent congressional immigration legislation, up to and including the present-day

---

[1] Certification: This response is timely.

version of 8 U.S.C. § 1326, which was first enacted in 1952. Because Defendant's attempt to definitively discern the various motives of the 500 plus members of the 70th Congress who voted on the 1929 statute conflicts with Supreme Court guidance barring such speculation, and because Congress possesses plenary power to enact exactly this type of immigration legislation (in 1929, in 1952, and today), Defendant's argument fails at the threshold.

More fundamentally, because the 1929 law has been replaced, Defendant's only argument—that Congress's allegedly impermissible motive in 1929 forever taints subsequent illegal reentry laws—fails. Even assuming Congress's 1929 illegal reentry law was wholly the result of impermissible racial animus, well-established doctrine holds that such legislative history would have no bearing on the law enacted by a subsequent Congress in 1952. Defendant's challenge to this consistently upheld, commonsense doctrine is premised entirely upon stray statements in a recent Supreme Court opinion that the Court explicitly acknowledged were *dicta*.[2] Defendant does not even attempt to argue that § 1326, as first enacted in 1952 and amended many times over, including during the height of the civil rights movement of the 1960s, was the product of similar animus. As explained below, these omissions doom Defendant's motion.

---

[2] While the Supreme Court in its opinion in *Ramos v. Louisiana* stated that its opinion "acknowledge[d] the racist history of Louisiana and Oregon's laws" regarding nonunanimous juries, and indicated it would not "leav[e] an uncomfortable past unexamined," it also explicitly stated that this inquiry was not necessary to its decision, noting that "the dissent is right about one thing – a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." *Ramos v. Louisiana*, 140 S.Ct. 1390, 1401 n.44 (2020).

## II. Statement of Facts and Procedural History

Defendant Gustavo Carrillo-Lopez is a citizen of Mexico. He has been removed from the United States on two prior occasions. Prior to his most recent removal in 2012, Defendant sustained convictions for felony drug possession and misdemeanor infliction of corporal injury on a spouse. Following that removal, at a time unknown, Defendant reentered the United States. On June 13, 2019, after a search of his residence uncovered two firearms, and plastic bags containing methamphetamine, cocaine and heroin, Defendant was arrested and charged with four counts of trafficking a controlled substance and one count of owning or possessing a firearm while a prohibited person. Defendant subsequently pleaded guilty to a single count of trafficking a controlled substance, pursuant to a plea agreement. On June 25, 2020, the Grand Jury returned an indictment charging Defendant with a single count of illegal reentry by a deported alien. ECF No. 1. On October 19, 2020, Defendant moved to dismiss the indictment (ECF No. 26), and the government now responds.

## III. Points and Authorities

### A.  Statutory Background

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. However, there was no penalty, other than repeated deportation, for reentering after deportation. Accordingly, to enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L.

No. 70-1018.[3] The Senate Report from the Committee on Immigration outlined the

purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of

the proposed illegal reentry crime and stated, "It is believed that such a statute would be of

material aid in enforcing our immigration laws." *Id.*

The Secretary of the Department of Labor—charged at that time with enforcing the

country's immigration laws—agreed. In a letter made part of the Senate Report, the

Secretary stated that the proposed law "would be of material assistance in the

administration of existing immigration laws." The Secretary continued,

> It is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions. . . . Aside from the sexual immoral and members of the anarchistic and similar cases there is nothing in the immigration laws which

---

[3] The text stated,

> [I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years of by a fine of not more than $1,000, or by both such fine and imprisonment.

penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government. The enactment of a law imposing a penalty is recommended.

*Id.*

More than twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction).[4]  In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress passed another crime for reentry of a deported alien. The text stated,

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

Over the years, Congress has updated § 1326 multiple times—and always to increase its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death

---

[4]  By 1952, the antagonists in Defendant's motion were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or no longer alive (Coleman Blease, James Davis, John Box, Harry Laughlin).

Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting

collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus

Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among

other modifications, striking "arrested and deported, has been excluded and deported," and

inserting "denied admission, excluded, deported, or removed").

**B.** **Defendant Fails to Establish an Equal Protection Violation**

The Court should deny Defendant's motion to dismiss for at least three reasons.

