# Exhibit A

## Report to Senate Judiciary Committee

| 100TH CONGRESS 1st Session | [COMMITTEE PRINT] | S. PRT. 100–100 |
| --- | --- | --- |

# U.S. IMMIGRATION LAW AND POLICY: 1952–1986

## A REPORT

PREPARED FOR THE USE OF THE

## SUBCOMMITTEE ON IMMIGRATION AND REFUGEE AFFAIRS COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

Prepared by the

## CONGRESSIONAL RESEARCH SERVICE LIBRARY OF CONGRESS

ONE HUNDREDTH CONGRESS

FIRST SESSION



DECEMBER 1987

U.S. GOVERNMENT PRINTING OFFICE

82–078                    WASHINGTON : 1988

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

## COMMITTEE ON THE JUDICIARY

JOSEPH R. BIDEN, JR., Delaware, *Chairman*

| | |
|---|---|
| EDWARD M. KENNEDY, Massachusetts | STROM THURMOND, South Carolina |
| ROBERT C. BYRD, West Virginia | ORRIN G. HATCH, Utah |
| HOWARD M. METZENBAUM, Ohio | ALAN K. SIMPSON, Wyoming |
| DENNIS DeCONCINI, Arizona | CHARLES E. GRASSLEY, Iowa |
| PATRICK J. LEAHY, Vermont | ARLEN SPECTER, Pennsylvania |
| HOWELL HEFLIN, Alabama | GORDON J. HUMPHREY, New Hampshire |
| PAUL SIMON, Illinois | |

MARK H. GITENSTEIN, *Chief Counsel*
DIANA HUFFMAN, *Staff Director*
TERRY L. WOOTEN, *Minority Chief Counsel*
R.J. DUKE SHORT, *Minority Staff Director*

————

### SUBCOMMITTEE ON IMMIGRATION AND REFUGEE AFFAIRS

EDWARD M. KENNEDY, Massachusetts, *Chairman*

PAUL SIMON, Illinois                    ALAN K. SIMPSON, Wyoming

JERRY M. TINKER, *Staff Director*
CAROLYN P. OSOLINIK, *Chief Counsel*
RICHARD W. DAY, *Minority Counsel*

(II)

## LETTER OF SUBMITTAL

THE LIBRARY OF CONGRESS,
CONGRESSIONAL RESEARCH SERVICE,
*Washington, DC, December 8, 1987.*

Hon. EDWARD M. KENNEDY,
*Chairman, Committee on the Judiciary, Subcommittee on Immigration and Refugee Affairs, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: In response to your request, I am submitting a report on the development of immigration law and policy, 1952–1986.

The report was written by Joyce Vialet, Specialist in Immigration Policy, Education and Public Welfare Division. As you requested, it is an updated version of a report she prepared at your request in 1979. Like the previous version, it presents a comprehensive overview and analysis of the major policy issues relating to immigration since 1952. It also traces the development of the Immigration and Nationality Act of 1952 which, with substantial amendment, remains the basic law in the area of immigration. In particular, the updated version includes new chapters on recent developments and amendments relating to refugees and illegal immigration, including the Refugee Act of 1980 and the Immigration Reform and Control Act of 1986.

We hope that this report will serve the needs of the Subcommittee on Immigration and Refugee Affairs and the Committee on the Judiciary, as well as the needs of other committees and Members of Congress concerned with immigration.

Sincerely,

JOSEPH E. ROSS, *Director.*

Enclosure.

(III)

# FOREWORD

### By Senator Edward M. Kennedy, Chairman

Over a year ago, the 99th Congress enacted one of the most important and far-reaching immigration laws in our recent history—"The Immigration Reform and Control Act of 1986". This action followed 6 years of lengthy and often very controversial debate on what was admittedly a complex piece of legislation.

The full implications of this new law are only now being felt as the key provisions—the legalization program and employer sanctions—are being implemented. Only time will tell whether this legislation will achieve the goals its sponsors advocated, or result in what its critics feared.

But it remains an extremely important revision of our Nation's immigration laws. Therefore I asked the Congressional Research Service of the Library of Congress to review it in the course of updating a report that I had originally requested to assist the work of the Select Commission on Immigration and Refugee Policy—whose recommendations laid the basis for all recent proposals for immigration reform. The original CRS report was entitled "U.S. Immigration Law and Policy: 1952-1979", and it remains an invaluable resource for those working in immigration law. But it is now out of print and outdated.

Since it was written, Congress also enacted another reform of long-term significance—"The Refugee Act of 1980." In addition, other legislative developments have also occurred as well as, of course, the sweeping provisions of the Immigration Reform and Control Act.

So as we continue to review proposals for immigration reform—particularly the current effort to revise our legal immigration system—I believed it would be helpful to see where we have been on this issue over the past several decades. I asked the original author of the report, Ms. Joyce Vialet, a specialist on immigration policy at the Congressional Research Service, to update her report to reflect recent developments in U.S. immigration law.

This revised report is now available, and I commend it to all those interested in promoting future immigration reform by learning from our immigration past.

# CONTENTS

|  | Page |
|---|---|
| Letter of Submittal | III |
| Introduction by Senator Edward M. Kennedy, chairman | v |
| I. The Immigration and Nationality Act and reaction, 1952–53 | 1 |
| Summary of major provisions | 2 |
| A. Numerical restrictions | 3 |
| B. Subversives | 6 |
| Report of the President's Commission on Immigration and Naturalization | 8 |
| II. Immigration and refugee legislation during the Eisenhower years, 1953–60 | 11 |
| 83d and 84th Congresses, 1953–56 | 11 |
| A. Legislation establishing temporary programs | 13 |
| B. Permanent enactments | 14 |
| C. Parole of Hungarian refugees | 14 |
| 85th Congress, 1957–58 | 14 |
| 86th Congress, 1959–60 | 17 |
| Cuban refugees | 20 |
| Summary, 1953–60 | 20 |
| III. Illegal immigration and the Bracero program | 25 |
| Background: The legal admission of temporary workers, 1942–52 | 26 |
| Illegal immigration, 1944–54 | 32 |
| The Bracero program, 1952–64 | 39 |
| IV. Immigration and refugee legislation, 1961–64 | 43 |
| Cuban refugees and 1962 refugee legislation | 45 |
| The Kennedy administration immigration reform bill | 47 |
| V. The Immigration and Nationality Act Amendments of 1965 and their aftermath, 1965–68 | 50 |
| Legislative history of the 1965 amendments | 54 |
| Summary of the major provisions of the 1965 amendments | 55 |
| Cuban refugees | 57 |
| Report of the Select Commission on Western Hemisphere Immigration | 58 |
| Other legislation of the 89th and 90th Congresses, 1965–68 | 59 |
| VI. Western Hemisphere reform, a worldwide ceiling, and other immigration legislation, 1969–78 | 61 |
| Western Hemisphere reform and a worldwide ceiling | 61 |
| Other legislation | 67 |
| A. 91st Congress, 1969–70 | 67 |
| B. 92d and 93d Congresses, 1971–74 | 67 |
| C. 94th Congress, 1975–76 | 68 |
| D. 95th Congress, 1977–78 | 68 |
| VII. Indochinese refugees, the Refugee Act of 1980, and Cuban/Haitian Entrants | 70 |
| The Admission and resettlement of Indochinese refugees, 1975–1980 | 70 |
| A. Admission of Indochinese refugees | 71 |
| B. Indochinese refugee resettlement assistance | 74 |
| The Refugee Act of 1980 | 77 |
| Cuban/Haitian Entrants | 82 |
| VIII. Illegal immigration and the Immigration Reform and Control Act, 1971–1986 | 86 |
| The 1970s | 86 |
| The Select Commission on Immigration and Refugee Policy: Recommendations and response | 90 |

VIII

Page

VIII. Illegal immigration and the Immigration Reform and Control Act, 1971–1986—Continued

    Legislative History of the Immigration Reform and Control Act ....... 93

        A. 97th Congress (1981–1982) ............................................................. 93

        B. 98th Congress (1983–1984) ............................................................. 96

        C. 99th Congress (1985–1986)............................................................. 100

    Major provisions of the Immigration Reform and Control Act ........... 105

        A. Employer sanctions and antidiscrimination measures............ 105

        B. Legalization ...................................................................................... 106

        C. Agricultural worker programs ..................................................... 107

        D. Other provisions.............................................................................. 107

IX. Other immigration legislation, 1979–1986 ........................................... 109

    96th Congress (1979–1980)............................................................................. 109

    97th Congress (1981–1982)............................................................................. 109

    98th Congress (1983–1984) ............................................................................ 110

    99th Congress (1985–1986)............................................................................. 110

## APPENDIX

The Immigration and Nationality Act: Questions and Answers ........................... 113

## SUMMARY OF DEVELOPMENTS

## I. THE IMMIGRATION AND NATIONALITY ACT AND REACTION, 1952–1953

The Immigration and Nationality Act enacted on June 27, 1952 [1] was a major recodification and revision of existing immigration and nationality law.[1a] It followed a comprehensive study of existing law and policy by the Senate Judiciary Committee, published under the title, "The Immigration and Naturalization Systems of the United States." [2] This study formed the blueprint for the legislation enacted in 1952 under the leadership of Senator Pat McCarran (D.-Nev.) and Representative Francis Walter (D.-Pa.).

Prior to the 1952 recodification, the two major immigration laws were the Immigration Act of 1917,[3] setting forth qualitative grounds for exclusion, and the Immigration Act of 1924,[4] setting forth numerical limitations, primarily in the form of the national origins quota system. The 1952 Act codified and carried forward, with modifications, the essential elements of both acts, as well as those provisions of the Internal Security Act of 1950 [5] relating to the exclusion of Communists.

Characterized by supporters and opponents alike as basically a restrictionist measure, the 1952 Act was very much a product of its time. It was enacted in the post-World War II period, during the Korean War and at the height of the Cold War with Stalin's Russia. It was strongly opposed by those who had hoped the new internationalism following World War II would bring with it the opportunity for formulating a less restrictive immigration policy. Led by House Judiciary Chairman Emanuel Celler (D.-N.Y.) and Senators Hubert Humphrey (D.-Minn.) and Herbert Lehman (D.-N.Y.), and subsequently backed by President Harry Truman, those who hoped to liberalize the immigration law in 1952 suffered a resounding defeat.

The legislation initially passed the House by a vote of 206 to 68, and the Senate by voice vote. President Truman vetoed the bill, concentrating his criticism on the continuation of the national origins quota system, of which he said:

> The basis of this quota system was false and unworthy in 1924. It is even worse now. At the present time this quota system keeps out the very people we want to bring in. It is incredible to me that, in this year of 1952, we

---

[1] Pub. L. 414, 82d Congress; 66 Stat. 163; 8 USC 1101 *et seq.*
[1a] With extensive amendment, the 1952 Act remains our basic law today. Major provisions of the law in its current form are summarized in an appendix.
[2] S. Rept. 1515, 81st Congress, 2d session, 1950.
[3] Act of Feb. 5, 1917; 39 Stat. 874.
[4] Act of May 26, 1924; 43 Stat. 153.
[5] Act of Sept. 23, 1950; 64 Stat. 987.

2

should again be enacting into law such a slur on the patriotism, the capacity, and the decency of a large part of our citizenry.

Today, we have entered into an alliance, the North Atlantic Treaty, with Italy, Greece, and Turkey against one of the most terrible threats mankind has ever faced. We are asking them to join with us in protecting the peace of the world. We are helping them to build their defenses, and train their men, in the common cause. But, through this bill we say to their people: You are less worthy to come to this country than Englishmen or Irishmen. . . .

Today, we are "protecting" ourselves as we were in 1924, against being flooded by immigrants from Eastern Europe. This is fantastic. The countries of Eastern Europe have fallen under the Communist yoke—they are silenced, fenced off by barbed wire and minefields—no one passes their borders but at the risk of his life. We do not need to be protected against immigrants from these countries—on the contrary we want to stretch out a helping hand, to save those who have managed to flee into Western Europe, to succor those who are brave enough to escape from barbarism, to welcome and restore them against the day when their countries will, as we hope, be free again. . . . These are a few examples of the absurdity, the cruelty of carrying over into this year of 1952 the isolationist limitations of our 1924 law.

In no other realm of our national life are we so hampered and stultified by the dead hand of the past, as we are in this field of immigration.[6]

President Truman made the general observation that, "By and large, the changes that would be made by the bill do not depart from the basically restrictive spirit of our existing laws—but intensify and reinforce it." [7] The bill passed both Houses by the two-thirds majority necessary to override the veto—in the House by a vote of 278 to 113, and in the Senate by 57 to 26.

Although presumably some of its supporters were motivated by racial prejudice, in the words of one commentator, passage of the 1952 Act was "in essence an act of conservatism rather than of intolerance." [8] It embodied the political choice of limiting immigration by continuing the national origins quota system which had become an institution, albeit a controversial one, after 30 years of existence. Just as importantly, it reflected the view that Communist subversion represented a serious danger to the country, against which our immigration law formed a vital line of defense.

### SUMMARY OF MAJOR PROVISIONS

As indicated above, the 1952 Act carried forward many of the provisions and underlying policies of the legislation it repealed and

---

[6] House Doc. 520, 82d Cong., 2d sess., June 25, 1952, pp. 4–5.
[7] Ibid., p. 8.
[8] Robert A. Divine. American Immigration Policy, 1924–52 (New Haven, Yale University Press), 1957, p. 190. (Cited as Divine (1957).)

superseded. Significant modifications made by the 1952 Act were summarized as follows in a treatise on immigration law:

> Different from the earlier laws, the 1952 Act:
>
> (1) made all races eligible to naturalization and eliminated race as a bar to immigration;
>
> (2) eliminated discrimination between sexes with respect to immigration;
>
> (3) introduced a system of selective immigration by giving a quota preference to skilled aliens whose services are urgently needed in the United States;
>
> (4) placed a limit on the use of the governing country's quota by natives of colonies and dependent areas;
>
> (5) provided an escape clause permitting the immigration of certain former voluntary members of proscribed organizations;
>
> (6) broadened the grounds for exclusion and deportation of aliens;
>
> (7) tightened criteria for the regularization of status of deportable aliens in the United States and added a provision for adjustment from nonimmigrant status to that of permanent resident; and
>
> (8) provided greater procedural safeguards to aliens subject to deportation.[8a]

The 1952 Act was, and remains, lengthy and complex legislation. Many of the original provisions are still law today, including the provision for dual administration by the State Department and the Justice Department, carried forward from previous legislation; the basic distinction between immigrants and nonimmigrants; and the lengthy and detailed lists of the grounds for exclusion and deportation.

From a policy point of view, probably the most important provisions of the 1952 Act were those relating to numerical restriction, including the national origins quota system, the Asia-Pacific Triangle, the four-point selection system, and the absence of a numerical ceiling on Western Hemisphere immigration. None of these provisions, discussed briefly below, remains in the current law, reflecting the major shift in immigration policy which has occurred since 1952.

### A. NUMERICAL RESTRICTIONS

As enacted, the 1952 Act retained the national origins quota system of the 1924 Act, with some modifications. Under the national origins quota formula which went into effect on July 1, 1929, the annual quota of any nationality was "a number which bears the same ratio to 150,000 as the number of inhabitants in the United States in 1920 having that national origin bears to the number of white inhabitants of the United States in 1920, with a minimum quota of 100 for each nationality." [9] Natives of countries in the

---

[8a] Elizabeth J. Harper, Immigration Laws of the United States, third ed. (Indianapolis, Bobbs-Merrill Co., Inc.), 1975, pp. 21–22. (Cited as Harper (1975).)

[9] H. Rept. 1365, 82d Cong., 2d sess., Feb. 14, 1952, p. 37.

4

"barred zone," encompassing most oriental countries, were generally inadmissible as immigrants, with certain exceptions.

This system was modified by the 1952 Act which set the annual quota for an area at ⅙ of 1 percent of the number of inhabitants in the continental United States in 1920 whose ancestry or national origin was attributable to that area. All countries were allowed a minimum quota of 100, with a ceiling of 2,000 on most natives of countries in the Asia-Pacific triangle, which broadly encompassed the Asiatic countries. Aliens were chargeable to their country of birth, with the exception of those of Asian ancestry; aliens with 50 percent or more Asian ancestry were chargeable to the Asian quotas. It should be noted that the provisions relating to Asian countries represented a liberalization of the previous law, which had barred immigration from most Asian countries.

In general, race played a less important role in the determination of immigration policy in the 1950's than it had in the 1920's. The national origins quota system originally derived from popular biological theories of the period alleging the superiority of certain races. Two statements by Dr. Harry N. Laughlin, a eugenics consultant to the House Judiciary Committee on Immigration and Naturalization in the early 1920's, clearly indicate the important role these theories played in the development of immigration policy immediately after World War I:

> We in this country have been so imbued with the idea of democracy, or the equality of all men, that we have left out of consideration the matter of blood or natural born hereditary mental and moral differences. No man who breeds pedigreed plants and animals can afford to neglect this thing.

> \* \* \* \* \*

> The National Origins provisions of the immigration control law of 1924 marked the actual turning point from immigration control based on the asylum idea . . . definitely in favor of the biological basis. . . .[9a]

The difference between the climate of opinion in the 1920s and the early 1950s is apparent in the following statement in the 1950 report of the Senate Judiciary Committee, "Without giving credence to any theory of Nordic superiority, the subcommittee believes that the adoption of the national origins quota formula was a rational and logical method of numerically restricting immigration in such a manner as the best preserve the sociological and cultural balance in the population of the United States."[10] In contrast to the 1920s, the case for the national origins quota system in the early 1950s was not generally argued on the grounds of racial superiority. Instead the argument was based partly on sociological theories of the time relating to cultural assimilation.

Two other features of the numerical restrictions adopted in 1952 are of particular interest. These are the four-point selection system,

---

[9a] Quoted by Abba P. Schwartz. "The Open Society" (New York, Simon and Schuster), 1968, pp. 105–106.
[10] S. Rept. 1515, 81st Cong., 2d sess. (1950), p. 455.

and the continued absence of a numerical restriction on Western Hemisphere immigration.

The 1952 Act combined a four-category selection system with the national origins quota system in the allocation of visas to Eastern Hemisphere countries. This was a refinement of the two-preference selection system based primarily on family relationship contained in the 1924 Act. The "inclusion, to a certain extent, of the principle of selectivity in our present system," had been recommended in the Senate Judiciary Committee report, which concluded that "under our present system the immigrant selects this country rather than this country selecting the immigrant."[11] Quoting further, "The subcommittee, therefore, recommends that the immigration laws be amended to provide a means of selecting immigrants for admission whose skills and services are urgently needed in the United States."[12] However, the Senate report noted that "the subcommittee has been unable to arrive at any satisfactory standards which would permit immigration on a purely selective basis, while at the same time preserving the sociological and cultural balance in our population."[13]

The four-category selection system was adopted in a somewhat modified form, with little debate. Fifty percent of each national quota was allocated for first preference distribution to aliens whose services were determined by the Attorney General "to be needed urgently in the United States because of the high education, technical training, specialized experience, or exceptional ability of such immigrants and to be substantially beneficial prospectively to the national economy, cultural interests, or welfare of the United States." The remaining three preference categories assigned priorities to various types of relatives of U.S. citizens and permanent resident aliens. This four-point selection system was the direct antecedent of our current six-category preference system.

Finally, the numerical restrictions in the 1952 Act did not apply to the Western Hemisphere. Natives of other countries in the Western Hemisphere were originally omitted from the quota restrictions imposed on the Eastern Hemisphere in the 1920s for three main reasons, according to one source:

> (1) Some of these countries had few or no nationals in the United States upon whom a national origins quota could be based and under the quota system they would have been totally excluded in the future. (2) The borders between this country and Canada and Mexico were considered too extensive to patrol against illegal entries effectively. (3) The desirability of continued favored treatment to sister nations of the Western Hemisphere.[14]

This omission was explained as follows in the 1950 Senate report, "The blanket nonquota status in the case of Western Hemisphere aliens rests chiefly upon considerations arising from geographical

---

[11] Ibid., p. 456.
[12] Ibid., p. 457.
[13] Ibid., p. 456.
[14] Marion T. Bennett, "American Immigration Policies" (Washington, Public Affairs Press), 1963, p. 61. (Cited as Bennett (1963).)

proximity of the Western Hemisphere countries and considerations of friendly relations among them." [15]

The Senate report recommended that the nonquota status be retained for Western Hemisphere aliens, and that their immigration "continue to be regulated by the qualitative restrictions in the law, such as those relating to literacy, health, morals, and economic conditions." [16] This recommendation was accepted in the legislation enacted into law in 1952. The present restrictions on Western Hemisphere immigration derive from the amendments enacted beginning in 1965. .

Two other immigration-related issues of this period which involved the Western Hemisphere were illegal aliens, and the importation of temporary alien workers, particularly from Mexico under the Bracero program. These are discussed in section III below.

### B. SUBVERSIVES

The Immigration and Nationality Act of 1952 also reflected the intense concern of the Congress during the early 1950s regarding Communist infiltration. The subject of subversives was treated at length in the 1950 Senate report, and the importance of the issue as an immigration problem was emphasized as follows:

> . . . the conclusion is inescapable that the Communist Party and the Communist movement in the United States is an alien movement, sustained, augmented, and controlled by European Communists and the Soviet Union. The severance of this connection and the destruction of the life line of communism becomes, therefore, substantially an immigration problem. [17]

The Congress decided in 1950 that the issue of subversives was too important to await inclusion in the omnibus immigration bill. Provisions relating to the exclusion and deportation of subversives, specifically including Communists and Fascists, were enacted as part of the Internal Security Act of 1950. These provisions developed directly from legislation dating back to the beginning of the century. "Anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States or of all government or of all forms of law, or the assassination of public officials," were added to the list of excludable aliens in an early revision and recodification of the immigration laws enacted on March 3, 1903, [18] not long after the assassination of President William McKinley. This and related penalty provisions were incorporated with some elaboration but little substantive change in the Act of Feb. 5, 1917. [19]

Legislation prohibiting the entry of anarchists, subversives, and others believed to be dangerous to the national security was subsequently recodified in the Anarchist Act of 1918, [20] enacted shortly

---

[15] S. Rept. 1515, 81st Cong., 2d sess. (1950), p. 473.
[16] Ibid., p. 474.
[17] Ibid., p. 787.
[18] 32 Stat. 1213.
[19] 39 Stat. 874.
[20] Act of Oct. 16, 1918; 40 Stat. 1012.

before the end of World War I. From its enactment in 1918 until its repeal in 1952, this statute was the basic law in the area rather than the Immigration Act of 1917. Most subsequent enactments, including legislation enacted in 1920, 1940, and section 22 of the Internal Security Act of 1950, amended the 1918 legislation.

The 1950 legislation marked the first time that Communists and Fascists were specifically excluded from admission by name. Robert Divine comments as follows on the significance of this fact:

> In the passage of the Internal Security Act of 1950 the restrictionists finally achieved one of their oldest objectives, the specific exclusion of Communists and Fascists from admission into the United States. While this action embodied only a slight change in existing legislation, it marked a highly significant shift in the formulation of immigration policy. Previously the primary motivation of the restrictionists had been racial and cultural nationalism— the desire to preserve the predominant cultural patterns and ethnic composition of the United States by limiting immigration. With the rise of totalitarian governments and the crisis of the Second World War, a new stress on nationalism in its most fundamental meaning, the security of the nation, became evident. Beginning in 1940, when the jurisdiction over immigration affairs was transferred from the Department of Labor to the Department of Justice, the intense concern for the loyalty of immigrants developed and grew, reaching a peak with the coming of the cold war with Russia. The fear of Communistic infiltration, which played such a large role in mid 20th-century American life, permeated discussions of immigration legislation and tended to replace the old fear of ethnic invasion as the dominating concern in immigration policy.[21]

The immigration provisions of the Internal Security Act of 1950 were incorporated in the 1952 legislation with several significant changes, allowing for an exemption in the case of an alien seeking entry as an immigrant if he shows that his membership in a proscribed organization was involuntary or qualifies as a defector. The provisions relating to the exclusion of various classes of potentially subversive aliens and alien members of proscribed organizations have remained unchanged since 1952, although their application has been restricted by judicial decision, and, in instances where a waiver is possible, their administration today is considerably more relaxed than it was in the 1950s.

More specifically, the Immigration and Nationality Act, in sec. 212(a)(28) (8 U.S.C. 1182(a)(28)), provides for the exclusion of aliens who are members of proscribed political organizations, primarily the Communist Party and affiliated groups. This provision may be waived in the case of aliens seeking to enter as nonimmigrants, if such a waiver is sought by the Secretary of State and approved by the Attorney General. In recent years, waivers for nonimmigrants have been sought and approved in the vast majority of cases. This trend was reinforced by the passage in 1977 of an amendment to

---

[21] Divine (1957), p. 163.

the State Department's basic enabling legislation, requiring the Secretary of State to recommend that the Attorney General grant a waiver unless the Secretary determines it would be contrary to the security interests of the United States, and so certifies to the Congress. The Immigration and Nationality Act also provides for the exclusion, without the possibility of a waiver, of any alien believed to be seeking entry to engage in activities which would be prejudicial to the public welfare (sec. 212(a)(27); 8 U.S.C. 1182(a)(27)), or who is believed likely to engage in subversive activities after entry (sec. 212(a)(29); 8 U.S.C. 1182(a)(29)).

### REPORT OF THE PRESIDENT'S COMMISSION ON IMMIGRATION AND NATURALIZATION

In his message vetoing the Immigration and Nationality Act, President Truman suggested the creation by the Congress of a bipartisan "representative commission of outstanding Americans to examine the basic assumptions of our immigration policy, the quota system and all that goes with it, the effect of our present immigration and nationality laws, their administration, and the ways in which they can be brought into line with our national ideals and our foreign policy." [22] Not surprisingly, having enacted the new Immigration and Nationality Act over the President's veto, the Congress did not act to establish such a Commission.

On September 4, 1952, President Truman issued Executive Order 10392 establishing the President's Commission on Immigration and Naturalization, "to make a survey and evaluation of the immigration and naturalization policies of the United States," and to "make recommendations to the President for such legislative, administrative, and other action as in its opinion may be desirable in the interests of the economy, security, and responsibilities of this country," not later than January 1, 1953. The Chairman of the Commission was Philip B. Perlman, former Solicitor General of the United States. The staff director was Harry N. Rosenfield, a former member of the Displaced Persons Commission and an immigration lawyer.

The report of the President's Commission, entitled "Whom We Shall Welcome," was highly critical of the new immigration legislation, recommending that "it should be reconsidered and revised from beginning to end." [23] If the 1952 Act embodied the restrictionist view that, quoting Divine, "immigration was a source of potential danger to the Nation, . . . [and] the basic aim of immigration policy should be to protect the institutions and traditions of the United States," the Truman Commission report reflected the opposite premise, "that immigration policy should express a spirit of friendliness and generosity to the less fortunate people of the world." [24] The views expressed in the Truman Commission report were as liberal as those which led to the 1952 legislation were conservative.

The Commission summarized its conclusions as follows:

---

[22] H. Doc. 520, 82d Cong., 2d sess., June 25, 1952, p. 8.
[23] U.S. President's Commission on Immigration and Naturalization, "Whom We Shall Welcome" (Washington, G.P.O.), 1953, p. 263. (Cited as President's Commission Report (1953).)
[24] Divine (1957), p. 165.

> The immigration and nationality law embodies policies and principles that are unwise and injurious to the nation.
>
> It rests upon an attitude of hostility and distrust against all aliens.
>
> It applies discriminations against human beings on account of national origin, race, creed and color.
>
> It ignores the needs of the United States in domestic affairs and foreign policies.
>
> It contains unnecessary and unreasonable restrictions and penalties against individuals.
>
> It is badly drafted, confusing and in some respects unworkable.
>
> It should be reconsidered and revised from beginning to end.[25]

The 1953 report examined our immigration policy primarily in the context of the domestic economy and our foreign policy. In terms of the domestic economy, the 1952 legislation was found wanting because of the need for additional manpower in an expanding economy in a period of almost full employment. The report stressed the ability of the Nation to absorb more immigrants than the law permitted to enter, and the economic need for them. This point was argued on the grounds that the population was growing older, women outnumbered men, and that there was a lack of reserve manpower for national defense purposes. The Commission recommended:

> The maximum annual quota immigration should be one-sixth of 1 percent of the population of the United States, as determined by the most recent census. Under the 1950 census, quota immigration would be open to 251,162 immigrants annually, instead of the 154,657 now authorized.[26]

The Commission was even more critical of the 1952 legislation on foreign policy grounds. Quoting again:

> American immigration policies have frustrated and handicapped the aims and programs of American foreign policy throughout the period since 1924. The interference is acute today. . . .
>
> The major disruptive influence in our immigration law is the racial and national discrimination caused by the national origins system.[27]

It emphasized what it saw to be the inadequacy of the immigration law in the face of "the new circumstance of American leadership in the world rivalry between democratic freedom and Communist tyranny," [28] as well as the inappropriateness of our approach to the refugee situation which remained in the wake of World War II.

The Commission recommended that the national origins quota system be abolished and replaced by a "unified quota system, which would allocate visas without regard to national origin, race,

---

[25] President's Commission Report (1953). p. 263.
[26] Ibid.
[27] Ibid., p. 52
[28] Ibid.

creed, or color." [29] It also recommended that "all immigration and naturalization functions now in the Department of State and the Department of Justice should be consolidated into a new agency, to be headed by a Commission on Immigration and Naturalization whose members should be appointed by the President and confirmed by the Senate." [30] The Commission's distrust of the Congress as the direct and primary overseer of immigration policy was apparent in its recommendation that this Commission be responsible for determining the annual quota of visas and for distributing them according to five criteria—the right of asylum, reunion of families, needs in the U.S., special needs in the Free World, and general immigration.

Additional recommendations were made under the headings of Fair Hearings and Procedure; Admissions and Deportation; Security; and Citizenship.

The report of the President's Commission had no immediate impact on U.S. immigration policy. The 1952 Act had been enacted over the President's veto by an overwhelming vote, and clearly represented the sense of the majority in Congress at that time. The Truman Commission's viewpoint gradually was to become the majority position over the next 13 years, culminating in the abolition of the national origins quota system in 1965. But in the interim, despite President Eisenhower's repeated criticism of the 1952 Act, changes in the law were either piecemeal or, in the case of refugees and temporary agricultural workers, outside the framework of the basic immigration statute.

---

[29] Ibid., p. 263.
[30] Ibid.

## II. IMMIGRATION AND REFUGEE LEGISLATION DURING THE EISENHOWER YEARS, 1953–60

A number of bills constituting major revisions of the permanent immigration law were introduced but not enacted during the period following the Immigration and Nationality Act of 1952. For the most part, the Congress limited itself during the Eisenhower years to "some tinkering with machinery," in Elmer Fried's phrase.[1] In addition to "tinkering" with the permanent law, much of the legislative action in the decade involved liberalizing the admission of various refugee and immigrant groups for temporary periods of time.

### 83D AND 84TH CONGRESSES, 1953–56

With the exception of the Refugee Relief Act of 1953, no major legislation was enacted in the area of immigration in the period immediately following the 1952 Act. However, the Refugee Relief Act was an important exception from several perspectives. First, it was the beginning of a long series of emergency refugee enactments outside the basic framework of the Immigration and Nationality Act. The necessity for such emergency legislation had been predicted by President Truman in his veto of the Immigration and Nationality Act the year before. Referring to the Displaced Persons Act of 1948, which expired at the end of 1951, he said:

> The inadequacy of the present quota system has been demonstrated since the end of the war, when we were compelled to resort to emergency legislation to admit displaced persons. If the quota system remains unchanged, we shall be compelled to resort to similar emergency legislation again, in order to admit any substantial portion of the refugees from communism or the victims of overcrowding in Europe.[2]

Secondly, the Refugee Relief Act of 1953 was "the first major breach in the numerical restrictions of the Act of 1952 and the national origins formula."[3]

President Dwight D. Eisenhower took an active interest in the subject of immigration, beginning with his State of the Union address in February 1953 when he called upon Congress to review the existing law and "enact a statute which will at one and the same time guard our legitimate national interests and be faithful to our basic ideas of freedom and fairness to all."[4] The Refugee Relief Act

---

[1] Elmer Fried, "Immigration and Nationality Law," New York University Law Review, vol. 35, January 1960, p. 188.
[2] H. Doc. 520, 82d Cong., 2d sess., June 25, 1952, p. 3.
[3] Bennett (1963), p. 195.
[4] Congressional Record, Feb. 2, 1953: 752.

originated as an administration bill accompanied by a letter from President Eisenhower, dated April 22, 1953, citing the plight of war refugees and escapees from behind the Iron Curtain, as well as the problem of overpopulation in Europe. Quoting:

> These refugees, escapees, and distressed peoples now constitute an economic and political threat of constantly growing magnitude. They look to traditional American humanitarian concern for the oppressed. International political considerations are also factors which are involved. We should take reasonable steps to help these people to the extent that we share the obligation of the free world.[5]

The President recommended the enactment of emergency immigration legislation providing for the special admission of 120,000 immigrants per year for the next 2 years, and urged the Congress to act quickly "in order to help resolve this current immigration and refugee problem in the tradition of our American policy."[6]

On February 8, 1956, during the second session of the 84th Congress, President Eisenhower sent to the Congress the first of three special messages on the subject of immigration. He portrayed the 1952 legislation as "essentially a codification of many separate and, sometimes, overlapping and inconsistent immigration and nationality laws," noting that, "It was thought inappropriate, in connection with that legislation, to revise our basic immigration policies."[7] Quoting further:

> The time has now come to consider those policies. Experience in the postwar world demonstrates that the present national-origins method of admitting aliens needs to be re-examined, and a new system adopted which will admit aliens within allowable numbers according to new guidelines and standards.[8]

The President called for a congressional study and examination of our basic immigration policies with a view toward the formulation of a new system based on such factors as "the needs of this country for persons having specialized skills or cultural accomplishments, close family relationships, the populations and immigration policies of countries sending immigrants to this country, their past immigration and trade relationships with this country, and their assistance to the joint defense of the friendly free nations of the world."[9]

In the meantime, he recommended a "four-point program designed to reshape our existing immigration laws," which he summarized as follows in a subsequent letter to Senator Arthur Watkins:

> This program would revise and bring up to date the quota system and remove the quota mortgages; provide a fair and workable substitute for the private bill system of

---

[5] Final Report of the Administrator of the Refugee Relief Act of 1953, as amended, Senate Committee Print, 85th Cong., 1st sess., Nov. 15, 1957, p. 1.
[6] Ibid., p. 2.
[7] H. Doc. No. 329, 84th Cong., 2d sess., Feb. 8, 1956, p. 2.
[8] Ibid.
[9] Ibid.

granting relief from deportation in hardship cases; make a series of other improvements and provide an exclusive, speedy, and fair system of judicial review of administrative deportation orders. I emphasized then and I emphasize now that this country should have larger immigration and that the national origins system should be reviewed in its entirety.[10]

### A. LEGISLATION ESTABLISHING TEMPORARY PROGRAMS

Strictly speaking, the Act of July 29, 1953 [11] was the first non-quota refugee legislation enacted after the Immigration and Nationality Act. It was one of a continuing series of "orphan acts", and provided for the nonquota admission for permanent residence of 500 eligible orphans under 10 years of age adopted by U.S. citizens serving abroad in the Armed Forces, or employed abroad by the Federal Government. These laws were necessitated by the fact that the Immigration and Nationality Act as originally enacted did not grant such adopted children nonquota or immediate relative status.

*The Refugee Relief Act of 1953,* as enacted on August 7, 1953 and subsequently amended on August 31, 1954,[12] was, as noted above, the most significant legislation of this period. It has been described as "a smaller version" of the expired Displaced Persons Act of 1948, which like its predecessor "did not represent a single program but was an omnibus refugee law that benefitted diverse groups in various areas." Quoting further:

It included provisions for German expellees; for escapees in Germany and Austria; and for Italian, Dutch, and Greek refugees and relatives. It also made visas available for 4,000 war orphans. Particularly significant were its provisions for 3,000 visas for Far Eastern refugees; 2,000 for Chinese refugees; and 2,000 for Arabs. This represented a departure from the basic United States immigration policy which had practically excluded Asians.[13]

The 1953 legislation was simultaneously less generous than the DP Act, authorizing a total of 214,000 visas as compared to the approximately 400,000 entries under the earlier legislation; and more generous, in that the visas were not mortgaged against the future quotas of the quota areas from which the refugees came. Of the 214,000 special nonquota visas authorized under the legislation, 205,000 were authorized for use by certain refugees, escapees, expellees, and relations of U.S. citizens. These were divided into several groups, of which the largest were 90,000 visas available to escapees from Communism, and 60,000 for Italian refugees and relatives. Each refugee admitted under the act was required to be sponsored by a U.S. citizen who would give assurance that the refugee

[10] "President Eisenhower to Senator Watkins," July 18, 1956, Department of State Bulletin, vol. 35, July 30, 1956, p. 194.
[11] Public Law 162, 83d Cong., 67 Stat. 229.
[12] Public Law 203, 83d Cong., 67 Stat. 400; amended by Public Law 751, 83d Cong., 68 Stat. 1044.
[13] Richard F. Smith, "Refugees," Annals of the American Academy of Political and Social Science, vol. 367, September 1966, p. 45.

would have employment, adequate housing, and would not become a public charge.

The Refugee Relief Act was in effect for just under three and a half years, until December 31, 1956. Legislation enacted on September 11, 1957 authorized the issuance of the 18,656 special visas which remained unused when the law expired to German expellees, Netherlands refugees, and "refugee-escapees" from persecution in Communist countries or countries in the Middle East area.

The Act of September 3, 1954 [14] made available 385 nonquota immigrant visas to sheepherders from oversubscribed quota areas, primarily Spain.

### B. PERMANENT ENACTMENTS

During 1953–56, legislation was enacted exempting from inadmissibility to the U.S. aliens who had committed a single petty offense; [15] tightening the conditions under which "J" exchange visitor nonimmigrants could adjust to permanent resident or temporary worker status; [16] and strengthening the provisions relating to the admission and deportation of aliens convicted of narcotics violations. [17]

### C. PAROLE OF HUNGARIAN REFUGEES

The unsuccessful Hungarian revolution of October 1956 was followed by a mass exodus of Hungarian refugees to Austria. On November 8, 1956, President Eisenhower directed that up to 5,000 Hungarians be admitted to the United States using nonquota immigrant visas available under the Refugee Relief Act of 1953. On December 1, he announced the U.S. would offer asylum to 21,500 Hungarians, of whom 6,500 would receive visas under the Refugee Relief Act. The remainder were to enter as "parolees" under section 212(d)(5) of the Immigration and Nationality Act, which authorizes the Attorney General to temporarily admit aliens to the United States for emergency reasons or reasons in the public interest. This marked the first, but by no means the last, use of the parole provision for the mass admission of refugees. A total of 38,000 Hungarian refugees were eventually resettled in the United States, 6,130 with Refugee Relief Act visas and the remainder under the parole provision. Legislation permitting the Hungarian parolees to adjust to permanent resident status was enacted in July 1958.