First, immigration laws are subject to a highly deferential standard of review, and the

defendant does not even begin to overcome that standard. Section 1326 bears an undeniably

rational relationship to the government's legitimate interest in enforcing its immigration

laws. It therefore passes with ease even ordinary rational-basis review. Second, in the highly

deferential context of immigration legislation, courts are not permitted to probe the alleged

motives of those who passed the challenged law. And finally, even if courts were free to

look behind an immigration law's clearly valid purpose, Defendant's challenge to § 1326

would nonetheless fail because it focuses entirely on the legislative motives of the 1929

Congress, not the Congress that actually passed, or repeatedly confirmed through

amendment, § 1326.

Indeed, other courts considering arguments identical to those presented here have

squarely rejected this challenge to Congress's ability to enact criminal immigration laws.[5]

This Court should do the same and deny the Motion.

---

[5] To the government's knowledge, two courts have addressed the precise challenge
presented in Defendant's motion. Both have squarely rejected it. *See United States v. Palacios
Arias*, No. 3:20-cr-62-JAG, ECF No. 37 at 6 n.7 (E.D. Va. Oct. 13, 2020) ("Even assuming,
however, that the Court can consider the discriminatory purpose that the defendant alleges
motivated Congress to pass the Undesirable Aliens Act of 1929, this evidence has only

1.       *Congress's immigration laws are subject to rational-basis review.*

For more than a century, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The Supreme Court has called Congress's inherent immigration power "plenary"; the Ninth Circuit has deemed it "sweeping." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) and *Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)). "Whatever the label, all agree that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82 (1976)); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential

marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-three years later."); *United States v. Morales-Roblero*, 2020 WL 5517594, at *9 (S.D. Cal. Sept. 14, 2020) ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed, however, because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted."); *see also id.* at *10 ("There is no support for Defendant's suggestion that § 1325(a)(1) should be judged according to legislative history from laws enacted decades before, and Defendant has not attempted to argue that § 1325(a)(1) would be unconstitutional under an *Arlington Heights* analysis of relevant legislative history.").

standard of review" applies in context of establishment clause challenge to executive order concerning immigration).

According to Supreme Court jurisprudence, this "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford. 408 U.S. at 756-57. The professors who wished to hear Mandel challenged that decision under the First Amendment, and the Supreme Court acknowledged that their constitutional "right to receive information" was implicated. *Id.* at 764-65. But the Court limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.* at 769. Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770. And, in holding as such, the Court declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver," which he asserted was a "sham." *Id.* at 778 (Marshall, J., dissenting). The Supreme Court continues to apply *Mandel*'s instruction. *See Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) ("*Mandel* instructs us not to 'look behind' the Government's exclusion of" the alien); *see also Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) (*Din* "left things as *Mandel* had left them," and "*Mandel* tells us not to go behind a facially legitimate and bona fide explanation").

The Supreme Court later confirmed that *Mandel's* deferential test applies equally to congressional decisionmaking. In *Fiallo*, decided in 1977, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy. In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *Id.*; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

In the Ninth Circuit, *Mandel* and *Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo's* standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational

basis standard . . . ."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context");[6] *contrast also Hunt v. Cromartie*, 526 U.S. 541, 548-49 (1999) (involving racial gerrymandering) ("[o]ur decisions have established that all laws that classify citizens on the basis of race, . . . are constitutionally suspect and must be strictly scrutinized"), *with Fiallo*, 430 U.S. at 792 ("[I]n the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens.") (quotation omitted).[7]

Based on arguments in other cases, the United States anticipates the defense will argue that § 1326 is not subject to rational-basis review because it is a criminal law, not an immigration law. That is a distinction without a difference. Indeed, the Ninth Circuit has explicitly found that Section 1326—a criminal law—is "well within the ambit of Congress's sweeping power over immigration matters." *United States v. Hernandez-Guerrero*, 147 F.3d

---

[6] In a concurring opinion in *Ledezma-Cosino*, three judges said the government's burden in the immigration context is "even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, J., concurring). And in *Hawaii*, the Supreme Court stated that "[a] conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to our review." 138 S. Ct. at 2420. Nonetheless, at the government's suggestion, the Court went further to apply rational-basis review to the immigration policy at issue. In any event, regardless of the precise standard of review, it is no more than rational basis.

[7] In any event, given Congress's plenary authority over immigration, the illegal-reentry law would satisfy strict scrutiny. That is, it is legislation "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1326 achieves that interest in the most possible tailored way.