### 85TH CONGRESS, 1957–58

On January 31, 1957, President Eisenhower delivered the second of his three messages on the subject of immigration to the Congress. Beginning with the words, "The eyes of the free world have been fixed on Hungary over the past 2½ months," [18] the President

---

[14] Public Law 770, 83d Cong., 68 Stat. 1145.
[15] Ibid.
[16] Act of June 4, 1956, Public Law 555, 84th Cong., 70 Stat. 241.
[17] Act of June 18, 1956, Public Law 728, 84th Cong., 70 Stat. 567, 575.
[18] H. Doc. 85th Cong., 1st sess., Jan. 31, 1957, p. 1.

focused on the plight of the Hungarian refugees. He also noted the inadequacy of the permanent immigration law to cope with refugee problems, a theme which continued until the enactment of the Refugee Act of 1980.[18a] He recommended the enactment of permanent legislation giving the President power to authorize the Attorney General to parole into the country refugees from Communist persecution, as well as legislation permitting the adjustment of status of eligible refugees to that of permanent resident.

In addition to the recommendations relating to refugees, which were partially enacted on a temporary basis, the President also reiterated many of the recommendations he had made in his message to the 84th Congress regarding the need for the reform of the immigration law. He again urged the Congress "to reexamine the method laid down in the law for the admission of aliens,"[19] noting that "in the 4½ years that have elapsed since the enactment of the Immigration and Nationality Act, the practical application of that law has demonstrated certain provisions which operate inequitably and others which are outmoded in the world of today."[20] In the meantime, he recommended "certain interim measures which should be taken to remove obvious defects in the present quota system,"[21] including basing the quotas on the 1950 census, pooling unused quota numbers, and eliminating mortgages on future quotas carried forward from the Displaced Persons Act of 1948.

In the Congress, there was little interest in a reexamination of the basic principles of the immigration legislation enacted 5 years previously. However, major compromise legislation was enacted on September 11, 1957, providing relief, in most cases of a temporary basis, for various hardships which had arisen under the 1952 Act and particularly under the quota system.

The extent to which the legislation eventually enacted as the Act of September 11, 1957[22] was a compromise measure was stressed by both Senator James O. Eastland, Chairman of the Senate Judiciary Subcommittee on Immigration, and Senator John F. Kennedy, the bill's chief sponsor. The two Senators held diametrically opposite views about the basic principles of the McCarran-Walter Act, and particularly the national origins quota system. Senator John Kennedy stressed that, because of the urgent need for short-term remedial action, "the bill which is now before us does not . . . go to the heart of what many of us believe are critical weaknesses in our immigration policy." Quoting further:

> I believe that a full examination of certain aspects of immigration policy should be undertaken by the Congress at an early date, for I do not believe that our immigration policy is geared to the challenges and requirements of the age in which we live. Therefore, let it be clear to all that this bill is not the final answer to our immigration problems. It is merely designed to meet some pressing and obvious situations which require legislative action now.[23]

---

[18a] Act of March 17, 1980, Public Law 96–212, 96th Cong., 94 Stat. 102.
[19] H. Doc. 85, 85th Cong., 1st Sess., Jan. 31, 1957, p. 3.
[20] Ibid., p. 1.
[21] Ibid., p. 3.
[22] Public Law 85–316; 71 Stat. 639.
[23] Congressional Record [daily ed.], August 21, 1957: 14131.

Although speaking from the opposite philosophical point of view, Senator Eastland agreed with Senator Kennedy about the limited nature of the 1957 legislation in the overall context of immigration policy. As floor manager for the bill, he opened his remarks as follows:

> Mr. President, this bill is a compromise. It does not touch the basic provisions of the McCarran-Walter Act. It is designed to relieve certain hardship conditions which have arisen in the administration of that act.
>
> At the outset, I wish to emphasize that in making these adjustments the bill does not modify the national origins quota provisions which have been a part of our immigration and nationality system since 1924, and which were carried forward in the Immigration and Nationality Act.[24]

The Act of September 11, 1957, while not directly modifying the quota system, addressed the problem of quota oversubscription by removing the mortgages on quotas imposed under the Displaced Persons Act and other acts. In addition, it provided for the granting of nonquota status to aliens qualifying under the first three preference groups on whose behalf petitions had been filed by a specified date, the first of a series of such enactments. As noted above, the act also authorized the issuance of the approximately 19,000 nonquota visas that had remained unused under the Refugee Relief Act. Among those eligible for these visas were "refugee-escapees," defined as persons fleeing persecution in Communist countries or countries in the Middle East. This definition of "refugee" was incorporated in the permanent immigration law in 1965, and continued until 1980. The 1957 Act was popularly referred to as the "Refugee-Escapee Act."

Additionally, the 1957 Act amended the Immigration and Nationality Act to grant nonquota status under the definition of "child" to certain stepchildren, adopted children, and illegitimate children of U.S. citizens; authorized a temporary program for the issuance of nonquota immigrant visas to certain alien orphans; provided the Attorney General discretionary authority to admit certain relatives of U.S. citizens and permanent resident aliens who would be otherwise excludable for criminal or moral grounds, for misrepresentation, or, until June 30, 1959, because of tuberculosis; and permitted the waiving of fingerprint requirements in the case of nonimmigrants.

The 5-year virtual moratorium on immigration legislation following the Immigration and Nationality Act of 1952 came to a decisive end with the enactment of the 1957 legislation. A series of bills relating to immigration was enacted in 1958, all of which liberalized the law on either a permanent or temporary basis.

The *Act of July 25, 1958* [25] authorized eligible Hungarian refugees who had been paroled into the United States to adjust to immigrant status after two years residence. The *Act of August 8, 1958* [26] amended the Immigration and Nationality Act to liberalize

[24] Congressional Record [daily ed.], August 21, 1957: 14124.
[25] Public Law 85–559; 72 Stat. 419.
[26] Public Law 85–616; 72 Stat. 546.

the "registry provision" (sec. 249), under which certain aliens illegally in the United States may be granted lawful residence, by advancing the date from which continuous residence was required from July 1, 1924, to June 28, 1940. The *Act of August 20, 1958* [27] amended the Immigration and Nationality Act to facilitate the naturalization of adopted children and spouses of certain U.S. citizens performing religious duties abroad.

The *Act of August 21, 1958* [28] amended the Immigration and Nationality Act (sec. 245) to liberalize the criteria for adjustment of status by nonimmigrants to that of permanent resident. It also extended for an additional year the provision of the Act of September 11, 1957 allowing nonquota status for certain first preference applicants.

The *Act of September 2, 1958* [29] made 1,500 special nonquota immigrant visas available to the victims of volcanic eruptions and earthquakes in the Azores, and 3,000 nonquota visas available to displaced Dutch-Indonesians.

### 86TH CONGRESS, 1959–60

Like the preceding Congress, the 86th Congress was active in the area of immigration legislation, although it stopped short of the overall immigration reform called for by President Eisenhower, as well as by both party platforms in the 1956 election campaign. Rather, the legislation enacted in the 86th Congress followed "the pattern set by previous immigration legislation passed since the enactment of the Immigration and Nationality Act of 1952 in that certain provisions amend existing law while others are set up as independent statutory provisions, although they effect the operations of the Immigration and Nationality Act." [30] This observation was made regarding legislation passed in 1959, but it is applicable to the "Fair Share Refugee Law" as well, the major legislation passed in 1960.

The major immigration legislation enacted by the 86th Congress was prompted by the humanitarian goals of facilitating the reunification of families in the immigration process, and assisting in the settlement of world refugee problems. Like the September 11, 1957 Act, the laws enacted in pursuit of these goals were compromise measures, in that they were not unacceptable to restrictionists and only partially satisfactory to those who agreed with President Eisenhower that, "In the world of today our immigration law badly needs revision." [31]

The major immigration legislation enacted in 1959 was the Act of September 22, 1959. [32] It was designed to assist in reuniting families both on a permanent basis, through amendments to the Immigration and Nationality Act, and through temporary programs. The bill originated in the House, where it was introduced by the

---

[27] Public Law 85–697; 72 Stat. 687.
[28] Public Law 85–700; 72 Stat. 699.
[29] Public Law 85–892; 72 Stat. 1712.
[30] Frank L. Auerbach, "Immigration Legislation, 1959," Department of State Bulletin, Oct. 26, 1959, p. 600.
[31] "Liberalization of Restrictions upon Immigration," H. Doc. 360, 86th Cong., 2d sess., March 17, 1960, p. 2.
[32] Public Law 86–363; 73 Stat. 644.

co-author of the McCarran-Walter Act, Representative Francis Walter, Chairman of the House Judiciary Subcommittee on Immigration. As Auerbach notes, the bill reflected the finding of the House Judiciary Committee that "the recognized principle of avoiding separation of families could be furthered if certain categories of such relatives were reclassified in the various preference portions of the immigration quotas." [33] No changes were made in the actual quotas themselves. The changes in the preference categories resulting from the Act of September 22, 1959 are shown in the following chart, reproduced from the *Department of State Bulletin:* [34]

| | Quota preferences under previous law | Quota preferences under Public Law 86–363 |
|---|---|---|
| 1st preference | 50 percent of each quota to skilled aliens and spouses and children if accompanying or following to join them. | Same. |
| 2d preference | 30 percent of each quota to parents of U.S. citizens. | 30 percent of each quota to parents and unmarried sons and daughters of U.S. citizens. |
| 3d preference | 20 percent of each quota to spouses and children of permanent resident aliens. | 20 percent of each quota to spouses and unmarried sons and daughters of permanent resident aliens. |
| 4th preference | 25 percent of portion of each quota not used by 1st 3 preference groups, to brothers, sisters, sons, and daughters of U.S. citizens. | 50 percent of the portion of each quota not used by the 1st 3 preference groups, to brothers, sisters, and married sons and daughters of U.S. citizens and their spouses and children if accompanying them. |

The legislation also amended the Immigration and Nationality Act to specifically preclude the granting of nonquota or preference status to adult aliens adopted by U.S. citizens or permanent resident aliens.

Additionally, in two temporary measures aimed at facilitating family reunification, Public Law 86–363 granted nonquota status to second, third, and fourth preference aliens who had registered and had their petitions approved by specified dates; and made nonquota visas available to certain immediate relatives of aliens who had entered the country under the Refugee Relief Act of 1953.

Other immigration legislation enacted in 1959 included the *Act of August 4, 1959*,[35] which made several changes in the naturalization provisions of the Immigration and Nationality Act exempting certain naturalized citizens from losing citizenship by residing abroad; and the *Act of September 9, 1959*,[36] which amended the Act of September 11, 1957 by extending the authority contained in that act to waive the excludability of certain aliens afflicted with tuberculosis, and to issue nonquota immigrant visas to eligible alien orphans.

The most significant immigration legislation enacted in 1960 was the "Fair Share Refugee Act," [37] also referred to as the World Refugee Year Law. In a proclamation issued May 19, 1959, President Eisenhower proclaimed the period from July 1, 1959 to June 30,

[33] Auerbach, *op. cit.*, p. 600. Quoted from H. Rept. 582, 86th Cong., 1st sess., June 26, 1959, p. 2.
[34] Auerbach, *op. cit.*, p. 601.
[35] Public Law 86–129; 73 Stat. 274.
[36] Public Law 86–253; 73 Stat. 490.
[37] Act of July 14, 1960, P.L. 86–648; 74 Stat. 504.

1960 as World Refugee Year, "as a practical means of securing increased assistance for refugees throughout the world." [38]

The legislation enacted into law originated as H.J. Res. 397, introduced by Representative Francis Walter and was, in his words, "designed primarily to eliminate the remaining camps in Europe in which refugees have resided for a long period of time." [39] The act established a temporary program, to terminate on July 1, 1962, for paroling in refugees who were under the mandate of the U.N. High Commissioner for Refugees, thereby limiting the program mainly to Western Europeans. The number of the refugee-escapees who could be admitted was limited to one-fourth of the total number resettled by other countries.

Provision was made for the adjustment of status of such refugees to that of permanent resident after a 2-year residence in the United States, providing they were otherwise eligible. This procedure was subsequently incorporated in the permanent law in the form of the provision for "conditional entry" of refugees who could adjust to permanent resident status after two years, a period shortened to one year by the Refugee Act of 1980.

The Fair Share Law was criticized by the administration and by some Members of Congress from both parties for its limited scope and temporary nature, which had been fully intentional. Supporting the legislation, Senator Eastland said during the Senate floor debate, "This is not a general refugee measure. The primary purpose of the joint resolution is to enable the United States to participate in World Refugee Year and to make a concerted effort to close the refugee camps which are still maintained in Europe, and have been since the close of World War II." [40] Objections were raised to the failure of the bill to integrate refugee admission procedures into the permanent immigration law; to the discrimination against refugees from the Middle East and Asia, who had not been generally determined as falling within the mandate of the U.N. High Commissioner; and to the "fair share" concept, which made the U.S. refugee effort proportionate to that of other countries, substituting, in Senator Hubert Humphrey's words, "a concept of 'fellowship' . . . for the concept of leadership which has been our tradition." [41]

In addition to these temporary refugee provisions, Public Law 86-648 contained provisions amending the Immigration and Nationality Act to include illicit possession of marijuana among the grounds for exclusion and deportation; and further liberalizing the provision for adjustment of status to that of permanent resident by, among other things, extending eligibility to aliens paroled into the United States. It also included temporary extensions of both the alien orphan program, and the legislation granting nonquota status to Portuguese nationals in the Azores and Dutch-Indonesians expelled from Indonesia.

---

[38] Proclamation No. 3292, in H. Rept. No. 1433, 86th Cong., 2d sess., March 29, 1960, p. 4.
[39] Congressional Record, April 5, 1960: A2997.
[40] Congressional Record [daily ed.], July 1, 1960; 14387.
[41] Congressional Record [daily ed.], July 1, 1960; 14387.

### CUBAN REFUGEES

With the fall of the Batista Government in late 1959, Cuban refugees began entering the United States in large numbers. Until diplomatic relations between the U.S. and Cuba were broken on January 1, 1961, the majority of Cubans entering this country obtained visas and entered either permanently as immigrants, or temporarily as nonimmigrants, under the provisions of the Immigration and Nationality Act. Cubans with nonimmigrant status who wanted to remain in this country requested political asylum, again through the channels provided by the 1952 legislation.[42] Those who entered without visas were generally paroled into the country under the discretionary authority of the Attorney General.

Direct Federal financial assistance for the Cuban refugees began in December 1960, when President Eisenhower authorized $1 million from the President's Contingency Fund under the Mutual Security Act of 1954, as amended, for use in establishing and operating a Cuban Refugee Emergency Center in Miami, Florida. This was largely in response to an appeal in October 1960 from a Miami citzens' committee, for financial assistance in coping with the large number of refugees entering the Miami/Dade County area.

### SUMMARY, 1953–60

Immigration and refugee policy during the period 1953–60 was characterized by tension between the restrictive provisions of the Immigration and Nationality Act, particularly the national origins quota system, and the generally perceived need for more humanitarian measures regarding admission of refugees and family reunification. In order to bypass the heavily oversubscribed quotas under the Immigration and Nationality Act, a series of temporary programs were enacted which provided for nonquota admission of refugees. These included the Refugee Relief Act of 1953, the Refugee-Escapee Act of 1957, the Fair Share Refugee Law of 1960, a series of alien orphan measures, as well as measures relating specifically to the adjustment of status of Hungarian parolees and the nonquota admission of Portuguese and Dutch-Indonesians.

There was also a series of temporary programs designed to reduce the quota backlogs by giving nonquota status to immigrants who had registered under the different preferences and had their applications approved by specified dates. Finally, during this period there was, as President Eisenhower noted, an "avalanche . . . of private bills for the relief of aliens."[43] According to Marion Bennett, "Twenty percent of all legislation introduced in the 85th Congress constituted 4,364 private immigration bills, affecting 5,282 persons. In fiscal 1958, 501 of these bills became private laws."[44]

Immigration during the decade 1951–60 totalled 2,515,479, the highest since the 1920s (see table 1). This is not surprising, since the two intervening decades included the depression of the 1930's, and World War II. Less than half—1,098,790—of the immigrants

---

[42] J. Patton Hyman, "Immigration: the Status of Cuban Refugees in the United States," University of Florida Law Review, summer 1968, p. 74.

[43] H. Doc. 329, 84th Cong., 2d sess., Feb. 8, 1956, p. 3.

[44] Bennett (1963), p. 226.

were admitted under the quota system.[45] While many came under the special temporary programs, many others entered as nonquota immigrants (e.g., from the Western Hemisphere) under the basic law.

The gradual recognition that the national origins quota system was not functioning effectively as a means of regulating immigration helped pave the way for the major policy revision which came in 1965. Permanent refugee provisions were to come èven sooner, in 1962, based with modifications on the provisions of the Fair Share Law.

TABLE 1.—*Immigration to the United States: Fiscal Years 1820–1986*

The numbers shown are as follows: from 1820–67, figures represent alien passengers arrived at seaports; from 1868–91 and 1985–97, immigrant aliens arrived; from 1892–94 and 1898–1986, immigrant aliens admitted for permanent residence. From 1892–1903, aliens entering by cabin class were not counted as immigrants. Land arrivals were not completely enumerated until 1908.

| Year: | Number |
|---|---|
| 1820–1986 | 53,122,066 |
| 1820 | 8,385 |
| 1821–30 | 143,439 |
| 1821 | 9,127 |
| 1822 | 6,911 |
| 1823 | 6,354 |
| 1824 | 7,912 |
| 1825 | 10,199 |
| 1826 | 10,837 |
| 1827 | 18,875 |
| 1828 | 27,382 |
| 1829 | 22,520 |
| 1830 | 23,322 |
| 1831–40 | 599,125 |
| 1831 | 22,633 |
| 1832 | 60,482 |
| 1833 | 58,640 |
| 1834 | 65,365 |
| 1835 | 45,374 |
| 1836 | 76,242 |
| 1837 | 79,340 |
| 1838 | 38,914 |
| 1839 | 68,069 |
| 1840 | 84,066 |
| 1841–50 | 1,713,251 |
| 1841 | 80,289 |
| 1842 | 104,565 |
| 1843 | 52,496 |
| 1844 | 78,615 |
| 1845 | 114,371 |
| 1846 | 154,416 |
| 1847 | 234,968 |
| 1848 | 226,527 |
| 1849 | 297,024 |
| 1850 | 369,980 |
| 1851–60 | 2,598,214 |
| 1851 | 379,466 |
| 1852 | 371,603 |
| 1853 | 368,645 |
| 1854 | 427,833 |
| 1855 | 200,877 |
| 1856 | 200,436 |
| 1857 | 251,306 |

---

[45] Ibid., p. 236.

| Year | Number |
|------|--------|
| 1858 | 123,126 |
| 1859 | 121,282 |
| 1860 | 153,640 |
| 1861–70 | 2,314,824 |
| 1861 | 91,918 |
| 1862 | 91,985 |
| 1863 | 176,282 |
| 1864 | 193,418 |
| 1865 | 248,120 |
| 1866 | 318,568 |
| 1867 | 315,722 |
| 1868 | 138,840 |
| 1869 | 352,768 |
| 1870 | 387,203 |
| 1871–80 | 2,812,191 |
| 1871 | 321,350 |
| 1872 | 404,806 |
| 1873 | 459,803 |
| 1874 | 313,339 |
| 1875 | 227,498 |
| 1876 | 169,986 |
| 1877 | 141,857 |
| 1878 | 138,469 |
| 1879 | 177,826 |
| 1880 | 457,257 |
| 1881–90 | 5,246,613 |
| 1881 | 669,431 |
| 1882 | 788,992 |
| 1883 | 603,322 |
| 1884 | 518,592 |
| 1885 | 395,346 |
| 1886 | 334,203 |
| 1887 | 490,109 |
| 1888 | 546,889 |
| 1889 | 444,427 |
| 1890 | 455,302 |
| 1891–1900 | 3,687,564 |
| 1891 | 560,319 |
| 1892 | 579,663 |
| 1893 | 439,730 |
| 1894 | 285,631 |
| 1895 | 258,536 |
| 1896 | 343,267 |
| 1897 | 230,832 |
| 1898 | 229,299 |
| 1899 | 311,715 |
| 1900 | 448,572 |
| 1901–10 | 8,795,386 |
| 1901 | 487,918 |
| 1902 | 648,743 |
| 1903 | 857,046 |
| 1904 | 812,870 |
| 1905 | 1,026,499 |
| 1906 | 1,100,735 |
| 1907 | 1,285,349 |
| 1908 | 782,870 |
| 1909 | 751,786 |
| 1910 | 1,041,570 |
| 1911–20 | 5,735,811 |
| 1911 | 878,587 |
| 1912 | 838,172 |
| 1913 | 1,197,892 |
| 1914 | 1,218,480 |
| 1915 | 326,700 |
| 1916 | 298,826 |
| 1917 | 295,403 |
| 1918 | 110,618 |

23

| | |
|---|---:|
| 1919 | 141,132 |
| 1920 | 430,001 |
| 1921–30 | 4,107,209 |
| 1921 | 805,228 |
| 1922 | 309,556 |
| 1923 | 522,919 |
| 1924 | 706,896 |
| 1925 | 294,314 |
| 1926 | 304,488 |
| 1927 | 335,175 |
| 1928 | 307,255 |
| 1929 | 279,678 |
| 1930 | 241,700 |
| 1931–40 | 528,431 |
| 1931 | 97,139 |
| 1932 | 35,576 |
| 1933 | 23,068 |
| 1934 | 29,470 |
| 1935 | 34,956 |
| 1936 | 36,329 |
| 1937 | 50,244 |
| 1938 | 67,895 |
| 1939 | 82,998 |
| 1940 | 70,756 |
| 1941–50 | 1,035,039 |
| 1941 | 51,776 |
| 1942 | 28,781 |
| 1943 | 23,725 |
| 1944 | 28,551 |
| 1945 | 38,119 |
| 1946 | 108,721 |
| 1947 | 147,292 |
| 1948 | 170,570 |
| 1949 | 188,317 |
| 1950 | 249,187 |
| 1951–60 | 2,515,479 |
| 1951 | 205,717 |
| 1952 | 265,520 |
| 1953 | 170,434 |
| 1954 | 208,177 |
| 1955 | 237,790 |
| 1956 | 321,625 |
| 1957 | 326,867 |
| 1958 | 253,265 |
| 1959 | 260,686 |
| 1960 | 265,398 |
| 1961–70 | 3,321,677 |
| 1961 | 271,344 |
| 1962 | 283,763 |
| 1963 | 306,260 |
| 1964 | 292,248 |
| 1965 | 296,697 |
| 1966 | 323,040 |
| 1967 | 361,972 |
| 1968 | 454,448 |
| 1969 | 358,579 |
| 1970 | 373,326 |
| 1971–80 | 4,493,314 |
| 1971 | 370,478 |
| 1972 | 384,685 |
| 1973 | 400,063 |
| 1974 | 394,861 |
| 1975 | 386,194 |
| 1976 | 396,613 |
| 1976, TQ | 103,676 |
| 1977 | 462,315 |
| 1978 | 601,442 |

24

| | |
|---|---:|
| 1979 | 460,348 |
| 1980 | 530,639 |
| 1981–86 | 3,466,114 |
| 1981 | 596,600 |
| 1982 | 594,131 |
| 1983 | 559,763 |
| 1984 | 543,903 |
| 1985 | 570,009 |
| 1986 | 601,708 |

Source: U.S. Immigration and Naturalization Service, 1986 Statistical Yearbook, Table 1.

## III. ILLEGAL IMMIGRATION AND THE BRACERO PROGRAM

In 1952, the Congress enacted the Immigration and Nationality Act restricting quota immigration to 154,657. The same year, a total of 528,815 deportable aliens were apprehended by the Immigration and Naturalization Service (INS). Two years later, in 1954, the number of deportable aliens apprehended rose to 1,089,583. During the same period, close to 200,000 temporary Mexican Bracero workers were admitted in 1952, and more than 300,000 were admitted in 1954. Participation in the Bracero program rose to a high of 445,197 in 1956, and remained above 400,000 for the rest of the decade.

Observers have commented on the apparent contradiction in our immigration policy reflected in the relatively unconcerned attitude toward both legal and illegal Mexican temporary workers, in contrast to the restrictionist attitude toward immigrants and refugees embodied in the Immigration and Nationality Act. Quoting from one author:

> With illegal immigration from Mexico rising in an almost geometric progression, the 1944–1954 decade represented a curious social paradox: the political forces clamoring for an even more restrictionist general immigration policy were either strangely silent with respect to the situation on our southern border or openly condoned it. The late Senator Pat McCarran, co-author of the Immigration and Nationality Act, whose name in most person's minds is synonymous with restrictionist immigration thinking, defended the illegal traffic over our southern border on the grounds that legal entry of Mexicans for employment in American agriculture and industry involved too much "red tape." [1]

A probable explanation for this apparent contradiction is that the Mexican temporary workers and illegal entrants were not perceived as posing a threat on national security grounds as Communist infiltrators, although this possibility was raised; nor were they perceived as permanent additions to our population.

The illegal immigration problem of this period and the Bracero program are inextricably linked, although there is considerable controversy over the cause and effect relation of this linkage. The problem of illegal immigration from Mexico was at its height during the period 1944–54, while the Bracero program began in 1942 and continued until 1964. A review of the history of the legal importation of temporary labor through 1952 follows below, as

---

[1] Eleanor Hadley, "A Critical Analysis of the Wetback Problem," Law and Contemporary Problems, Duke University School of Law, vol. XXI, spring 1965. p. 336. (Cited as Hadley (1956).)

26

background for a discussion of illegal immigration and of the subsequent course of the Bracero program.

### The Legal Admission of Temporary Workers, 1942–52

In 1942, in response to the U.S. manpower shortage arising from World War II, the United States and Mexico negotiated a treaty permitting the entry of Mexican farm workers, known as "braceros", under contract to U.S. employers with the contracts guaranteed by the U.S. Government. This emergency wartime measure was the beginning of the Bracero program, which continued under various legal authorizations for 22 years and involved approximately 5 million Mexican workers.

The detailed formal diplomatic accord negotiated with Mexico in August 1942 reflected, in part, the desire of the Mexican Government to protect its nationals. The large-scale deportation of Mexican nationals from the United States during the depression of the 1930s caused considerable political sensitivity in Mexico, and led to the enactment of legislation by the Mexican Government prescribing the conditions under which its citizens could accept foreign employment. The bilateral agreement reflected these conditions as well as the desire of the United States to protect its own workers from adverse effects due to the importation of foreign labor. The general provisions of this and subsequent related agreements were summarized as follows in the comprehensive 1950 Senate Judiciary Committee Report on Immigration and Naturalization Systems of the United States:

> These international agreements have generally provided that (1) such laborers would be exempt from selective service; (2) such laborers would be exempt for certain requirements of our immigration laws, such as literacy requirements and payment of head tax or other admission charges; (3) such laborers would be guaranteed round-trip transportation; (4) hours of work and wages would be equal to those of domestic labor in the United States; and (5) the foreign government would determine the number and types of laborers who could leave that country without adversely affecting its economy.[2]

The legislative authority for the admission of Mexican farm workers under the Bracero program was initially the ninth proviso of section 3 of the Immigration Act of 1917, which authorized a waiver of exclusion to certain inadmissible aliens—in this case contract laborers. A certification by the U.S. Employment Service that local workers were unavailable was also required as a condition of entry.

On April 29, 1943, the 78th Congress enacted Public Law 45, authorizing the U.S. Government to temporarily admit "native-born residents of North America, South America, and Central America, and the islands adjacent thereto, desiring to perform agricultural labor in the United States."[3] Public Law 45 provided the authority

---

[2] S. Rept. 1515. 81st Cong., 2d sess. p. 579.
[3] 57 Stat. 70, 73.

27

and funds for the recruitment, transportation, and placement of agricultural workers not only from Mexico but from what were then the British West Indies, notably Jamaica, and the Bahamas. It exempted foreign workers entering under its authority from a variety of provisions of the Immigration Act of 1917, including the prohibition against the admission of contract laborers, and the requirement of a bond from the employer.

Public Law 45 was the first of a series of acts during the period 1943–47 referred to as the farm labor supply appropriations acts. Together with the international agreement with Mexico, renegotiated on April 26, 1943 and at several subsequent dates, they formed the basis for the emergency labor supply program which operated under direct governmental supervision until December 31, 1947. During this period, the U.S. Government actively assisted U.S. employers in the recruitment of the Mexican workers and guaranteed the contracts.

With the lapse of the special wartime legislation at the end of 1947, the Mexican program continued to be regulated by international agreement at the specific request of the Mexican Government, in contrast to the British West Indies (BWI) and other temporary worker programs. During the period 1948–1951, the importation of workers from Mexico proceeded under a frequently revised agreement, and for a particularly stormy period in 1948–49, under no treaty at all. During this postwar period, Mexican temporary workers were admitted under the ninth proviso, as were other temporary workers, and clearance was required from the U.S. Employment Service. In contrast to the war period, the U.S. employer paid all transportation and recruitment expenses for the braceros, and the U.S. employer, rather than the U.S. Government, was the contractor.

While apparently preferable to U.S. growers, this arrangement was much less satisfactory to the Mexican Government, and of concern to our State Department because of its potential for damaging U.S.-Mexican relations. Quoting from a U.S. Labor Department history of the Bracero program, "The Mexican Government expressed concern about what it considered to be inadequate compliance measures, methods for determining the prevailing wage rate, and the lack of formal Government participation in the program as a guarantor of employers fulfilling the contracts." [4]

In 1950, the Senate Judiciary Special Subcommittee to Investigate Immigration and Naturalization considered temporary agricultural workers in its comprehensive report discussed above. The subcommittee found "that the agricultural labor supply in the United States, particularly in the Southwestern States, requires supplementation," and made the following recommendation:

> . . . provisions should be made in permanent legislation which would permit the admission of temporary agricultural labor in a nonimmigrant classification when like labor cannot be found in this country. The determination of the necessity for the importation of such labor in any

[4] U.S. Department of Labor, "The Admission of Aliens into the United States for Temporary Employment," in Study of Population and Immigration Problems, Special Series No. 11, House Judiciary Committee, Subcommittee No. 1, 1963, p. 36.

> particular instance should be made by the Commissioner of Immigration and Naturalization upon application by the interested employer before the importation and after a full investigation of the facts and consultation with appropriate agencies.[5]

This recommendation was essentially enacted into law in the Immigration and Nationality Act of 1952, and remains in effect today. However, the importation of Mexican agricultural labor was authorized by separate legislation, Public Law 78,[6] in 1951. The expiration date was extended by successive amendments until December 31, 1964.

A report issued prior to the enactment of Public Law 78, in March 1951 by President Truman's Commission on Migratory Labor, was critical of the post-war administration of the alien contract labor program. Specifically, the Commission criticized the administration of the Mexican segment of the program in terms of the failure of the responsible U.S. Government agencies to adequately protect domestic farm labor. Its conclusions in this regard were based largely on an examination of wage rates in the occupation (cotton picking) and States (California during the war; Texas, New Mexico, and Arkansas after the war) most heavily impacted by Mexican workers. They found that "changes in wages in the principal areas of employment and the principal crop of employment have been inverse to the numbers of contract Mexicans."[7] The Commission generally concluded that "alien labor has depressed farm wages and, therefore, has been detrimental to domestic labor."[8]

Considering the program in the context of national immigration policy, the Commission was equally critical:

> Thus, temporary foreign laborers passing in and out of this country with little restriction have come to substitute for a supply subject to stringent numerical restrictions, thereby furnishing the very competition to American labor that it is the purpose of the immigration law to prevent.
>
> This undermining of national policy stands out more clearly in that it has been the negotiators for foreign governments, notably of Mexico, rather than our own representatives, who have secured reasonable limitation of numbers and some protection to labor standards. While their motive is primarily to protect the standards of their own nationals working in the United States, the effect of their concern, fortunately, is also to help sustain the tenets of American policy. The contrast in this curious difference of attitudes is heightened by the fact that through the negotiations of their governments, foreign laborers have actually achieved, in most instances, better living and working conditions than domestic workers whose protection is a main concern of American immigration law.[9]

---

[5] S. Rept. 1515, 81st Congress, 2d sess., p. 586.
[6] Act of July 12, 1951; 65 Stat. 119.
[7] U.S. President's Commission on Migratory Labor, Migratory Labor in American Agriculture, Washington, 1951, p. 58.
[8] Ibid., p. 59.
[9] Ibid., pp. 64–65.

29

The responsible U.S. administrative agencies, rather than the U.S. employers or the braceros themselves, were the primary objects of the Commission's criticism. Thus, the passage quoted above is preceded by the following observation:

> . . . official vigilance for the protection of living and working standards of alien farm laborers was largely abandoned in the postwar phase. Responsible United States administrative agencies practically ceased to exert effective effort to preserve the requirements of national immigration policy. The same ineffectiveness or laxity that undermined protective standards in the contract spread also to the official scrutiny of the number of foreign laborers that employers claimed they needed.[10]

The Commission was particularly concerned about the United States' willingness to operate temporary worker programs such as the British West Indies program, without benefit of formal government-to-government agreements, which existed in the case of the Mexican Bracero program. The first recommendation by the President's Commission on Migratory Labor on the subject of alien contract labor pertained to the desirability of equal treatment of the different sending countries based on intergovernmental agreements, as follows:

We recommend that:

> (1) Foreign labor importation and contracting be under the terms of intergovernmental agreements which clearly state the conditions and standards of employment under which the foreign workers are to be employed. These should be substantially the same for all countries. No employer, employer's representative or association of employers, or labor contractor should be permitted to contract directly with foreign workers for employment in the United States. This is not intended to preclude employer participation in the selection of qualified workers when all other requirements of legal importation are fulfilled.[11]

Public Law 78, authorizing the terms and conditions of the Mexican worker program, was enacted on July 12, 1951, against the background of the reports and recommendations discussed above, and in response both to the domestic manpower shortage resulting form the Korean War, and Mexico's dissatisfaction with the terms of the 1949 agreement governing the temporary export of her workers. An amendment to the Agricultural Act of 1949, Public Law 78 evolved from legislation (S. 984–H.R. 3048, 82d Congress) originally introduced by Senator Allen J. Ellender·(D.-La.) which, he indicated, "authorized the Government to carry out its part of the agreement reached on the importation of farm agricultural workers at Mexico City in February [1951]."[12] Quoting from the Senate report on the genesis of the legislation enacted as Public Law 78:

[10] Ibid., p. 64.
[11] Ibid., p. 66.
[12] U.S. Senate Committee on Agriculture and Forestry, "Farm Labor Program," Hearings, 82d Cong., 1st sess., 1951. p. 8.

30

As an alternative method to the recruitment of farm workers in Mexico by private employers and subsequent posting of compliance bonds, it was suggested at the conference that an agency of the United States recruit such workers and that the Government of the United States guarantee compliance with the individual work contract. It was understood that the United States Government is not now authorized to undertake such a program. The United States delegation agreed to have such legislation introduced in the Congress, and since its enactment would require time for following legislative procedure, the Mexican Government agreed to continue the present international agreement until June 30, 1951.[13]

As enacted on July 12, 1951, Public Law 78 established the basic framework under which the Mexican Bracero program operated until the mid 1960's, as refined by subsequent amendments and international agreements. Public Law 78 authorized the Secretary of Labor to take certain steps to recruit and transport Mexican workers, subject to the following restrictions:

SEC. 503. No workers recruited under this title shall be available for employment in any areas unless the Secretary of Labor has determined and certified that (1) sufficient domestic workers who are able, willing, and qualified are not available at the time and place needed to perform the work for which such workers are to be employed, (2) the employment of such workers will not adversely affect the wages and working conditions of domestic agricultural workers similarly employed, and (3) reasonable efforts have been made to attract domestic workers for such employment at wages and standard hours of work comparable to those offered to foreign workers.

Among other things, the legislation in combination with the revised 1951 International Agreement which followed it, provided that the U.S. Government establish and operate reception centers at or near the Mexican border; provide transportation, subsistence, and medical care from the Mexican recruiting centers to the U.S. reception centers, and guarantee performance by employers in matters relating to transportation and wages, including all forms of remuneration.

U.S. employers were required to pay the prevailing wages in the area, and to guarantee the workers employment for three-fourths of the contract period. Additionally, they were required to provide the workers with free housing and adequate meals at a reasonable cost, and they were responsible for the round-trip cost of transportation to the U.S. Government-operated reception centers. They were also required to reimburse the Government for essential expenses of the program, including penalties for workers not returned to the reception centers.

During the course of the debate on Public Law 78, the Labor Department argued that domestic workers should be provided with

---

[13] S. Rept. 214, 82d Cong., 1st sess., 1951, p. 3.

the same benefits as those provided foreign workers, including free transportation, housing, and basic medical care. Congressman W.R. Poage (D.-Tex.), the vice chairman of the House Committee on Agriculture, argued against this position as follows:

> It seems to me that this very provision is one of the greatest safeguards that you can provide for American labor. If it, in fact, costs the employer more to bring in foreign labor, then no matter what kind of laws you write he is not going to bring in foreign labor, as long as American labor is cheaper.[14]

The exact extent of the cost differential is not clear. For instance, under the terms of Public Law 78, U.S. employers were not required to post bonds, and the workers—limited to adult males—were also exempt from both social security and income tax withholding provisions.

As enacted, Public Law 78 was restricted in its application to "agricultural workers from the Republic of Mexico." However, as originally introduced, the bill applied to "agricultural workers within the Western Hemisphere." The omission of the British West Indies (BWI) and other foreign temporary workers programs from the purview of the legislation was done at the request of U.S. employers who argued that the existing arrangements were satisfactory to all concerned.

All other temporary workers, including those entering under the BWI program, have been admitted under the terms of Public Law 414, the Immigration and Nationality Act of 1952, since it went into effect on December 24, 1952. Temporary alien workers, referred to as H-2 workers, were included in one of the categories of nonimmigrants defined under section 101(a)(15)(H), which read as follows prior to its amendment in 1986:

> (H) An alien having a residence in a foreign country which he has no intention of abandoning . . . (ii) who is coming temporarily to the United States to perform other temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country.

The H-2 temporary labor provision was administered by the Attorney General in consultation with "appropriate agencies of Government," under section 214(c), as follows, again prior to a 1986 amendment:

> The question of importing any alien as a nonimmigrant under section 101(a)(15)(H) in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval

---

[14] U.S. House of Representatives Committee on Agriculture, "Farm Labor," Hearings, 82d Cong., 1st sess., 1951, p. 16.