10

1075, 1078 (9th Cir. 1998). "In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Id.*[8]  Likewise, in *United States v. Lopez-Flores*, 63 F.3d 1468, 1470 (9th Cir. 1995), the Ninth Circuit addressed an equal protection challenge to the Hostage Taking Act, 18 U.S.C. § 1203, which classifies offenders and victims based on alienage. The defendants argued that the Act violated the Equal Protection Clause because of this classification. *Id.* The Ninth Circuit held that "[f]ederal legislation that classifies on the basis of alienage, enacted pursuant to Congress' immigration or foreign powers, is therefore subject to the lowest level of judicial review." *Id.* at 1475 (emphasis in original). The court applied rational-basis review and found the "classifications contained in the [Act] were clearly intended to serve Congress' legitimate foreign policy concerns." *Id.* Finally, in *United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007), the Ninth Circuit applied rational basis review to the illegal reentry sentencing guideline—a criminal sentencing provision—and found it passed that test. *See id.* at 1091 ("Because the illegal reentry statute is a proper exercise of Congress's immigration power, and because § 2L1.2 properly implements this congressional directive, we must conclude that the 16 level enhancement in §2L1.2 serves a legitimate government interest and has a rational basis.") (citations omitted).

---

[8] That analysis by the Ninth Circuit—*i.e.*, that criminalizing reentry is a necessary component of U.S. immigration law—is exactly the reasoning employed by the original Congress in enacting the original illegal reentry crime in 1929. *See supra* at 2-3.

2.      <u>*Section 1326 easily satisfies even ordinary rational-basis review.*</u>

The rational-basis test is an "exceedingly low level of judicial scrutiny." *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320).

"The rational basis standard . . . does not require that the [governmental entity] choose the best means of advancing its goals." *Vermouth v. Corrothers*, 827 F.2d 599, 603 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule and the governmental interest, regardless of whether that rule is an "exact fit" for the interest at issue. *Mauro v. Arpaio*, 188 F.3d 1054, 1059-60 (9th Cir. 1999). Moreover, rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015).

As the statutory background above outlines, and as common sense informs, the government has a legitimate interest in deterring illegal reentry. And there is a clear rational relationship between that interest and § 1326. "In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078.

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138

S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (citing *Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973)). That is clearly not the case here with § 1326—a law seeking to deter all aliens from illegally reentering the country following deportation.

Defendant cites the high percentage of illegal-reentry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those numbers are a product of geography, not discrimination. For instance, in FY19, Border Patrol had 859,501 total encounters. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of those encounters (851,508) occurred on the southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019. Those numbers are neither surprising nor illuminating of Congress's motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately affected individuals of any particular ethnicity—including those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (finding disparate impact of DACA rescission for Latinos from Mexico—totaling 78 percent of DACA recipients—did not establish plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable

immigration policy could be challenged on equal protection grounds") (citation omitted);[9] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

Moreover, Defendant's statistics are meaningless without proportionality. He complains that the number of absolute cases prosecuted in 1929 and 1939 was high. ECF No. 26 at 17. And he cites the high percentage of Mexicans who comprised "border crossing crime" defendants in 1929 and 1939. *Id.* But he provides no statistics for the prosecution of Mexican citizens as a proportion of the overall illegal entrant population, across all nationalities, subject to prosecution.  It makes sense that Mexican citizens comprised a high percentage of illegal entry defendants, given the suggestion that they made up a disproportionately high percentage of the overall illegal alien population. *See e.g.* ECF No. 26, Ex. A at 6 ("the U.S. Immigration Service estimated that Mexicans made an estimated half-million unauthorized border crossings during the 1920s" and "[w]ith western industries continuing to expand, every indicator suggested that Mexican immigration, both authorized and unauthorized, would only increase in the years ahead"). Notably, apprehensions during the decade 1934-1944 saw average apprehension of deportable aliens hover around 12,000 a year. *U.S. Immigration Law and Policy 1952-1986: a Report Prepared for the Use of Subcommittee on Immigration and Refugee Affairs, Committee on the Judiciary, United States Senate*, 32 (December 8, 1987). "That number rose abruptly" to 31,174 in 1944; more than doubled to 69,164 in 1945; and continued upward to 1,089,583

---

[9] For this same reason, Defendant's attempt to show disparate impact under *Arlington Heights* fails. *See* ECF No. 28 at 23-26.

in 1954. *Id.* This increase is attributed largely to the creation of the Bracero farm labor program, which stimulated both legal and illegal migration from Mexico—not to the effect or implementation of racial animus against Mexicans. *Id.* at 34, 38-39; *see also* Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2018) ("federal prosecutors began to focus their attention on bringing unlawful entry cases against Mexican migrants to deter workers from going around the Bracero program").