32

of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant.

According to the House report on the 1952 Act, the purpose of the section 101(a)(15)(H) temporary worker provision and section 214(c), which provides for its administration by the Attorney General, was to "grant the Attorney General sufficient authority to admit temporarily certain alien workers, industrial, agricultural, or otherwise, for the purpose of alleviating labor shortages as they exist or may develop in certain branches of American productive enterprises, particularly in periods of intensified production."[15]

Regulations published by the Justice Department's Immigration and Naturalization Service required Labor Department certification of the unavailability of domestic workers as a prerequisite for admitting H–2 workers, thus following the pattern established during the initial period of the temporary foreign labor programs, and after 1947. However, Labor Department certifications in the case of H–2 workers were advisory only, and could be overriden by the Justice Department, which had final authority. The H–2 provisions differed in this respect from those governing the Bracero program, under which the role of the Labor Department was considerably more extensive. This difference was explained as follows by a Labor Department representative during 1963 hearings:

> In all foreign-labor programs we have the responsibility for certification as to need and as to the conditions of employment. In other words, we certify that the conditions of employment of the temporary entrants will not adversely affect domestic workers similarly employed.
>
> In the Mexican program, we also have responsibility for carrying out the international agreement and the standard work contract. What this means is that we have the compliance responsibility. . . .
>
> In the other foreign-labor programs, our only responsibility is the certification as to the need for the workers, and that they will not adversely affect the domestics. Responsibility for the enforcement of that contract then falls within the purview of the Immigration and Naturalization Service.[16]

#### ILLEGAL IMMIGRATION, 1944–54

During the 10-year period 1934–43, apprehensions of deportable aliens by INS averaged under 12,000 a year. The number rose abruptly from 11,175 in fiscal year 1943 to 31,174 in 1944, more than doubled to 69,164 in 1945, and continued upward to 1,089,583 in fiscal year 1954 (see table 2). Despite their limitations, then as now, INS apprehension figures are the best available indication of the degree of illegal immigration. Without question, illegal immigration was very high during this period, rivaling the 1970's, although not as high as during the 1980's.

---

[15] H. Rept. 1365, 82d Cong., 2d sess., 1952, pp. 44–45.
[16] U.S. House of Representatives Committee on the Judiciary, Study of Population and Immigration Problems, Administrative Presentations (III), Special Series No. 11, 1963.

TABLE 2. ALIENS APPREHENDED, DEPORTED, AND REQUIRED TO DEPART, FISCAL YEARS 1892–1986

| Year | Apprehended | Aliens expelled | | |
|---|---|---|---|---|
| | | Total | Deported | Required to depart |
| 1892–1986 | 22,742,467 | 21,135,976 | 930,394[1] | 20,205,582 |
| 1892–1900 | NA | 3,127 | 3,127 | NA |
| 1901–10 | NA | 11,558 | 11,558 | NA |
| 1911–20 | NA | 27,912 | 27,912 | NA |
| 1921–30 | 128,484 | 164,390 | 92,157 | 72,233 |
| 1931–40 | 147,457 | 210,416 | 117,086 | 93,330 |
| 1941–50 | 1,377,210 | 1,581,774 | 110,849 | 1,470,925 |
| 1951–60 | 3,598,949 | 4,013,547 | 129,887 | 3,883,660 |
| 1951 | 509,040 | 686,713 | 13,544 | 673,169 |
| 1952 | 543,535 | 723,959 | 20,181 | 703,778 |
| 1953 | 885,587 | 905,236 | 19,845 | 885,391 |
| 1954 | 1,089,583 | 1,101,228 | 26,951 | 1,074,277 |
| 1955 | 254,096 | 247,797 | 15,028 | 232,769 |
| 1956 | 87,696 | 88,188 | 7,297 | 80,891 |
| 1957 | 59,918 | 68,461 | 5,082 | 63,379 |
| 1958 | 53,474 | 67,742 | 7,142 | 60,600 |
| 1959 | 45,336 | 64,598 | 7,988 | 56,610 |
| 1960 | 70,684 | 59,625 | 6,829 | 52,796 |
| 1961–70 | 1,608,356 | 1,430,902 | 96,374 | 1,334,528 |
| 1961 | 88,823 | 59,821 | 7,438 | 52,383 |
| 1962 | 92,758 | 61,801 | 7,637 | 54,164 |
| 1963 | 88,712 | 76,846 | 7,454 | 69,392 |
| 1964 | 86,597 | 81,788 | 8,746 | 73,042 |
| 1965 | 110,371 | 105,406 | 10,143 | 95,263 |
| 1966 | 138,520 | 132,851 | 9,168 | 123,683 |
| 1967 | 161,608 | 151,603 | 9,260 | 142,343 |
| 1968 | 212,057 | 189,082 | 9,130 | 179,952 |
| 1969 | 283,557 | 251,463 | 10,505 | 240,958 |
| 1970 | 345,353 | 320,241 | 16,893 | 303,348 |
| 1971–80 | 8,321,498 | 7,478,496 | 231,684 | 7,246,812 |
| 1971 | 420,126 | 387,713 | 17,639 | 370,074 |
| 1972 | 505,949 | 467,193 | 16,266 | 450,927 |
| 1973 | 655,968 | 584,847 | 16,842 | 568,005 |
| 1974 | 788,145 | 737,564 | 18,824 | 718,740 |
| 1975 | 766,600 | 679,252 | 23,438 | 655,814 |
| 1976 | 875,915 | 793,092 | 27,998 | 765,094 |
| 1976 TQ | 221,824 | 199,207 | 8,927 | 190,280 |
| 1977 | 1,042,215 | 897,243 | 30,228 | 867,015 |
| 1978 | 1,057,977 | 1,003,886 | 28,371 | 975,515 |
| 1979 | 1,076,418 | 992,025 | 25,888 | 966,137 |
| 1980 | 910,361 | 736,474 | 17,263 | 719,211 |
| 1981–86 | 7,560,513 | 6,213,854 | 109,760 | 6,104,094 |
| 1981 | 975,780 | 836,953 | 16,596 | 820,357 |
| 1982 | 970,246 | 823,731 | 14,154 | 809,577 |
| 1983 | 1,251,357 | 943,554 | 16,763 | 926,791 |
| 1984 | 1,246,981 | 930,539 | 18,006 | 912,533 |
| 1985 | 1,348,749 | 1,066,862 | 20,560 | 1,046,302 |
| 1986 | 1,767,400 | 1,611,471 | 22,937 | 1,588,534 |

[1] Aliens apprehended first recorded in 1925. Prior to 1960, represents total aliens actually apprehended. Since 1960, figures are for total deportable aliens located, including nonwillful crewman violators.
[2] Aliens required to depart first recorded in 1927.

Source: U.S. Immigration and Naturalization Service, 1986 Statistical Yearbook, Table 54.

34

The Bracero program has been identified as being among the causes of the upward swing in illegal entries beginning in 1944, 2 years after the program's inception. Quoting from a mid-fifties analysis:

> Apparently, the relation between this Mexican contract labor program and the spiraling illegal immigration was this: Contract workers returned with exciting tales of the money that could be earned in the United States. The next year these same workers wanted to repeat their performance and their neighbors wanted to join. The result was that there were many more Mexicans who wanted to come to the United States than there were certifications of need issued by the Secretary of Labor. Further, managing to be among the workers selected by the Mexican officials for the program characteristically required the persuasion of a bribe. Thus, it seemed to many much simpler to seek American employment on their own. Accordingly, those with experience volunteered or were persuaded to lead others.[17]

Other causes cited for the increasing number of illegal entrants during this period were the United States' economic recovery following the depression of the 1930s; the economic imbalance between the U.S. and Mexico, exacerbated by population pressure and inflation in Mexico; rapid Mexican economic development in areas immediately south of the U.S. border; and the expansion of unskilled farm labor requirements in the U.S. Southwest.[18]

The legal and illegal entry of temporary Mexican workers were also related in other ways because of the mechanics of the Bracero program. For example, the initial agreement between the United States and Mexico prohibited the contracting of Mexican workers in States where they were subject to discrimination. Texas was excluded from participation in the program on these grounds during the wartime period. However, thousands of aliens entered the United States illegally during this period, going particularly to Texas, New Mexico, and Southern California. This led, in 1947, to a process initially proposed by Mexico[19] and sanctioned by international agreement of "legalizing the illegals," which, according to the President's Commission on Migratory Labor in early 1951, "was to be the dominant feature of the Mexican alien farm-labor program not only for 1947 but also in the years since."[20] Quoting further:

> For the 3 years, 1947–49, the Mexican farm-labor program in summary amounts to this: 74,600 Mexican nationals under contract were brought from the interior of Mexico; 142,200 wetbacks already in the United States were legalized by being put under contract. Legalization of wetbacks occurred again in 1950. Meanwhile, the accelerated wetback traffic continued unabated.[21]

---

[17] Hadley (1956), p. 344.
[18] President's Commission on Migratory Labor (1951), pp. 71–73.
[19] Ibid., p. 52.
[20] Ibid., p. 38.
[21] Ibid., p. 53.

The process of legalizing the illegals took a variety of forms over the years and proceeded both under the auspices of and outside of existing legislation and international agreements. It was deplored by the President's Commission on Migratory Labor, which recommended that, "The Department of State should negotiate with the Government of Mexico such a workable international agreement as will assure its operation as the exclusive channel for the importation of Mexican nationals under contract, free from the competition of illegal migration." [22] They also recommended that:

(1) The Immigration and Naturalization Service be strengthened by (a) clear statutory authority to enter places of employment to determine if illegal aliens are employed, (b) clear statutory penalties for harboring, concealing, or transporting illegal aliens, and (c) increased appropriations for personnel and equipment.

(2) Legislation be enacted making it unlawful to employ aliens illegally in the United States, the sanctions to be: (a) removal by the Immigration and Naturalization Service of all legally imported labor from any place of employment on which any illegal alien is found employed; (b) fine and imprisonment; (c) restraining orders and injunctions; and (d) prohibiting the shipment in interstate commerce of any product on which illegal alien labor has worked.[23]

Mexico was also increasingly concerned about the continuing high level of illegal immigration, which it viewed as something of a diplomatic embarrassment and also as a form of unilateral contracting by U.S. employers. The 1951 international agreement, negotiated after the enactment of Public Law 78, was purposefully set for a duration of only 6 months, in order "to create pressure upon the Congress to take measures to eliminate illegal migrants." [24]

Attempts to pass legislation prohibiting the employment and establishing penalties for the harboring [25] of illegal aliens in 1951 and 1952 were only partially successful. The result was the Act of March 20, 1952,[26] subsequently recodified as sections 274 and 287(a)(3) of the Immigration and Nationality Act of 1952. Under the law prior to its 1986 amendment, the willful importation, transportation, or harboring of illegal aliens was a felony, punishable by a $2,000 fine or imprisonment of up to 5 years, or both. However, employment was specifically exempted from the penalties for harboring in what was popularly referred to as the Southwest or Texas proviso. During the Senate floor debate in February 1952, Senator Paul Douglas offered an amendment to provide penalties for the employment of illegal aliens if the employer had "reasonable grounds to believe a worker was not legally in the United States." It was resoundingly defeated by a vote of 69–12 following a heated debate, with the arguments similar to those used during the 1970's and 1980's for and against employer sanctions.

---

[22] Ibid., p. 66.
[23] Ibid., p. 88.
[24] Labor Department report, House Judiciary hearings (1963), p. 38.
[25] The Supreme Court had ruled that the provision in the Immigration Act of 1917 prohibiting the harboring of illegal aliens did not include a penalty, *U.S.* v. *Evans*, 333 U.S. 483 (1948).
[26] P.L. 283, 82d Cong., 2d sess., 66 Stat. 26.

In addition to being a diplomatic embarrassment to Mexico and the United States, the issue of illegal entrants became the focus of considerable press attention in the early fifties. "Time," "Life," and "The Nation" all published articles on the subject in the spring of 1951. However, during the period 1941–52, the INS border patrol was cut by 350 officers, while apprehensions increased by 4,000 percent.[27] Congress was described as being "splendidly indifferent to this whole situation on the southern border,"[28] as reflected here by the cut in the INS budget.

Congress, however, was only partially to blame, since the INS budget cuts accurately reflected Justice Department priorities. This changed in 1954, when the decision was made within the executive branch to increase the border patrol and attempt to get control of the situation. The result was Operation Wetback, an area sweep operation which simultaneously helped end the illegal alien problem of the mid-fifties, and left scars in the Mexican-American community which remain today.

The decisions leading to Operation Wetback followed a visit by Attorney General Herbert Brownell to the California border in August 1953. During the course of the trip, he described the situation as "shocking," and characterized the previous decisions to cut border patrol manpower for economy which he had himself supported 4 months previously, as "the most pennywise and pound-foolish policy I've ever seen."[29] The increase in the border patrol from 1,079 to 1,479 over the period fiscal year 1954–55 reflects the results of Attorney General Brownell's conversion.

General Joseph Swing, a former classmate of President Eisenhower's at West Point, was appointed Commissioner of INS in the spring of 1954. According to Richard Craig, General Swing "discouraged the attorney general from sending U.S. troops to the border in an effort to halt the influx,"[30] although reports on this differ as they do in general regarding the tactics of Operation Wetback.

The operation was described as follows in the 1955 INS annual report:

> "Wetbacks". A large scale task force operation in the Southwest, working in proximity of the border, accounted for a great majority of apprehensions. This "Special Mobile Force Operation" began in California in the last few days of fiscal 1954, and after the backbone of the wetback invasion was broken in California shifted to south Texas. Mobile task forces were assembled and set into action. Light planes were used in locating illegal aliens and directing ground teams in jeeps to effect apprehensions. Transport planes were used to airlift aliens to staking areas for prompt return to Mexico.
>
> Uncounted thousands of aliens departed California of their own accord during the operation. When the oper-

[27] Hadley (1956), p. 348.
[28] Ibid.
[29] Ibid., p. 350.
[30] Richard Craig, The Bracero Program. Interest Groups and Foreign Policy (Austin, University of Texas Press), 1971, p. 128. (Cited as Craig (1971).)

ation shifted to Texas, 60,456 aliens returned to Mexico through ports of entry during the first 30 days to avoid arrest. Others simply fled across the Rio Grande River.

These activities were followed by mopping up operations in the interior and special mobile force units are continuing to discover illegal aliens who have eluded initial sweeps through such cities as Spokane, Chicago, Kansas City, and St. Louis, which removed 20,174 illegal Mexican aliens from industrial jobs.

The volume of apprehensions of Mexican nationals continued to decrease following the apprehension and expulsion of large numbers of wetbacks and the mass exodus of thousands of others who departed of their own accord. Nevertheless, vigorous efforts were continued to apprehend those who managed to escape detection and those who succeeded in their attempts to enter illegally or abandoned status after legal entry. By the end of June 1955, the rate of apprehensions had dropped to 11 percent of that of June 1954, and 59 percent of those apprehended were taken into custody within 48 hours after crossing the border.[31]

The 1955 INS Annual Report concluded that, "The so-called 'wetback' problem no longer exists. . . . The border has been secured."[32] It also emphasized the future desirability of the prevention of illegal entries, as opposed to the expulsion process of which Operation Wetback was an example. Quoting:

To maintain that state of security the Service cannot afford to revert to its operational procedures in effect before the past year. The prevention of illegal entries, as the major ingredient of border control, is more difficult, requires more ingenuity, more men and equipment, but is, in the long run, more economical and more humane than the expulsion process.[33]

Without question, the Bracero program was also instrumental in ending the illegal alien problem of the mid-forties and fifties. It should be noted that throughout its duration, and particularly during the fifties, one of the major arguments used in support of the Bracero program was that it offered an alternative and, therefore, at least a partial solution to the illegal alien problem. This position was taken by both the Mexican Government and the U.S. State Department, among others. It was stated in a 1954 House report, as follows:

Reason clearly indicates that if a Mexican who wants to come to the United States for this employment can enter this country legally, with all the protection and benefits that a well-considered and well-administered employment program give him he will do so, rather than come in illegally and be deprived of the benefits of such a program

---

[31] U.S. Department of Justice, Annual Report of the Immigration and Naturalization Service, 1955, pp. 14–15.
[32] Ibid, p. 15.
[33] Ibid.

38

and any rights or standing in American courts. If, because the program is not available or is not realistically geared to the requirements of employers or workers, the Mexican seeking employment finds it's impossible or difficult to come in legally, many of them will find their own way across the long border between the United States and Mexico and get employment where they can, under whatever wages and working conditions they are able to obtain.[34]

In their accounts of Operation Wetback, Julian Samora and Richard Craig stressed the importance of "public sentiment, including that of the growers"[35] as a factor in the success of the INS operation. According to Craig:

> Based upon coordinated action of many elements at various levels, Operation Wetback was an overwhelming success. The greater part of what it accomplished was due to cooperation from grower interests. Such complicity did not come by accident. From the operation's inception, General Swing took pains to cultivate grower cooperation. Farmers were promised assistance in securing domestics and legally contracted braceros to replace wetbacks. In return, most of them cooperated.[36]

Similarly, in his comments on the success of Operation Wetback in dealing with the illegal alien problem, Ernesto Galarza indicated that a key factor was

> . . . the change in attitude of farm employers, hundreds of whom had come to accept the legal *braceros* as a practical and safe alternative [to Wetbacks] and had joined associations to procure them. By the time the operation was launched the bracero system had shown its economic and political feasibility.[37]

In his otherwise highly critical examination of the Bracero program, Galarza credits it with "the dramatic reduction, if not the total elimination, of the Wetback traffic," although by dubious means: "The [illegal] traffic became suppressed only when it became possible to assure farm employers, substantially on their terms, that they could have as many contract laborers as they might demand."[38]

The probable causal relationship between the Bracero program and the swelling illegal alien traffic which began in 1944, 2 years after the inception of the legal program, must also be kept in mind. Julian Samora, Eleanor Hadley, and others have argued that the Bracero program stimulated illegal migration to the United States, in part because more Mexicans wished to come than were legally permitted, and partly because it was often easier to enter illegally

---

[34] H. Rept. 1199, 83d Cong., 2d sess., 1954, p. 3.
[35] Julian Samora, "Los Mojados: The Wetback Story" (Notre Dame, University of Notre Dame Press), 1971, p. 52.
[36] Craig (1971), p. 129
[37] Ernesto Galarza, "Merchants of Labor, the Mexican-Bracero Story" (Charlotte, McNally & Loftin, Pub.), 1964, p. 70.
[38] Ibid., p. 255.

than legally. Samora notes that during the 22-year life of the Bracero program, over 5 million illegal aliens were apprehended, a figure exceeding the 4.8 million braceros contracted.[39]

In short, the Bracero program appears to have been simultaneously a major cause of as well as a significant cure for the illegal alien problem of this period—and Galarza and others argue that the cure was effected at a heavy price as far as the welfare of domestic farm labor was concerned.

### THE BRACERO PROGRAM: 1952-64

The use of Mexican workers under the Bracero program was considerably more extensive during the fifties than it had been during the wartime period. Statistics on the admission of Mexican, British West Indians, Bahamians, and other foreign agricultural workers during the period 1942-64 are shown in table 3. The Mexican figures, which dwarf the others, rose steadily after the enactment of Public Law 78 in 1951 until a peak of 445,197 in 1956, and remained over 400,000 until 1959, when they began a steady decline.

TABLE 3.—FOREIGN WORKERS ADMITTED FOR TEMPORARY EMPLOYMENT IN U.S. AGRICULTURE, BY YEAR AND NATIONALITY [1]

| Year | Total | Mexicans | British West Indians | Bahamians | Canadians | Others |
|---|---|---|---|---|---|---|
| 1942 [2] | 4,203 | 4,203 | | | (3) | |
| 1943 | 65,624 | 52,098 | 8,828 | 4,698 | (3) | |
| 1944 | 84,419 | 62,170 | 16,574 | 3,048 | 1,414 | [4] 1,213 |
| 1945 | 73,422 | 49,454 | 17,291 | 2,100 | 4,055 | [4] 522 |
| 1946 | 51,347 | 32,043 | 11,081 | 2,690 | 5,533 | |
| 1947 | 30,775 | 19,632 | 1,017 | 2,705 | 7,421 | |
| 1948 [5] | 44,916 | 35,345 | 2,421 | 1,250 | 5,900 | |
| 1949 | 112,765 | 107,000 | 1,715 | 1,050 | 3,000 | |
| 1950 | 76,525 | 67,500 | 4,425 | 1,800 | 2,800 | |
| 1951 | 203,640 | 192,000 | 6,540 | 2,500 | 2,600 | |
| 1952 | 210,210 | 197,100 | 4,410 | 3,500 | 5,200 | |
| 1953 | 215,321 | 201,380 | 4,802 | 2,939 | 6,200 | |
| 1954 | 320,737 | 309,033 | 2,159 | 2,545 | 7,000 | |
| 1955 | 411,966 | 398,650 | 3,651 | 2,965 | 6,700 | |
| 1956 | 459,850 | 445,197 | 4,369 | 3,194 | 6,700 | [5] 390 |
| 1957 | 452,205 | 436,049 | 5,707 | 2,464 | 7,300 | [6] 685 |
| 1958 | 447,513 | 432,857 | 5,204 | 2,237 | 6,900 | [6] 315 |
| 1959 | 455,420 | 437,643 | 6,622 | 2,150 | 8,600 | [6] 405 |
| 1960 | 334,729 | 315,846 | 8,150 | 1,670 | 8,200 | [6] 863 |
| 1961 | 310,375 | 291,420 | 8,875 | 1,440 | 8,600 | [6] 40 |
| 1962 | 217,010 | 194,978 | 11,729 | 1,199 | 8,700 | [6] 404 |
| 1963 | 209,218 | 186,865 | 11,856 | 1,074 | 8,500 | [6] 923 |
| 1964 | 200,022 | 177,736 | [7] 14,361 | (7) | 7,900 | 25 |

[1] This does not include a small number of Basques and other workers.
[2] Data for 1942–47 were obtained from USDA reports.
[3] Not available.
[4] Newfoundlanders transported.
[5] Data for 1948–61 were compiled by Bureau of Employment Security, U.S. Department of Labor.
[6] Includes 390 Japanese in 1956; 652 Japanese and 33 Filipinos in 1957; 315 Japanese in 1958; 400 Japanese and 5 Filipinos in 1959; Japanese only in 1960 and 1961; 279 Japanese and 125 Filipinos in 1962; Japanese only in 1963–64.
[7] Bahamians included with British West Indians.

Source: "The Migratory Farm Labor Problem in the United States," 87th Cong., 2d sess., S. Rept. No. 1225, Washington, p. 10, 1962; and "Farm Labor Market Developments," Bureau of Employment Security, U.S. Department of Labor, January 1964 and January 1965. U.S. Department of Agriculture. Termination of the Bracero Program, Agricultural Economic Report No. 77, Washington, June 1965, p. 5.

[39] Samora (1971), p. 19.

40

Public Law 78 was extended three times during this period; for 2 years in 1953 without amendment; for 3½ years in 1955 with only minor amendments; and for 2 years in 1958. International agreements were renegotiated with Mexico throughout this period with more or less difficulty. In 1954, for instance, there was a heated dispute between the United States and Mexico regarding Mexico's contention that the prevailing wage determination by the Labor Department was too low.

By the end of the 1950's, the Bracero program was coming under increasing attack by labor and welfare groups, including a four-member consultants' group appointed by Secretary of Labor James P. Mitchell.[40] It was argued that the Braceros were adversely affecting the wages and working conditions of domestic workers, particularly in certain areas and occupations. This position was presented by Secretary of Labor Arthur J. Goldberg who noted that in "Bracero-dominated areas" of which they had identified 80, the prevailing wage standard offered no protection to domestic workers since the prevailing wage was in fact set by the Braceros themselves. Quoting Secretary Goldberg:

> And what happens there is that the wage level, which we have been able to fix since the standard was adopted, has remained stationary for 10 years at a time when throughout the country the domestic farm-labor rate has been increasing. And there is no domestic labor really available at the wages which prevail there.
>
> I think the increase in the wages of domestic farm labor since 1946, if I remember correctly, has been 46 percent throughout the country—46 percent wage increases.
>
> Yet in these areas, the wage has remained stationary.[41]

Secretary Goldberg indicated that the Kennedy administration was not advocating termination of the Bracero program. However, they were seeking several substantive and controversial amendments. One of them—the statutory limitation of Braceros to temporary or seasonal agricultural work, excluding the operating of machines and certain processing functions—was adopted. However, an amendment requiring that wages offered Braceros be based on 90 percent of the statewide or national average, in order to afford protection to "Bracero-dominated areas," was dropped in conference. As noted below, a related measure was adopted administratively the following year. The 1961 legislation extended Public Law 78 through December 31, 1963 and contained the last substantive amendment made to this legislation.

President John F. Kennedy indicated in October 1961 that he was signing the legislation extending the Bracero program through December 31, 1963 reluctantly:

> The adverse effect of the Mexican farm labor program as it has operated in recent years on the wage and employment conditions of domestic workers is clear and cumulative in its impact. We cannot afford to disregard it. We do

[40] U.S. Senate Committee on Agriculture and Forestry, "Extension of Mexican Farm Labor Program," Hearings, 87th Cong., 1st sess., 1961, pp. 267–284.
[41] Ibid., p. 230.

41

not condone it. Therefore, I sign this bill with the assurance that the Secretary of Labor will, by every means at his disposal, use the authority vested in him under the law to prescribe the standards and to make the determinations essential for the protection of the wages and working conditions of domestic agricultural workers.[42]

In response to this direction, the Labor Department held public hearings in all States using foreign workers, and in May 1962 set an adverse-effect rate for each State which employers were required to offer foreign workers. Adverse-effect rates were the minimum wage rates which the Department of Labor determined had to be offered and paid by the employers of temporary alien agricultural workers in order to prevent their employment from having an adverse effect on the wages of U.S. workers who were similarly employed.

In the majority of cases, the adverse-effect rates were higher than the prevailing rates. Where piece-rates were paid, the hourly earnings had to equal the established adverse-effect rates. Since U.S. employers were required to offer domestic workers wages equal to foreign workers as a prerequisite for labor certification, these adverse-effect wage scales were also applicable to domestic workers in cases where farmers intended to seek foreign workers.

In 1963, the Kennedy administration proposed a 1-year extension of the Bracero program. A 2-year extension was defeated in the House on May 29, 1963 by a vote of 158–174. On August 15, a 1-year extension with amendments favored by the Labor Department but opposed by the growers, passed the Senate by a vote of 62–25. An unamended 1-year extension passed the House on October 31 by a vote of 173–160, and the Senate agreed to the House provisions, by 50–36, on December 4, 1963. The bill, extending Public Law 78 until December 31, 1964 without amendment, was signed into law December 13, 1963 (Public Law 88–203).

After the House defeat in May of the 2-year extension, the legislative alternatives presented to the proponents of the Bracero program were quite limited. They were essentially given their choice of a 1-year extension, with or without amendments, or nothing. In bringing the bill to the Senate floor, Senator Ellender promised that he would not seek a further extension of the program in 1964.

However, it was generally assumed by proponents of the program during the 1963 debates that, barring insuperable objections by the Mexican Government, the importation of Mexican workers would continue under the authority of Public Law 414, the Immigration and Nationality Act.

In fact, on December 19, 1964, Secretary of Labor Willard Wirtz published regulations which made it clear that it was not the intention of the Labor Department that the Bracero program continue under the auspices of Public Law 414.

There was a strong reaction to these regulations in the Congress, including a move in 1965 to legislatively transfer responsibility for the certification of temporary alien agricultural workers from the Department of Labor to the Department of Agriculture. This was

---

[42] Quoted in S. Rept. No. 391, 88th Cong., 1st sess., 1963, p. 13.

defeated in the Senate by a vote of 46–45, with the initial tie vote broken by Vice President Hubert Humphrey.[43] Secretary Wirtz prevailed in his intention to prevent the continued importation of temporary Mexican workers under the H–2 provision of the Immigration and Nationality Act.

Apprehensions of illegal aliens began mounting steadily with the termination of the Bracero program in the mid-sixties. Quoting from the INS 1970 annual report:

> Since the expiration of the Mexican Agriculture Act on December 31, 1964, the number of deportable aliens located has continued an upward climb. For the 6-year period, fiscal years 1965–70, 71 percent of the 1,251,466 total deportable aliens located were of Mexican nationality. Year by year, the annual percentage of this nationality group has risen, from 50 percent in 1965 to 80 percent this year.[44]

The patterns of employment which grew up during the Bracero period, as well as the elimination of the legal channels for temporary employment provided by the program, were viewed by many as significant factors in the growing illegal migration problem, discussed in section VIII below.

---

[43] Food and Agriculture Act of 1965, Congressional Record, Sept. 13, 1965: 23504–23530.
[44] U.S. Department of Justice, Annual Report of the Immigration and Naturalization Service, 1970, p. 11.

## IV. IMMIGRATION AND REFUGEE LEGISLATION, 1961–64

The patterns established in the fifties regarding immigration policy and legislation continued into the early sixties. The Immigration and Nationality Act of 1952, including the national origins quota system, determined the basic policy in the area.

In the omnibus 25-section *Act of September 26, 1961,*[1] Congress continued its previous pattern of combining amendments to the 1952 Act—some of which were of major importance—with a temporary provision for the nonquota admission of specified groups of aliens outside the provisions of the permanent law. Further, like much of the immigration legislation enacted in the period following the 1952 Act, Public Law 87–301 was a compromise measure containing provisions aimed at both liberalizing and tightening the regulation of immigration, reflecting the highly divergent views on immigration policy within the Congress.

Among the liberal amendments were permanent provisions closely related to those which had previously been enacted on a temporary basis, granting nonquota status to adopted alien orphans. Like the prior series of temporary provisions, the amended permanent law covered children who were adopted abroad or who were coming to the United States for adoption, although without provision for children adopted abroad by proxy. Prior temporary statutes allowing the admission of aliens afflicted with tuberculosis who were close relatives of U.S. citizens or permanent resident aliens also became part of the permanent law.

The 1961 Act liberalized the quota provisions of the Immigration and Nationality Act in two minor but significant respects. It eliminated the ceiling of 2,000 on the aggregate quota of the Asia-Pacific triangle, and it provided that whenever one or more quota areas have a change of boundaries which might lessen their aggregate quota—such as the West Indian Federation, which was about to be granted independence—they were to maintain the quotas they had before the change took place. The law also eliminated the requirement that a visa applicant state in his application his race and ethnic classification.

One of the most controversial changes in the Immigration and Nationality Act since its enactment was the addition in 1961 of a new section 106 to establish a statutory form of judicial review of deportation and exclusion orders. The provision was generally viewed as a conservative measure and was prompted by the concern of the Justice Department and congressional committees about what they viewed as an exploitation of the various judicial remedies by some aliens seeking to delay or pevent deportation. Accordingly, provisions were adopted intended to prevent repeated

---

[1] Public Law 87–301; 75 Stat. 650.

44

proceedings in the U.S. district and appeals courts, and to generally speed up judicial review of both deportation and exclusion proceedings. In minority views appended to the report on the bill from which the final legislation evolved, House Judiciary Committee Chairman Emanuel Celler and two colleagues summed up their objections as follows: "Because the bill creates unnecessary hardships for many aliens, because it denies access to the district courts for relief and forces the aggrieved alien to go into the court of appeals, and because it narrows relief to a writ of habeas corpus and eliminates relief by declaratory judgment in exclusion cases, we are opposed to the bill." [2]

Additional provisions of the omnibus 25-section act codified as parts of the Immigration and Nationality Act provisions of prior laws granting waivers to certain aliens who were excludable on various grounds, such as conviction for a petty offense; and provisions relating to exchange visitors. It barred the derivation of immigration benefits from sham marriages. Additionally, it contained a number of amendments to the naturalization provisions of the permanent law.

Both the Act of September 26, 1961 and the Act of October 24, 1962 [3] established temporary programs allowing nonquota status for backlogged preference cases, following the precedent set by the series of similar enactments in the fifties. The 1961 Act applied to beneficiaries of second and third preference petitions, and the 1962 Act applied to beneficiaries of first and fourth preference petitions, all filed by specified dates.

The willingness of the Congress to enact these special nonquota programs to relieve backlogged preferences under the quota system appears to reflect a gradual shift in focus, at least on an ad hoc basis, from the regulation of immigration on the basis of national origins to a regulation based on the values represented by the preference system—the admission of aliens with needed skills, and the reunification of families. These values, in reverse order, were soon to become the dominant, rather than the subordinate, themes of our immigration policy under the major amendments to the Immigration and Nationality Act enacted in 1965.

In addition to the temporary program providing nonquota status for backlogged first and fourth preference cases, the Act of October 24, 1962—the last significant immigration enactment before the 1965 amendments—also amended the Immigration and Nationality Act relating to suspension of deportation by redefining the classes of eligible aliens.

Besides the Migration and Refugee Assistance Act of 1962, discussed below, the only other immigration legislation enacted in the 87th and 88th Congresses was the final extension of the Mexican Bracero program until December 31, 1964. Also of importance during this period was the series of hearings by House Judiciary Subcommittee No. 1, which had jurisdiction over immigration. They were announced by Subcommittee Chairman Francis Walter on June 27, 1962, 10 years after the enactment of the 1952 legislation, "to guide the Congress in the consideration of any revision of

[2] H. Rept. 565, 87th Cong., 1st sess., 1961, p. 36.
[3] P.L. 87-885; 76 Stat. 1247.

45

our immigration policy." [4] The hearings continued after Congressman Walter's death under the chairmanship of Congressman Michael Feighan, until September 1964, resulting in 18 volumes of hearings which covered all aspects of immigration, with special emphasis on population-related issues.

### CUBAN REFUGEES AND 1962 REFUGEE LEGISLATION

During the period 1961–62, refugees entered the United States in substantial numbers from Cuba, and also from Hong Kong. Cuban refugees began entering the United States in late 1959. Diplomatic relations between the United States and Cuba were severed January 1, 1961, meaning that Cubans could no longer obtain visas to enter this country except through a third country. About this time, the U.S. Government adopted whosesale a practice of paroling the refugees into the country. Up until June 30, 1961, only 4,000 Cubans had been paroled into the United States; 58,530 were paroled during the next 12 months. The number of Cubans entering decreased with the cessation of commercial flights between Havana and Miami following the missile crisis of October 1962, although refugees continued to enter, some coming in small boats across the straits of Florida.

In January 1961, President Kennedy issued a directive officially establishing the Cuban Refugee Program as a part of the U.S. Department of Health, Education and Welfare. An additional $4 million was authorized from the Mutual Security Contingency Fund for use through June 30, 1961. During fiscal 1962, financing was provided from the President's Contingency Fund under the Foreign Assistance Act of 1961, as amended. In June of 1962, the Migration and Refugee Assistance Act was enacted, and funds for the program were appropriated by Congress under the authority of this Act until the program's phaseout under the Refugee Act of 1980.

The Hong Kong refugee situation, intensified by the famine in China, was also a matter of considerable concern during this period, and the subject of a series of hearings by the Senate Judiciary's Subcommittee on Refugees and Escapees, chaired by the late Senator Philip Hart. In May 1962, the President and Attorney General agreed to parole in approximately 15,000 Chinese refugees from Hong Kong. This was followed by the admission of a group of Chinese orphans from Hong Kong who were adopted in the United States.

As a member of both the House and Senate, President Kennedy had taken a particular interest in immigration and refugees. He introduced the Senate bill eventually enacted as the Act of September 11, 1957, and in 1959 he introduced a joint resolution broadening the authority of the Attorney General to cope with the admission of refugees on a permanent basis. As a member of the House in 1952, he had voted against the Immigration and Nationality Act, and during the 1960 Presidential campaign, he stressed the need for a major revision of our immigration law.

---

[4] Hon. Francis Walter, Study of Immigration and Population Problems, Congressional Record, [daily ed.], June 27, 1962: 11128.

46

During his brief term in Office before his assassination in November 1963, President Kennedy sponsored major legislation relating to both refugees and immigration. The Kennedy administration's refugee bill was enacted with amendments as the Migration and Refugee Assistance Act of 1962.[5] In his transmittal letter, President Kennedy outlined four principles underlying the bill he was proposing, as follows:

1. The United States, consistent with the traditional humanitarian regard of the American people for the individual and for his right to a life of dignity and self-fulfillment, should continue to express in a practical way its concern and friendship for individuals in free world countries abroad who are uprooted and unsettled as the result of political conditions or military action.

2. The successful reestablishment of refugees, who for political, racial, religious or other reasons are unable or unwilling to return to their country of origin or of nationality under conditions of freedom, dignity, and self-respect, is importantly related to free world political objectives. These objectives are: (a) continuation of the provision of asylum and friendly assistance to the oppressed and persecuted; (b) the extension of hope and encouragement to the victims of communism and other forms of despotism, and the promotion of faith among the captive populations in the purposes and processes of freedom and democracy; (c) the exemplification by free citizens of free countries, through actions and sacrifices, of the fundamental humanitarianism which constitutes the basic difference between free and captive societies.

3. Some refugee problems are of such order of magnitude that they comprise an undue burden upon the economies of the countries harboring the refugees in the first instance, requiring international assistance to relieve such countries of these burdens.

4. It is important to assist in the movement of persons to developing countries in need of manpower—the most valuable asset of the free world. The contributions of the United States, together with other free nations, to international migration assistance programs, not only helps build and strengthen developing countries and thus the free world, but it enlarges the opportunities of individuals to live useful, productive lives.[6]

The bill separated from the foreign aid legislation and consolidated in one law existing and new authorizations to conduct and appropriate funds to support United States assistance programs for refugees, escapees, and other selected persons. As enacted on June 28, 1962, the bill also included a House floor amendment offered by Congressman Francis Walter removing the expiration date from the Refugee Fair Share Law, Public Law 86–648. The effect of this was to make permanent the Attorney General's authority to parole

---

[5] Act of June 28, 1962; P.L. 87–510; 76 Stat. 121.
[6] H. Rept. No. 1066, 87th Cong., 1st sess., Aug. 29, 1961, p. 4.

47

in refugees who came under the mandate of the U.N. High Commissioner for Refugees. Prior to the repeal of the provision in 1965, approximately 19,700 persons entered the country under this parole authority.