3. *Defendant's reliance on* Arlington Heights *is misplaced.*

Notwithstanding the above, Defendant insists that § 1326 violates equal protection principles due to its predecessor statute's allegedly checkered past. Defendant's "forever tainted" argument hinges almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). But his reliance on *Arlington Heights*, which involved a rezoning request to accommodate the placement of low-income housing— "which would probably be racially integrated" (*id.* at 258)—fails for two reasons: (1) *Arlington Heights* requires an inquiry into congressional motives that the jurisprudence surrounding Congress's plenary powers over immigration plainly forbids, and (2) Defendant's challenge is directed entirely towards the motives of a handful of legislators who passed a statute more than 20 years prior to the passage of section 1326—motives that have no bearing on the passage of the law he actually challenges.

Indeed, Defendant fails to cite any case holding that the rubric of *Arlington Heights* is applicable to immigration laws passed by Congress. And for good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the

justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. Such an inquiry cannot be squared with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.[10]

The inherent problem with the congressional motive-probing urged by Defendant is well stated in *United States v. O'Brien*, 391 U.S. 367, 384 (1968):

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. *We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.*

*Id.* at 384 (emphasis added); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) ("Respondent's argument that the ordinance is 'aimed' at suppressing expression through a ban on nude dancing . . . is really an argument that the city council also had an illicit

---

[10] United States District Judge John A. Gibney, Jr., Eastern District of Virginia, recently agreed that (1) rational basis review applies to the equal protection claim involving the illegal reentry statute; (2) the illegal reentry statute satisfies rational basis review; and (3) *Arlington Heights* does not apply because it is not the judicial role to test the justifications behind immigration policy, and the Court's analysis ends with finding that the illegal reentry statute rationally relates to a legitimate government interest. *United States v. Francisco Edgardo Palacios-Arias*, Case 3:20-cr-00062-JAG, 4 (E.D.Va. October 13, 2020) (courtesy copy attached as Exhibit A). Nonetheless, Judge Gibney proceeded to consider the *Arlington Heights* analytical framework and rejected the defendant's arguments—the exact same arguments made in this case. *Id.* at 4-8.

motive in enacting the ordinance. As we have said before, however, this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive.") (citing *O'Brien*); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) ("The Supreme Court has held that an otherwise constitutional statute will not be invalidated on the basis of an 'alleged illicit legislative motive,' and has refused to inquire into legislative motives.") (citing *O'Brien*); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n.29 (9th Cir. 2005) ("The Supreme Court has held unequivocally that it 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (citing *O'Brien*). *O'Brien* flatly prohibits the inquiry the defendant urges the Court to make— particularly where there is no showing of the disproportionate impact necessary justify the *Arlington Heights* motive inquiry in the first place. This ends the matter altogether.[11]

Moreover, Defendant cannot escape the reality that the "governing statutory framework" of United States's immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA.[12] *See* Pub. L. No. 82-414, 66 Stat. 163

---

[11] In *Hunter v. Underwood*, 471 U.S. 222, 228-229 (1985), the Court acknowledged the continuing validity of *O'Brien*, but distinguished *Hunter* because "testimony and opinions of historians were offered and received without objection." The evidence in *Hunter* unequivocally established that the motivation of the Alabama Constitutional Convention was to disenfranchise African-Americans, as documented by the convention president's statement that the aim of the convention was to "establish white supremacy in this State." Moreover, the law challenged in that case was the same law passed at that convention. Not so here, where, as discussed *infra*, Defendant cherry-picks portions of longer statements, made by a few Congressmen discussing American job security, to establish the alleged anti-Mexican racist motivation of the entire Congress in passing the initial illegal reentry law in 1929—a different statute from the current illegal reentry law that applies to Defendant.

[12] Nor can he escape the fact that "passage of the 1952 Act was in essence an act of conservativism rather than intolerance. It embodied the political choice of limiting immigration by continuing the national origins quota system which had become an institution, albeit a controversial one, after 30 years of existence. Just as importantly, it reflected the view that Communist subversion represented a serious danger to the country,

(codified as amended at 8 U.S.C. § 1 et seq.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) (tracing history of "governing statutory framework"); *City & Cty. of San Francisco v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 795 (9th Cir. 2019) ("Congress substantially revised the immigration laws in the Immigration and Nationality Act of 1952."). Or, that the Immigration and Nationality Act of 1965 redefined immigration law through an express anti-discriminatory lens. *See* Pub. L. No. 89-236, 79 Stat. 911 (October 3, 1965); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 275 (November 1996) ("The revolutionary feature of the 1965 Act was its elimination of race and national origin as selection criteria for new Americans"). Nor can Defendant escape the fact that § 1326 has been updated or modified—each time strengthened—multiple times by Congress, including in 1988, 1990, 1994, 1996, and 1997.