Abba Schwartz, who was appointed by President Kennedy as Assistant Secretary of State with authority over the Bureau of Security and Consular Affairs, a position created by the 1962 legislation, commented on the general significance of the Migration and Refugee Assistance Act as follows:

> Enactment of this statute was significant, because for the first time in our Nation's history it gave the President and the executive branch a broad and flexible mandate, on a permanent basis, in conducting refugee affairs. It not only sanctioned those affairs of state regularly associated with continuing refugee matters, but it also permitted the President to respond instantly to emergency refugee needs in any part of the world. In omitting any special reference to refugees from communist dominated areas and "cold war" responsibilities on the part of the free world, the statute also broadened our national perspective on the origin and cause of refugee movements, and implied our willingness to assist all who have fled their homes. This was important in view of developing refugee problems in Africa and elsewhere.[7]

### THE KENNEDY ADMINISTRATION IMMIGRATION REFORM BILL

On July 23, 1963, President Kennedy submitted to the 88th Congress his administration's proposals for "revising and modernizing our immigration law," of which the most important was the repeal, after a 5-year phaseout period, of the national origins quota system. Quoting from his transmittal letter:

> The most urgent and fundamental reform I am recommending relates to the national origins system of selecting immigrants. . . .
>
> The system is based upon the national origins of the population of the United States in 1920. The use of the year 1920 is arbitrary. It rests upon the fact that this system was introduced in 1924 and the last prior census was in 1920. The use of a national origins system is without basis in either logic or reason. It neither satisfies a national need nor accomplishes an international purpose. In an age of interdependence among nations, such a system is an anachronism, for it discriminates among applicants for admission into the United States on the basis of accident of birth.[8]

President Kennedy proposed that the existing quotas be reduced by 20 percent a year. The released and unused quota numbers were to be placed in a "quota reserve pool," to be made available under

---

[7] Abba Schwartz, "The Open Society" (New York, Simon & Schuster), 1968, p. 142. (Cited as Schwartz (1968).)

[8] President's Immigration Message to the Congress, July 23, 1963; reprinted in Schwartz (1968), pp. 210–211. The quotes in the discussion immediately following are from this message.

48

a revised preference system which continued to place first priority on "the skills of our immigrants and their relationship to our needs," followed by preferences based on "the family relationship between immigrants and persons already here, so that the reuniting of families is encouraged." This system was to regulate the distribution of all the visa numbers after the 5-year phaseout was completed. During this interim period, a number of safeguards were provided to "ensure that the pattern of immigration is not distorted by excessive demand from any one country."

One of the more controversial features of the legislation proposed by the Kennedy administration was the creation of a seven-man immigration board, to be composed of two Members each of the House and Senate, and three members appointed by the President. The immigration board's functions were to include "formulating recommendations regarding the use of the quota reserve pool" and making "a continuous study of our immigration policy."

The proposed immigration board is reminiscent of the Commission on Immigration and Naturalization proposed 10 years earlier by the Truman Commission. Like the earlier Commission, it appears to reflect distrust by the more liberal executive branch of conservative congressional views on immigration policy. The immigration board proposed in President Kennedy's bill would have had considerably less power than the Commission proposed 10 years previously. However, it was not included in the 1965 legislation, discussed in the following section, which evolved directly from the proposals introduced at President Kennedy's request in July 1963.

Other features of particular interest were the repeal of the "special discriminatory formula" relating to the Asia-Pacific triangle; the according of nonquota status to the parents of U.S. citizens; and the continued nonquota status for Western Hemisphere countries, including the newly independent Jamaica, Trinidad and Tobago, which had not been granted nonquota status.

In editorials praising the administration's immigration proposals both the Washington Post [9] and the New York Times [10] pointed out that the President's proposals did not represent a significant increase in the number of immigrants who would be admissible annually, nor was this among the President's stated purposes. The *Times* quoted as follows from President Kennedy's 1958 book, *A Nation of Immigrants*: "The most serious defect in the present law is not that it is restrictive but that many of the restrictions are based on false and unjust premises." The labels "restrictionist" and "antirestrictionist" used throughout the fifties tended to blur the real nature of the difference between the opponents and proponents of the national origins quota system. President Kennedy's opposition to this system in no way meant that he was committed to unrestricted immigration, as his bill clearly demonstrated.

The administration bill was introduced as S. 1932 on July 24, 1963 by Senator Philip Hart and 26 cosponsors. In the House it was introduced on July 23, 1963 as H.R. 7700 by Congressman Emanuel Celler. However, hearings were not held until after President Kennedy's death.

---

[9] "Immigration: A Sea Breeze," Washington Post, July 24, 1963, p. A16.
[10] "A New Immigration Law," New York Times, July 25, 1963, p. 24.

In his State of the Union Message on January 8, 1964, President Lyndon Johnson emphasized his commitment to the goals of the Kennedy Administration bill, as follows:

> We must lift by legislation the bar of discrimination against those who seek entry into our country, particularly those with much-needed skills and those joining their families. In establishing preferences, a Nation that was built by the immigrants of all lands can ask those who now seek admission: "What can you do for your country?" But we should not be asking: "In what country were you born?" [11]

He reemphasized this commitment in a meeting of key members of the House and Senate and representatives of interested organizations on January 13, 1963.[12]

On that same day, hearings were held by the Senate Judiciary Committee under the acting chairmanship of Senator Edward Kennedy. The hearings were brief, and the record was not published. The first witness was Senator Philip Hart, the chief sponsor of the Administration bill, who argued for the repeal of the provisions of the current law based on race and national origins, as follows:

> Discriminatory provisions against immigrants from eastern and southern Europe, token quotas for Asian and African countries, and implications of race superiority in the Asian-Pacific Triangle concept have no place in the public policy of the United States.
>
> A newcomer should not arrive at our nation's door, hat in hand, apologizing for his parentage or birthplace. This is the great vice of the national origins quota system.
>
> True, we need a careful selection of immigrants. We should discriminate—but not with irrational concepts founded on the theories of ethnic superiority.
>
> Congress must enact a statute that will be discriminatory in the best meaning of the world—on the grounds of security and economic and scientific benefit; on the principles of family unity and asylum to the homeless and the oppressed.[13]

Hearings were held by House Judiciary Subcommittee No. 1, with jurisdiction over immigration, beginning in June 1964 under the chairmanship of Congressman Michael Feighan, who was opposed to aspects of the administration bill, although not ultimately to the repeal of the national origins quota system.

The 88th Congress adjourned without further action beyond the hearing stage. However, the introduction of the Kennedy administration bill and the subsequent hearings had begun the process which led to the enactment of the major 1965 amendments.

---

[11] Congressional Record, Jan. 8, 1964: 115.
[12] Schwartz (1968), p. 118.
[13] Quoted by Edward M. Kennedy, "The Immigration Act of 1965." The Annals of the American Academy of Political and Social Science, vol. 367, Sept. 1966, p. 141.

## V. THE IMMIGRATION AND NATIONALITY ACT
### AMENDMENTS OF 1965 AND THEIR AFTERMATH, 1965–68

The Immigration and Nationality Act Amendments of 1965, signed into law on October 3, 1965,[1] repealed the national origins quota system which had formed the basis for the numerical restrictions on immigration since the 1920s. According to one authority on the subject, "The Act of October 3, 1965 represents the most far-reaching revision of immigration policy in the United States since the First Quota Act of 1921." [2]

In terms of policy, the 1965 amendments overshadow the major 1952 recodification, despite the fact that they were enacted within the framework of the 1952 Act. The 1952 Act carried forward the national origins quota system as our basic mechanism for numerical restriction, reaffirming, the importance of nationality and ethnic considerations as determinants of our immigration policy. The 1965 amendments rejected these principles, substituting a system of priorities based primarily on reunification of families and needed skills.

It was not the intent of the 1965 legislation to significantly increase the number of immigrants who would be admissible. Throughout the 1965 debates, it was emphasized that the repeal of the national origins quota system as the basis for numerical restriction, not the elimination of numerical restriction itself, was the primary object of the legislation. Quoting from Senator Edward M. Kennedy, floor manager during the debate:

> This bill is not concerned with increasing immigration to this country, nor will it lower any of the high standards we apply in selection of immigrants. The basic change it makes is the elimination of the national origins quota system, in line with the recommendations of the last four Presidents of the United States, and Members of Congress from both parties.[3]

Far from diminishing the importance of the concept of numerical restriction as part of our immigration policy, the 1965 Act in its final form imposed an annual ceiling of 120,000 on Western Hemisphere immigration, which had previously been numerically unrestricted.

The repeal of the national origins quota system had, as Senator Kennedy noted during the debate, been urged by four successive Presidents, beginning with President Truman's impassioned veto message. In an article published the following year, Senator Kennedy pointed out "that a truly concerted effort" to eliminate the

---

[1] Public Law 89–236; 79 Stat. 911.
[2] Harper (1975), p. 38.
[3] Congressional Record, September 17, 1965: 24225.

quota system "began with the works of President Truman's Commission on Immigration and Naturalization and its historic report, *Whom We Shall Welcome.*" [4] However, the system remained essentially unbudgeable throughout the fifties. The primary option open to its opponents were end-runs around the system in the form of temporary special programs for the admission of refugees, and to relieve preference backlogs. These programs, combined with increasingly extensive "tinkering with the machinery" of the 1952 Act, constituted the legislative history of our immigrant policy between 1952 and 1965.

Supporters of the McCarran-Walter Act viewed this succession of special programs, in combination with the nonquota provisions of the 1952 Act itself, as major factors leading to the final demise of the national origins quota system. Noting that "almost half a million immigrants were permitted to come in as special exceptions to the national-origins formula" [5] during 1953–64, Marion T. Bennett observed:

> Whether by design or circumstance, Congress had, in a 12-year period, by legislative exception to the McCarran-Walter Act of 1952, abandoned the national-origins quota selection system without repealing it outright. It was dead. Its obituary was in the statute books, and its life's failures were delineated in the statistics of the Immigration and Naturalization Service on immigrant admissions for 36 years. It remained only for a successor system of immigrant selection to be identified by formal public law. [6]

The House report on the 1965 legislation made a related observation, as follows:

> The national origins system has failed to maintain the ethnic balance of the American population as it was designed and intended since the nations favored with the high quotas have left their quotas largely unused. Immigration statistics establish that only one of every three immigrants, during the last two decades, actually was admitted to the United States as a quota immigrant under the national origins system. [7]

In addition to this perceived ineffectiveness of the national origins quota system, the circumstances which led to its repeal in 1965 were a complex combination of changing public perceptions and values, politics, and legislative compromise. Public support for the repeal of the national origins quota system reflected genuine changes in public attitudes toward race and national origins. The 1965 immigration legislation was as much a product of the mid-sixties, and the heavily Democratic 89th Congress which also produced major civil rights legislation, as the 1952 Act was a product of the Cold War period of the early 1950's. Senator Edward Kenne-

---

[4] Kennedy, Annals. 1966, p. 138.
[5] Marion T. Bennett, "The Immigration and Nationality (McCarran-Walter) Act of 1952 as Amended to 1965," The Annals of the American Academy of Political and Social Science, vol. 367, September 1966, p. 134.
[6] Ibid., p. 136.
[7] H. Rept. No. 745, 89th Cong., 1st sess., Aug. 6, 1965, p. 11.

52

dy, the Senate floor leader for the 1965 immigration amendments, analyzed the question "as to why Congress acted in 1965" as follows:

> There is little doubt that of key importance was the unusual parliamentary situation in Congress, where the large Democratic majority was generally responsive to the spirit, if not the letter, of the administration's proposal. Republican leaders were also ready to act on the issue. Moreover, in the Judiciary Committees of both Houses, the balance of power lay with those who long worked for reform, or who readily recognized the need for changes in policy governing the admission of immigrants. And in the executive branch, for the first time in more than a decade, the White House, under both President Kennedy and President Johnson, was deeply committed to basic reform and actively mobilized its forces to see it through.
>
> The legislative history of the bill, especially the drawing of a consensus which, in effect, neutralized any significant opposition both within and without the Congress, generated an atmosphere receptive to reform which was consonant with changing attitudes among our citizens on questions of race and national origin. And not to be forgotten in any list of reasons is the tremendous effort put forth by the several private organizations, whose many years of work throughout the country were helping to bring the hope of reform into reality.[8]

As Senator Kennedy notes, the compromise and accommodation which went on throughout the processing of the legislation was of considerable importance in neutralizing the opposition. In its final form, the bill contained several key provisions—specifically, the Western Hemisphere ceiling, and the labor certification provision—which made the bill acceptable to those who feared increased immigration and adverse competition from immigrants in the labor market. Without question, these amendments were essential to the bill's final enactment.

The imposition of a ceiling on Western Hemisphere immigration represented a departure from past immigration policy that was second in importance only to the repeal of the national origins quota system. The ceiling was highly controversial and the background leading to its adoption is discussed briefly below.

The inclusion of a numerical restriction on Western Hemisphere immigration in the 1965 amendments was the result of a growing concern that immigration would increase significantly as a result of population pressure in Latin America, combined with political considerations relating to the passage of the legislation. The political situation at the time is described as follows in a House Judiciary Committee report:

> To a considerable extent, passage of the provision for a ceiling on Western Hemisphere immigration came about because a sufficient number of those opposed to it agreed

---

[8] Kennedy, Annals, 1966, p. 149.

53

to accept it as the price that had to be paid in order to ensure passage of legislation abolishing the national origins quota system which dated back to the 1920's. This latter goal was the primary purpose of the 1965 legislation since its inception, and this emphasis accounts in large part for the very limited consideration given to the actual implementation of the Western Hemisphere ceiling during the 1965 debate.[9]

However, the final inclusion of the ceiling in the enacted bill was not simply a quid pro quo in exchange for abolishment of the national origins quota system. The debate for and against the ceiling turned basically on the issue of how many more immigrants would be entering this country, on the one hand, versus foreign policy considerations on the other. There is considerable evidence that the majority in the Congress, as well as the American public, were in favor of restricting rather than liberalizing immigration, and felt that a ceiling on Western Hemisphere immigration was thus necessary. A Harris poll, cited in the Washington Post on May 31, 1965, indicated that those polled were against allowing more people in the United States by a margin of 2 to 1.[10]

The argument in favor of a quota on Western Hemisphere immigration given the most weight was population pressure. It was noted in the "Additional Views" appended to the House Judiciary Committee report on the 1965 legislation that:

> The most compelling reason for placing a numerical ceiling upon the Western Hemisphere relates to the worldwide population explosion and the possibility of a sharp increase in immigration from Western Hemisphere countries. Testimony before the Judiciary Committee identified Latin America as the area of greatest future population growth.[11]

In opposition, the Johnson administration was strongly against the imposition of a ceiling on foreign policy grounds. The argument that such a ceiling would, in the words of Representative Emanuel Celler, "muddy the waters of foreign affairs,"[12] combined with support for the administration in its judgment on the conduct of foreign policy, formed the basis for the case against a numerical ceiling on Western Hemisphere immigration.

As enacted, the 1965 amendments provided for a ceiling of 120,000 on Western Hemisphere immigration to go into effect July 1, 1968 "unless legislation inconsistent herewith" was enacted. At the same time, the 1965 Act created a Select Commission on Western Hemisphere Immigration which was instructed to recommend "whether, and if so how, numerical limitations should be imposed upon immigration to the United States from the nations of the Western Hemisphere."

---

[9] H. Rept. 94-1553, 1976, p. 2.
[10] Immigration, Hearings before the Subcommittee on Immigration and Naturalization of the Committee on the Judiciary, Senate, 89th Cong., 1st sess., 1965, Part 2, pp. 666–667.
[11] H. Rept. 745, 89th Cong., 1st sess., 1965, p.48.
[12] Congressional Record [daily ed.], Aug. 25, 1965; 20955.

54

The Select Commission had serious reservations about the ceiling, and recommended that the effective date be postponed for a year in order to permit further study. This recommendation was not acted on, and the ceiling went into effect on July 1, 1968.

### Legislative History of the 1965 Amendments

The legislative history of the Immigration and Nationality Act Amendments of 1965 is complex, convoluted, and in some respects, controversial, primarily because a clear consensus was not initially present among the major parties involved. The following is intended only as a brief summary of the key legislative events.

Legislative activity leading to the final enactment of Public Law 89–236 began during the first session of the 88th Congress, with President John Kennedy's message to Congress on July 23, 1963 recommending extensive reforms in the immigration law, including the abolition of the national origins quota system. Companion bills implementing these recommendations were introduced by Senator Philip Hart (S. 1932) and Representative Emanuel Celler (H.R. 7700). During the second session of the 88th Congress, hearings were held on the Senate side by the Immigration and Nationality Subcommittee of the Senate Judiciary Committee, with Senator Edward Kennedy as acting chairman; and on the House side by Judiciary Subcommittee No. 1, chaired by Representative Michael Feighan. The 88th Congress adjourned without further action on the bills.

On January 13, 1965, at the opening of the 89th Congress, President Lyndon Johnson sent a message to Congress (House Document 52) reaffirming his support of immigration reform. Companion bills, similar to the earlier Kennedy administration bill, were introduced by Senator Philip Hart and 33 cosponsors (S. 500) and by Representative Emanuel Celler (H.R. 2580). The Senate Judiciary Subcommittee on Immigration and Nationality, again with Senator Kennedy as acting chairman, began open hearings on February 10, 1965 and concluded them on August 3, with a total of 56 witnesses testifying before the subcommittee. House hearings, held by Judiciary Subcommittee No. 1 under the chairmanship of Representative Feighan, began March 3 and ended June 1, 1965.

On August 6, the full House Judiciary Committee favorably reported H.R. 2580, with amendments (H. Rept. 745). While the amended version of H.R. 2580 abolished the national origins quota system and retained non-quota status for Western Hemisphere countries, it differed substantially from the administration bill, reflecting the influence of a substitute bill, H.R. 8662, introduced by Subcommittee Chairman Michael Feighan June 1, 1965. The reported bill passed the House August 25 after 2 days of debate by a roll call vote of 318 to 95. An amendment offered by Representative Clark MacGregor (R.-Minn.) which would have placed an annual ceiling of 115,000 on Western Hemisphere immigration was narrowly defeated after a heated floor debate. Except for three minor amendments, the bill as passed by the House and sent to the Senate was the same one reported by the House Judiciary Committee.

55

The full Senate Judiciary Committee reported H.R. 2580 to the Senate floor September 15, 1965 (S. Rept. 748). It differed from the House-passed bill most significantly in the inclusion of an amendment offered in committee by Senator Sam Ervin (D.-N.C.) and strongly supported by Senator Everett Dirksen (R.-Ill.), setting a ceiling of 120,000 on annual Western Hemisphere immigration beginning July 1, 1968 unless legislation providing otherwise was enacted by Congress before then. A Select Commission on Western Hemisphere Immigration was also created, with instructions to study the subject in detail and report to Congress with recommendations in January, 1968. The bill was debated on the Senate floor September 17, 20, 21, and 22, and passed by a roll call vote of 76 to 18 with no amendments adopted on the floor.

A conference was requested by the Senate to reconcile differences in the House and Senate-passed versions of the bill, most notably the Western Hemisphere ceiling. The ceiling was retained, and the Conference report was submitted September 29, 1965 (H. Rept. 1101). It was agreed to by the Senate September 30 by a voice vote, and by the House by a roll call vote of 320–69.

H.R. 2580, as amended, was signed into law as Public Law 89–236 by President Lyndon Johnson in a ceremony at the foot of the Statue of Liberty on October 3, 1965. President Johnson said that it was "one of the most important acts of this Congress and of this administration. . . . This bill says simply that from this day forth those wishing to immigrate to America shall be admitted on the basis of their skills and their close relationship to those already here." [13]

## SUMMARY OF THE MAJOR PROVISIONS OF THE 1965 AMENDMENTS

In the process of changing the system for the numerical control of immigration, the 1965 amendments changed some of the basic nomenclature of the Immigration and Nationality Act. The basic distinction between immigrants and nonimmigrants was retained under the amended law. Immigrants are those aliens admitted for permanent residence, as opposed to the different classes of nonimmigrants who are granted temporary admission (section 101(a)(15)). Previously, however, immigrants had been classified as either "quota immigrants" or "nonquota immigrants," designating respectively those aliens admitted within or outside of the numerical restrictions of the quota system. The word "quota" was dropped under the 1965 amendments. Those aliens entering under the Eastern Hemisphere preference system were classified as "immigrants." Those aliens previously classified as "nonquota immigrants" were subsumed under two new categories, "special immigrants" and "immediate relatives," the latter including the spouses and children of U.S. citizens, and the parents of U.S. citizens who are 21 or over.

The 1965 amendments provided that, exclusive of "special immigrants" and numerically exempt "immediate relatives," the number of aliens who may be issued immigrant visas annually was

---

[13] Signing of the Immigration bill, the President's remarks at the ceremony on Liberty Island, with his offer of asylum for Cuban refugees, Oct. 3, 1965. Weekly Compilation of Presidential Documents, Oct. 11, 1965, pp. 364–365.

56

not to exceed 170,000. Since immigrants from the Western Hemisphere, classified as special immigrants, were restricted as of July 1, 1968 to 120,000 visas annually, this meant that the 1965 amendments provided for an annual total of 290,000 visas, under two separate ceilings, beginning in fiscal year 1968.

The total annual immigration quota for 1965 under the 1952 Act had been 158,561 visas for Eastern Hemisphere countries. Immigrants from Western Hemisphere countries were classified as "non-quota immigrants" and could enter without numerical restriction. However, the countries with the largest quotas, notably the United Kingdom and Ireland, did not use their full allotment of quota numbers, which were nontransferable. As an example, in 1964, Great Britain used only 30,560 of its annual quota of 65,361, resulting in a loss of about 35,000 visa numbers that year. Italy, in contrast, had an annual quota of 5,666 and a waiting list of at the beginning of 1964 of approximately 250,000.

A key amendment of the 1965 Act was the provision that "No person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of his race, sex, nationality, place of birth, or place of residence. . . ." This provision abolished the Asia-Pacific triangle as well as other provisions of the law which had discriminated against aliens because of their birthplace or ancestry. Under the controversial Asia-Pacific triangle provisions, any alien whose ancestry was one-half or more Oriental was not charged to his country of birth, as was normally the case, but to one of the quotas of designated areas in Asia or the Pacific, most of which were limited to 100.

Most of the provisions of the Act went into effect on December 1, 1965. However, the complete abolition of the national origins quota system and the ceiling on Western Hemisphere immigration did not become effective until July 1, 1968.

During the transition period, Western Hemisphere immigration continued to be numerically unrestricted. Eastern Hemisphere immigration continued to be regulated by the national origins quota system, but with an important difference. The unused quota numbers of each prior year during the 2½-year transition period were placed in a pool redistributed to preference immigrants in countries with oversubscribed quotas.

Beginning on July 1, 1968, immigrants entering from countries in the Eastern Hemisphere were subject to an annual ceiling of 170,000, and a per country limit of 20,000. Within these numerical limitations, visas were available on a first-come, first-served basis under a newly defined seven category preference system. The major difference between the new preference system, which was slightly altered by amendments in 1976, and the previous one was the reversal in emphasis from attracting needed professional and skilled labor to reuniting families.

Refugees, included as the seventh preference category, differed from other immigrants in that they were granted "conditional entry," with an opportunity to obtain permanent resident status after 2 years. The definition of "refugee" included those fleeing from Communist-dominated countries or the Middle East because of persecution, and the victims of a "catastrophic natural calami-

57

ty" in any Eastern Hemisphere country. These provisions have since been changed by the Refugee Act of 1980.

The 1965 Act provided that Western Hemisphere immigration would be limited to 120,000 annually beginning June 30, 1968, unless legislation providing otherwise was enacted prior to that time. It also provided for the establishment of a 15-member Select Commission on Western Hemisphere Immigration, and outlined its composition and areas of study. The Commission was instructed to make a first report to the President and Congress by July 1, 1967 and a final report by January 15, 1968, including recommendations regarding the numerical limitation. No provision was made for the application of the preference system or 20,000 per country limit to the Western Hemisphere. Consequently, when the 120,000 ceiling went into effect, immigrant visas became available on a first-come, first-served basis subject only to the exclusionary restrictions, including the labor certification provision.

The labor certification provision, section 212(a)(14) of the Immigration and Nationality Act, was revised by one of the more important of 1965 amendments to give the Secretary of Labor more power to protect the American labor market from competition resulting from immigration. Under the law as amended, aliens cannot enter this country to perform skilled or unskilled labor unless the Secretary of Labor certifies that there is a shortage of similar workers at the time of their application and at the place where they will be employed, and that their employment will not adversely affect the wages and working conditions of U.S. citizens who are similarly employed. Prior to the amendment, the legislation excluded aliens only if the Secretary of Labor certified that there was *not* a labor shortage and that their entry *would* adversely affect wages and working conditions in this country. The difference was summed up as follows by a representative of the Labor Department, "In the 1952 Act, the alien could enter unless the Secretary of Labor closed the door. Under the 1965 statute, the door is closed to the alien, unless the Secretary of Labor opens it." The provision applied to all Western Hemisphere "special immigrants" other than the parents, spouses or children of U.S. citizens and permanent resident aliens, and to third and sixth preference and nonpreference immigrants.

### CUBAN REFUGEES

The other major issue relating to immigration during this period was the admission and status of Cuban refugees. The number of refugees increased dramatically with the Cuban airlift program, announced by President Johnson on October 3, 1965. This followed Fidel Castro's announcements of September 28 and October 1, 1965 that Cubans who wished to leave could do so. President Johnson told the people of Cuba that those who sought refuge here would find it, and he directed the Departments of State, Justice, and Health, Education and Welfare "to immediately make all necessary arrangements to permit those in Cuba who seek freedom to make an orderly entry into the United States of America." [14]

---

[14] Ibid., p. 366

58

This was followed on November 6, 1965 by the President's announcement of the exchange of diplomatic notes by the Cuban Foreign Ministry and the Swiss Embassy in Havana, which represented U.S. interests in Cuba, constituting a memorandum of understanding regarding procedures and means for the movement of Cuban refugees to the United States.[15]

The legal basis for the Cuban airlift rested in the power granted to the Attorney General under the Immigration and Nationality Act of 1952 to temporarily parole into the United States aliens seeking admission. Quoting from the 1968 report to the Select Commission on Western Hemisphere Immigration:

> The Cuban airlift program represents an administrative exercise of the parole feature of the immigration law. Under it, the number of refugees who may come to the United States from Cuba is unlimited and, apparently, the President plans to continue this unrestricted humanitarian admission program.[16]

Public Law 89–732, approved November 2, 1966,[17] was enacted in response to the problem posed by the growing number of Cuban refugees who were unable to adjust their status to that of alien admitted for permanent residence without first leaving the country and applying for readmission on an immigrant basis. Public Law 89–732 authorized the Attorney General, upon application, to adjust the status of a Cuban refugee who arrived here after January 1, 1959 to that of permanent resident alien after he was physically present in this country for 2 years. Refugees who adjusted their status under the provisions of this Act were counted against the overall annual ceiling of 120,000 on Western Hemisphere immigration until 1976, an action subsequently declared illegal by a U.S. district court.

### REPORT OF THE SELECT COMMISSION ON WESTERN HEMISPHERE IMMIGRATION

The Western Hemisphere ceiling and the chargeability of Cuban refugees to that ceiling were the two major issues dealt with by the Select Commission on Western Hemisphere in its report submitted in January 1968. As provided by the 1965 legislation, the Select Commission consisted of five Senate appointees, five House appointees, and five Presidential appointees. The latter included the chairman, Richard M. Scammon, the vice president of the Governmental Affairs Institute; Leo Cherne, also from the private sector; and representatives from the Department of State, Labor, and Justice.

In what was intended as an interim report, the Commission majority made two recommendations. The first recommendation read as follows:

> The Commission is not able to make a final, definitive recommendation with respect to the imposition of an

---

[15] Weekly Compilation of Presidential Documents, Nov. 15, 1965, pp. 471–474.
[16] U.S. Select Commission on Western Hemisphere Immigration, Report, January 1968. p. 20.
[17] 80 Stat. 1161.

annual ceiling of 120,000 on Western Hemisphere immigration. While the Commission majority favors some type of immigration limitation in the New World as in the Old, implementation of the labor certification provisions of our new legislation is as yet insufficiently advanced to permit a meaningful judgment on the role of this device in the general limitation of immigration. With this situation in mind, the Commission recommends that the effective date for the imposition of the 120,000 ceiling on Western Hemisphere immigration be extended from July 1, 1968, to July 1, 1969.[18]

In the accompanying comments, it was noted that while the 1965 Act had caused "little adverse hemispheric reaction," this may be due to the fact that the ceiling had not yet gone into effect. Quoting further, "our embassies have reported that, in time, a numerical ceiling could lead to waiting lists and visa issuance delays similar to those in parts of the Eastern Hemisphere and have indicated that some general ill will could result." [19]

In addition to recommending that the effective date for the ceiling be postponed for a year, the Commission also recommended that the date for the filing of the final report be extended from January 1968 to January 1969. Legislation implementing both of these recommendations was introduced by House Judiciary Committee Chairman Emanuel Celler and passed by the House. However, no action was taken by the Senate, with the result that the life of the Select Commission was not extended, and the Western Hemisphere ceiling went into effect on July 1, 1968.

The second recommendation of the Commission majority read as follows:

In the event a ceiling of 120,000 on Western Hemisphere immigration does become effective July 1, 1968, the Commission recommends that no national origins quotas be adopted; that an annual maximum limitation of no more than 40,000 per country be instituted, and that Cuban refugees on parole in this country not be counted as a part of the ceilings at such time as they adjust their status from parolee to immigrant.[20]

The recommendation against adopting national origin quotas ·for the Western Hemisphere was not controversial, and no such quotas have been proposed. The other two recommendations were not implemented at that time.

### Other Legislation of the 89th and 90th Congresses, 1965–68

Other immigration legislation enacted during the 89th Congress amended the Immigration and Nationality Act to include the Canal Zone within the definition of the term "United States" for the purposes of section 341, thereby authorizing the Attorney General to issue certificates of citizenship in the Canal Zone.[21] The Act

---

[18] Report of the Select Commission on Western Hemisphere Immigration (1968), p. 9.
[19] Ibid., p. 11.
[20] Ibid., p. 12.
[21] Act of Nov. 2, 1966, Public Law 89–710; 80 Stat. 1104.

of November 6, 1966[22] amended the naturalization provisions of the Immigration and Nationality Act to provide that time spent abroad by U.S. citizens (or their dependent children) in the employ of the U.S. Government or certain international organizations could be treated as physical presence in the United States for the purpose of transmitting U.S. citizenship to children born abroad.

Legislation enacted during the 90th Congress amended the naturalization provisions of the Immigration and Nationality Act to permit naturalization for certain employees of U.S. organizations abroad engaged in disseminating information which significantly promotes U.S. interests;[23] to provide for the expeditious naturalization of the surviving spouse of a U.S. citizen who dies while serving in active duty status in the U.S. Armed Forces;[24] and to provide for the naturalization of persons who have served in active-duty status in the U.S. Armed Forces during the Vietnam hostilities, or in other periods of military hostilities.[25] The Act of October 21, 1968[26] amended the Immigration and Nationality Act to eliminate the statutory prescription of certain fees.

---

[22] Public Law 89–770; 80 Stat. 1322.
[23] Act of Dec. 18, 1967, Public Law 90–215; 81 Stat. 661.
[24] Act of June 29, 1968, Public Law 90–369; 82 Stat. 279.
[25] Act of Oct. 24, 1968, Public Law 90–633; 82 Stat. 1343.
[26] Public Law 90–609; 82 Stat. 1199.

## VI. WESTERN HEMISPHERE REFORM, A WORLDWIDE CEILING, AND OTHER IMMIGRATION LEGISLATION, 1969–78

During the decade after the 1965 amendments took full effect in 1968, the three most important issues in immigration policy were the regulation of immigration from the Western Hemisphere, illegal immigration, and refugees, listed in the chronological order in which they emerged as national issues.

By the end of the 95th Congress in December 1978, only one of them had been dealt with by the enactment of remedial legislation. This was the regulation of Western Hemisphere immigration, a two-step process culminating in the enactment of legislation in 1978 establishing a single worldwide ceiling with a single preference system. This legislation, as well as other immigration legislation enacted during the period, is discussed below. The admission of refugees and the issue of illegal immigration are discussed in the following two sections.

### WESTERN HEMISPHERE REFORM AND A WORLDWIDE CEILING

The October 3, 1965 amendments to the Immigration and Nationality Act provided for an annual ceiling of 120,000 on Western Hemisphere immigration which went into effect on July 1, 1968. The principal argument used in support of the controversial ceiling in 1965 was the fear of greatly increased immigration due to the expanding populations of many Western Hemisphere countries. Opponents of the ceiling argued that immigration levels would remain the same, and that the ceiling would be an unnecessary affront to other countries in this hemisphere.

The rapid development of a Western Hemisphere backlog tended to support the arguments of those who had favored the ceiling. During hearings in 1970 before House Judiciary Subcommittee No. 1, the Administrator of the State Department's Bureau of Security and Consular Affairs, Barbara Watson, testified:

> The situation in the Western Hemisphere has evolved rapidly since the imposition of the ceiling 2 years ago. And the results have been so troublesome that serious consideration should now be given to remedial action. In the 2 years since the imposition of the Western Hemisphere limitation, the demand for visa numbers has consistently exceeded the supply. Thus, the waiting period for the issuance of a visa to an alien chargeable to the Western Hemisphere has steadily increased and has now reached 13 months. Furthermore, it appears that the demand will continue to be heavy.

62

> This situation affects all countries in the Western Hemi-
> sphere to some extent, but by far the most seriously affect-
> ed is Canada.[1]

By the time remedial legislation was enacted in 1976, the backlog
amounted to approximately 300,000 persons, or a waiting period of
2½ years.

There was little pressure from either the administration or the
Congress to repeal the ceiling after it went into effect. Instead, at-
tention focused on the actual mechanics of the operation of the
ceiling, and inequities in the treatment of the two hemispheres
under the immigration law.

Beginning in 1969, in the 91st Congress, major omnibus immigra-
tion reform bills with the primary purpose of equalizing the provi-
sions of law regulating immigration from the two hemispheres
were introduced by key Members of the House and Senate, both for
themselves and on behalf of the administration. Initially, the bills
provided for a single worldwide ceiling, but during the 93d Con-
gress, the House Judiciary Committee decided that immigration
reform should proceed in two stages, and deferred consideration of
a unified ceiling until a later date. Quoting from Representative
Peter W. Rodino, who at that time was Chairman of Subcommittee
No. 1, with jurisdiction over immigration:

> In view of the hardships we are unintentionally causing
> would-be immigrants from this hemisphere, and the ad-
> verse diplomatic effects of the increasingly deteriorating
> situation . . . it seems possible that further reform of the
> immigration law will have to be a two-step operation, with
> the first step being immediate enactment of legislation
> supplementing the 1965 act by extending its Eastern
> Hemisphere provisions with only essential modifications to
> the Western Hemisphere.[2]

Legislation reported by the House Judiciary Committee in the
93d Congress passed the House of Representatives by a vote of 336
to 30 on September 26, 1973. However, the Senate Judiciary Com-
mittee, under the chairmanship of Senator Eastland, took no action
on the bill. Related but simplified legislation was reported by the
House Judiciary Committee in the 94th Congress, passed by the
House and Senate, and enacted into law as Public Law 94-571.[3]

The general purpose of the 1976 legislation and the earlier bills
from which it had evolved was to complete the work which had in-
advertently been left unfinished by the 89th Congress in the enact-
ment of the 1965 legislation, primarily because of its focus on the
repeal of the national origins quota system. Quoting from the
House report on the 1976 bill:

> However, because the Western Hemisphere has no pref-
> erence system and no per-country limit, in effect, the
> United States has two different immigration laws for the
> two hemispheres. For example, under the provisions deter-

---

[1] U.S. House Committee on the Judiciary, Subcommittee No. 1, "Immigration," Hearings, 91st
Cong., 2d sess., 1970, p. 154.
[2] Quoted in H. Rept. 93-461, 93d Cong., 1st sess., Sept. 11, 1973, p. 8.
[3] Act of Oct. 20, 1976; 90 Stat. 2703.

63

mining Eastern Hemisphere immigration, the 22-year-old British citizen daughter of a U.S. citizen or the Spanish wife of a permanent resident alien would receive preferential treatment compared to other intending immigrants whose relational ties were more distant or who were entering under the occupational preferences. However, the 22-year-old Brazilian daughter of a U.S. citizen or the Canadian wife of a permanent resident alien would be required to line up behind the other intending immigrants from this hemisphere—now numbering close to 300,000—and to wait more than 2 years for a visa. In contrast, immigrant visas for the Eastern Hemisphere are immediately available under the relative preference categories for all countries except the Philippines and Korea. . . .

In short, when repealing the national origins quota system, the 89th Congress did not provide an adequate mechanism for implementing the Western Hemisphere ceiling, nor did it sufficiently integrate the ceiling into the immigration law as a whole. The result, completely unforeseen and unintended, has been considerable hardship for intending immigrants from this hemisphere who until 1968 enjoyed the privilege of unrestricted immigration. It is the express purpose of this legislation to correct the situation.[4]

The 1976 amendments extended a slightly modified version of the seven-category preference system, as well as the 20,000 per-country limit, equally to both hemispheres under the separate ceilings of 170,000 for the Eastern Hemisphere and 120,000 for the Western Hemisphere. It also allowed for the adjustment of status of Western Hemisphere natives, and provided that Cuban refugees who adjust their status to that of permanent resident alien will not be charged to the Western Hemisphere ceiling.

The only provision of any real controversy in the Immigration and Nationality Act Amendments of 1976 was the extension of the 20,000 per-country limit to Mexico. Prior to this Act, which went into effect January 1, 1977, immigration from all independent countries in the Western Hemisphere had been numerically limited only by the overall ceiling of 120,000 immigrant visas exclusive of immediate relatives, with no per-country limitations. Mexican immigration under the Western Hemisphere ceiling has exceeded 20,000 every year since the ceiling went into effect on July 1, 1968 (Table 4).

TABLE 4.—MEXICAN IMMIGRATION, FISCAL YEARS 1966–76

| | Total | Western Hemisphere ceiling | Eastern Hemisphere ceiling | Numerically exempt |
|---|---|---|---|---|
| 1966 | 45,163 | NA | NA | NA |
| 1967 | 42,371 | NA | NA | NA |
| 1968 | 43,563 | NA | NA | NA |
| 1969 | 44,623 | 31,933 | 18 | 12,672 |

[4] H. Rept. No. 94–1553, 94th Cong., 2d sess., Sept. 15, 1976, pp. 3–4.

TABLE 4.—MEXICAN IMMIGRATION, FISCAL YEARS 1966–76—Continued

| | Total | Western Hemisphere ceiling | Eastern Hemisphere ceiling | Numerically exempt |
|---|---|---|---|---|
| 1970 | 44,469 | 27,044 | 20 | 17,405 |
| 1971 | 50,103 | 31,695 | 15 | 18,393 |
| 1972 | 64,040 | 41,694 | 13 | 22,333 |
| 1973 | 70,141 | 43,510 | 71 | 26,560 |
| 1974 | 71,586 | 45,156 | 91 | 26,339 |
| 1975 | 62,205 | 41,894 | 83 | 20,228 |
| 1976 | 57,863 | 39,314 | 145 | 18,404 |

NA signifies not applicable.
Source: U.S. Immigration and Naturalization Service, annual report, fiscal years 1966–76.