---

against which our immigration law formed a vital line of defense." *See U.S. Immigration Law and Policy 1952-1986: a Report Prepared for the Use of Subcomittee on Immigration and Refugee Affairs, Committee on the Judiciary, United States Senate*, 2 (December 8, 1987). The chief proponent of the 1952 Act, Patrick McCarran, himself expressed his view that the law "does not contain one iota of racial or religious discrimination." "It is, however, tough, very tough on the Communists, as it is on criminals and other subversives." Jia Lynn Yang, *One Mighty and Irresistable Tide: The Epic Struggle Over American Immigration 1924-1965*, 192 (2020). McCarran also viewed immigration law as a tool to protect the economy and to support the American worker, characterizing immigration law as "defending the economy of the country." *Id.* at 128-29. In short, the 1952 Act "was very much a product of its time"— passed at the height of the cold war. *U.S. Immigration Law and Policy 1952-1986*, at 1. Although the 1952 Act continued the national quota system, the report of the Senate Judiciary Committee on which the law derives expressly disavowed "any theory of Nordic superiority" in keeping the quota system. *Id.* at 4. Even opponents of the 1952 Act who sought liberalization of immigration and an end to quotas characterized the 1952 Act as embodying "the restrictionist view" that "immigration was a source of potential danger to the nation . . . [and] the basic aim of immigration policy should be to protect the institutions and traditions of the United States." *Id.* at 8.

Defendant's motion waves away this lengthy congressional record, claiming "later reenactments do not cleanse the law of its original taint." ECF No. 26 at 19. Under Defendant's view, the taint of prior discriminatory intent forever forbids the criminalization of illegal reentry. This makes little sense. Whether intentional discrimination existed in 1929 legislation—a point contested below—is a question about the motives of the 1929 legislature. Legislative intent is not an artifact that "carr[ies] over" from one law to the next. *See Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (pl. op.) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful").

Viewed accordingly, even assuming *Arlington Heights* applies in this case, it would only get Defendant so far. First, even when a court finds that prior discrimination was recent, "[t]he ultimate question" under *Arlington Heights* must be "whether a discriminatory intent has been proved in [the] given case"—that is, for the particular challenged enactment. *City of Mobile*, 446 U.S. at 74 (plurality opinion). Here, the discriminatory intent Defendant cites is neither recent—preceding § 1326 by over two decades—nor proven in the "given case," *i.e.* the 1952 statute or any of its subsequent versions. While it is true that under *Arlington Heights* "legislative or administrative history may be highly relevant," the Court has specified that this is especially so "where there are *contemporary* statements by members of the decisionmaking body[.]" *Arlington Heights*, 429 U.S. at 268 (emphasis added); *see also id.* at 267 (focusing the Court's "historical background" analysis on the "specific sequence of events leading up to the challenged decision"). The Supreme Court's most recent application of *Arlington Heights* bears this out. *See DHS v. Regents of the Univ. of*

*California*, 140 S. Ct. 1891, 1916 (2020) (plurality opinion) ("[T]hese statements—remote in time and made in unrelated contexts—do not qualify as 'contemporary statements' probative of the decision at issue." (quoting *Arlington Heights*, 429 U.S. at 268)).

Even if the Court were to conduct a motive-probing inquiry under *Arlington Heights* and conclude that a discriminatory purpose was a substantial or motivating factor behind the 1929 immigration law's enactment, and that the motive behind the 1929 enactment was relevant to the statute at issue here, the burden would then "shift[] to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). That burden is easily met here, where the law has a clear rational basis and where Defendant does not even attempt to challenge Congress's 1952 enactment of § 1326 or any of its subsequent modifications. Indeed, we need not speculate that the law *would have been* enacted: it was, and several times over. So, even if we accept the worst about the original Congress that enacted the 1929 legislation—itself a substantial leap—§ 1326 still would not violate the Equal Protection Clause. Congress's repeated efforts—over the course of multiple decades—to strengthen the law against unlawful reentry underscores the implausibility of Defendant's claim that Congress has been acting out of a discriminatory animus, rather than seeking to address the lasting, and difficult, problem of illegal immigration.