Because of this high demand, there had been support in the past for a higher per-country allocation for the contiguous countries. In fact, this would have affected only Mexico; Canadian immigration under the Western Hemisphere ceiling never even approached 20,000. However, as the House Judiciary Committee stated, "During the 94th Congress, a general consensus has been reached that the 20,000 per-country limit should be extended to all countries of the world, including those geographically contiguous to the United States."[5] Included in this consensus was the administration, which in previous Congresses had backed a 35,000 allocation for the two contiguous countries. In the 94th Congress, the administration bill (H.R. 10323) included a 20,000 per-country limit for all Western Hemisphere countries, an approach defended as follows in a joint statement by the Departments of Justice and State:

> Based on a review of existing data, a uniform ceiling for each country . . . would be preferable. This would permit an equitable distribution of immigration from throughout the hemisphere and from throughout the world. Problems with illegal immigration will exist whether immigration from Mexico is limited to 20,000 or 35,000 per year or not at all. While permitting 35,000 immigrants a year from Mexico would ease their demand slightly, this would only increase the waiting lists and the demand throughout the rest of the hemisphere.[6]

This position was reversed by President Gerald Ford in his statement on signing the Immigration and Nationality Act Amendments of 1976 into law. At that time he voiced concern "about one aspect of the legislation which has the effect of reducing the legal immigration into this country from Mexico." Quoting futher:

> The United States has a very special and historic relationship with our neighbor to the south. In view of this special status we have with the Mexican Government and the Mexican people, I will submit legislation to the Congress in January to increase the immigration quotas for Mexicans desiring to come to the United States.[7]

[5] H. Rept. No. 94–1553 (1976), p. 8.
[6] Quoted in H. Rept. No. 94–1553, p. 9.
[7] Weekly compilation of Presidential Documents, Oct. 25, 1976, p. 1548.

In August 1977, President Jimmy Carter also endorsed legislation pending before the 95th Congress which would increase the numbers of immigrant visas available annually to Mexico and Canada.[8]

Legislation enacted by the 95th Congress, Public Law 95–412,[9] completed the reform process which the 1965 amendments began. The Act of Oct. 5, 1978 established a single worldwide ceiling of 290,000 for the admission of immigrants, combining the existing separate ceilings of 170,000 and 120,000 on the Eastern and Western Hemispheres, respectively. The preference system was applied once under this single worldwide ceiling, as follows: First preference (unmarried sons and daughters of U.S. citizens): 20 percent of the over-all limitation of 290,000 in any fiscal year; second preference (spouses and unmarried sons and daughters of aliens lawfully admitted for permanent residence): 20 percent of over-all limitation, plus any numbers not required for first preference; third preference (members of the professions or persons of exceptional ability in the sciences and arts): 10 percent of over-all limitation; fourth preference (married sons and daughters of U.S. citizens): 10 percent of over-all limitation, plus any numbers not required by the first three preference categories; fifth preference (brothers and sisters of U.S. citizens 21 years of age or over): 24 percent of over-all limitation, plus any numbers not required by the first four preference categories; sixth preference (skilled and unskilled workers in short supply): 10 percent of over-all limitation; seventh preference (refugees): 6 percent of over-all limitation; and nonpreference (other immigrants): numbers not used by the seven preference categories. This preference system was subsequently amended by the Refugee Act of 1980, chiefly by the removal of refugee admissions.

Public Law 95–412 originated on the House side as legislation introduced by Representative Joshua Eilberg, the Chairman of the House Judiciary Subcommittee on Immigration, Citizenship, and International Law. Quoting from the House report, "While no hearings were held specifically . . . during the 95th Congress, the concept of a worldwide ceiling has been under continuous consideration and review by the subcommittee for a number of years and has been discussed frequently in past hearings relating to Western Hemisphere immigration." [10] The State Department's views on the legislation were set forth in a letter from Assistant Secretary Douglas J. Bennett in part as follows:

> The Department has long believed that this step represented the ultimate goal to be achieved in perfecting the existing system of immigration and we continue to hold that belief. The 1965 and 1976 amendments to the Act were designed to establish the principle of uniformity of opportunity for immigration, without regard to place of birth. These two sets of amendments have had the effect of eliminating distinctions based upon country of birth. The proposal set forth in this bill would have the effect of eliminating the remaining distinction based upon hemisphere of birth and would create a single worldwide

---

[8] Undocumented Aliens, H. Doc. No. 95–202, 95th Cong., 1st sess., Aug. 4, 1977, p. 6.
[9] Act of Oct. 5, 1978; 92 Stat. 907.
[10] H. Rept. No. 95–1206, 95th Cong., 2d sess., May 18, 1978, p. 4.

66

system under which all prospective immigrants would compete with all others on equal terms. Clearly, therefore, this proposal represents the ultimate step in eliminating distinctions based upon an individual's place of origin.[11]

The bill passed the House on July 18, 1978 by a vote of 396–20, and passed the Senate by voice vote on September 20, 1978. Quoting Senator Edward Kennedy:

The establishment of a worldwide ceiling corrects an anomaly in the law, and is a logical step in consequence of the major immigration reforms Congress enacted in 1965— which I served as floor manager at the time.

In the long-term, this reform makes more flexible the provisions of the preference system, and in the short-run it has the likely effect of allowing the use of more nonpreference visas next year for the backlog in the Western Hemisphere and the use of more conditional entry vias for Indochina refugees—a need that is extraordinarily urgent in Southeast Asia today. All this will not involve, however, any increase in the total annual immigration authorized under the law.[12]

It is of interest that, while the concept of a single worldwide ceiling originally developed in the context of the concern about the inequitable treatment of the Western Hemisphere, the principal issue leading to its enactment in 1978 was the short-run consideration referred to by Senator Kennedy, the freeing up of seventh preference refugee visa numbers unused by the Western Hemisphere for refugees from the Eastern Hemisphere.

Public Law 95–412 also established the Select Commission on Immigration and Refugee Policy, a 16-member body instructed to study and evaluate "existing laws, policies and procedures governing the admission of immigrants and refugees to the United States and to make such administrative and legislative recommendations to the President and the Congress as are appropriate." Quoting from the House report:

The committee believes that it is appropriate that the law establishing a worldwide ceiling, and thus completing the process of immigration law reform which began with the enactment of the 1965 amendments, should also create a Select Commission to study immigration law and policy. The purpose of the Commission is to help pave the way for future development in immigration and refugee law and policy in order to meet the specific needs of our time and of the time to come.[13]

Senator Kennedy, then Chairman of the Senate Committee on the Judiciary, indicated the importance he placed upon the formation of the Select Commission as follows:

Regarding the establishment of a Select Commission on Immigration and Refugee Policy, I have long urged the for-

---

[11] Ibid., pp. 11–12.
[12] Congressional Record [daily ed.], Sept. 20, 1978; S15599.
[13] H. Rept. No. 95–1206 (1978), pp. 7–8.

mation of a high level commission to take a thorough look at the immigration and nationality statutes. The time is past due for us to approach the revision of our antiquated immigration law like we have approached the revision of the criminal code—to dump the old law, and start anew. To do this, we need to have an objective and thorough study of current immigration law and practice—a review that is beyond the capacity and scope of a single agency of the executive branch or a committee of Congress, and which must involve a broad spectrum of opinion and groups concerned with immigration reform.[14]

### OTHER LEGISLATION

A brief summary of legislation amending the Immigration and Nationality Act follows in chronological order by Congress. The legislation is primarily of a technical rather than a broad policy nature. It ranges in scope from legislation correcting certain deficiencies in the Immigration and Nationality Act, such as that which evolved from legislation introduced by Representative Elizabeth Holtzman (D.–N.Y.) to remedy the absence of adequate authority for the exclusion and deportation of Nazi war criminals (Public Law 95–549); to housekeeping measures, albeit of a symbolic nature in the case of the repeal of the "coolie trade" laws (Public Law 93–461).

#### A. 91ST CONGRESS (1969–70)

One of the more important enactments of this period was Public Law 91–225, approved April 7, 1970 (84 Stat. 116). It created new nonimmigrant categories for the termporary admission of foreign fiances and fiancees ("K" nonimmigrants), and international executives ("L" nonimmigrants). It also liberalized the terms applying to the entry of nonimmigrant temporary workers of distinguished merit ("H–1" nonimmigrants) by allowing them to enter temporarily to perform services which may be permanent in nature; and limited the applicability of the 2-year foreign residence requirement for "J" nonimmigrant exchange visitors wishing to adjust their status.

Public Law 91–136, approved December 5, 1969 (83 Stat. 283), repealed the provision in the Immigration and Nationality Act that citizenship may not be acquired through naturalization during a period of 60 days preceding a general election. Public Law 91–313, approved July 10, 1970 (84 Stat. 413), was a housekeeping measure amending the Immigration and Nationality Act to provide that cash received as security on bonds be deposited in the Treasury rather than the Postal Savings System, which had been abolished in 1966.

#### B. 92D AND 93D CONGRESSES (1971–74)

Public Law 92–584, approved October 27, 1972 (86 Stat. 1289), amended the naturalization provisions relating to the retention of derivative U.S. citizenship acquired by a child born abroad to a

---

[14] Congressional Record [daily ed.], Sept. 20, 1978; S15599–S15600.

U.S. citizen parent and an alien parent, by reducing the U.S. residence requirement from 5 to 2 years to occur between the child's 14th and 28th birthday.

Public Law 93–461, approved October 20, 1974 (88 Stat. 1387), repealed the "coolie trade" laws enacted in 1862 and 1871 (8 U.S.C. 331–339) to protect oriental aliens from exploitation. The laws had been of no practical effect for years and, in the words of the House Judiciary Committee report, served as "a disparaging reminder of a past historical period." [15]

### C. 94TH CONGRESS (1975–76)

Public Law 94–484, approved October 12, 1976 (90 Stat. 2243), the Health Professions Educational Assistance Act of 1976, included amendments to the Immigration and Nationality Act tightening the restrictions on foreign medical graduates (FMG's) seeking entry both on a temporary basis, primarily as "J" exchange visitors, and on a permanent basis in cases where labor certification is required. This legislation, which originated in the Senate Labor and Public Welfare Committee, reflected a policy decision essentially outside the immigration field, to the effect that there was no longer an overall shortage of doctors in this country necessitating their importation on a widescale basis. It also reflected a desire to ensure that broadly similar standards would be applied to domestic and foreign medical graduates.

Provisions of Public Law 94–571, approved October 20, 1976 (90 Stat. 2703), relating to the Western Hemisphere are discussed above. Additionally, the law amended the Immigration and Nationality Act to require that, if a country has the maximum total of 20,000 immigrant visas made available to it in a given year, in the following year visas will be made available to that country according to the percentages assigned to each preference category, in order to ensure equitable distribution. It also modified the third and fifth preferences, and amended the labor certification provision to provide that labor certification for teachers and aliens in the arts and sciences could only be denied if there are equally qualified persons in the United States.

### D. 95TH CONGRESS (1977–78)

Legislative activity relating to immigration was unusually heavy during the 95th Congress, particularly in comparison to the preceding years of the decade. The Immigration and Nationality Act was amended by provisions contained in nine different enactments, summarized below in the chronological order of their enactment.

Public Law 95–83, approved August 1, 1977 (91 Stat. 383) included minor amendments to the 1976 provisions of the Immigration and Nationality Act relating to the admission and exclusion of foreign medical graduates (FMG's) as immigrants and nonimmigrants. Public Law 95–105, approved August 17, 1977 (91 Stat. 844), included an amendment changing the name of the State Department's Bureau of Security and Consular Affairs to the Bureau of Consular Affairs, and the title of its top official from Administrator to As-

---

[15] H. Rept. 93–1347, 93d Cong., 2d sess., Sept. 11, 1974, p. 2.

69

sistant Secretary of State for Consular Affairs. The provisions of Public Law 95–412, approved October 5, 1978 (92 Stat. 907), relating to the worldwide ceiling and to the establishment of a Select Commission on Immigration and Refugee Policy are discussed above.

Public Law 95–417, approved October 5, 1978 (92 Stat. 917), removes the statutory prohibition on the approval of more than two petitions filed by one person on behalf of alien adopted children, provides for uniform procedures for the admission to the United States of adopted or prospective adoptive alien children of U.S. citizens, and expedites the naturalization process for certain adopted alien children.

Public Law 95–426, approved October 7, 1978 (92 Stat. 963), includes an amendment relating to travel documentation of aliens and citizens.

Public Law 95–432, approved October 10, 1978 (92 Stat. 1046), eliminates the U.S. residency requirement as a condition of citizenship for children born abroad of one citizen and one noncitizen parent, and repeals certain expatriation sections which have been declared unconstitutional or whose application has been severely limited by U.S. Supreme Court decisions.

Public Law 95–549, approved October 30, 1978 (92 Stat. 2065), in title I amends the Immigration and Nationality Act to exclude from admission into, and to deport from, the United States all aliens who persecuted any person on the basis of race, religion, national origin, or political opinion, under the direction of the Nazi Government of Germany. Title II contains temporary provisions relating to Indochinese refugees.

Public Law 95–579, approved November 2, 1978 (92 Stat. 2474), provides for a waiver of the English literacy requirement for naturalization for anyone over 50 who has been living in the United States for periods totalling 20 years following lawful admission for permanent residence. Public Law 95–582, approved November 2, 1978 (92 Stat. 2479), provides for the seizure and forfeiture of vehicles used to illegally transport aliens into the United States.

## VII. INDOCHINESE REFUGEES, THE REFUGEE ACT OF 1980, AND CUBAN/HAITIAN ENTRANTS

During the 5-year period, 1975–1980, refugees and refugee-related issues dominated congressional concern with immigration more than they had since the years following World War II. Beginning with the fall of Vietnam and Cambodia in April 1975, this period saw the admission of more than 400,000 Indochinese refugees, the enactment of major amendments to the Immigration and Nationality Act in the form of the Refugee Act of 1980, and the exodus from Mariel Harbor, Cuba to Southern Florida.

These events were interrelated. The 1980 refugee legislation was enacted in part in response to Congress's increasing frustration with the difficulty of dealing with the ongoing large-scale Indochinese refugee flow under the existing ad hoc refugee admission and resettlement mechanisms. Together with the continuing flow of undocumented Haitians, the entry of the Mariel Cubans beginning in April 1980 was the first test of the Refugee Act, which had been enacted 1 month before. Among other things, it demonstrated the difficulty of finding a viable alternative to refugee status when it is undesirable or impossible to repatriate aliens deemed not to be refugees. This problem resurfaced in the debate during the 1980s over extended voluntary departure (EVD) status for specific national groups, and was a pending issue before the Congress at the end of 1986.

### THE ADMISSION AND RESETTLEMENT OF INDOCHINESE REFUGEES, 1975–1980

The Indochinese refugee situation was initially perceived to be short-term in nature and somewhat different from past U.S. refugee experiences. As a history of the period notes, "The original Indochinese admissions program was perceived as a 'rescue operation' precipitated by military defeat, rather than a traditional 'refugee' situation involving demonstrated victims of past persecution." [1] The unexpectedly rapid collapse of the Saigon government in April 1975 was accompanied by the attempted rescue of U.S. personnel and Vietnamese and Cambodian government and military officials closely associated with the U.S. Government. This had been preceded by Operation Babylift, under which over 2,000 orphans had been flown to the United States for adoption.

The parole of 130,000 Indochinese refugees was authorized in April, and the Congress was fully supportive of Administration proposals regarding their admission and the funding for their resettlement. Opening hearings before the House Judiciary Subcommittee

---

[1] Loescher, Gil and Scanlan, John A. Calculated Kindness: Refugees and America's Half-open Door, 1945 to the Present. (New York, Free Press), 1986, p. 119.

(70)

on Immigration, Citizenship, and International Law on May 5, Sub-committee Chairman Joshua Eilberg (D.-PA) said, "The primary issues confronting us at this time are not whether the evacuation was proper and legal, nor whether the President has exceeded his authority in admitting refugees, but rather, what efforts should be made to resettle these refugees and what funds must be made available to meet this problem." [2] Legislation authorizing Federal funds to assist in resettlement was introduced at the request of the Administration and processed by the Congress with unusual speed.

However, this spirit of amity was not to continue as the Indochinese refugee situation proved to be an ongoing one, involving increasing numbers of refugees. Factors contributing to the increased flow of refugees beginning in 1976 included the persecution of the ethnic Chinese, the war between Vietnam and China, the Vietnamese occupation of parts of Cambodia and Laos, the flight to Thailand of refugees from Pol Pot's Cambodia, the ongoing exodus of the "boat people," and the increasing hostility of neighboring first-asylum countries towards the refugees.

There was no legislative mechanism prior to the 1980 Refugee Act for coordinating the admission of refugees and the authorization of funds for their resettlement. These procedures occurred separately for the first 5 years the Indochinese refugees were admitted, accompanied by controversey and delays due in part to the use of the parole provision for admission.

### A. ADMISSION OF INDOCHINESE REFUGEES

Prior to its amendment by the Refugee Act of 1980, the Immigration and Nationality Act as amended in 1965 and 1978 provided for the conditional entry annually of 17,400 refugees under the seventh preference category, with immigrant status generally available after 2 years residence. Because of the numerical and other limitations on the seventh preference category, another provision of the Immigration and Nationality Act, the parole provision (sec. 212(d)(5); 8 U.S.C. 1182(d)(5)), was primarily used for the admission of Indochinese refugees, as it had been in a different legislative context but for similar reasons in 1956 for the Hungarians and in the 1960s for the Cubans.

Both before and after its amendment in 1980, the parole provision authorized the Attorney General to parole any alien into the United States temporarily, at his or her discretion and under conditions he or she prescribes, in emergencies or for reasons in the public interest. While parole is not admission for permanent residence, under certain circumstances a parolee may adjust his or her status to that of an alien lawfully admitted for permanent residence (i.e., an immigrant) under section 245 of the Immigration and Nationality Act, subject to the numerical limitations of the Act.

The legislative history appears to indicate that when the parole provision was enacted in 1952, it was intended to be used on a case-by-case basis. This position was explicitly affirmed by the House

---

[2] U.S. House Committee on the Judiciary. Subcommittee on Immigration, Citizenship, and International Law, Indochina Refugees. Hearings, 94th Cong., 1st sess., 1975, p. 1.

72

and Senate Judiciary Committee reports on the 1965 amendments.[3] The use of parole for groups of refugees rather than for individual aliens originated in 1956 with the parole of Hungarian refugees. In terms of numbers, it is the Cubans who entered beginning in the 1960s who constitute a precedent for the extent to which parole was used to admit the Indochinese refugees. At least eight separate Indochinese parole programs were authorized,[4] some with extensions, accounting for the entry of approximately 400,000 refugees.

The usual procedure followed in the parole of the Indochinese refugees was for the Attorney General to authorize the refugee parole program after receiving a recommendation from the Secretary of State and upon consultation with Congress. However, consultation with Congress was not required by law and was not always conducted to the satisfaction of some Members of Congress. Concern with the continuing admission of the Indochinese refugees was expressed early on by some key congressional members, notably Representative Eilberg. In particular, he and other Members of Congress were concerned with what they saw as the questionable legality of the use of the parole provision and the virtually unlimited discretion it afforded the Executive Branch at the expense of the Congress. At a hearing on February 5, 1976 on the Ford Administration's request for parole authority for an additional 11,000 refugees, Representative Eilberg obtained a promise from Assistant Secretary of State Philip Habib that there would be "no request for additional parole authority on this legislation," and the two men agreed on the desirability of the committee's exploring "general refugee legislation." [5]

As the refugee problems worsened with the increase in the number of "boat people," the Carter Administration did not feel bound by the Ford Administration's agreement that no more refugees would be admitted without new legislation. However, on several occasions Attorney General Griffin Bell indicated reservations about the use of parole. In a consultation session November 28, 1978 with the House Judiciary Committee on paroling, among others, an additional 21,875 Southeast Asian refugees, Attorney General Bell summed up his difficulties with the use of the parole provision for refugee admissions as follows:

> I am not comfortable about the use of the parole authority in these nor any other group situations where I have exercised that authority in the past. Nor is this discomfort unique to me. Every Attorney General before me, faced with such requests, has voiced similar reservations because the intent of the Congress, in establishing the parole authority, was to provide a safety valve for unusual, individual cases of compelling need that could not otherwise be

[3] H. Rept. 745, 89th Cong., 1st sess., 1965, pp. 15–16. S. Rept. 748, 89th Cong., 1st sess., 1965, p. 17.
[4] U.S. Dept. of Justice. Annual Report of the Attorney General of the United States; 1979, p. 142. For more detail on the specific parole programs, see U.S. Senate Committee on the Judiciary. Review of U.S. Refugee Resettlement Programs and Policies. Committee Print, 96th Cong., 2d sess., 1980, pp. 13–14. (Cited as Senate Refugee Committee Print (1980)).
[5] U.S. House of Representatives. Committee on the Judiciary. Refugees from Indochina, 94th Cong., 1st and 2d sess., 1975 and 1976, p. 524. See also Bernard Gwertzman, White House is Urged to Authorize Entry of 15,000 Indochinese. New York Times. July 4, 1977, p. 1.

met. It was not to provide the means to end-run the other provisions of the immigration law.

And yet, we are repeatedly forced to do just that because the refugee provisions of the law are inadequate to circumstances as we find them around the world and to our policies as a nation in attempting to respond.

As a result we are unable to give clear signals to other nations about the extent of our ability to meet world refugee needs. We are unable to plan effectively within our own government, with state and local governments, and with the voluntary agencies, whose role in refugee affairs is so vital, for necessities such as resettlement funds and sponsor families. Finally—and most regrettably—individual refugees are hostage to a system that necessitates that their plight build to tragic proportions so as to establish the imperative to act.

He concluded by urging the Committee "to act early in the next Congress on legislation that fashions a new, more workable refugee policy for this country." [6]

The Attorney General's sentiments were echoed in part in a State Department document inserted by Senator Edward Kennedy (D.-Mass.) in the *Congressional Record* when he introduced S. 643, the Administration bill subsequently enacted as the Refugee Act of 1980. Using "the unfolding history of the Indochinese refugees" as an illustration of the need for comprehensive legislation, the State Department observed that without it, "the Executive Branch was forced to wait repeatedly until the number of refugees in the countries of first asylum reached crisis proportions and then declare an 'emergency' which required yet another special parole program." [7]

By 1979, the Congress and the Executive Branch were generally unanimous in their support of new legislation as an alternative to the continued use of the parole provision for the admission of refugees. In a consultation session between the Senate Judiciary Committee and the Executive Branch on a pending parole action, Senator Strom Thurmond (D.-S.C.) stated:

The Senate has expressed its strong belief in prior consultation by its passage of S. 643, the refugee bill of 1979 by a vote of 85 to 0. . . .

The executive branch of our Government has admitted in excess of 200,000 refugees under parole authority since 1975. This fact was the basis for the passage of S. 643 by such an overwhelming vote. [8]

A major problem associated with the use of the parole provision for large groups of refugees was their adjustment to permanent resident status, since the numbers available under the seventh

---

[6] U.S. Dept. of Justice. Statement of the Attorney General, Consultation Session on Refugee Parole Programs. House Judiciary Committee Nov. 28, 1978, p. 10–11. Quoted in part in Christopher Dickey, Administration to Request Reform of Refugee Laws. Washington Post. Dec. 11, 1978, p. A20.

[7] U.S. Dept. of State. The Proposed Refugee Act of 1979—Meeting the Need for a Comprehensive Long-Term Policy on Refugees. Congressional Record, [daily ed.], Mar. 13, 1979. p. S2633.

[8] U.S. Senate Committee on the Judiciary. Refugee Consultation. Hearing, 96th Cong., 1st sess., 1979, p. 1–2.

74

preference conditional entry category were too limited to accommo-
date them. As it had in the past for the Hungarians and the
Cubans, Congress enacted legislation providing for the adjustment
to permanent resident status of Indochinese refugees paroled into
the United States. The eligibility cut-off date was initially set at
January 1, 1979;[9] it was subsequently moved forward first to Sep-
tember 30, 1980,[10] and then back to April 1, 1980 by the Refugee
Act of 1980.[11]

### B. INDOCHINESE REFUGEE RESETTLEMENT ASSISTANCE

Assistance to State and local governments and voluntary agen-
cies engaged in the resettlement of Indochinese refugees was pro-
vided from 1975 to 1980 under the Indochina Migration and Refu-
gee Assistance Act of 1975, which served as the authority for the
Indochinese Refugee Assistance Program (IRAP) within the Depart-
ment of Health, Education and Welfare (HEW). This Act was
amended four times before its repeal by the Refugee Act of 1980,
which superseded it as the authority for refugee resettlement as-
sistance.

As noted above, the Indochina Migration and Refugee Assistance
Act of 1975 was processed by the Congress with unusual dispatch.
The legislation was introduced at the request of the Ford Adminis-
tration on May 6, 1975 by Senator John Sparkman (D-Ala.), the
Chairman of the Senate Committee on Foreign Relations, and on
May 7 by Representative Peter Rodino (D.-NJ), the Chairman of
the House Committee on the Judiciary. It passed the House on
May 14, and the Senate on May 16, the conference report (H. Rept.
94–230) was approved by both bodies on May 21, and the bill was
signed into law as Public Law 94–23 (89 Stat. 87) on May 23, 1975.
The accompanying appropriations legislation moved even more rap-
idly, and was signed into law as Public Law 94–24.[12]

Public Law 94–23, the Indochina Migration and Refugee Assist-
ance Act of 1975, authorized Federal assistance for the domestic re-
settlement of Indochinese refugees through September 30, 1977. It
did this by incorporating by reference those provisions of the Mi-
gration and Refugee Assistance Act of 1962 which were then the
basis for the Cuban refugee program. Basically, the legislation pro-
vided for Federal reimbursement of State and local governments
for medical and cash assistance, and for social services and admin-
istrative costs. As both the House and Senate Committee reports on
the 1975 legislation noted, providing assistance "under the frame-
work of the Migration and Refugee Assistance Act of 1962 . . . [uti-
lized] established procedures and administrative machinery with
which the voluntary agencies and the state and local governments
are familiar." [13] At the same time, the enactment of separate legis-
lation emphasized the fact that the program was intended to be

---

[9] Act of Oct. 28, 1977; Public Law 95–145; 91 Stat. 1223.
[10] Act of Oct. 5, 1978; Public Law 95–412; 92 Stat. 909.
[11] Act of Mar. 17, 1980; Public Law 96–212; 94 Stat. 108.
[12] Act of May 23, 1975; 89 Stat. 89. In general, this report is limited to authorizing legislation
and does not track appropriations legislation.
[13] H. Rept. 94–197, 94th Cong. 1st sess., 1975, p. 1; S. Rept. 94–119, 94th Cong., 1st sess., 1975,
p. 1.

temporary, in contrast to the open-ended Cuban assistance program authorized by the Migration and Refugee Assistance Act.

As originally enacted, the Indochina Migration and Refugee Assistance Act of 1975 limited assistance to refugees from Vietnam and Cambodia. In a noncontroversial amendment, it was extended in June 1976 by Public Law 94–313 [14] to include refugees from Laos.

The issue of the temporariness of the program proved considerably more controversial. This is reflected in the legislative history of the subsequent amendments to the Indochina Migration and Refugee Assistance Act, and in the unpredictability of funding which characterized both this legislation and the Indochina Refugee Children Assistance Act of 1976.[15] Commenting on the "perhaps not atypical lack of predictability" of Federal funding of the Indochinese Refugee Assistance Program (IRAP) and related Indochinese assistance efforts, one study observed:

> Thus Congress authorized funds to assist in the education of Indochinese chidren but did not appropriate them in recent years; there was a five-month interruption in HEW-IRAP funding in the winter of 1977–78; Congress decided, in late FY 1978, to drop its earlier plans for a three-year phase down of the program, and authorized its extension only through the end of FY 1979. Similarly, in the late spring and summer of 1979 reception and placement grant funds from the State Department dried up as increasing numbers of refugees came to the U.S.[16]

Funding authority for IRAP expired on September 30, 1977, at a time when 150,000 refugees has been resettled in more than 30 States, and parole has been granted for an additional 15,000. The Carter Administration proposed a 3-year phasedown of the program. The Senate Human Resources Committee reported a substitute amendment (S. Rept. 95–471) which Senator Kennedy offered as a floor amendment to the House-passed bill providing for the adjustment of status of Indochinese refugees who had been paroled into the United States. He observed that "the substitute amendment satisfies the need for a continuing Federal program of refugee assistance, while at the same time avoids the danger that the program may become institutionalized."[17] The amendment was passed by the Senate, accepted by the House, and enacted as title II, Extension of the Indochina Migration and Refugee Assistance Act of 1975, of Public Law 95–145.[18] Among other things, Public Law 95–145 provided for a 4-year phasedown of IRAP, from 100 percent Federal reimbursement of eligible costs for FY 1978 to 25 percent in FY 1981, ending completely in FY 1982. In fact, the phasedown never went into effect, except on a temporary basis for the first month of FY 1979. After some delay, funding was appropri-

---

[14] Act of June 21, 1976; 90 Stat. 691.
[15] Act of Sept. 10, 1976; P.L. 94–405; 90 Stat. 1225.
[16] Taft, Julia Vadala, North, David S., and Ford, David A. Refugee Resettlement in the U.S.: Time for a New Focus. (Washington, New TransCentury Foundation), 1979, p. 125. Reprinted in Senate Refugee Commitee Print (1980). p. 247.
[17] Congressional Record, [daily ed.], Oct. 10, 1977. p. S16840.
[18] Act of Oct. 28, 1977; 91 Stat. 1223.

76

ated for FY ·1978, followed by further amendment of the authorizing legislation to suspend the phasedown.

Far from abating in 1978, the flow of Indochinese refugees was increasing, with three different parole programs authorized that year. On September 30, 1978, Federal participation in the Indochina refugee program dropped from 100 percent to 75 percent. As in 1977, the Senate amended a House-passed bill by the addition of a title II amending the Indochina Migration and Refugee Assistance Act of 1975, in this case to continue full funding for FY 1979, retroactive to October 1, 1978. The House agreed to the amendment, and the bill was signed into law as Public Law 95-549.[19]

As explained in floor statements by Senator Alan Cranston (D.-Calif.) and Senator Kennedy, the amendment was a· compromise necessitated by the lateness of the session. The bill jointly reported by the Committee on Human Resources and the Committee on Foreign Relations (S. Rept. 95-1245) had been their desired approach, described as follows by Senator Cranston: "a revised proposal was worked out with the adminstration to provide 100 percent Federal assistance for all refugees during each individual refugee's first 36 months in the United States." [20]

The funding mechanism described here marks a change in the concept of the refugee resettlement assistance program from a temporary program which would eventually be phased out, to a permanent program which would provide assistance to the individual refugees participating in it for a limited duration of time. This was a significant departure from both the earlier view of Indochinese refugee assistance as something which, like the various parole programs, would eventually come to a complete end; or, conversely, of the Cuban program which had provided assistance to Cuban refugees on more or less an open-ended basis since the early 1960s. By the late 1970s, Congress was wary of both extremes. Senator Kennedy described the 1-year extension of the Indochinese program enacted into law along with the repeal of the phasedown as follows: "This is a compromise, and next year we will look at providing 100 percent support for 3 more years for all new refugees—only new refugees—entering the United States after next year." [21] In fact, with some coverage for refugees already here, this was the basic provision adopted in the Refugee Act of 1980.

The Indochina Migration and Refugee Assistance Act of 1975 was amended once more, by Public Law 96-110,[22] which extended full Federal funding of IRAP through FY 1981. The authority for IRAP had expired on September 30, 1979, and while the Refugee Act of 1979 had passed the Senate, it had not yet been considered by the House. The extension was intended, as Senator Cranston said in offering it as a floor amendment, as a stop-gap measure "to assure certaintly in funding for the current IRAP program until Congress resolves the issues involved in the Refugee Act of 1979." [23]

---

[19] Act of Oct. 30, 1978; 92 Stat. 2065.
[20] Congressional Record [daily ed.], Oct. 10, 1978. p. S18077.
[21] Congressional Record [daily ed], October 10, 1978: S18116.
[22] Act of Nov. 13, 1979; 93 Stat. 843.
[23] Congressional Record [daily ed], Nov. 2, 1979: 15739.

The Indochina Migration and Refugee Assistance Act of 1975, Public Law 94–23 as amended, was repealed by the Refugee Act enacted March 17, 1980.[24]

## THE REFUGEE ACT OF 1980 [25]

While there is no question that the Indochinese refugee crisis was a major impetus leading to the enactment of the Refugee Act of 1980, the Act represented much more than a specific response to a specific refugee situation. In fact, the major purpose of the Act was to provide an alternative to the past U.S. pattern of responding to each new refugee crisis as if it were both unprecedented and unlikely to recur. Quoting from the Act's statement of purpose, "The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted" (sec. 101(b); 94 Stat. 102).

A scholar of the legislative history of the 1980 Act, Deborah Anker, concluded that, far from being "the rash product of an anomalous time in history, the panicked response of lawmakers to an extreme refugee crisis, following the end of the war in Vietnam," the Refugee Act was "one of the most carefully considered and constructed pieces of legislation in the post World War II era, the result of a consensus that evolved over four decades during which debate and compromise took place among many different forces." [26] During the House floor debate on the conference report, Representative Rodino, the Chairman of the House Judiciary Committee, characterized the Refugee Act as "one of the most important pieces of humanitarian legislation ever enacted by a U.S. Congress." [27]

Legislative concern with refugees as a group distinct from immigrants dates back to the period following World War II, as reflected in the series of temporary enactments beginning with the Displaced Persons Act of 1948 noted throughout this report. On a more short-term basis, the legislative history of the 1980 Act begins with the 1965 amendments to the Immigration and Nationality Act. For the first time, these amendments incorporated a provision for the admission of refugees as part of the permanent immigration law. However, as was recognized early on, the 1965 law was inadequate in its coverage of refugees in a variety of ways. For example, it made no provision for refugees coming from the Western Hemisphere, as President Johnson underscored in his announcement of the parole program for Cuban refugees during the signing of the 1965 Act. The conditional entry preference category for refugees added by the 1965 amendments was geographically and ideologically limited to Eastern Hemisphere aliens fleeing persecution

[24] Public Law 96–212, section 312(c) (94 Stat. 117).
[25] Act of Mar. 17, 1980; Public Law 96–212; 94 Stat. 102.
[26] Anker, Deborah. The Refugee Act of 1980: An Historical Perspective, In Defense of the Alien, ed. Lydio F. Tomasi, vol. V (New York, Center for Migration Studies), 1983, p. 90.
[27] Congressional Record [daily ed.], Mar. 4, 1980. p. H1522.

78

from Communist-dominated countries or countries in the Middle East, in addition to being severely restricted numerically.

Refugee provisions were included in major omnibus immigration reform legislation considered in every Congress beginning with the 91st Congress (1969–1970) through the 94th Congress (1975–1976), particularly on the House side.[28] These provisions focused on broadening the definition of "refugee" and on normal and emergency admission procedures, major issues not resolved until the 1980 legislation.

On the Senate side, S. 3202, the "Immigration and Nationality Act Amendments of 1969," was introduced in the 91st Congress by Senator Kennedy on December 4, 1969.[29] Senator Kennedy wrote in 1981 that his bill culminated from a series of hearings conducted during 1965–68 by the Senate Judiciary Subcommittee on Refugees, an investigative non-legislative subcommittee which he chaired.[30] The findings and recomendations resulting in part from these hearings were summarized in a Senate Judiciary Committee print entitled "U.S. Assistance to Refugees throughout the World."[31] In his 1981 discussion, Senator Kennedy identified as "the crucial recommendation—that 'Congress actively consider pending legislation providing for a worldwide asylum policy and a more flexible authority in our basic immigration statute for the admission of refugees in reasonable numbers.'"[32] He noted that this recommedation was not implemented until a decade later, in part because of inaction until 1978 by the Senate Judiciary Subcommittee on Immigration and Naturalization to which immigration legislation was referred.[33]

General legislation focusing only on refugees was first introduced in the 95th Congress, promoted by the worsening Indochinese refugee crisis. Representative Eilberg, Chairman of the House Judiciary Subcommittee on Immigration, Citizenship, and International Law, introduced H.R. 7175, the "Refugee Act of 1977," on May 13, 1977, following subcommittee markup of a bill he had introduced previously. Senator Edward Kennedy, the Chairman of the Senate Judiciary Committee, introduced S. 2751, the "Refugee and Displaced Persons Act of 1978," on March 15, 1978.

Both the House and Senate bills included a definition of "refugee" which basically conformed with the United Nations Convention and Protocol Relating to the Status of Refugees, eliminating the geographical and ideological limitations in existing law. Neither of the bills included provisions for refugee resettlement assistance. H.R. 7175 was more restrictive than S. 2751 regarding both refugee numbers and congressional control of the refugee admis-

[28] For a discussion of these provisions, see Deborah E. Anker and Michael H. Posner, "The Forty Year Crisis: A Legislative History of the Refugee Act of 1980," San Diego Law Review, vol. 19, Dec. 1981, p. 20–30. (Cited as Anker and Posner (1981)).
[29] The House companion bill to S. 3202 was H.R. 15092, introduced by Rep. Michael Feighan (D.-Ohio). H.R. 9112, introduced by Rep. Emanuel Celler (D.-N.Y.), and H.R. 17370, introduced by Rep. Rodino, contained similar refugee provisions.
[30] Edward M. Kennedy, "Refugee Act of 1980," International Migration Review, vol. 15, spring-summer 1981, p. 143–144. (Cited as Kennedy, IMR (1981)).
[31] U.S. Senate Committee on the Judiciary, "U.S. Assistance to Refugees throughout the World: Findings and Recommendations of the Subcommittee to Investigate Problems Connected with Refugees and Escapees," Committee Print, 91st Cong., 1st sess., 1969.
[32] Kennedy, IMR (1981), p. 144; quoting ibid., p. 72.
[33] Kennedy, IMR (1981), p. 144.

sions process, clearly reflecting House frustration with the lack of congressional control over the parole process. Anker and Posner observe that, "The Congress' call for limitations was not simply a reflection of a new restrictionist attitude, but an expression of its felt need to structure and control executive decision-making." [34] The strength of this feeling, particularly on the House side, led to near defeat of the Refugee Act in th 96th Congress.

The Refugee Act was introduced early in the 96th Congress on behalf of the Carter administration. Using the 95th Congress legislation as a starting point, it was drafted during extensive consultations between representatives of the House and Senate Judiciary Committees and the Departments of Justice, State, and HEW (now Health and Human Services (HHS)).