The way later congressional enactments undermine Defendant's argument accords with post-*Arlington Heights* cases which recognize, for example, that the historical background of a decision is one source of evidence of intentional discrimination under *Arlington Heights*, but that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298

n.20 (1987); *see also id.* ("Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent."). Other post-*Arlington Heights* cases have viewed variants of the "taint argument" with equal skepticism. For example, in *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, the Supreme Court held as follows:

> [P]etitioners note that Proposition 15, the initiative out of which § 25524.2 arose, and companion provisions in California's so-called nuclear laws, are more clearly written with safety purposes in mind. It is suggested that § 25524.2 shares a common heritage with these laws and should be presumed to have been enacted for the same purposes. The short answer here is that these other state laws are not before the Court, and indeed, Proposition 15 was not passed; these provisions and their pedigree do not taint other parts of the Warren-Alquist Act.

461 U.S. 190, 215–16 (1983). And most recently, in *Abbott v. Perez*, the Court explained that "the presumption of legislative good faith [is] not changed by a finding of past discrimination." 138 S. Ct. 2305, 2324 (2018). In so holding, the Court reiterated its almost forty-year-old statement that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (quoting *City of Mobile*, 446 U.S. at 74). Even more relevant, the Court ultimately held that in assessing an equal protection challenge, the relevant focus must be on the legislature that *actually* enacted the challenged law or policy, not on earlier legislatures:

> The 2013 Texas Legislature did not reenact the [redistricting] plan previously passed by its 2011 predecessor. Nor did it use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature. … Under these circumstances, there can be no doubt about what matters: It is the intent of the 2013 Legislature. And it was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature acted with invidious intent.

*Id.* at 2325.

Taken collectively, this trio of cases counsels strongly in favor of rejecting Defendant's attempt to shoehorn cherry-picked legislative history from the 1920s into the present day version of § 1326. As in *McCleskey*, Defendant's evidence from the 1920s "has little probative value" for understanding Congress's motivation for enacting § 1326 in 1952, to say nothing of its intent in 1988, 1990, 1994, 1996, or 1997. 481 U.S. at 298 n.20. Similarly, and more fundamentally, *Pac. Gas & Elec. Co.* instructs that viewing § 1326 through the lens of its possible predecessor statute makes little conceptual sense, as the 1929 statute is simply "not before the Court[.]" 461 U.S. at 215–16. And finally, *Abbott* reinforces the intuitive approach set forth in the Court's prior decisions in *City of Mobile* and *Pac. Gas & Elec. Co.* that legislative intent is not indelibly ingrained in statutory text and that in weighing the motives of legislators in the context of an equal protection challenge, a court's focus should always be on the legislature that passed the challenged law, not on earlier legislatures. 138 S. Ct. at 2324–25.

Nor do the cases Defendant relies on for his contrary "forever tainted" argument actually support the proposition he advances.[13] In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth Amendment requires that a jury find a criminal defendant guilty by a unanimous verdict. That result flowed simply from a historical and textual analysis of the Sixth Amendment. Based on that analysis, the Court concluded that at common law a "trial by an impartial jury" "unmistakabl[y]" required a

---

[13] Magistrate Judge Goddard of the Southern District of California found as much in a written order denying the same defense motion—directed at § 1325, not § 1326—in *United States v. Ruiz-Rivera*, Case No. 20-mj-20306-AHG, ECF No. 61 at 5-6 (S.D. Cal. Sept. 2, 2020) ("There is no support for Defendant's suggestion that § 1325(a)(1) should be judged according to the legislative history of the [Immigration Act of 1929], and Defendant has not attempted to argue that § 1325(a)(1) would be unconstitutional under an *Arlington Heights* analysis of relevant legislative history.").

jury to "reach a unanimous verdict in order to convict." *Id.* at 1395. The Court did not hold that the origins of the state laws at issue were the basis for invalidating those state laws. On the contrary, the majority, even while commenting on the racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons, that is deplorable, but what does that have to do with the broad constitutional question before us? The answer is: nothing."). Defendant's characterization of *Ramos*—suggesting the Court's discussion of the racial underpinnings of the state law drove the outcome—is simply mistaken. To the contrary, as the majority acknowledged, this examination was quintessential *dicta*.