The Administration bill was characterized as a "draft bill" by Representative Rodino in his introductory floor statement,[35] and it was processed as such by Senator Kennedy and Representative Elizabeth Holtzman (D–NY), the new Chairman of the House Judiciary Subcommittee on Immigration, Refugees, and International Law. The basic outlines of the final bill were present in the "draft bill" in the form of an expanded definition of "refugee;" the provision for normal and emergency refugee admissions outside the preference system; and the authorization of Federal refugee resettlement assistance. However, extensive changes were made by the Congress before the final enactment. A brief legislative history of the Refugee Act of 1980 follows.[36]

The "Refugee Act of 1979" was introduced on March 13, 1979. The Senate version was S. 643, introduced by Senate Judiciary Committee Chairman Kennedy. The House companion bill was H.R. 2816, introduced by House Judiciary Committee Chairman Rodino for himself and Representative Holtzman. The bills were referred to the Senate and House Judiciary Committees.

On the Senate side, S. 643 was considered by the full Judiciary Committee, as was immigration legislation generally under the chairmanship of Senator Kennedy. A hearing was held by the Senate Judiciary Committee on March 14, 1979. On July 10, 1979, the Committee considered and amended the bill, and agreed unanimously to report it. S. 643 was reported by the Senate Judiciary Committee on July 23, 1979 (S. Rept. 96–256). Amendments adopted during the Senate Committee markup provided for an expanded definition of "refugee" to include displaced persons in their own country, a specifically defined consultation process with the Congress, and an asylum procedure for aliens physically present in the U.S. who met the definition of "refugee."

S. 643 passed the Senate, as amended, on September 6, 1979 by a unanimous vote of 85 yeas. The Committee amendments were accepted, as were several amendments offered by Senator Walter Huddleston (D-KY) aimed at limiting the potential number of refugee admissions. Other amendments accepted were those offered by Senator Cranston and Senator Lawton Chiles (D–FL) providing for

[34] Anker and Posner (1981), p. 34.
[35] Congressional Record [daily ed.], Mar. 13, 1979: H1309.
[36] For a detailed legislative history of the Refugee Act of 1980, see Anker and Posner (1981), p. 43–64. See also Kennedy, IMR (1981); and Senate Refugee Committee Print (1980), p. 47–51.

continued funding, respectively, for Indochinese and Cuban refugees. In general, the bill was not controversial as reflected by its unanimous passage.

The House Judiciary Subcommittee on Immigration, Refugees, and International Law, chaired by Representative Holtzman, held 5 days of hearings on H.R. 2816 in May 1979. During subcommittee markup on August 1, Representative Holtzman introduced an amendment in the nature of a substitute which made significant changes in the refugee resettlement assistance provisions. As amended, the subcommittee amendment restructured the assistance program, amending title IV of the Immigration and Nationality Act rather than the Migration and Refugee Assistance Act of 1962, as did the original Administration and the Senate-passed bills. It also created an Office of Refugee Resettlement within HHS (then HEW) to administer the program, and required State plans as a prerequisite for participation. Amendments relating to refugee admissions similar in purpose to those adopted by the Senate included an expanded definition of "refugee" to include displaced persons, a specifically defined consultation process, and a statutory provision for asylum.

H.R. 2816 was ordered favorably reported to the full Committee on August 2, 1979. Following 2 days of markup, the full Committee ordered it reported, as amended, by a vote of 20–6. H.R. 2816 was reported by the House Judiciary Committee on November 9, 1979 (H. Rept. 96–608). It included an amendment providing that the parole provision could not be used for refugees unless the Attorney General determined it was justified by compelling reasons in the public interest, a provision retained in the enacted law.

H.R. 2816 passed the House, as amended, on December 20, 1979, by a vote of 328 yeas to 47 nays, and was repassed as S. 643. The House floor debate was considerably more heated than the Senate debate, with concern expressed over the numbers of refugees to be admitted and congressional control over the process. Amendments were adopted providing that after 3 years, the normal flow would revert from 50,000 to 17,400; strengthening the congressional consultation process; and providing for a congressional veto of certain refugee admissions.

In a 1981 article, Senator Kennedy characterized the House and Senate-passed bills and the conference process as follows:

> The two versions of the bill differed on some important points, but they were similar enough—and there was sufficient goodwill and cooperation on both sides—to assure that the differences could be easily resolved by a Conference Committee. In fact, this resolution was achieved in only two afternoon meetings, following extensive staff consultations.[37]

A Conference Committee met to resolve the differences between the House and Senate bills on February 19 and 20, 1979, and the conference report was filed on February 22, 1980 (H. Rept. 96–781). Regarding refugee admissions, the conferees adopted the Senate provision that after the sunset in 1982 of the 50,000 guideline for

---

[37] Kennedy, IMR (1981), p. 148–149.

the normal refugee flow, the normal flow would be determined in consultation with the Congress, as proved to be the case prior to 1982 as well. The House consultation procedures were adopted, although the one-house veto was dropped. A compromise was reached regarding the status of refugees, providing for adjustment to permanent resident status after 1 year. Another conference compromise provided for a statutory U.S. Coordinator for Refugee Affairs with the rank of Ambassador-at-Large.

Regarding refugee resettlement assistance, the conferees generally accepted the House provisions for the administration of the program by the Office of Refugee Resettlement within HHS (then HEW). A compromise was reached providing for Federal reimbursement for cash and medical assistance for refugees for 3 years, compared to 2 years in the Senate bill and 4 years in the House bill. The conferees required the President to determine whether administration of reception and placement grants should be transferred from the Department of State to HEW, as provided by the House but not by the Senate. The President subsequently determined that the responsibility should remain with State.

The Senate agreed to the conference report by voice vote on February 26, 1980. The House agreed to the conference report on March 4, 1980 by a vote of 207 yeas to 192 nays. The principal point of contention in the House, accounting in large part for the comparatively close vote, was the deletion of the legislative veto provision from the compromise conference bill. The House-passed bill had included a provision offered as a floor amendment by Representative Carlos Moorhead (R.-Calif.) that would have allowed a veto by either house of a Presidential decision to admit more than 50,000 refugees a year except in emergencies. This was not included in the Senate version and was dropped by the conferees.

The Refugee Act of 1980 (S. 643) was signed into law as P.L. 96–212 by President Jimmy Carter on March 17, 1980. A brief description of the principal provisions of the Refugee Act follows. For the most part, these provisions amended the Immigration and Nationality Act.

- ◉ The definition of "refugee" was revised to conform with the U.N. Convention and Protocol Relating to the Status of Refugees, and the geographical and ideological limits of previous law were eliminated. Under the Refugee Act's definition, refugee status is based on "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion (sec. 101(a)(42) of the Immigration and Nationality Act).

- ○ A statutory scheme was provided for both normal refugee flow and emergency refugee situations. A guideline of 50,000 was set for normal flow through 1982. Provision was made for a higher number to be set by the President following congressional consultation, and for the admission of additional refugees in emergency situations following a Presidential determination and consultation with the Congress. Refugee num-

bers are not included under the worldwide ceiling on immigration, which was set at 270,000.

- A clearly defined mandatory process of congressional consulation was set forth.
- Provision was made for the establishment of procedures for the granting of asylum, and the conditions for the withholding of deportation in persecution cases were redefined.
- Provision was made for the adjustment to permanent resident status by both refugees and asylees after one year's residence, outside of the numerical limitations on immigration. The number of refugees who may adjust to immigrant status annually is unlimited; but asylee adjustments are limited to 5,000 a year.
- The use of the parole provision in refugee situations was restricted.
- Authority was provided through fiscal year 1982 for a refugee resettlement assistance program, including up to 100 percent Federal reimbursement to States for cash and medical assistance to refugees during their first three years in the United States.
- An Office of Refugee Resettlement was established within the Department of Health and Human Services to administer this program.
- The position of U.S. Coordinator for Refugee Affairs was created by law as an Ambassador-at-Large.
- The previously authorized phasedown of the Cuban Refugee Program was continued, with the program scheduled to end completely at the end of fiscal year 1983.

The provisions of the Immigration and Nationality Act added by the Refugee Act were amended three times by the end of 1986. These amendments were limited to the provisions regulating the refugee resettlement assistance program. A major purpose was to reduce the welfare dependency of refugees. In order, the amendments were contained in the Refugee Assistance Amendments of 1982; [38] the Continuing Appropriations Resolution, 1985; [39] and the Refugee Assistance Extension Act of 1986.[40]

### CUBAN/HAITIAN ENTRANTS

Beginning in April 1980, thousands of Cubans began leaving Cuba from Mariel Harbor for Southern Florida, arriving without inspection or entrance documentation. This was the first instance in which the United States had experienced the mass arrival of aliens seeking refuge without prior processing abroad. There was confusion about how the influx should be handled, as well as about what their immigration status should be, and how such a large number of aliens could be processed in a timely fashion by INS. This confusion was exacerbated by concurrent increases in the

[38] Act of Oct. 25, 1982; P.L. 97–363; 96 Stat. 1734.
[39] Act of Oct. 12, 1984; P.L. 98–473; 98 Stat. 1837. This was the so-called Fish/Wilson amendment (98 Stat. 1877).
[40] Act of Nov. 6, 1986; P.L. 99–605; 100 Stat. 3449.

number of undocumented Haitians arriving by boat, as they had been throughout the 1970s.

As background to the Cuban emigration crisis, in early April 1980 over 10,000 Cubans entered the Peruvian Embassy compound in Havana, seeking asylum in Peru. When it became clear that Peru could not accept this number of refugees, Costa Rica agreed to act as a country of first asylum until permanent resettlement could be arranged. Due to the emergency nature of the Peruvian Embassy situation, the United States agreed to admit 3,500 of the Cubans in the compound as refugees. After consultation with the Congress, President Carter invoked the emergency provision of the Refugee Act to admit this number and made $4.25 million available from the U.S. Emergency Refugee and Migration Assistance Fund to cover transportation and other costs.[41] To date, this has been the only use of the emergency provision of the Refugee Act.

The Cuban Government terminated the airlift from the Peruvian Embassy to Costa Rica after only about 1,000 refugees left Cuba. On April 20, Cuban President Fidel Castro announced that Cubans wishing to emigrate to the United States could leave by boat from Mariel Harbor, including those from the Peruvian Embassy group. By September 26, 1980, when the Cuban Government closed Mariel Harbor, about 125,000 Cubans had arrived here.

The immigration status of the Cubans was controversial, especially because the United States had been receiving Cubans as refugees since Fidel Castro's takeover in 1959. There was support, by Senator Kennedy among others, for the President to designate the Cubans in the boatlift as "refugees" on a case-by-case basis under the emergency provisions of the Refugee Act. Such a determination would have been reasonable, supporters argued, because the Cubans were fleeing Communist repression in the same manner as those in the Peruvian Embassy designated refugees by the President. Refugee status would have facilitated their processing and made them immediately eligible for Federal assistance, a matter of great concern to the State of Florida.

The Carter Administration and others argued against providing refugee status for the undocumented Cubans on the grounds that they had not been screened abroad and granted priority admission according to criteria established by the U.S. Government. At least some of the emigres were apparently legally inadmissible and had no ties to the Unite States, and others were clearly coming to join their families and/or for economic betterment rather than fleeing persecution. In general, it was argued that it would establish a dangerous precedent for the United States to legitimize the uncontrolled entry of a large group of undocumented aliens through the use of the Refugee Act.

Since the undocumented Haitian emigres were in a situation similar to that of the Cubans under the immigration law, the above issues involved both groups. The Carter Administration stated that no distinction would be made between the two groups of emigres. Quoting President Jimmy Carter on May 14, 1980:

---

[41] Presidential Determination No. 80–16, Apr. 14, 1980. Federal Register, vol. 45, Apr. 28, 1980: 28079.

84

> I've instructed all appropriate Federal agencies to treat the Haitians now here in the same exact, humane manner as we treat Cubans and others who seek asylum in this country. Our laws never contemplated and do not adequately provide for people coming to our shores directly for asylum the way the Cubans and Haitians have done recently.[42]

Citing the broadened definition of "refugee" under the Refugee Act, House Judiciary Immigration Subcommittee Chairman Elizabeth Holtzman observed at a May 13 oversight hearing. "To treat Haitians in this country any differently from the incoming Cubans would be contrary both to the spirit and the letter of the law".[43]

On June 20, 1980, U.S. Coordinator for Refugee Affairs Victor Palmieri announced on behalf of the Carter Administration that the Cubans and Haitians would be granted a six-month parole with work authorization as Cuban/Haitian Entrants (Status Pending).[44] Initially, the status was available for Cubans who had arrived in the United States between April 21 and June 19, 1980 and were in INS proceedings, and for all Haitians who were in INS proceedings as of June 19, 1980. Subsequently, the cut-off date for both groups was extended to October 10, 1980.[45]

This extended parole was originally intended as an interim measure to allow the Congress time to enact legislation proposed by the Administration which would legally establish a Cuban/Haitian Entrant status for eligible Cubans and Haitians, allow them to adjust to permanent resident status after 2 years, and provide for 75 percent Federal reimbursement of some associated costs. The Administration bill was introduced by request by Senator Kennedy and Representative Rodino. It was accompanied by a letter from Assistant Attorney General for Legislative Affairs Alan Parker explaining its need in part as follows:

> This special, one time only, legislation is necessary to meet problems not contemplated by the Refugee Act of 1980. The refugee provisions of the Act do not provide for the sudden and massive arrival of persons to the United States who did not undergo overseas processing. The asylum provisions of the Act must be applied on a case-by-case basis, a process which would be slow, leaving many arrivals without a clear status and without eligibility for federally-funded assistance. Additionally, many of the Cubans and Haitians would not qualify under the strict standards for asylum.[46]

Senator Kennedy simultaneously introduced a substitute amendment providing for refugee status under the terms of the 1980 Refugee Act for the Cubans and Haitians. He argued, as he had before,

[42] Weekly compilation of Presidential Documents, vol. 16, May 19, 1980, p. 915–916.
[43] U.S. House Committee on the Judiciary, Subcommittee on Immigration, Refugees, and International Law, "Caribbean Migration," Hearings, 96th Cong., 2d sess., 1980, p. 2–3.
[44] Statement of Victor H. Palmieri, United States Coordinator for Refugee Affairs, June 20, 1980, p. 3. See also "Text of State Dept. Statement on Refugee Policy," New York Times, June 21, 1980, p. 8.
[45] "President Expands Cuban-Haitian Entrant Program," Interpreter Releases, vol. 57, Oct. 23, 1980, p. 498–499.
[46] Reprinted in Congressional Record [daily ed.], Aug. 5, 1980: S10827.

that "The administration could and should have used the Refugee Act to deal with this problem." [47] No action was taken by either the House or Senate on the proposals during the 96th Congress.

However, legislation was enacted by the 96th Congress providing for 100 percent reimbursement of State and local expenses for benefits for the Cuban and Haitians on the same terms as refugees. Public Law 96-422, the Refugee Education Assistance Act of 1980,[48] contained in title V the legislative authority for appropriations for resettlement assistance and initial processing and maintenance of the Cuban and Haitians. Title V provided that the Cubans and Haitians were to receive the same benefits made available to refugees under title IV of the Immigration and Nationality Act as amended by the Refugee Act, thereby ensuring reimbursement to State and local governments for cash and medical assistance and other expenses associated with their resettlement. Title V of Public Law 96-422 was popularly referred to as the Fascell-Stone amendment, in reference to its chief sponsors, Senator Richard Stone (D.-Fla.) and Representative Dante Fascell (D.-Fla.).

In the absence of legislation regularizing the status of the Cubans and Haitians, their parole and work authorization were extended indefinitely. Beginning in 1984, the Reagan Administration adjusted the status of the majority of the Cubans under Public Law 89-732.[49] This was legislation enacted in response to the Cuban refugee situation in the 1960s which authorized the Attorney General to create a record of permanent residence for the Cubans, but not for the Haitians.

The status of the Cubans and Haitians was not finally resolved until enactment of the Immigration Reform and Control Act of 1986.[50] This Act included special legalization provisions for eligible Cubans and Haitians, allowing them to adjust to permanent resident alien status, retroactive to January 1, 1982. These provisions evolved from the Simpson-Mazzoli legislation as first introduced in the 97th Congress, and most directly from H.R. 4853, legislation introduced in the 98th Congress by Representative Rodino.

---

[47] Congressional Record [daily ed.], Aug. 5, 1980: S10825.
[48] Act of Oct. 10, 1980; 94 Stat. 1799.
[49] Act of Nov. 2, 1966; 80 Stat. 1161.
[50] Act of Nov. 6, 1986; P.L. 99-603; 100 Stat. 3359.

## VIII. ILLEGAL IMMIGRATION AND THE IMMIGRATION REFORM AND CONTROL ACT, 1971–1986

The pattern of immigration and the policy considerations relating to it in the 1970s resembled in some respects those of the 1950s after the enactment of the Immigration and Nationality Act of 1952. In both decades, the entry of aliens outside the qualitative and quantitative restrictions of the basic law—both illegally as undocumented aliens, and legally as refugees—were increasingly the dominant pattern in immigration and the basis for the major issues confronting the Congress. In the latter period, the issue of refugees was addressed by the Refugee Act of 1980, discussed in the preceding chapter. The issue of illegal immigration proved more difficult for the Congress to deal with. It took 15 years of more or less active consideration, from 1971 to 1986, for Congress to enact legislation aimed at controlling illegal immigration.

As measured by apprehensions by the U.S. Immigration and Nationalization Service (INS), illegal immigration increased dramatically over the past 20 years. Apprehensions increased from 161,608 in fiscal year 1967 to over a million each year in fiscal years 1977, 1978, and 1979; over 900,000 in fiscal years 1980, 1981, and 1982; and over a million in fiscal years 1983, 1984, and 1985, reaching an all-time high of 1,761,400 in 1986. The major impetus behind illegal migration to this country is thought to be the economic imbalance between the United States and the countries from which the aliens come. The prospect of employment at U.S. wages is generally agreed to be the magnet which draws aliens here illegally. Chief among the legislative approaches to the problem has been the establishment of penalties for the employment of illegal aliens, in order to cut off the economic attraction.

### The 1970's

The year 1971 marks the beginning of the concern with the problem of illegal immigration which culminated in the enactment of the Immigration and Reform and Control Act of 1986. A Nixon administration bill including sanctions for the employment of illegal aliens was introduced on January 26, 1971,[1] the first of a long series of such proposals. House Judiciary Subcommittee No. 1 under the chairmanship of Representative Peter Rodino (D.-N.J.) began its extensive investigative and legislative hearings on illegal aliens in the 92nd Congress on May 5, 1971, concluding them on March 24, 1982.[2] Quoting from a 1975 House Judiciary Committee

---

[1] H.R. 2328, section 26 (92nd Congress).
[2] U.S. House Committee on the Judiciary, Subcommittee No. 1, "Illegal Aliens," Hearings, 92d Cong., 1st and 2d sess., Pts. 1–5, 1971–1972. A Committee print summarizing the hearings was issued entitled "Illegal Aliens: A Review of Hearings Conducted during the 92d Congress (Serial No. 13, Pts. 1–5) by Subcommittee No. 1," published Feb. 1973.

87

report, "The basic conclusion reached by the majority of the members of the Subcommittee as a result of the hearings was that the adverse impact of illegal aliens was substantial, and warranted legislation both to protect U.S. labor and the economy, and to assure the orderly entry of immigrants into this country." [3]

These hearings formed the basis for a series of bills prohibiting the knowing employment of illegal aliens, and establishing a graduated three-step series of administrative, civil, and criminal penalties for employers violating this prohibition. The basic rationale for this approach was explained as follows during the 94th Congress in a House Judiciary Committee report:

> The Committee believes that the primary reason for the illegal alien problem is the economic imbalance between the United States and the countries from which aliens come, coupled with the chance of employment in the United States. Consequently, it is apparent that this problem cannot be solved so long as jobs can be obtained by those who enter this country illegally and by those who enter legally as nonimmigrants for the sole purpose of obtaining employment.

> The Committee, therefore, is of the opinion that the most reasonable approach to this problem is to make unlawful the "knowing" employment of illegal aliens, thereby removing the economic incentive which draws such aliens to the United States as well as the incentive for employers to exploit this source of labor. [4]

Legislation embodying this approach passed the House during the 92nd and 93rd Congresses, and received the support of the Nixon and Ford administrations during this period. H.R. 16188 passed the House during the 92nd Congress on September 12, 1972 by voice vote after a motion to recommit it to the Judiciary Committee was defeated by a vote of 297 nays to 53 yeas. During the 93rd Congress, H.R. 982 passed the House on May 3, 1973 by a vote of 297 yeas to 63 nays. However, neither bill received Senate action.

In a related area, legislation was enacted in the 93rd Congress [5] amending the Farm Labor Contractor Registration Act of 1963 to establish criminal penalties, in addition to the existing sanction of registration revocation, for certain farm labor contractors who knowingly enagage the services of illegal aliens. The Farm Labor Contractor Registration Act was superseded and repealed in the 97th Congress by the Migrant and Seasonal Agricultural Worker Protection Act, [6] which included a provision prohibiting farm labor contractors from using the services of aliens authorized to work in the United States with penalties for violation similar to those in the earlier legislation.

A bill identical to the House-passed H.R. 982 of the 93rd Congress was introduced at the beginning of the 94th Congress, and

---

[3] H. Rept. 94-506, 94th Cong., 1st sess., 1975, p. 3.
[4] Ibid., p. 6.
[5] Act of Dec. 7, 1974; P.L. 93-518; 88 Stat. 1652.
[6] Act of Jan. 14, 1983; P.L. 97-470; 96 Stat. 2583.

88

hearings were held by the House Judiciary Subcommittee on Immigration, Citizenship, and International Law. A clean bill, H.R. 8713, was reported to the House on September 24, 1975,[7] but received no further action by the House. H.R. 8713 differed from earlier versions of the House Judiciary illegal alien bill most notably in the inclusion of a provision allowing for the legalization of status of certain undocumented aliens who had been in the country since June 30, 1968, as well as a provision intended to prevent employment discrimination against those of foreign appearance who are legally entitled to work.

A related bill was introduced in the 95th Congress by the Chairman of the House Judiciary Subcommittee on Immigration, Citizenship, and International Law, Representative Joshua Eilberg (D.-Pa.), as H.R. 1663, but received no House action. Reportedly this was due to the fact that in the 95th Congress, the House Judiciary Committee had determined to wait for conclusive Senate action before moving again on the increasingly controversial legislation.

On the Senate side, bills providing for a graduated series of civil penalties for the employment of undocumented aliens, in conjunction with legalization provisions for certain aliens illegally present in the United States, were introduced by Senator Edward Kennedy (D.-Mass.), a member of the Senate Judiciary Subcommittee on Immigration and Naturalization, during the 93rd (S. 3827) and 94th (S. 561) Congresses. However, the first time illegal alien legislation received formal consideration by the Senate Judiciary Committee in the 1970s was during the 94th Congress. On March 4, 1976, Senator James O. Eastland (D.-Miss.), Chairman of the Senate Judiciary Committee and its Subcommittee on Immigration and Naturalization, introduced S. 3074, an omnibus immigration reform bill. It included graduated civil penalties for the knowing employment of illegal aliens and a legalization provision allowing certain aliens who entered the countrty illegally prior to July 1, 1968 to establish a record of lawful admission. The bill would also have modified the temporary alien worker ("H-2") provision of the Immigration and Nationality Act to permit entry under certain conditions of aliens for permanent as well as temporary work. The Senate Judiciary Subcommittee on Immigration and Naturalization held hearings on S. 3074, but did not report it to the full committee.

The issue of illegal immigration continued to be of concern to the Executive Branch. On January 6, 1975, President Gerald Ford established the Domestic Council Committee on Illegal Aliens, a Cabinet-level committee chaired by Attorney General Edward Levi.[8] In its report dated December 1976, the Domestic Council Committee concluded that the major impact of illegal aliens at that time seemed to be in the labor market, and recommended enactment of legislation establishing penalties for the knowing employment of illegal aliens, similar to that which had been under consideration by the Congress for a number of years. The Domestic Council Committee concluded further that prevention of illegal entry was by far the most desirable enforcement policy. It also concluded that a massive deportation of illegal aliens presently in the United States

---

[7] H. Rept. 94-506, 94th Cong., 1st sess., 1975.
[8] Weekly Compilation of Presidential Documents, vol. 11, Jan. 13, 1975, p. 26.

89

would be "both inhumane and impractical," [9] and recommended enactment of a permanent provision allowing for the legalization of status of otherwise eligible illegal aliens who had been in the United States since July 1, 1968.

The problem of undocumented aliens received extensive study by the Carter administration, principally under the direction of Attorney General Griffin Bell, INS Commissioner Leonel Castillo, and Secretary of Labor Ray Marshall. On August 4, 1977, President Jimmy Carter submitted a message to the Congress outlining "a set of actions to help markedly reduce the increasing flow of undocumented aliens in this country and to regulate the presence of the millions of undocumented aliens already here." [10] President Carter proposed civil penalties for the employment of illegal aliens, increased Southwest border enforcement, continued cooperation with major source countries, permanent resident status for eligible aliens who had been here continuously since 1970, and a 5-year temporary resident status for aliens who had been here continuously since January 1, 1977. The Administration bill entitled the "Alien Adjustment and Employment Act of 1977," was introduced in the House in the 95th Congress as H.R. 9531 by Judiciary Committee Chairman Rodino on October 12, 1977; and in the Senate as S. 2252 by Judiciary Committee Chairman Eastland on October 28, 1977. It did not receive action beyond Senate Judiciary Committee hearings on S. 2252 in May and September 1978.

Legislation which was enacted during the 1970's relating to the control of illegal immigration included two amendments to the Immigration and Nationality Act. In the 94th Congress, the Immigration and Nationality Act Amendments of 1976 (P.L. 94–571) [11] contained a provision prohibiting aliens who have entered the country legally as nonimmigrants, and who have subsequently violated the terms of their admission by accepting unauthorized employment, from adjusting their status to that of permanent resident alien while in this country. The provision was aimed at deterring tourists, foreign students, and other nonimmigrants from working illegally. In the 95th Congress, Public Law 95–582 [12] amended the Immigration and Nationality Act to provide for the seizure and forfeiture of vehicles used to illegally transport aliens into the United States.

Another enactment in the 95th Congress of particular relevance to illegal immigration was Public Law 95–412 [13] which, among other things, created a 16-member Select Commission on Immigration and Refugee Policy required to report to the President and the Congress on its administrative and legislative recommendations relating to the admission of immigrants and refugees. The Select Commission was established in part in response to Congress' frustration in dealing with the seemingly intractable undocumented alien issue. A general consensus had been reached that it was appropriate to consider this issue in the context of an overall review

[9] U.S. Domestic Council Committee on Illegal Aliens, Preliminary Report, Dec. 1976, p. 243.
[10] Undocumented aliens; message from the President of the United States. H. Doc. 95–202, 95th Cong., 1st sess., Aug. 4, 1977, p. 1.
[11] Act of Oct. 20, 1976; 90 Stat. 2703.
[12] Act of Nov. 2, 1978; 92 Stat. 2479.
[13] Act of Oct. 5, 1978; 92 Stat. 907.

of immigration law and policy. In fact, while the Select Commission's recommendations regarding the legislative control of illegal immigration did not differ significantly from the legislative proposals which had evolved during the 1970's, its work provided a major impetus for the continued congressional examination of illegal immigration in the early 1980's and the eventual enactment of legislation in 1986.

THE SELECT COMMISSION ON IMMIGRATION AND REFUGEE POLICY:
RECOMMENDATIONS AND RESPONSE

Early in the 97th Congress, the Select Commission on Immigration and Refugee Policy submitted its final report, entitled "U.S. Immigration Policy and the National Interest," dated March 1, 1981.[14] The 16-member Select Commission consisted of four members of the Senate Judiciary Committee (Senators Edward Kennedy (D.-Mass.), Charles Mathias (R.-Md.), Dennis DeConcini (D.-Ariz.), and Alan Simpson (R.-Wyo.)), four members of the House Judiciary Committee (Representatives Peter Rodino (D.-N.J.), Robert McClory (R.-Ill.), Elizabeth Holtzman (D.-N.Y.), and Hamilton Fish (R.-N.Y.)), four Carter Administration Cabinet members (State, Justice, HHS, Labor), and four public members appointed by President Carter, including its Chairman, the Reverend Theodore M. Hesburgh, then President of Notre Dame University.

As noted above, the Select Commission had been created by legislation enacted in 1978 to conduct a study and evaluation of immigration and refugee laws, policies, and procedures. Its basic conclusion was that controlled immigration had been and continued to be in the national interest, and this underlay many of its recommendations. At the same time, the Commission stressed the need to improve the enforcement of immigration law and to "regain control over U.S. immigration policy."[15] The Commission's recommendations were summed up as follows by Chairman Hesburgh in his introduction:

> We recommend closing the back door to undocumented-illegal migration, opening the front door a little more to accommodate legal migration in the interests of this country, defining our immigration goals clearly and providing a structure to implement them effectively, and setting forth procedures which will lead to fair and efficient adjudication and administration of U.S. immigration laws.[16]

Limiting consideration here to the Commission's findings and recommendations regarding illegal immigration, the Commission noted that "one issue has emerged as most pressing—the problem of undocumented/illegal migration."[17] It cited the Census Bureau estimate of 3.5 to 6 million aliens present illegally in the United States, but found that "there is almost no consensus regarding the impact of illegal immigration on U.S. society."[18] The Commission

---

[14] U.S. Select Commission on Immigration and Refugee Policy. U.S. Immigration Policy and the National Interest. Final Report and Recommendations. Washington, 1981. 453 p.
[15] Ibid., p. 12.
[16] Ibid., p. 3.
[17] Ibid., p. 35.
[18] Ibid., p. 37.

91

concluded that although the evidence regarding the impact of illegal immigration on the U.S. economy and social services was inconclusive, "the toleration of large-scale undocumented/illegal immigration can have pernicious effects on U.S. society," [19] particularly in the disrespect bred for other laws by the flouting of the immigration law.

The Commission recommended "immediate action to reduce the flow of undocumented/illegal migration." [20] It proposed a three-part program to address the problem, as follows: (1) better border and interior control by the INS, including increased Border Patrol funding, enhanced port-of-entry inspection, and other measures aimed at improving immigration law enforcement; (2) economic deterrents in the workplace, including the enactment of legislation making it illegal for employers to hire undocumented aliens, and increased enforcement of wage and working standards legislation; and (3) legalization of the status of otherwise eligible aliens who have been illegally present in the United States since at least January 1, 1980.[21] The Commission considered but specifically did not recommend a large-scale temporary alien worker program as a possible solution to illegal immigration.[22]

The Congress responded to the Select Commission's report and recommendations initially with joint hearings in May 1981 by the House and Senate Judiciary immigration subcommittees under the chairmanship of Senator Alan Simpson (R.-Wy.) and Representative Romano Mazzoli (D.-Ky.). These were the first joint congressional hearings on immigration since 1951, as Senator Simpson noted in his opening statement:

> This is a joint Congressional hearing. I think you'll find that such a procedure is nearly unprecedented. I understand the last such hearing was some 30 years ago, and then both Houses of Congress were controlled by my good colleagues on the other side of the aisle. Such is not the case at present.[23]

The joint hearings in 1951 preceded the enactment of the Immigration and Nationality Act of 1952 which, with considerable amendment, remains the basic immigration law (8 U.S.C. 1101 *et seq.*).

The Reagan Administration responded to the final report of the Select Commission by appointing a Cabinet-level Task Force on Immigration and Refugee Policy, chaired by Attorney General William French Smith, to review the Commission's recommendations and the issues. Its work formed the basis for the Administration's proposals for immigration and refugee policy reform announced by the President and presented by the Attorney General at a joint hearing of the House and Senate Judiciary immigration subcom-

---

[19] Ibid., p. 41.
[20] Ibid., p. 42.
[21] Ibid., p. 45–84.
[22] Ibid., p. 42–45.
[23] U.S. Senate Committee on the Judiciary, Subcommittee on Immigration and Refugee Policy, "Final Report of the Select Commission on Immigration and Refugee Policy." Joint hearings before the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary and the Subcommittee on Immigration, Refugees and International Law of the House Committee on the Judiciary, 97th Cong., 1st sess., 1981, p. 12.

mittees on July 30, 1981.[24] At that time, President Ronald Reagan pledged that "America's tradition as a land that welcomes peoples from other countries" would continue, but he emphasized the necessity of insuring that they be accepted "in a controlled and orderly fashion." [25] The administration's proposals focused on the control of illegal immigration and of mass arrivals of undocumented aliens by sea, reflecting in the latter case concern about the possible recurrence of a situation similar to the recent mass arrivals of the Cubans and Haitians.

Legislation to implement these provisions was introduced on behalf of the Reagan administration on October 22, 1981. The Omnibus Immigration Control Act was introduced as S. 1765 by Senate Judiciary Committee Chairman Strom Thurmond (R.-S.C.), and as H.R. 4832 by House Judiciary Committee Chairman Rodino. Provisions relating to the control of illegal immigration included employer sanctions for the knowing employment of unauthorized aliens, a legalization program, a 2-year experimental temporary worker program for up to 50,000 Mexican nationals annually, and an increase in the annual ceiling on Mexican and Canadian immigration. Provisions relating to mass arrivals by sea included special Presidential powers in the case of an immigration emergency, authorization for the Coast Guard to interdict certain vessels at sea, and provisions expediting exclusion and asylum proceedings.

The Reagan Administration proposals together with the Select Commission's recommendations were the subject of extensive hearings by the House and particularly the Senate Judiciary Immigration Subcommittees throughout the fall and winter of 1981 and early 1982. These hearings led to the introduction in March 1982 of identical bills by the subcommittee chairman, referred to as the Simpson-Mazzoli bill. This, rather than the Administration bill, became the vehicle for legislative action. Although it differed in some important respects from the Administration bill, Attorney General William French Smith said at its introduction that it "takes us a significant further step." [26] During joint subcommittee hearings on the Simpson-Mazzoli bill in April 1982, the Attorney General characterized it as "a rational and comprehensive set of reforms in the finest bipartisan tradition of the U.S. Congress," and indicated the Administration's strong commitment to enacting legislation "along the lines set out in Administration's and the chairmen's bills." [27] The Administration's differences with the provisions in the Simpson-Mazzoli bill were indicated in its comments

---

[24] U.S. House Committee on the Judiciary, Subcommittee on Immigration, Refugees and International Law, "Administration's Proposals on Immigration and Refugee Policy." Joint hearing before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary and Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 1st sess., 1981.

[25] "United States Immigration and Refugee Policy." Statement by the President, July 30, 1981. Weekly Compilation of Presidential Documents, vol. 17, Aug. 3, 1981, p. 829.

[26] U.S. Department of Justice press release, Mar. 17, 1982. Quoted by Mary Thornton, "Hill Chairmen Propose New Immigration Bill," Washington Post, March 18, 1982, p. A4.

[27] U.S. House Committee on the Judiciary, Subcommittee on Immigration, Refugees, and International Law, "Immigration Reform and Control Act of 1982." Joint hearings before the Subcommittee on Immigration, Refugees and International Law of the House Committee on the Judiciary and the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 2d sess., 1982, p. 322.

93

on the bill in its various forms, and parallel Administration legislation was not introduced in the 98th Congress.

### LEGISLATIVE HISTORY OF THE IMMIGRATION REFORM AND CONTROL ACT

The legislation enacted as the Immigration Reform and Control Act of 1986 evolved directly from the Simpson-Mazzoli bill introduced in the 97th Congress. As amended, the legislation passed the Senate in the 97th Congress, but received no final House action. With further amendments, the Simpson-Mazzoli bills passed both the House and Senate during the 98th Congress, but the conferees failed to reconcile the differences between the two versions. Related bills were reintroduced in the 99th Congress, this time with Representative Rodino as the chief sponsor of the House version. The legislation passed both houses of the Congress, as did the conference report, and it was signed into law as Public Law 99–603 on November 6, 1986 (100 Stat. 3359).

This legislative history is discussed in more detail below. In addition to the structural legislative history, the evolution of major provisions of the bills and the controversy surrounding them is noted. The emphasis is on employer sanctions, legalization, and agricultural worker programs.

#### A. 97TH CONGRESS (1981–1982)

On March 17, 1982, the Immigration Reform and Control Act of 1982 was introduced as S. 2222 by Senator Simpson, the Chairman of the Senate Judiciary Subcommittee on Immigration and Refugee Policy, for himself and Senators Charles Grassley (R.-Iowa) and Walter Huddleston (D.-Ky). Identical legislation was introduced as H.R. 5872 by Representative Mazzoli, the Chairman of the House Judiciary Subcommittee on Immigration, Refugees, and International Law, for himself and Representatives McClory and Fish, respectively the ranking minority members of the full Judiciary Committee and the Immigration Subcommittee. As introduced, the bill consisted of three titles. Title I, Control of Illegal Immigration, included employer sanctions, and provisions relating to enforcement and fees, adjudication procedures and asylum and adjustment of status. Title II, Reform of Legal Immigration, included amendments relating to both immigrants and nonimmigrants, including the key amendments relating to H–2 nonimmigrant agricultural workers. Title III covered legalization.

These provisions were intended to increase control over illegal immigration, mass arrivals by sea and the related issue of backlogged asylum adjudications, and the number of immigrants entering anually. The common theme underlying these issues was the growing concern that existing immigration law and policy were inadequate to control the increasing numbers of aliens entering the country, both legally and illegally. In introducing S. 2222, Senator Simpson said, "our present immigration law and enforcement procedures no longer serve the national interest," and stated that the bill he and Congressman Mazzoli were introducing was "intended to bring immigration to the United States back under the control

94

of the American people." [28] Representative Mazzoli stated that the purposes of the bill were "to reform outmoded and unworkable provisions of the present immigration law and to gain control of our national borders." [29]

Action on the legislation proceeded quite quickly, particularly on the Senate side. S. 2222, the Senate version of the Simpson-Mazzoli bill, was unanimously approved, as amended, by the Subcommittee on Immigration and Refugee Policy on May 6. It was ordered reported, 16–1, by the full Judiciary Committee with amendments on May 27, 1982, and reported on June 30 (S. Rept. 97–485). The bill passed the Senate by a rollcall vote of 80 to 19 on August 17, 1982 after three days of debate.