Footnote 44, repeatedly cited in Defendant's brief, does not advance his argument. The footnote merely serves to counter Justice Alito's dissenting support for *stare decisis* and the *Apodaca* plurality. The footnote bolsters the majority's decision to decline to apply *stare decisis* by pointing out a central flaw in *Apodaca*: *Apodaca* purports to find constitutionality based on the functional benefits of the non-unanimous jury rules, but does not consider the historically racist functions the rules were adopted to serve; and, moreover, the States' recodification of the rules does not excuse this incomplete analysis because the States had not yet recodified the laws when *Apodaca* was considered. *Id.* at 1401 n.44. Therefore, says the footnote, Justice Alito's support for the *Apodaca* plurality's omission of historical context, when that history is material to *Apodaca's* functionality ruling, is misplaced. The footnote does not suggest that a law's "uncomfortable past" is legally relevant. Indeed, while *Ramos* "acknowledg[es]" the laws' racist history, *see id.*, that history played no role in

deciding the constitutional issue. In any event, *Ramos* does not apply here because it does not involve immigration law and the concomitant deferential standard of review.[14]

As a final example of the error in Defendant's "forever tainted" argument, several courts have recognized that, when a state reenacts a voting provision that was intentionally discriminatory at its origin, the ultimate focus in subsequent litigation is the intent of the reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir.) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). And, like the Supreme Court recently held, *see Abbott*, 138 S. Ct. at 2325 ("we have never suggested that past discrimination flips the evidentiary burden on its head"), these courts have also rejected the proposition that prior

---

[14] *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly irrelevant. There, the Supreme Court considered whether application of a "no-aid" provision in Montana's constitution to bar religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254. The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id.* at 2255. The Court did not find the provision unconstitutional because of any "checkered tradition," as Defendant suggests. ECF No. 26 at 18. That phrase appears briefly in the opinion in response to the argument that a tradition arose in the late-19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."). Similar to *Ramos*, this comment was in response to a dissenting argument that accused the majority of considering a "historic and substantive tradition" that the dissenter believed was "incomplete at best." *Id.* at 2259, 2297 (Sotomayor, J., dissenting). In response, *Espinoza* points out that the brief history it is accused of ignoring was grounded in religious discrimination (anti-Catholicism), and therefore should not be viewed as establishing a "tradition" driving the Court's analysis of the Free Exercise Clause. In short, neither *Ramos* nor *Espinoza* stands for the proposition Defendant claims—that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint." ECF No. 26 at 19.

intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *Hayden*, 594 F.3d at 166–67; *accord Cotton*, 157 F.3d at 392 (affirming that plaintiff was required to show that the "current version" of the law was "adopted out of a desire to discriminate").

In any event, even assuming for purposes of argument that (1) Defendant's "forever tainted" position is permissible, (2) it is permissible for the Court to probe the motives of Congress, and (3) *Arlington Heights* applies to probe the justifications of Congress's immigration actions, Defendant's claim *still* fails. To begin, he fails to show a cognizable disparate impact. As outlined above, the statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States, the history of Mexican employment patterns, and other socio-political and economic factors that drive migration from Mexico to the United States—not discrimination. That alone is enough to reject Defendant's *Arlington Heights* analysis. *See, e.g.,* ECF No. 26 at 19 (Defendant agreeing that *Arlington Heights* requires establishing a law "disparately impacts a particular group"); *Regents*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, Defendant's perspective that early immigration laws, leading to the 1929 illegal entry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in

Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—Asia, for instance—the quota system completely excluded immigration. *See* https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not comport with Defendant's view that Congress was actively developing legislation with the intent and purpose of discriminating against persons from Mexico.

Digging slightly deeper into Defendant's claims reveals they are misleading. Indeed, Defendant selectively edits quotations from the Congressional record to support his theory. For instance, Defendant says that Rep. Thomas L. Blanton "complained that Mexicans 'come into Texas by hordes[.]'" ECF No. 26 at 14. But the full context shows Rep. Blanton was discussing a desire to preserve jobs for American citizens. Indeed, just moments later, Rep. Blanton stated, "They are taking away jobs from American citizens." 70 Cong. Rec. 3619 (1929).

As another example, Defendant states that Rep. Blanton "urged the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." ECF No. 26 at 14-15. Defendant omits the very next sentence, which again is directly tethered to jobs: "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]" 70 Cong. Rec. 3619 (1929).

As yet another example, Defendant says Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the bridges with no intention of ever going back.'" ECF No. 26 at 15. Defendant inserted a period at the end of that quote, but it was actually a comma. The full quote—again job focused—reads:

If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges . . . [a]nd stand there, he will see the hordes that come across the bridges with no intention of ever going back, coming across to get jobs of Americans, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it. I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

70 Cong. Rec. 3619 (1929).

Defendant quotes Rep. Schafer as saying, "[t]hese Mexicans also come into Wisconsin in droves[.]" ECF No. 26 at 15. But the full quote from Rep. Schafer shows he was likewise referring to preserving jobs. "These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm. Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor." 70 Cong. Rec. 3619 (1929).