The legislation proved much more controversial in the House, which did not complete action on it. The House version, H.R. 5872, was marked up and unanimously approved by the House Judiciary Immigration Subcommittee on May 18 and 19. A clean bill, H.R. 6514, was introduced by Representatives Mazzoli and Fish on May 27, and was marked by the full House Judiciary Committee for 5 days beginning September 14, 1982. The bill was ordered reported on September 22 after a motion to recommit it to the subcommittee failed 13–15. H.R. 6514 was reported by the Judiciary Committee on September 28 (H. Rept. 97–980, Pt. 1), and referred to four other committees for a period ending not later than November 30, 1982. It was reported by the House Education and Labor Committee with further amendments on December 1, 1982 (H. Rept. 97–980, Pt. II). H. R. 7357, a clean bill identical to the Judiciary Committee-reported bill except for a technical amendment addressing a budget concern, cleared the House Rules Committee on December 8. Under the modified open rule, all amendments to be offered on the floor were required to be printed no later than the December 9 *Congressional Record;* approximately 300 amendments were offered. The bill was debated December 16–18, 1982, but no final action was taken.

The controversy during the heated House debate in the lame duck session focused on employer sanctions, the legalization program, and temporary workers. The general opposition to employer sanctions by Hispanic and civil liberties groups was reflected in the House debate. The bill was strongly opposed by members of both the Hispanic Caucus and the Black Caucus on the grounds that employer sanctions would inevitably result in discrimination against members of minority groups. The various arguments against employer sanctions were summed up as follows by Representative Don Edwards (D.–Calif.):

> I have always been, and I remain, opposed to employer sanctions, which after all are the real heart of this bill. Putting the onus of law enforcement on employers is simply not appropriate to this problem and the U.S. Chamber of Commerce is justifiably opposed to this provision. In addition, I believe the employer sanction provision is discriminatory on its face. With the prospect of fines and

---

[28] Congressional Record [daily ed.], v. 128, May 27, 1982: S2216.
[29] Ibid., p. H940.

95

> criminal penalties looming over each employer, what em-
> ployer would be willing to talk about employment to some-
> one who looks or sounds foreign or bears a foreign sur-
> name? [30]

The controversy regarding employer sanctions turned in large part on the issue of identification, or how employer were to determine whether prospective employees were, in fact, legally authorized to accept employment. In an effort to meet concerns about discrimination, the Simpson-Mazzoli bill as originally introduced required that all employers examine specified documentation from all new hires, with penalities for failure to do so. While this all-inclusive requirement went through some permutations in various subsequent version of the bill, it was included in the legislation enacted in 1986.

The controversy about legalization during the 97th Congress centered on the desirability of the concept itself, as it continued to throughout the five years of debate. During the House debate, Representative Rodino emphasized that he would not support employer sanctions without legalization, a position he maintained consistently until final enactment. Legalization was generally supported on the grounds of equity and the lack of any viable alternative. Those opposing it argued that it condoned and encouraged law-breaking, and/or that it would be too costly. A major related issue was the extent of Federal reimbursement of State and local governments for costs related to legalization. As originally introduced, the bill included no reimbursement provision. In a major difference between the Senate-passed and House-reported versions, the Senate bill would have established a State impact aid block grant program, while the House bill provided for 100 percent reimbursement to the States, subject to available appropriations.

Finally, the issue of temporary agricultural workers was controversial in both the House and Senate during the 97th Congress, foreshadowing the importance it was to assume during the 98th and 99th Congresses. As background, underlying the perceived need for temporary worker provisions was the concern expressed by Administration officials and others that certain segments of seasonal agriculture, particularly in the West and the Southwest, had become heavily dependent on illegal workers and would be faced with potentially damaging labor shortages if employer sanctions were enacted. Amendments offered on the Senate floor and in the House Judiciary Committee to create a large-scale Mexican agricultural guest worker program were defeated. Instead, the bills would have modified the existing H-2 nonimmigrant temporary worker program authorized by section 101(a)(15)(H)(ii) of the Immigration and Nationality Act by statutorily creating separate streamlined procedures for the admission of H-2 seasonal agricultural workers.

As initially introduced, the proposed modifications to the H-2 program were assailed by growers as too restrictive and by organized labor as, at best, perpetuating an undesirable program. This pattern continued with the subsequent amendments to what proved to be one of the most controversial sections of the bill. Sena-

---

[30] Congressional Record [daily ed.], v. 128, Dec. 16, 1982: H10077.

96

tor Kennedy offered an amendment during the Senate floor debate to strike the H–2 provisions from S. 2222, leaving existing law unchanged, which was defeated 28 to 62. He argued that the effect of the H–2 amendments "has been to seriously weaken the labor certification and other labor controls on the H–2 program. This has understandably alarmed labor organizations, who see a weakening of the current high standards employers are now required to meet in seeking American workers first." [31] Senator Simpson argued against Senator Kennedy's amendment in part as follows, in words which proved prophetic regarding the critical role of the agricultural worker provisions:

> Of all the provisions considered in the last year and a half with regard to this legislation, I would say that we spent more time on these H–2 provisions in this bill. . . . Of all the areas of the legislation—and certainly some perilously mounted there—this is the one that hangs by the silken thread. [32]

By the end of the 97th Congress, the House and Senate versions of the Simpson-Mazzoli bill had evolved into two different bills. The principal difference was the omission of any changes in the numerical limits and preference system regulating the admission of legal immigrants in the House bill, compared to extensive revisions in the Senate bill. The House provisions relating to permanent legal immigration were deleted during Judiciary Committee mark-up by an amendment offered by Chairman Rodino, primarily on the grounds that they were premature before the results of legalization were known. [33] The employer sanctions provisions in the House bill were more graduated than those in the Senate bill. The legalization provisions in the two bills were similar, but the House bill provided for more Federal reimbursement of related State and local costs. It was with these and other differences that the two bills were reintroduced in the 98th Congress.

### B. 98TH CONGRESS (1983–1984)

The Simpson-Mazzoli legislation was introduced in the 98th Congress on February 17, 1983 as S. 529 by Senator Simpson, the Chairman of the Senate Judiciary Subcommittee on Immigration and Refugee Policy, and as H.R. 1510 by Representative Mazzoli, the Chairman of the House Judiciary Subcommittee on Immigration, Refugees, and International Law. The bills evolved from legislation passed by the Senate and reported by the House Judiciary Committee during the 97th Congress. S. 529 as introduced was identical to the Senate-passed S. 2222 of the 97th Congress, and H.R. 1510 as introduced was almost identical to H.R. 6514 as reported by the House Judiciary Committee in the 97th Congress.

Senate action was completed by May 1983. S. 529 was marked up and approved by the Senate Judiciary Subcommittee on Immigration and Refugee Policy on April 19, and was reported by the full

---

[31] Congressional Record [daily ed], v. 128, Aug. 13, 1982; S10430.
[32] Ibid., p. S10432.
[33] For a subsequent floor statement by Representative Rodino of this view, see Congressional Record [daily ed.], v. 128, Dec. 16, 1982: H10070–1.

Committee on April 21, 1983 (S. Rept. 98–62). It passed the Senate on May 18 by a vote of 76 to 18 after 4 days of floor debate.

As in the 97th Congress, House action was slower due to multiple referrals, greater controversy and, in a new twist, national politics. H.R. 1510 was marked up and approved by the House Judiciary Subcommittee on Immigration, Refugees, and International Law on April 5 and 6, and was reported by the full Judiciary Committee on May 13, 1983 (H. Rept. 98–115, Pt. 1) after 3 days of markup. At this point it was referred to four other committees, three of which reported it with amendments.

H.R. 1510 was reported on June 27 by the Committee on Agriculture (H. Rept. 98–115, Pt. 2)), and on June 28 by the Committee on Energy and Commerce (H. Rept. 98–115, Pt. 3) and the Committee on Education and Labor (H. Rept. 98–115, Pt. 4). The Committee on Ways and Means did not report the bill. Two amendments which were adopted on the House floor and subsequently became major issues during the House-Senate conference originated from these sequential referrals. These were the Panetta-Morrison amendment, creating an expanded temporary agricultural worker program, reported by the Agriculture Committee; and the antidiscrimination provisions of the amendment offered by Representative Gus Hawkins (D.-Calif.) and reported by the Education and Labor Committee, which later became known as the Frank amendment. Explaining the need for specific provisions of the original Hawkins amendment, the Education and Labor Committee report stated, "The Committee was especially concerned with the employment discrimination consequences Hispanic-Americans may suffer because of the employer sanctions provisions." [34]

Floor consideration of the House bill was delayed, first, by House Rules Committee Chairman Claude Pepper (D.-Fla.), who urged the chairmen of the four committees reporting the bill to reach some compromise on their sometimes mutually exclusive amendments. [35] It was delayed next by House Speaker Thomas P. (Tip) O'Neill (D.-Mass.), who announced on October 4 that he would not bring the bill to the House floor in 1983, or in 1984 without the approval of the House Hispanic Caucus. His motives were political. Quoting from the *Washington Post*, "He said he had heard that Reagan, who supported the bill when it passed the Senate earlier this year, would wait for the House's Democratic majority to pass the law and then veto it in order to win Hispanic support in the 1984 election." Representative O'Neill also observed, "Outside of editorials in a few liberal newspapers, is there any real constituency for this bill?" [36]

In November, House Speaker O'Neill reversed himself, saying that he would bring the immigration bill to the floor in early 1984. This followed an assurance by Senator Simpson that he would obtain the President's approval before the House took final action

[34] H. Rept. 98–115, Pt. 4, 98th Congress, 1st sess., 1983, p. 18.
[35] Nadine Cohodas, "Immigration Reform Bill Stalled in House Rules Panel," Congressional Quarterly, Aug. 6, 1983, p. 1638.
[36] T.R. Reid, "O'Neill Exercises Power, Bars Immigration Bill," Washington Post, Oct. 5, 1983, p. 2.

98

on a bill,[37] a promise which proved to be of a critical importance in the final outcome of the conference in 1984.

In fact, H.R. 1510 did not reach the House floor until June of 1984. Prior to that, the House Rules Committee heard testimony from almost 50 congressmen in April. It reported out a modified open rule which the Judiciary Committee version of the bill designated for floor action, and 69 amendments scheduled for consideration including those by the three other committees reporting the bill.

The House debated H.R. 1510 for 7 days beginning on June 11, 1984, and passed it on June 20, 1984 by the unexpectedly close vote of 216–211. The narrow vote was attributed in large part to opposition to the legalization program, although an amendment offered by Representative Bill McCollum (R.-Fla.) to strike the legalization provisions was defeated, 233–195. According to one source, Representatives "Mazzoli and Dan Lungren, R-Calif., principal floor manager for the Republicans, agreed that the legalization issue was the main reason for the close final vote," and "said that a number of members who had voted for amendments during the debate ended up opposing the bill because they believed its legalization provisions were too lenient."[38] Without question, the expanded nonimmigrant seasonal agricultural worker program added by an Agriculture Committee amendment offered by Representative Leon Panetta (D.-Calif.) and adopted, 228–172, accounted for some of the negative vote. There was also continued opposition to employer sanctions, but to some extent this issue had been defused by the adoption, 404–9, of an amendment offered by Representative Barney Frank (D.-Mass.). The Frank amendment, which originated as part of an Education and Labor Committee amendment, made it unlawful for an employer to discriminate against any individual with respect to hiring, recruitment, or referral for employment on the basis of national origin or alienage, and created procedures for enforcement and penalties for violation.

After further delays resulting from both national politics and strategy planning,[39] the House-Senate conference on the immigration bill convened on September 13, 1984. The House delegation consisted of 29 members, including representatives from the four committees which had reported the bill and Representative Edward Roybal (D.-Calif.), with some members restricted to consideration of certain sections of the bill.[40] Ten of the House conferees were from California, a fact which subsequently proved important. Seven Senate conferees were appointed, led by Senator Simpson.[41]

Under the chairmanship of Representative Rodino, the conferees met for 10 days between September 13 and October 9, 1984, but failed to reach an agreement. The final stalemate involved issues

[37] Martin Tolchin, "O'Neill, in a Reversal, Supports Immigration Bill," New York Times, Dec. 1, 1983, p. A19.
[38] Nadine Cohodas, "House Passes Immigration Bill by Five Votes," Congressional Quarterly, June 23, 1984, p. 1494.
[39] See Robert Pear, "Chief Sponsor Moves to Rescue Immigration Bill," New York Times, Aug. 4, 1984, p. 24; Maxwell Glen, "Immigration Bill Knocked Out in Final Round, But Sponsors Promise Rematch," National Journal, Nov. 3, 1984, p. 2087.
[40] Congressional Record [daily ed.], v. 130, Sept. 6, 1984: H9152; Spencer Rich, "House Chooses 29 Conferees on Immigration Legislation," Washington Post, Sept. 7, 1984, p. A9.
[41] Congressional Record [daily ed.], v. 130, Aug. 7, 1984: S9878.

relating to the major undocumented alien provisions: employer sanctions, legalization, and seasonal agricultural workers. By September 21, the conferees had agreed on all issues except the Frank amendment regarding antidiscrimination. However, two of these agreements, involving Federal reimbursement for legalization expenses and the nonimmigrant seasonal agricultural worker program, would come back to haunt them.

The conferees initially deadlocked over the provisions barring employment discrimination on the basis of alienage, with Senator Simpson and House Republicans arguing against making U.S. employers liable for hiring citizens instead of non-citizens. After the conference recessed, a compromise was mediated by Representative Charles Schumer (D.-N.Y.) between Senator Simpson and Representative Frank which replaced alienage with intending citizenship, thereby extending coverage only to aliens who signed a declaration of intention to become a citizen.

In the meantime, Senator Simpson had received word from the White House that the ageement reached by the conferees to specify an annual cap of $1 billion for the 4-year legalization assistance program in the statement of managers was not sufficient. In order to avoid a Presidential veto, it was necessary that this cap be specified in the statute itself.

Consequently, the compromise presented to the conferees when the conference reconvened on October 9 consisted of two parts: the substitution of intending citizenship for alienage in the Frank antidiscrimination provision, and the statutory limitation on Federal legalization assistance to $1 billion annually. The House conferees accepted the change in the Frank amendment by 15–8. Senator Simpson concurred on behalf of the Senate conferees with "the gravest reservations." However, the House conferees rejected the statutory legalization cap, 15–13, resulting in the termination of the conference.[42]

Several factors appear to have been involved in the rejection of the legalization cap, which had previously been agreed to by the conferees as part of the statement of managers in the conference report. The Governor of California, George Deukmejian, urged the California conferees to vote against the cap and, in fact, several who had previously voted for it changed their vote. However, it was surmised that some may have been motivated as much by displeasure with modifications in the seasonal agricultural worker program as with the legalization cap.

In a previous agreement, the conferees had dropped the additional seasonal agricultural worker program added by the Panetta amendment, and incorporated some of its provisions in the expanded H–2 temporary agricultural worker program. While this compromise was reportedly satisfactory to Representative Panetta, Patrick Quinn, a lobbyist for the National Council of Agricultural Employers, was quoted as saying, "A significant portion of Western agriculture will oppose this."[43] The *National Journal* stated that

[42] "Simpson-Mazzoli Conference Recesses in Impasse," Interpreter Releases, v. 61, Oct. 12, 1984, p. 829–830.
[43] Nadine Cohodas, "Conferees Near Agreement on Immigration Reform Bill," Sept. 22, 1984, p. 2298.

100

"there was universal agreement that agricultural interests deserved the credit" for vote changes on the legalization cap, and quoted Senator Simpson as follows, "You could see that the cap was being used when you saw three legislators vote against the cap who would ordinarily have supported it because the growers in their district got to [them] and said, 'Here's a way to kill the bill.' " [44]

### C. 99TH CONGRESS (1985–1986)

In the 99th Congress, Senator Simpson introduced S. 1200, the Immigration Reform and Control Act of 1985, on May 23, 1985. The bill was a streamlined version of his earlier bills, focusing almost entirely on illegal immigration. Provisions of earlier versions of the legislation relating to changes in legal immigration and to asylum adjudications were removed because they were, quoting Senator Simpson, "a less important part of the immigration debate, in order to focus our intentions on the most essential elements of the bill." [45] In his introductory floor statement, Senator Simpson underscored his view of the harmful effect of illegal immigration, stating, "It is my judgment that uncontrolled immigration is one of the greatest threats to the future of this country." At the same time, he stressed the danger of increased public intolerance toward legal as well as illegal immigration unless illegal immigration was controlled, and observed, "It is this unwanted and wretched result that this bill today attempts to avoid." [46]

On the House side, H.R. 3080, "The Immigration Control and Legalization Amendments Act of 1985", was introduced by Representative Rodino for himself and Representative Mazzoli on July 25, 1985. Thus, in the 99th Congress, the Simpson-Mazzoli bill became the Simpson-Rodino-Mazzoli bill, which was believed by many to be a significant factor in its final enactment. This was the first time in 10 years that Representative Rodino, the Chairman of the House Judiciary Committee, had been the principal sponsor of a bill aimed at illegal immigration control, and it appeared to signal his commitment to move the legislation. As introduced, H.R. 3080 resembled, with some changes, the final product of the conferees on the House-Senate bills in the 98th Congress.

Like Senator Simpson, both House sponsors cited the danger of a backlash against legal immigration as a principal reason for enacting legislation to control illegal immigration. Stating that he was "fearful that unless Congress acts to address this problem [of undocumented immigration] now, the time may come when America is forced to close its door to everyone," Representative Rodino described his bill as "a reasonable attempt to balance our Nation's conflicting needs in a humane and measured fashion by restoring the integrity of our borders while remaining faithful to our immigrant tradition." [47] Representative Mazzoli observed, "Unless Con-

---

[44] Maxwell Glen, "Immigration Bill Knocked Out in the First Round, But Sponsors Promise Rematch," National Journal, Nov. 1984, p. 2088.
[45] Congressional Record [daily ed.], v. 131, May 23, 1985: S7039.
[46] Ibid.
[47] Congressional Record [daily ed.], v. 131, July 25, 1985: H6392.

gress acts now to resolve the serious national problem of illegal immigration, our Nation's traditional, generous, and humane legal immigration program could collapse amid backlash, frustration, and resentment." [48] This fear of a backlash against legal immigration was a very real concern throughout the debate on immigration control legislation in the 1980s, particularly at the beginning of the 99th Congress following a number of years of frustration.

The Senate completed action on Senator Simpson's bill in September 1985. Following 4 days of markup in July, the Senate Judiciary Committee reported S. 1200 on August 28, 1985 (S. Rept. 99–132). The bill passed the Senate on September 19, 1985 by a vote of 69–30 after 7 days of debate.

Debate over a large-scale seasonal worker program for perishable commodities dominated the Senate floor debate on S. 1200, with three major votes on the issue. A proposal by Senator Pete Wilson (R.-Calif.) to create such a program was first narrowly defeated by two votes. Senator Simpson and Senator Kennedy, respectively the majority and minority floor managers for the bill, strongly opposed the amendment. Its defeat was followed by consideration of a similar proposal by Senator Wilson capped at 350,000 alien workers in the country at any one time, which passed 51–44. Finally, an amendment offered by Senator Paul Simon (D.-Ill). to sunset the seasonal agricultural worker program after 3 years unless Congress continued it by means of a joint resolution survived a tabling motion by 40–56, and was subsequently passed by voice vote. The modified Wilson amendment was adopted in addition to two other provisions in the bill providing for increased alien agricultural labor.

Another significant amendment adopted during the Senate floor debate was Senator Kennedy's proposal providing that if the U.S. General Accounting Office (GAO) determined at the end of 3 years that a widespread pattern of discrimination had resulted from the employer sanctions provisions and Congress approved GAO's findings by means of a joint resolution, the employer sanctions provisions would terminate. Senator Kennedy observed that his amendment offered "a statutory guarantee that Congress can easily address the issue of discrimination should it arise." [49] The amendment was accepted by Senator Simpson and passed by voice vote, and it was retained in the enacted legislation. Related amendments offered by Senator Kennedy in the 97th and 98th Congresses had been defeated.

The issue of seasonal agricultural labor continued to dominate consideration of the immigration reform bill as action moved to the House, in part because of Representative Rodino's objection to a large-scale guest worker program as being exploitive of both domestic and alien workers. He said he was "deeply disappointed" by the Senate's adoption of the amendment establishing the agricultural worker program immediately after its passage, and stated further, "This action by the Senate certainly complicates the issue and makes the job of the House Judiciary Committee and the full

---

[48] Ibid., p. E3541.
[49] Congressional Record [daily ed.], v. 131, Sept. 13, 1985; S11423.

House of Representatives more difficult." [50] This proved to be an understatement.

The House Judiciary Immigration Subcommittee completed 2 days of markup of H.R. 3080 on November 19, 1987, and the result was introduced as a clean bill, H.R. 3810, by Representatives Rodino and Mazzoli on November 21. This was the number under which the House bill was processed until it was repassed by the House as S. 1200.

Even before subcommittee markup, a group of Congressmen had begun trying to devise a compromise alternative to a guest worker program. The key members of this group as it evolved were Representative Charles Schumer (D.-N.Y.), Representative Howard Berman (D.-Calif.), and Representative Leon Panetta (D.-Calif.). Their task was to arrive at a program which would be satisfactory to both the influential and well-funded agricultural interests, and to those opposed to a large temporary guest worker program. The necessity for this compromise was made more immediate by the Senate's adoption of the modified Wilson amendment, which closely resembled the Panetta amendment which had been adopted by a 56-vote margin by the House during the 98th Congress. If such an amendment were to be passed by the House in the 99th Congress, its inclusion in any conference agreement would be inevitable. However, what seemed more likely was that Representative Rodino would not bring such a bill to conference, thus assuring the demise of immigration reform legislation in the 99th Congress.

Full House Judiciary markup of H.R. 3810 did not begin until June of 1986. Its postponement was due principally to two factors. First, as Representative Rodino had indicated even before introducing his bill, be believed presidential leadership on the immigration bill was critical. [51] He received the necessary assurance of the President's commitment to the legislation in a meeting with President Reagan on March 11, 1986, which also included Senator Simpson, Representative Mazzoli, and others. [52] House Judiciary consideration of the immigration bill was next delayed by Representative Rodino reportedly at the request of the majority of the Democrats on the Committee, in order to allow negotiations on the compromise foreign worker plan to continue. [53]

Full Judiciary Committee markup began on June 17 with an opening statement by Chairman Rodino in which he said:

> I cannot—and will not—support a bill with a guest worker component . . . . I would rather see no bill than one which could jeopardize the wages and working conditions of American farm workers and allows the large-scale influx of foreign farm workers. [54]

[50] Robert Pear, "Senate Alien Bill Draws Criticism," New York Times, Sept. 19, 1985, p. A21.

[51] Peter W. Rodino, Jr., "Immigration Needs the President's Clout," Los Angeles Times, July 6, 1985.

[52] Robert Pear, "Reagan Agrees to Press for Immigration Bill," New York Times, March 12, 1986, p. A12; Mary Thornton, "Reagan's Support Seen Aiding Immigration Bill; Way Cleared for House Action, Rodino Says," Washington Post, March 12, 1986, p. A10.

[53] Robert Pear, "Rodino Delays Immigration Bill to Seek Compromise on Farm Issue," New York Times, May 2, 1986, p. A18.

[54] Nadine Cohodas, "Immigration Bill Stalls Over Farm Labor Issue," Congressional Quarterly, June 21, 1986, p. 1411.

The issue of agricultural labor dominated House Judiciary markup of H.R. 3810 as it had the Senate floor debate, and the bill reported by the full Committee included a provision which was as controversial as the Senate Wilson amendment. This was the Schumer amendment, drafted after months of negotiations by Representatives Schumer, Berman, and Panetta as an alternative to a large-scale temporary worker program. Among other things, it granted permanent resident status to aliens who had worked 60 days in U.S. agriculture during a specified prior period, with the intent of protecting the alien workers from exploitation and U.S. workers from unfair competition. The amendment was adopted by a 16–19 vote after a heated debate. Opponents, which included Representatives Mazzoli and Lungren, respectively the chairman and ranking minority member of the Immigration Subcommittee, criticized it as "a rolling legalization program," and some who voted for it indicated they were doing so only to keep the bill alive.[55]

H.R. 3810 was ordered reported by the full Judiciary Committee on June 25, 1986 by a vote of 25–10 after 4 days of markup. It was reported by the Judiciary Committee on July 16, 1986 (H. Rept 99–682, Pt. 1) and sequentially referred to six other committees, four of which reported it. It was reported with amendments on August 5, 1986 by the Committee on Education and Labor (H. Rept. 99–682, Pt. 2), the Committee on Ways and Means (H. Rept. 99–682, Pt. 3), the Committee on Energy and Commerce (H. Rept. 99–682, Pt. 4), and the Committee on Agriculture (H. Rept. 99–682, Pt. 5). The amendments resulting from sequential referral were less controversial than they had been in the 98th Congress, in large part because the Education and Labor and Agriculture Committees accepted the basic outlines of the Judiciary Committee's agricultural labor amendments.

The major showdown in the 99th Congress came about in getting the immigration bill to the House floor. This took three attempts. The first, on September 26, was blocked by a procedural vote against the rule under which the bill was to be considered. The fight against the rule was led by Representative Lungren, who described the chain of events in part as follows:

> When the bill finally was brought to the House Rules Committee on September 23, 1986, I sought a rule that would allow a vote on my [guest worker] amendment as a substitute for the provisions contained in the House Judiciary Committee bill . . . . The rule reported by the Rules Committee precluded any debate on this controversial area of the bill. . . .
>
> This was simply unacceptable to the vast majority of those of us on the Republican side of the aisle. Accordingly, on September 26, 1986, we sought through a procedural motion a vote on the previous question which would have allowed the rule to be amended. On this point, we were defeated by a vote of 196 to 189. Voting the rule down was

---

[55] Nadine Cohodas, "House Panel Breaks Deadlock, Sends Immigration Bill to Floor," June 28, 1986, pp. 1479–1480.

104

the only available alternative; we did this by a vote of 202 to 180.[56]

Representative Lungren, generally one of the immigration bill's strongest supporters, explained further that it had not been his intention in defeating the rule to kill the bill:

> While our decision to defeat the rule was obviously a politically risky proposition, as well as a danger to the bill substantively, the House would have defeated the legislation in its existing form anyway. In other words, it was better to use the rule's defeat as a means of confronting the problems in the bill while there was still time to make changes that would enhance its chances for passage.[57]

The next attempt to bring the bill to the floor was a surprise Republican-led effort on October 1 to link its consideration to consideration of the Department of Justice Authorization bill, a move that was defeated 235–177 largely along partisan lines. This was followed by intensive bipartisan negotiations which led to a successful compromise on the agricultural labor issue. The compromise made House consideration of the bill possible, and was also agreed to in advance by Senator Simpson. Among other things, the compromise package required aliens to have worked in U.S. agriculture for 90 rather than 60 days in order to obtain first temporary and then permanent resident status, with the number partially capped at 350,000.

Once this compromise was agreed to, action moved swiftly, as it had to since the 99th Congress was nearing adjournment. The bill was brought to the House floor under H. Res. 580, a rule which provided for the substitution of the contents of H.R. 5665 for H.R. 3810. H.R. 5665 was introduced on October 8 by Representatives Rodino and Fish and included a number of amendments which had been reported by the committees to which the Judiciary-reported bill had been sequentially referred. The House passed H.R. 3810 with amendments on October 9, 1986 by 230–166, and substituted it for the contents of S. 1200. While the bill itself passed by a comfortable margin, an amendment offered by Representative McCollum to strike the legalization program provisions was defeated by a vote of 192–199; passage of this amendment would undoubtedly have killed the bill.

House-Senate conferees began work immediately and reached a final agreement on October 14 after 3 days of deliberations. Among the key issues considered were the legalization eligibility date, funding of legalization assistance, and temporary suspension of deportation for Salvadorans and Nicaraguans. The 1982 House cut-off date for legalization eligibility was accepted, and the temporary suspension provision—also in the House bill—was dropped with the promise that it would be reconsidered in the 100th Congress.

The conference threatened to run aground on the issue of legalization assistance funding, as it had in the 98th Congress. However, the conferees—already meeting in closed session—retired to a

---

[56] Daniel E. Lungren, "The Immigration Reform and Control Act of 1986," San Diego Law Review, v. 24, Mar./Apr. 1987, p. 284–285.
[57] Ibid., p. 285.

105

small room off the main Senate Judiciary hearing room and emerged several hours later with an agreement on a 4 year appropriation capped at $1 billion a year, to be distributed among the States according to specified factors.

The conference report (H. Rept. 99-1000) passed the House on October 15 by a vote of 238-173. For the first time, Senate passage initially proved more difficult, but after some parliamentary manoeuvres, the conference report on S. 1200 passed the Senate on October 17 by a vote of 63-24. The 99th Congress adjourned on October 18. President Reagan signed the Immigration Reform and Control Act of 1986 into law as Public Law 99-603 on November 6, 1986 (100 Stat. 3359).[58]

## Major Provisions of the Immigration Reform and Control Act

The major provisions of Public Law 99-603, the Immigration Reform and Control Act of 1986, address the control of illegal immigration by employer sanctions for the employment of unauthorized aliens, legalization of some undocumented aliens, and the legal admission of alien agricultural workers. Public Law 99-603 consists primarily of amendments to the basic immigration law, the Immigration and Nationality Act (INA) of 1952, as amended (8 U.S.C. 1101 *et seq.*).

### A. Employer Sanctions and Antidiscrimination Measures

Public Law 99-603 prohibits the employment, or recruitment or referral for a fee, of aliens known to be unauthorized to accept employment in the United States, and establishes mandatory penalties for violation. This prohibition applies to all employers, regardless of the number of employees. Violations are punishable by a graduated series of civil fines for each alien involved ranging from $250 to $10,000, and a criminal penalty of up to $3,000 for each alien and/or not more than 6 months imprisonment for a pattern or practice of violations.

Employer sanctions apply only to aliens hired, recruited, or referred on or after November 6, 1986, the date of enactment. While employer sanctions were effective upon enactment, the legislation provides for an 18-month phase-in period. No proceedings were conducted during the 6-month "public information period" that began December 1, 1986. During the subsequent 12-month period, June 1, 1987 through May 31, 1988, the law provides that a citation or warning be issued for a first offense, to be followed by penalties for subsequent offenses.

In an effort both to meet the concern of those fearful of discrimination in hiring and to provide employers with a defense against violation of employer sanctions, Public Law 99-603 requires all employers to examine specified documentation for all new hires. There are penalties for failure to comply. Compliance in good faith with the verification procedures constitutes an affirmative defense against a charge of knowingly hiring, recruiting, or referring undocumented aliens.

---

[58] Weekly Compilation of Presidential Documents, vol. 22, Nov. 10, 1986, p. 1533-1537.

106

The Immigration Reform and Control Act incorporates two other provisions intended to protect against discrimination. It includes a provision for a possible sunset of employer sanctions in the event that at the end of 3 years GAO finds that a widespread pattern of discrimination has resulted and Congress approves the finding. It also prohibits discrimination in hiring and firing based on citizenship status or national origins if the person alleging discrimination is a U.S. citizen or an alien who has filed a declaration of intention to become a U.S. citizen. However, an employer may choose a U.S. citizen over an alien when the applicants are equally qualified. These provisions apply to employers of four or more, to recruitment or referral for a fee, and to discrimination not covered by title VII of the Civil Rights Act of 1964. Public Law 99–603 creates a Special Counsel for Immigration-related Unfair Employment Practices within the Department of Justice to investigate and prosecute charges of such discrimination. Penalities are provided for violation. The antidiscrimination provisions will sunset in the event that employer sanctions do, or if GAO finds after 3 years either that no significant discrimination has resulted from employer sanctions, or that they have resulted in an unreasonable burden on employers, and Congress approves the finding.

### B. LEGALIZATION

The legalization program established by Public Law 99–603 provides temporary resident status for otherwise eligible aliens who have continuously resided in the United States in an unlawful status since before January 1, 1982. Aliens may apply for such adjustment during the 12-month period which began on May 5, 1987. After 18 months in temporary status, they may adjust to permanent resident status during a subsequent 12-month period, providing they can demonstrate a minimal understanding of English and U.S. history and government, or are pursuing the necessary instruction.

Legalized aliens are disqualified from Federal public welfare assistance for 5 years after adjustment to temporary status, with the exception of assistance designed for persons who are aged, blind, or disabled; Medicaid benefits for emergency services, pregnant women, and children; and certain other specified programs. The Act appropriates $1 billion a year for 4 years beginning with fiscal year 1988 for State legalization impact-assistance grants to reimburse Federal, State, and local governments for health, welfare, education, and administrative costs of legalized aliens during their first 5 years after adjustment to temporary status.

Section 249 of the Immigration and Nationality Act, the "registry provision," was also amended by Public Law 99–603 on a permanent basis to authorize the Attorney General, in his discretion, to adjust to permanent resident status otherwise eligible aliens who entered the United States illegally prior to January 1, 1972. Section 249 had most recently been amended by the Immigration and Nationality Act Amendments of 1965,[59] which had advanced

---

[59] Act of Oct. 3, 1965; P.L. 89–236, sec. 19; 79 Stat. 911, 920.

the eligibility cut-off date from June 28, 1940 to June 30, 1948. Unlike legalized aliens, aliens who adjust under this provision are not barred from participation in certain Federal financial assistance programs.

Additionally, Public Law 99–603 authorizes the Attorney General, in his discretion, to adjust to permanent resident status certain otherwise eligible Cuban or Haitian nationals under conditions generally more favorable than those of the basic legalization program.

### C. AGRICULTURAL WORKER PROGRAMS

The Immigration Reform and Control Act establishes a 7-year special agricultural worker (SAW) program which provides temporary and subsequently permanent status for otherwise eligible aliens who have worked at least 90 days in seasonal agriculture in the United States during the year ending May 1, 1986. The aliens may adjust to permanent resident status after either 1 or 2 years, depending on how long they have worked in U.S. seasonal agriculture, with those adjusting after 1 year limited to 350,000. They are not required to remain in agriculture. Beginning in fiscal year 1990 through fiscal year 1993, replenishment workers may be granted temporary resident status if there is a shortage of seasonal agricultural workers. Replenishment workers are required to work 90 days a year in seasonal agriculture for the first 3 years after admission to avoid deportation, and may adjust to permanent resident status at the end of that time. Special agricultural and replenishment workers are temporarily disqualified from some Federal public assistance programs, and States may be reimbursed for certain costs incurred by them under the State legalization impact-assistance grants.

Public Law 99–603 also contains detailed amendments to the H-2 nonimmigrant temporary worker provision of the INA intended to make needed H-2A temporary agricultural workers more readily available and to increase statutory protections for U.S. and alien labor.

### D. OTHER PROVISIONS

Other provisions of the Immigration Reform and Control Act relating to illegal immigration include additional penalties for fraud and misuse of immigration-related documents; authorizations of supplemental appropriations for INS and the Department of Labor; authorization of a $35 million immigration emergency fund; the requirement that INS officers obtain search warrants before entering outdoor agricultural operations; authorization of INS's automated SAVE (Systematic Alien Verification for Entitlements) system under which States are required to verify the eligibility of aliens applying for certain Federal benefits; and the establishment of a 12-member Commission for the Study of International Migration and Cooperative Economic Development.

While the focus of Public Law 99–603 is on illegal immigration, it also contains some provisions relating to legal immigration. These include the increase in the "colonial quota" from 600 to 5,000 annually; provision of an additional 5,000 nonpreference immigrant

108

visas annually in fiscal years 1987 and 1988 to be made available to natives of foreign states adversely affected by the 1965 amendments to the INA; authorization of a 3-year visa waiver pilot program, given certain conditions; and the provision of special immigrant status for certain G–IV nonimmigrant retired employees of international organizations and/or their immediate family members.

## IX. OTHER IMMIGRATION LEGISLATION, 1979–1986

As discussed in detail in the preceding two chapters, the major immigration legislation enacted during 1979–1986 was the Refugee Act of 1980 and the Immigration Reform and Control Act of 1986. Other legislation amending the Immigration and Nationality Act (INA) during this period is summarized briefly below by Congress and in chronological order of enactment.

Probably the most important of these other enactments were Public Law 97–116, the INS efficiency act; Public Law 99–639, the Immigration Marriage Fraud Amendments of 1986; Public Law 99–653, the consular efficiency amendments; and the two extensions and revisions of refugee assistance, Public Law 97–363 and Public Law 99–605.

### 96TH CONGRESS (1979–1980)

Public Law 96–70, the Panama Canal Act of 1979 (September 27, 1979; 93 Stat. 452) amended the INA to allow for the admission of a limited number of aliens and their immediate relatives who had been employed for specified periods and types of employment at the time that the Panama Canal Treaty of 1977 entered into force (93 Stat. 496).

Public Law 96–212, the Refugee Act of 1980 (March 17, 1980; 94 Stat. 102), amended the INA to provide for the admission and resettlement of refugees, and is discussed in detail in chapter VII above.

Public Law 96–538, the Health Programs Extension Act of 1980 (December 17, 1980; 94 Stat. 3183) extended for 1 year, until December 31, 1981, the period during which certain entry requirements for nonimmigrant foreign medical graduates (FMGs) could be waived (94 Stat. 3192).

### 97TH CONGRESS (1981–1982)

Public Law 97–116, the Immigration and Nationality Act Amendments of 1981 (December 29, 1981; 95 Stat. 1611), was popularly referred to as the INS efficiency bill, and was described throughout its processing as both noncontroversial and technical. It included a series of amendments to the INA intended to save time and money by clarifying or repealing some INS procedures and eliminating certain unnecessary requirements. It was also intended to reduce the number of private bills handled by Congress by remedial amendment of several of the provisions frequently addressed by such bills. Public Law 97–116 included provisions relating to foreign students, FMGs, foreign-born adopted children, waivers of inadmissibility for possession of marihuana, place of deportation of excludable aliens, alien address reports, and adjustment of status of certain alien investors, among other things.

110

Public Law 97–359 (October 22, 1982; 96 Stat. 1716) amended the INA by the addition of a new section 204(g) providing preferential treatment in the admission of certain children of mixed Asian and American heritage (Amerasians).

Public Law 97–363, the Refugee Assistance Amendments of 1982 (October 25, 1982; 96 Stat. 1734), amended title IV of the INA to authorize appropriations for refugee assistance through fiscal year 1983 and to modify the terms under which it was provided.

### 98TH CONGRESS (1983–1984)

Public Law 98–164, the Department of State Authorization Act, fiscal years 1984 and 1985 (November 22, 1983; 97 Stat. 1017), deleted section 412(b)(1)(B) of the INA, a reporting requirement relating to refugees which had been met (97 Stat. 1061).

Public Law 98–454 (October 5, 1984; 98 Stat. 1732) amended the INA to authorize a nonimmigrant visa waiver program for aliens entering Guam as visitors for up to 15 days, provided Guam had an adequate arrival and departure control system (98 Stat. 1737). The provision was amended by P.L. 99–396.