Likewise, Defendant cites some startling comments of Rep. John Box, but omits his comments during the congressional debate regarding the job problems facing his constituents in Texas. "They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now." *Id.*

And again, Defendant cites a "radio speech" given by Rep. Robert Green in January 1928, seizing upon several startling snippets. The complete speech shows Rep. Green was not targeting Mexicans. Rather, Rep. Green outlined his broad immigration policies, seeking a general strengthening of immigration law. Rep. Green saw a "tremendous situation" facing immigration authorities. 69 Cong. Rec. 2461 (1928). He

27

observed that "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States." *Id.* He noted that the "immigration department" employed only 2,700 people, which was "inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol." *Id.* Rep. Green stated that 113,105 aliens were "inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses." *Id.* He continued, "[t]he economic loss represented by these figures is appalling." *Id.* Rep. Green spoke at length about the "communists" and "bolshevists"—not Mexicans—"here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our homes." *Id.* at 2462. He also spoke about immigration from Mexico, stating "hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises." *Id.* He also stated—regrettably, but clearly not singling out Mexicans—that it was "time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores." *Id.*

The point is not that these Congressmen did not say things unbecoming of elected officials. It is that indulging even briefly in Defendant's desired probe of the Congressional record reveals a more complicated, multi-dimensional picture than the flat caricature he paints. The endeavor also reinforces the Supreme Court's caution—leading to the prohibition against probing motives—that "it is extremely difficult for a court to ascertain the motivation, or collection of difference motivations, that lie behind a legislative enactment." *Palmer*, 403 U.S. at 224. For "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *O'Brien*, 391 U.S. at 384.

At the conclusion of his *Arlington Heights* analysis, Defendant claims the government would have to show that the contested law would have passed "even had the impermissible purpose not been considered." ECF No. 26 at 22 (citing *Arlington Heights*). There is no need to reach this point. Still, Congress *did* pass a new illegal reentry law in 1952, and was later amended multiple times. Defendant does not suggest any discriminatory purpose with those pieces of legislation.

3.   *An evidentiary hearing is unnecessary.*

This Court need not hold an evidentiary hearing. Defendant's entire claim rests on *Arlington Heights*. But *Arlington Heights* does not govern equal protection analysis of immigration law. And, the legislative motivations leading up to the 1929 statute are immaterial to an equal protection challenge to the illegal reentry statute that applies in this case—the current law, most recently amended and reenacted in 1997. This illegal reentry statute inexorably satisfies rational basis review. Moreover, Defendant has made no claim, nor presented any evidence, to suggest discriminatory motive underlying that statute. There is therefore no reason to hold an evidentiary hearing. *See, e.g., United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (evidentiary hearing not required where the material provided to the court "show as a matter of law that [the defendant] was not entitled to relief").

By any measure, Defendant has failed to carry his burden of showing that § 1326 violates the Fifth Amendment's Equal Protection Clause. *Cf. Heller*, 509 U.S. at 320. Instead of grappling with the legislative history of the Immigration and Nationality Act of 1952, Defendant opts to train his sights on the statements of government officials from the 1920s who were either no longer in government or were deceased by the time § 1326 was

enacted. Defendant offers precisely nothing by way of evidence or argument as to the current law. Attached to his motion are almost two hundred pages of congressional material from the 1920s. Yet not a word of that material has any bearing on the law Congress passed in 1952. *See McCleskey*, 481 U.S. at 298 n.20 ("[U]nless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value.").

The Supreme Court has cautioned that courts "should be skeptical . . . of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006). At bottom, this is exactly Defendant's approach. He does not engage with the substance of § 1326 or its clear and obvious purpose. Rather, his motion is aimed at legislative history several times removed from the current version of the statute. In the same way "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (internal quotation marks omitted), the legislative history of an earlier Congress cannot forever taint a law that has been reenacted repeatedly without animus.

## IV. Conclusion

For the foregoing reasons, the Court should deny Defendant's motion to dismiss. Respectfully submitted this 2nd day of November, 2020.

NICHOLAS A. TRUTANICH
United States Attorney

*s/ Peter Walkingshaw*
PETER WALKINGSHAW
Assistant United States Attorney