Public Law 98–473, the Continuing Appropriations Resolution, fiscal year 1985 (October 12, 1984; 98 Stat. 1837) included "technical and conforming" crime-related amendments to sections 212(a)(9) and 242(h) of the INA (98 Stat. 2028); and amended section 412(e) of the INA to require the implementation of alternative resettlement assistance projects to encourage refugee self-sufficiency (98 Stat. 1877).

Private Law 98–47 (October 30, 1984) amended section 101(a)(9) of the INA to repeal the visa issuance authority of Governors of the Canal Zone and other U.S. possessions.

### 99TH CONGRESS (1985–1986)

Public Law 99–169, the Intelligence Authorization Act (December 4, 1985; 99 Stat. 1002), amended section 316 of the INA to facilitate naturalization of certain foreign intelligence sources, limited to 5 a year (99 Stat. 1007).

Public Law 99–217, the Sentencing Reform Amendments Act of 1985 (December 26, 1985; 99 Stat. 1728), delayed until November 1, 1987 the effective date of the amendment by Public Law 98–473 to section 212(a)(9) of the INA, relating to the exclusion of aliens who have been convicted of a crime involving turpitude.

Public Law 99–396 (August 27, 1986; 100 Stat. 837) amended section 212(1) of the INA relating to a waiver of the nonimmigrant visa requirement for Guam (100 Stat. 842); and sections 308 and 341 of the INA relating to U.S. non-citizen national status (100 Stat. 842, 843).

Public Law 99–500, the Continuing Appropriations Resolution, fiscal year 1987 (October 18, 1986; 100 Stat. 1783), amended section 286 of the INA to require immigration inspection fees.

Public Law 99–505 (October 21, 1986; 100 Stat. 1806) amended section 101(a)(15)(D) of the INA to permit alien crewmen on U.S.-based fishing vessels to stop temporarily at ports in Guam.

Public Law 99–570, the Anti-Drug Abuse Act of 1986 (October 27, 1986; 100 Stat. 3207), amended sections 212(a)(23) and 241(a)(11) of

111

the INA to broaden the grounds for exclusion and deportation of alien drug offenders; and section 287 of the INA relating to INS custody of illegal alien drug offenders.

Public Law 99–603, the Immigration Reform and Control Act of 1986 (November 6, 1986; 100 Stat. 3359), amended the INA to provide for employer sanctions, legalization, and agricultural worker programs, among other things, and is discussed in detail in Chapter VIII above.

Public Law 99–605, the Refugee Assistance Extension Act of 1986 (November 6, 1986; 100 Stat. 3449) amended title IV of the INA to authorize appropriations for refugee assistance through fiscal year 1988 and to modify the terms under which it was provided.

Public Law 99–639, the Immigration Marriage Fraud Amendments of 1986 (November 10, 1986; 100 Stat. 3537), consisted of a series of amendments to the INA intended to deter immigration-related marriage fraud. It provided that certain alien spouses and sons and daughters who become permanent resident aliens by virtue of marriage will be in a conditional status for 2 years. Such aliens are required to file a petition requesting removal of their conditional status within 90 days of the end of this 2-year period, and must appear for an interview with INS. Additionally, Public Law 99–639 increased the criminal penalty for marriage fraud; required fiance(e)s to have met within 2 years before requesting K finance(e) nonimmigrant visas; prohibited the future entry of aliens determined to have attempted marriage fraud; prohibited aliens who marry while in exclusion or deportation proceedings from obtaining immigrant status based on the marriage until they have lived abroad for 2 years; and amended the grounds for exclusion relating to misrepresentation.

Public Law 99–653, the Immigration and Nationality Act Amendments of 1986 (November 14, 1986; 100 Stat. 3655), was popularly known as the State Department consular efficiency act. Among other things, it included amendments to the INA which required that an adopted child be in the custody of the adopting parents for two years, rather than 2 years after adoption, to qualify as a "child" for entry to the U.S.; extended foreign state chargeability to aliens qualified to "follow to join" an immigrant; eliminated the fingerprinting requirement and the requirement that consular posts retain duplicate visa documents; reduced the citizenship transmission period for certain children; facilitated the acquisition of U.S. citizenship by the illegitimate child of a U.S. citizen father; clarified loss of citizenship requirements; and provided for administrative rather than judicial naturalization for certain foreign-born children adopted by U.S. citizens.

## APPENDIX

### 87-917 EPW

---

#### CRS REPORT FOR CONGRESS

#### THE IMMIGRATION AND NATIONALITY ACT--QUESTIONS AND ANSWERS

by
Joyce Vialet
Specialist in Immigration Policy
Education and Public Welfare Division



---



November 23, 1987

CONGRESSIONAL
RESEARCH
SERVICE
THE LIBRARY
OF CONGRESS

The Congressional Research Service works exclusively for the Congress, conducting research, analyzing legislation, and providing information at the request of committees, Members, and their staffs.

The Service makes such research available, without partisan bias, in many forms including studies, reports, compilations, digests, and background briefings. Upon request, CRS assists committees in analyzing legislative proposals and issues, and in assessing the possible effects of these proposals and their alternatives. The Service's senior specialists and subject analysts are also available for personal consultations in their respective fields of expertise.

115

## ABSTRACT

The basic United States law governing immigration and naturalization is contained in the Immigration and Nationality Act of 1952, as amended (8 U.S.C. 1101 et seq.). The following questions and answers have been prepared to explain the way in which the Immigration and Nationality Act as amended through FY 1987 regulates the entry of aliens for permanent and temporary residence in the United States, and other major provisions of the law. Emphasis is placed on subjects which have been of particular interest to the Congress in recent years, including amendments by the Immigration and Reform Act of 1986 relating to employer sanctions and legalization. This supersedes CRS Report No. 85-56 EPW.

116

CRS-v

## CONTENTS

ABSTRACT.................................................................. iii

THE IMMIGRATION AND NATIONALITY ACT--QUESTIONS AND ANSWERS
    (1) What is the difference between an alien, an immigrant, and
        a nonimmigrant, as the terms are used in the Immigration
        and Nationality Act?........................................ 1
    (2) What are the numerical restrictions on immigration? How
        many immigrants are admitted annually?...................... 2
    (3) What is the preference system, and how does it work?.......... 3
    (4) How does an alien qualify for an immigrant visa under the
        relative and occupational preferences or as an immediate
        relative of a U.S. citizen?................................. 4
    (5) What provisions are made for the legalization of status of
        undocumented aliens, and what Federal benefits are they
        eligible for?.............................................. 5
    (6) What provisions are made for the legalization of status of
        seasonal agricultural workers?............................. 6
    (7) What are the different categories of nonimmigrants, and
        how many are admitted?..................................... 7
    (8) What provision is made for the admission of temporary
        workers?.................................................. 8
    (9) How are groups of refugees admitted to the United States?...... 8
   (10) Are there refugee-related provisions for individuals, in
        addition to the procedures for regular and emergency
        refugee group admissions described above?................... 10
   (11) What is extended voluntary departure (EVD)?................... 11
   (12) What is a commuter alien, or "green-card commuter?"........... 11
   (13) What is an illegal or undocumented alien?.................... 12
   (14) What are the employer sanctions provisions of the
        Immigration and Nationality Act?........................... 12
   (15) What sanctions are provided by the Immigration and
        Nationality Act for undocumented aliens.................... 14
   (16) What other criteria exist for the admission of aliens,
        and for their remaining in the United States?.............. 14
   (17) What is labor certification?................................ 15
   (18) What provision is there in the Immigration and Nationality
        Act to insure that immigrants will be self-supporting, or
        provided for by relatives, and will not require public
        assistance?............................................... 16
   (19) What provisions are there regarding the entry of aliens
        who are likely to endanger the public safety, and/or who
        belong to proscribed political organizations?............. 17

CRS-vi

(20)  How does an immigrant become a citizen?.......................  18
(21)  What are the principal agencies involved in administering
      the Immigration and Nationality Act?..........................  19
(22)  What have been the major amendments to the Immigration and
      Nationality Act since its enactment in 1952?..................  19

### THE IMMIGRATION AND NATIONALITY ACT--QUESTIONS AND ANSWERS

The basic United States law governing immigration and naturalization is contained in the Immigration and Nationality Act of 1952, as amended (8 U.S.C. 1101 et seq.). The following questions and answers have been prepared to explain the way in which the Immigration and Nationality Act, as amended through October 1, 1987, regulates the entry of aliens for permanent and temporary residence in the United States, and other major provisions of the law. Emphasis is placed on subjects which have been of particular interest to the Congress in recent years. Additionally, several questions highlight major amendments to the Immigration and Nationality Act by P.L. 99-603, the Immigration Reform and Control Act of 1986, which focused on illegal immigration (see question (22)).

(1) <u>What is the difference between an alien, an immigrant, and a nonimmigrant, as the terms are used in the Immigration and Nationality Act?</u>

The Immigration and Nationality Act defines an alien as "any person not a citizen or national of the United States," and sets forth the conditions under which aliens may enter this country. A basic distinction is made between immigrants and nonimmigrants. Immigrants are those aliens who are lawfully admitted for permanent residence. Nonimmigrants are granted temporary admission for such purposes as tourism or temporary business trips. Fewer immigrants than nonimmigrants are admitted, and the conditions of their admission are more stringent.

CRS-2

Once they are admitted, immigrants are subject to fewer restrictions than nonimmigrants.   For example, while some nonimmigrants are admitted for the express purpose of temporary employment, most nonimmigrants—including all tourists—are prohibited from legally accepting employment.   Immigrants, on the other hand, may freely accept and change employment.   All nonimmigrants are required to leave the country at the end of their allotted time.   Immigrants, in contrast, are admitted permanently and may apply for U.S. citizenship through the naturalization process.

In addition to immigrants and nonimmigrants, the immigration law also designates several categories of aliens who are in the process of acquiring immigrant status following the required time period and provided they are otherwise eligible.   These categories include refugees and asylees (see questions (9) and (10)); and legalized aliens and special agricultural workers in temporary status (see questions (5) and (6)).

## (2)  What are the numerical restrictions on immigration?  How many immigrants are admitted annually?

Numerically restricted immigration is limited to 270,000 a year, exclusive of refugees.   Under this worldwide ceiling, each independent country is restricted to a maximum of 20,000 immigrant visas, a number reached in recent years by China, Korea, Mexico, the Philippines, India, and the Dominican Republic.   Territories and possessions of independent countries are limited to 5,000 immigrant visas annually.

Additionally, there are several categories of immigrants which are exempt from numerical restrictions.   Most exempt entrants are the immediate relatives of U.S. citizens, defined by the law to include the unmarried children under 21 and spouses of U.S. citizens, and the parents of U.S. citizens aged 21 or over.   Certain aliens who acquire immediate relative status through marriage are in a conditional status for 2 years.   Other immigrants admitted outside of

CRS-3

the numerical limits include legalized aliens and special agricultural workers
admitted for permanent residence under the temporary programs authorized by the
Immigration and Nationality Act as amended by P.L. 99-603.

Statistics follow on the number of immigrants admitted over the 10-year
period fiscal years 1977-1986:

| | |
|---|---|
| 1977 | 462,315 |
| 1978 | 601,442 |
| 1979 | 460,348 |
| 1980 | 530,639 |
| 1981 | 596,600 |
| 1982 | 594,131 |
| 1983 | 559,763 |
| 1984 | 543,903 |
| 1985 | 570,009 |
| 1986 | 601,708 |

(3)  What is the preference system and how does it work?

Immigrant visas available under the current worldwide ceiling of 270,000
are distributed according to a six-category preference system which gives
priority to family members and those with needed skills, as follows:

First preference (unmarried sons and daughters of U.S. citizens):  20
percent of the overall limitation of 270,000 in any fiscal year;

Second preference (spouses and unmarried sons and daughters of aliens
lawfully admitted for permanent residence):  26 percent of overall
limitation, plus any numbers not required for first preference;

Third preference (members of the professions or persons of
exceptional ability in the sciences and arts):  10 percent of overall
limitation;

Fourth preference (married sons and daughters of U.S. citizens):  10
percent of overall limitation, plus any numbers not required by the
first three preference categories;

Fifth preference (brothers and sisters of U.S. citizens 21 years of
age or over):  24 percent of overall limitation, plus any numbers not
required by the first four preference categories;

Sixth preference (skilled and unskilled workers in short supply):  10
percent of overall limitation;

Nonpreference (other immigrants):    numbers not used by the six
preference categories.

CRS-4

Immigrant visas are made available under the preference system to the various countries on a first-come, first-served basis, not to exceed 20,000 per country a year. However, if a country has the maximum total of 20,000 made available to it in a given year, in the following year visas will be made available to that country according to the percentages assigned each preference category, in order to insure equitable distribution.

(4)  **How does an alien qualify for an immigrant visa under the relative and occupational preferences or as an immediate relative of a U.S. citizen?**

In the case of an alien applying for entry under one of the relative preferences (first, second, fourth, and fifth) or as the immediate relative of a U.S. citizen, a visa petition accompanied by the required documents is initially filed by the U.S. citizen or immigrant relative with the U.S. Department of Justice's Immigration and Naturalization Service (INS).  Upon final approval the applicant awaits ·a visa along with the other aliens registered in that category, except for immediate relatives of U.S. citizens who are exempt from numerical limitations and eligible for a visa upon final approval (see question (2)).

In the case of the occupational preferences (third and sixth), a job offer and labor certification (see question (17)) are required for entry.  In most cases, the employer initiates the process by applying to the U.S. Department of Labor (DOL) for labor certification.  Once labor certification has been obtained, the employer submits it with a visa petition to INS in the case of sixth preference applicants; the visa petition may be submitted by either the employer or the alien beneficiary in the case of third preference applicants.  As with applicants under the relative preferences, upon final approval the applicant awaits a visa along with other aliens registered in that category.

122

CRS-5

Further information is available either from the local INS district office or from the U.S. embassy or consulate in the alien's country of residence.

(5) **What provisions are made for the legalization of status of undocumented aliens, and what Federal benefits are they eligible for?**

The legalization program established by the Immigration and Nationality Act as amended by P.L. 99-603 provides temporary resident status for otherwise eligible aliens who have continuously resided in the United States in an unlawful status since before January 1, 1982. Aliens may apply for such adjustment during a 12-month period beginning on May 5, 1987. After 18 months in temporary status, they may adjust to permanent resident status during a subsequent 12-month period, providing they can demonstrate a minimal understanding of English and U.S. history and government, or are pursuing the necessary instruction, and are otherwise eligible.

Legalized aliens are disqualified from Federal public welfare assistance for 5 years after adjustment to temporary status, with the exception of assistance designed for persons who are aged, blind, or disabled; Medicaid benefits for emergency services, pregnant women, and children; and certain other specified programs. In a section which does not amend the Immigration and Nationality Act, P.L. 99-603 appropriates $1 billion a year for 4 years, beginning with FY 1988, for State legalization impact-assistance grants to reimburse Federal, State, and local governments for health, welfare, education, and administrative costs of legalized aliens during their first 5 years after adjustment to temporary status.

Sec. 249 of the Immigration and Nationality Act, the "registry provision," was also amended by P.L. 99-603 on a permanent basis to authorize the Attorney General, in his discretion, to adjust to permanent resident status otherwise eligible aliens who entered the United States illegally prior to

CRS-6

1972. Unlike legalized aliens, aliens who adjust under this provision are not barred from participation in certain Federal financial assistance programs.

Additionally, in another section not amending the Immigration and Nationality Act, P.L. 99-603 authorizes the Attorney General, in his discretion, to adjust to permanent resident status before November 7, 1988, certain otherwise eligible Cuban or Haitian nationals under conditions generally more favorable than those of the basic legalization program. This provision applies to, among others, aliens designated as Cuban/Haitian Entrants by the Carter Administration after the mass entry of Cubans beginning in April 1980.

### (6) What provisions are made for the legalization of status of seasonal agricultural workers?

As amended by the Immigration Reform and Control Act (P.L. 99-603), the Immigration and Nationality Act provides for a 7-year special agricultural worker (SAW) program which provides temporary and subsequently permanent status for otherwise eligible aliens who have worked at least 90 days in seasonal agriculture in the United States during the year ending May 1, 1986. The aliens may adjust to permanent resident status after either 1 or 2 years, depending on how long they have worked in U.S. seasonal agriculture, with those adjusting after 1 year limited to 350,000. They are not required to remain in agriculture. Beginning in FY 1990 through FY 1993, replenishment workers may be granted temporary resident status if there is a shortage of seasonal agricultural workers. Replenishment workers are required to work 90 days a year in seasonal agriculture for the first 3 years after admission to avoid deportation, and may adjust to permanent resident status at the end of that time. Special agricultural and replenishment workers are temporarily disqualified from some Federal public assistance programs, and States may be

124

CRS-7

reimbursed for certain costs incurred by them under the State legalization
impact-assistance grants (see question (5)).

(7) <u>What are the different categories of nonimmigrants, and how many are
admitted</u>?

Nonimmigrants are aliens admitted for a specified period of time and for a
specific purpose, and are required to leave at the end of their authorized
stay. The Immigration and Nationality Act defines 14 different categories of
nonimmigrants, as follows:   (A) diplomats and other officials of foreign
governments, (B) temporary visitors for business or pleasure (tourists), (C)
aliens in transit through the United States, (D) alien crewmen, (E) treaty
aliens, (F) academic foreign students, (G) international organization aliens,
(H) temporary workers, (I) representatives of foreign information media, (J)
exchange visitors, (K) fiancees and fiances of U.S. citizens, (L) intracompany
transferees, (M) vocational foreign students, and (N) specified relatives of
certain "G" international organization aliens granted special immigrant status.

By far the greatest number of nonimmigrants enter as tourists.   Of the
10,471,024 nonimmigrants admitted in FY 1986, 7,341,988 were tourists, or
temporary visitors for pleasure ("B-2" nonimmigrant visa classification), and
1,937,929 were temporary visitors for business ("B-1" nonimmigrant visa
classification).   Other categories of particular interest in recent years are
"F" foreign students, who accounted for 255,653 of the FY 1986 nonimmigrant
entries; "H" temporary workers, who accounted for 85,359 of the FY 1986
entries; and "J" exchange visitors, who accounted for 130,416 of the FY 1986
entries (these figures do not include accompanying spouses and children).

(8)  What provision is made for the admission of temporary workers?

The principal nonimmigrant category providing for the entry of temporary alien workers at the request of U.S. employers is the "H" temporary worker category (sec. 101(a)(15)(H); 8 U.S.C. 1101(a)(15)(H)).  It consists of four subsections:   (i) workers of distinguished merit and ability; (ii) "H-2" workers who are coming temporarily to perform (a) temporary agricultural labor ("H-2A" workers), or (b) other temporary services, provided similarly skilled U.S. workers are not available; (iii) trainees; and (iv) the spouses and children of the above.

The "H-2" provision, as it was commonly referred to prior to its amendment by P.L. 99-603, has been the most widely used.  It is administered by the Department of Justice in consultation with DOL and, now in the case of H-2A workers, the Department of Agriculture.  It is subject to neither numerical nor geographical restrictions.   Approximately 20,000 temporary agricultural H-2 workers have been entering annually in recent years; approximately 5,000 non-agricultural H-2 workers have been entering recently, primarily in sports and entertainment.

P.L. 99-603 amended the Immigration and Nationality Act to provide for a statutory H-2A temporary agricultural worker program, and to codify in law many of the requirements for the program which existed previously in DOL regulations.   The new provisions are intended simultaneously to make the program more accessible to growers, and to increase protections for both U.S. and alien labor.

(9)  How are groups of refugees admitted to the United States?

All refugees are admitted to the United States under the authority of the Immigration and Nationality Act, as amended by the Refugee Act of 1980 (Act of March 17, 1980; P.L. 96-212).  Refugee admissions are separate from immigrant

admissions; they are subject to neither the worldwide ceiling and per-country limits, nor to the preference system.

The term "refugee" is defined by the law to conform with the definition used in the United Nations Protocol and Convention Relating to the Status of Refugees, to which the United States is a party. A "refugee" is a person who is unwilling or unable to return to his country of nationality or habitual residence because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion (sec. 101(a)(42); 8 U.S.C. 1101(a)(42)).

The total annual number of refugee admissions and the allocation of these numbers among refugee groups are determined at the beginning of each fiscal year by the President after consultation with the Congress (sec. 207(a); 8 U.S.C. 1157(a)). U.S. refugee admission levels are ceilings, and the actual number of refugees entering the United States has been somewhat lower. The annual ceiling has ranged from 231,000 agreed to for FY 1980 to 67,000 for FY 1986. According to State Department figures, actual admissions have ranged from 207,116 in FY 1980 to 61,681 in FY 1983. The FY 1987 figure was 64,831. Indochinese refugees have constituted the majority of entries, ranging from 163,799 in FY 1980 to 39,408 in FY 1983. The FY 1988 ceiling is 72,500, including 4,000 numbers which are unallocated by region and require private funding.

If, during the course of a given year, the President determines after appropriate consultation with the Congress that an unforeseen emergency refugee situation exists and that the admission of the refugees is justified by grave humanitarian concerns or is otherwise in the national interest, he may specify an additional number of refugees to be admitted during the succeeding 12-month period (sec. 207(b); 8 U.S.C. 1157(b)). This provision has been used only once, by President Jimmy Carter, for 3,500 Cubans who had sought refuge in the Peruvian Embassy in Havana in the spring of 1980.

CRS-10

Refugees may have their status adjusted to that of immigrant, or permanent resident alien, after residence in the United States for a year, without regard to any numerical limitations (sec. 209; 8 U.S.C. 1159).   Title IV of the Immigration and Nationality Act provides for various types of refugee resettlement assistance.


(10) Are there refugee-related provisions for individuals, in addition to the procedures for regular and emergency refugee group admissions described above?

Provision is made for the granting of asylum on a case-by-case basis to aliens who meet the definition of "refugee" and who are physically present in the United States or at a land border or port of entry, regardless of their status (sec. 208; 8 U.S.C. 1158).   Aliens granted asylum may adjust to immigrant status after a year's residence in the United States.   Such adjustments are limited to 5,000 a year.

Additionally, the Attorney General is required to withhold the deportation of any alien, with certain specified exceptions, if he determines that upon the alien's return home, his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion (sec. 243(h); 8 U.S.C. 1253(h)).

Finally, individual refugees may be admitted under the parole provision of the Immigration and Nationality Act in certain narrowly defined cases.   This provision authorizes the Attorney General to parole any alien into the United States temporarily, at his discretion and under conditions he prescribes, in emergencies or for reasons in the public interest.   While parole is not admission for permanent residence, under certain circumstances a parolee may adjust to immigrant status. The parole provision has been used in the past for the admission of groups of refugees, including Hungarians, Cubans, and Indochinese.   It was amended in 1980 to specifically restrict its use for the

128

CRS-11

admission of refugees to individual cases where the Attorney General determines that compelling reasons in the public interest require the alien's parole rather than his admission as a refugee (sec. 212(d)(5); 8 U.S.C. 1182(d)(5)).

(11) What is extended voluntary departure (EVD)?

Extended voluntary departure (EVD) is an administrative and discretionary form of temporary relief from deportation provided by the Attorney General or, pursuant to a delegation of authority, INS, usually following a recommendation by the Department of State. The statutory authority generally cited for this discretionary procedure is the provision of the Immigration and Nationality Act conferring authority for general enforcement on the Attorney General (sec. 103; 8 U.S.C. 1103), and the voluntary departure authority included in sec. 242(b) of the Immigration and Nationality Act (8 U.S.C. 1252(b)). EVD has not been formally defined by INS regulations or operating instructions.

EVD is the only form of discretionary relief from deportation used for blanket relief for members of a national group. INS currently grants EVD status to Poles who entered this country prior to July 21, 1984; Ethiopians who arrived here before June 30, 1980; and Afghans currently in the United States.

(12) What is a commuter alien, or "green-card commuter?"

Commuter aliens, sometimes referred to as "green-card commuters," are aliens who have been admitted as immigrants, for permanent residence, and who live in either Canada or Mexico and commute to the United States for daily or seasonal employment. The legality of the commuter status has been challenged in the courts, but was upheld by the U.S. Supreme Court in Saxbe v. Bustos (419 U.S. 65 (1974)). The number of commuters reported as of September 1985 was 49,765, of which 42,543 commuted across the Mexican border, and 7,222 commuted across the Canadian border.

CRS-12

The card used by the commuter to enable him to pass freely across the U.S. border as an immigrant legally entitled to work in this country is no longer the green border crossing identification card once used, but the alien registration receipt card (Form I-551) issued by INS to immigrants.   In addition, commuters are required to possess a Form I-178, the commuter status card, which is issued every 6 months as proof of employment in the United States.

(13) <u>What is an illegal or undocumented alien</u>?

Illegal aliens are aliens who have violated the immigration law.   The phrase is a popular expression, rather than a term defined in the Immigration and Nationality Act.  It generally refers to two categories of immigration law violators.   Most illegal aliens enter the United States illegally, bypassing inspection.  A smaller number enter the United States legally, usually as nonimmigrants, and violate the terms of their admission, usually by overstaying and accepting unauthorized employment.  The term "illegal alien" is disliked by some, partly because of the connotation of criminality.  Synonymous terms are undocumented alien, undocumented worker, illegal immigrant, and deportable alien.

The number of illegal or undocumented aliens in the United States is not known.   The most frequently cited estimates of the illegal population range from three to six million.   There were 1,767,400 apprehensions in FY 1986, of which an unknown number were multiple apprehensions of the same people.

(14) <u>What are the employer sanctions provisions of the Immigration and Nationality Act</u>?

As amended by the Immigration Reform and Control Act (P.L. 99-603), the Immigration and Nationality Act prohibits the employment, recruitment, or

CRS-13

referral for a fee of aliens known to be unauthorized to accept employment in the United States, and establishes mandatory penalties for violation. This prohibition applies to all employers, regardless of the number of employees. Violations are punishable by a graduated series of civil fines for each alien involved ranging from $250 to $10,000, and a criminal penalty of up to $3,000 for each alien and/or not more than 6 months imprisonment for a pattern or practice of violations.

Employer sanctions apply only to aliens hired, recruited, or referred on or after November 6, 1986, the date of enactment of P.L. 99-603. While employer sanctions were effective upon enactment, the legislation provides for an 18-month phase-in period. No proceedings were conducted during the 6-month "public information period" that began December 1, 1986. During the subsequent 12-month period, June 1, 1987 through May 31, 1988, the law provides that a citation or warning be issued for a first offense, to be followed by penalties for subsequent offenses.

In an effort both to meet the concern of those fearful of discrimination in hiring and to provide employers with a defense against violation of employer sanctions, the law requires all employers to examine specified documentation for all new hires. There are penalties for failure to comply. Compliance in good faith with the verification procedures constitutes an affirmative defense against a charge of knowingly hiring, recruiting, or referring undocumented aliens. Other provisions intended to protect against employment discrimination include a possible sunset of employer sanctions at the end of 3 years, and the creation of a Special Counsel for Immigration-related Unfair Employment Practices within the Department of Justice to investigate and prosecute charges of such discrimination.

CRS-14

(15) <u>What sanctions are provided by the Immigration and Nationality Act
for undocumented aliens?</u>

Under sec. 275 (8 U.S.C. 1325), any alien who enters the United States
without examination by INS or through misrepresentation or fraud, is guilty of
a misdemeanor punishable by up to 6 months' imprisonment and/or a $500 fine.  A
second offense is a felony, punishable by not more than 2 years' imprisonment
and/or a $1,000 fine.  Sec. 276 (8 U.S.C. 1326) provides that an alien who was
previously deported and who enters without permission from the Attorney
General is guilty of a felony punishable by not more than 2 years'
imprisonment, and/or a fine of $1,000.  These penalties are not mandatory, and
in fact most illegal entrants are granted voluntary departure rather than being
prosecuted under the penalty procedures.

Aliens who are legally admitted as nonimmigrants and subsequently accept
employment or otherwise violate the conditions of their admission are subject
to deportation under sec. 241(a)(9)(A) of the Act (8 U.S.C. 1251(a)(9)(A)),
which provides that an alien shall be deported if he "was admitted as a
nonimmigrant and failed to maintain the nonimmigrant status in which he was
admitted or to which it was changed pursuant to sec. 248, or to comply with
the conditions of any such status."

(16) <u>What other criteria exist for the admission of aliens, and for their
remaining in the United States?</u>

The Immigration and Nationality Act sets forth 33 grounds for exclusion of
aliens.   All aliens must satisfy admitting officials that they are not
excludable under these provisions unless the provisions are waived or otherwise
declared inapplicable (e.g., in the case of refugees).  The Attorney General is
given discretionary authority to waive most of the provisions as they apply to
nonimmigrants, but relatively few may be waived for immigrants.  The grounds
for exclusion relate generally to personal qualifications, including health,

132

CRS-15

economic and occupational status, and literacy; misconduct, including criminal behavior, immorality, potentially subversive activities or affiliations, and draft evasion; and formalities in application for entry, including documentary requirements.

The Immigration and Nationality Act also includes a list of 19 grounds for deportation, many of which are related to the grounds for exclusion. The vast majority of deportable aliens are aliens who entered illegally without inspection. Most are granted voluntary departure rather than being prosecuted under the penalty provisions for illegal entry, or undergoing formal deportation procedures.

Three of the grounds for exclusion which have been of particular interest to the Congress recently are those relating to labor certification, the admission of aliens likely to become public charges, and the admission of aliens who are likely to engage in subversive activities and/or are members of proscribed organizations. These are discussed below.

(17) What is labor certification?

Labor certification refers to sec. 212(a)(14) (8 U.S.C. 1182(a)(14)), one of the 33 grounds for exclusion itemized by the Immigration and Nationality Act. It is limited in applicability to would-be immigrants seeking entry under the occupational preferences (third and sixth), and to aliens who will be employed in the United States who are seeking entry as nonpreference immigrants. Aliens seeking to enter as immigrants under these classifications may do so only if the Secretary of Labor certifies that there are not sufficient "able, willing, qualified, and available" U.S. workers, and that the alien's admission will not adversely affect the wages and working conditions of similarly employed U.S. workers.

133

CRS-16

The purpose of the labor certification provision is to protect U.S. workers from adverse competition from alien labor. It has been criticized on the grounds that it is unduly cumbersome to administer; that it does not apply to the majority of immigrants who enter as relatives, or to refugees; and that many aliens entering with labor certification change occupations shortly after entry.

(18) <u>What provision is there in the Immigration and Nationality Act to insure that immigrants will be self-supporting, or provided for by relatives, and will not require public assistance?</u>

The Immigration and Nationality Act provides for the exclusion of aliens who are "likely at any time to become public charges" (sec. 212(a)(15); 8 U.S.C. 1182(a)(15)). It also provides for the deportation of an alien who has become a public charge within 5 years after entry, unless the reasons for this are affirmatively shown to have arisen after entry (sec. 241(a)(8); 8 U.S.C. 1251(a)(8)). In order to establish that he is not likely to become a public charge, an alien seeking admission may be required to provide assurance of financial support, in the form of an affidavit of support, from a resident of the United States. However, court decisions have generally established that such affidavits of support are not legally binding on the U.S. resident sponsors. According to various administrative and judicial decisions, in order for an alien to be deportable under the public charge provision, there must be a liability for payment, a demand for payment, and a refusal or omission to pay. These conditions are not generally present in cases where an alien legally participates in a public service or benefit program.

Alien eligibility requirements for participation in the major Federal public assistance programs are set forth in the laws and/or regulations establishing and governing those programs, rather than in the Immigration and Nationality Act. Aliens lawfully admitted for permanent residence and refugees

134

CRS-17

are currently eligible, with the restrictions noted below, for most major public assistance programs, including the Supplemental Security Income (SSI) program, Aid to Families with Dependent Children (AFDC), Medicaid, and the food stamp program. Nonimmigrants and illegal aliens are generally not eligible for participation in these programs.

Legislation enacted by the 96th and 97th Congresses restricts the availability of SSI and AFDC benefits and food stamps for certain immigrants who have met the public charge requirement for entry by means of an affidavit of support from a U.S. resident sponsor. The enabling legislation for each of these programs has been amended to provide that for the purposes of determining eligibility for participation, immigrants will be deemed to have some portion of their immigration sponsors' income and resources available for their support for a period of 3 years after entry.

(19) **What provisions are there regarding the entry of aliens who are likely to endanger the public safety, and/or who belong to proscribed political organizations?**

The Immigration and Nationality Act, in sec. 212(a)(28) (8 U.S.C. 1182(a)(28)), provides for the exclusion of aliens who are members of proscribed political organizations, primarily the Communist Party and affiliated groups. This provision may be waived in the case of aliens seeking to enter as nonimmigrants, if such a waiver is sought by the Secretary of State and approved by the Attorney General. An exemption is possible in the case of an alien seeking entry as an immigrant if he shows that his membership was involuntary or qualifies as a defector.

The Immigration and Nationality Act also provides for the exclusion, without the possibility of a waiver, of any alien believed to be seeking entry to engage in activities which would be prejudicial to the public welfare (sec. 212(a)(27); 8 U.S.C. 1182(a)(27)), or who is believed likely to engage in

subversive activities after entry (sec. 212(a)(29); 8 U.S.C. 1182(a)(29)). These provisions have remained unchanged since the enactment of the Immigration and Nationality Act in 1952, which was known at the time as the McCarran-Walter Act.

A primary purpose of these provisions has been to exclude terrorists and other aliens who constitute a threat to the national security. While there has been no controversy about this goal, there has been increasing concern over the years about the desirability of excluding aliens solely on the basis of their political or ideological beliefs if their potential actions do not endanger the public safety. In the mid-1970s, this concern led to the enactment of the McGovern amendment to the basic State Department enabling legislation (22 U.S.C. 2691), which generally made it easier for members of the Communist party and affiliated organizations to enter the United States as nonimmigrants if they were not a national security threat.

## (20) How does an immigrant become a citizen?

The process whereby an immigrant becomes a citizen is known as naturalization, the subject of title III of the Immigration and Nationality Act. In most cases, an applicant for naturalization must be an alien lawfully admitted for permanent residence (immigrant), who is at least 18, and who has resided in the United States continuously for at least 5 years. He must also be of good moral character; believe in the principles of the Constitution of the United States; and be able to speak, read, and write simple English, unless exempt because of age and length of residence. There are exceptions to these requirements for special classes, such as children, U.S. veterans, and the spouses of U.S. citizens. The naturalization provisions are administered by INS, and applications must be submitted to that agency.

136


CRS-19

(21) <u>What are the principal agencies involved in administering the Immigration and Nationality Act</u>?

Major responsibility for administering the immigration law rests with INS, within the Department of Justice, and the State Department's Bureau of Consular Affairs. State Department activities encompass most of the overseas functions, including the issuance of visas by consular officers. INS inspects all aliens entering at the U.S. border and airports, and issues alien registration receipt cards (Form I-551) to immigrants, and the arrival-departure card (Form 1-94) to nonimmigrants. Domestic enforcement of immigration laws as well as many of the service functions relating to benefits fall within the jurisdiction of INS, frequently in cooperation with the State Department. Important roles are also played by the Department of Labor (DOL), in employment-related admissions; and by the Department of Health and Human Services's Public Health Service, in the medical examination of aliens who apply for admission to the United States.


(22) <u>What have been the major amendments to the Immigration and Nationality Act since its enactment in 1952</u>?

While the structure of the Immigration and Nationality Act has remained basically the same since 1952, the immigration provisions were significantly changed by the Act of October 3, 1965 (P.L. 89-236; 79 Stat. 911). These amendments abolished the 40-year old national origins quota system as the primary control on U.S. immigration, replacing it with an annual ceiling on Eastern Hemisphere immigration of 170,000 and a 20,000 per country limit. Within those restrictions, immigrant visas were distributed on a first-come, first-served basis according to a seven-category preference system. The 1965 amendments also provided for a ceiling on Western Hemisphere immigration for the first time in our history, limiting total immigration from other countries in this Hemisphere to 120,000 a year.

CRS-20

The Immigration and Nationality Act Amendments of 1976 (P.L. 94-571; 90 Stat. 2703) extended the 20,000 per-country limit and a slightly modified version of the seven-preference system equally to the Western Hemisphere. The preference system and the per-country limits were applied to the two hemispheres under the separate ceilings of 170,000 for the Eastern Hemisphere, and 120,000 for the Western Hemisphere. Legislation enacted in 1978 (P.L. 95-412; 92 Stat. 907) combined the separate ceilings on the two hemispheres in a single worldwide ceiling of 290,000 with a single preference system. It also created the Select Commission on Immigration and Refugee Policy, which submitted its final report, entitled U.S. Immigration Policy in the National Interest, in early 1981.

Major amendments were enacted by the 96th Congress in the form of the Refugee Act of 1980 (P.L. 96-212; 94 Stat. 102), which revised the procedures for the admission of refugees and provided general authority for Federal assistance for refugee resettlement. Provision is made for both a regular flow and the emergency admission of refugees, following legislatively prescribed consultation with the Congress. The legislation eliminated refugees as a category of the preference system, and set the permanent worldwide ceiling at 270,000, exclusive of refugees.

Major immigration legislation focusing on illegal immigration was enacted in the 99th Congress as P.L. 99-603 (100 Stat. 3359), the Immigration Reform and Control Act of 1986. The Immigration Reform and Control Act is popularly known as the Simpson-Rodino-Mazzoli bill after its principal Senate and House sponsors. On the Senate side, it was introduced by Senator Alan Simpson, Chairman of the Senate Judiciary Subcommittee on Immigration and Refugee Policy; on the House side, it was introduced by Representative Peter Rodino, Chairman of the House Judiciary Committee for himself and Representative Romano Mazzoli, Chairman of the House Judiciary Subcommittee on Immigration, Refugees, and International Law. The legislation enacted in the 99th Congress evolved

CRS-21

directly from the Simpson-Mazzoli bills passed by both houses in the 98th Congress but not enacted, and passed by the Senate in the 97th Congress. Reform of the law relating to the control of illegal immigration has been under consideration by the Congress and the Executive Branch since the early 1970s.

P.L. 99-603 consists primarily of amendments to the basic immigration law, the Immigration and Nationality Act. The principal provisions address the control of illegal immigration by employer sanctions for the employment of unauthorized aliens, legalization of some undocumented aliens, and the legal admission of alien agricultural workers.   Additionally, in free-standing provisions, P.L. 99-603 created two new commissions.  These are the Commission on Agricultural Workers (sec. 304), and the Commission for the Study of International Migration and Cooperative Economic Development (sec. 601).

Two other significant enactments of the 99th Congress amending the Immigration and Nationality Act were P.L. 99-639 (100 Stat. 3537), the "Immigration Marriage Fraud Amendments of 1986," and P.L. 99-653 (100 Stat. 3655), the "Immigration and Nationality Act Amendments of 1986," popularly referred to as the State Department Consular Efficiency Amendments.

○