1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
2     BEFORE THE HONORABLE MIRANDA M. DU, CHIEF DISTRICT JUDGE
                    ---o0o---
3

4   UNITED STATES OF AMERICA,     :
                         :
5            Plaintiff,    : No. 3:20-cr-26-MMD-WGC
                         :
6       -vs-            : January 22, 2021
                         :
7   GUSTAVO CARRILLO-LOPEZ,     :  Reno, Nevada
                         :
8         Defendant.     :
   _____:

9

10

11               TRANSCRIPT OF MOTION HEARING

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:     PETER WALKINGSHAW
                      Assistant United States Attorney
15                      Reno, Nevada

16

17  FOR THE DEFENDANT:      LAUREN GORMAN and KATE BERRY
                      Assistant Federal Public Defenders
18                      Reno, Nevada

19

20  CERTIFIED INTERPRETER:    JUDY JENNER

21

22  Reported by:          Margaret E. Griener, CCR #3, FCRR
                      Official Reporter
23                      400 South Virginia Street
                      Reno, Nevada 89501
24

25

1            RENO, NEVADA, FRIDAY, JANUARY 22, 2021, 10:00 A.M.

2                            ---o0o---

3

4            THE CLERK:  Case 3:20-CR-26-MMD-WGC, USA versus

5   Gustavo Carrillo-Lopez.

6            The Spanish interpreter has been sworn.

7            Defendant is in custody at Warm Springs

8   Correction Center.  He is on the telephone with the

9   interpreter.

10            Present on Zoom for the government is Peter

11   Walkingshaw.  Present on Zoom for the defendant is Lauren

12   Gorman.  Kate Berry listens to the proceeding via telephone.

13            THE COURT:  All right.  Good morning, everyone.

14            This hearing is set on the defendant's motion to

15   dismiss the indictment which is docket number 26, and for the

16   record I have reviewed the government's response, defendant's

17   reply, as well as the two supplements the defendant filed.

18            I'm going to give the government the opportunity

19   to respond at least to the last supplement, which I still

20   don't understand why it was filed shortly before the hearing

21   even though the information offered could have been offered in

22   connection with the motion or even the reply.

23            I also want to assess from this hearing whether

24   or not I should have an evidentiary hearing so I'm going to --

25   I'll decide that at the conclusion of the hearing.

1          I want to address a preliminary issue and that

2     is that, for the record, the defendant, Mr. Carrillo-Lopez, is

3     participating in this hearing by phone.  This hearing is

4     conducted virtually with counsel on video and

5     Mr. Carrillo-Lopez on the phone.

6          I want to make sure that Mr. Carrillo-Lopez

7     understands, and I'm going to pose these questions to him.

8          Mr. Carrillo-Lopez, I want to make sure you

9     understand that you have a right to have this hearing be

10    conducted in person and that you have a right to attend this

11    hearing in person, but it is a right that you can waive, and

12    if you waive that right, the hearing can proceed with you

13    participating on the phone.

14          Do you understand that you have those rights?

15          THE DEFENDANT:  Yes.  Yes, I do understand.

16          THE COURT:  Did you talk to your attorney about

17    your right to appear at this hearing in person and your

18    decision to waive that right?

19          THE DEFENDANT:  Yes, I did.  I did talk to her

20    about it.

21          THE COURT:  And after talking to your attorney,

22    is it your decision to agree to have this hearing be conducted

23    on video and with you listening on the phone?

24          THE DEFENDANT:  Yes, I am.  I am in agreement.

25          THE COURT:  All right.  I have reviewed

4

1    Mr. Carrillo-Lopez's waiver of his right to appear at this

2    hearing in person which is ECF number 34.  I find that he

3    understands his right, and that his waiver is a knowing and

4    voluntary waiver.

5            I also find that because of the spread of

6    COVID-19 in this district, having this hearing proceed in

7    person would affect the health and safety of everyone

8    involved, but that delaying the hearing would not serve the

9    interests of justice, and for those reasons I'm going to

10   accept the waiver and proceed with this hearing with

11   Mr. Carrillo-Lopez participating by phone.

12           So as indicated to you, counsel, I don't know

13   yet whether or not an evidentiary hearing is warranted.  As it

14   stands, Ms. Gorman has requested an evidentiary hearing, the

15   government has not.  The government, of course, can change its

16   position.  I'll decide at the end of the hearing whether an

17   evidentiary hearing is needed.

18           I also want you to focus your arguments with the

19   understanding that I'm going to find that the *Arlington*

20   *Heights* framework applies, and that is that the

21   defendant's argument here is that the statute -- that

22   Section 1326 violates his Equal Protection rights by way of a

23   disparate impact theory so I think that the framework of

24   *Arlington Heights* applies.  You can focus your arguments on

25   that.

1           With that, I will hear arguments from counsel,

2    and I will start with Ms. Gorman.

3           MS. GORMAN:  Thank you, your Honor.

4           And, your Honor, I would ask that the Court

5    consider hearing the testimony of the -- particularly the

6    historian Professor Hernandez from UCLA.  She's a recipient of

7    the MacArthur Grant, and she has studied and written

8    extensively about the statute and its historical origins.

9           And I would also invite the Court to interrupt

10   me at any time.  I had initially prepared an oral argument

11   which is rather lengthy, and -- but I want to be as responsive

12   as possible to this Court's concerns, so please feel free to

13   interrupt me at any time.

14          But since this Court has already held that the

15   *Arlington Heights* factors applies, I think that the

16   appropriate place is to start with the legislative history of

17   this case and particularly the government's arguments

18   regarding the reenactments.

19          In terms of the statute that was passed in 1929,

20   that historical framework is extremely important.  Much of it

21   is in the Congressional Records, but as the Court has read

22   from the declaration of Professor Hernandez and from the

23   legislative history provided to the Court, the initial idea to

24   criminalize reentering the United States after deportation was

25   initially -- that was the 1929 legislation which exists in

1    substantially the same form today despite these reenactments

2    which essentially make it even more punitive and more harsh.

3                    THE COURT:  But wasn't there enough of a

4    sufficient break between the 1929 statute and the 1952 version

5    of the statute and enactment such that -- so this is where

6    I -- one of the issues for me, is there enough of a -- was the

7    1952 reenactment sufficiently distanced from the 1929 statute

8    such that even if the legislative history indicates

9    discriminatory intent, that it cannot be considered with the

10   1952 enactment?

11                   MS. GORMAN:  Your Honor, I think the answer to

12   that question is no, and I don't think that it's -- that it

13   can never be the case that a legislative reenactment -- during

14   this case it was largely just a recodification -- can save

15   legislation that is essentially the result of pervasive racial

16   animus.

17                   But one thing that I -- one of the questions

18   that this Court asked at the beginning of the hearing is why I

19   filed that supplement after the case was already briefed, and

20   the short answer is nothing too exciting other than in doing

21   as much of a deep dive as I could into the 1952 legislation I

22   came across a few things.

23                   One is a 1977 case which I'll read into the

24   record, *United States versus Ortiz-Martinez*, 557 F.2d 214, and

25   I'm quoting from 216, and it specifically says, "Regarding the

1    reenactment of this legislation" -- sorry.

2                "An exhaustive reading of the congressional

3         debate indicates that Congress was deeply concerned

4         with many facets of the Immigration and Nationality

5         Act of June 27th, 1952, but sections 1325 and 1326

6         were not among the debated sections."

7                "The House Report contains only this brief

8         description of the sections."

9                Quote, "In addition to the foregoing,

10        criminal sanctions are provided for entry of an alien

11        at an improper time or place, for misrepresentation

12        and concealment of facts, for reentry of certain

13        deported aliens..."

14                And then it quotes to the 1952 Congressional

15   Record, and, of course, your Honor has that case as part of

16   the supplements.

17                Another interesting fact that I came across is

18   that President Truman actually vetoed this bill.  His veto was

19   ultimately overridden, but one of the comments he made in

20   vetoing it were that,

21                "Many of the aspects of the bill which have

22        been most widely criticized in the public debate are

23        reaffirmations or elaborations of the existing

24        statutes or administrative procedures.  Time and

25        again, examination discloses that the revisions of

1          existing law that would be made by the bill are

2          intended to solidify some restrictive practice of our

3          immigration authorities, or to overrule or modify

4          some ameliorative decision of the Supreme Court or

5          other federal courts.  By and large, the changes that

6          would be made by the bill do not depart from the

7          basically restrictive spirit of our existing law but

8          intensify and reinforce it."

9                    That veto was overturned, but it was also very

10    prescient.  And I think part of the -- the reason that

11    precipitate, I think, the challenge that we are raising now --

12    and it's not just me who is raising it but multiple federal

13    defenders have raised an Equal Protection challenge -- also

14    comes from Supreme Court dicta in two cases in 2020.

15                    So -- and I'm referring to the *Espinoza* case and

16    the *Ramos* case.  In particular I'll highlight Justice Alito's

17    statements in *Espinoza*.

18               "I argued in dissent that this original

19          motivation, though deplorable, had no bearing on the

20          law's constitutionality because such laws can be

21          adopted for nondiscriminatory reasons, and 'both

22          states readopted their rules under different

23          circumstances in later years.'  But I lost, and *Ramos*

24          is now precedent.  If the original motivation for the

25          laws mattered there, it certainly matters here."

```
1              And that would be *Espinoza v Montana Department
2    of Revenue*, 140 Supreme Court 2246 at 2268.
3              THE COURT:  So if the original -- the
4    legislative history of the original enactment, the 1929
5    enactment, matters in terms of demonstrating discriminatory
6    intent, can a later reenactment ever be untainted absent some
7    kind of specific repudiation from Congress?
8              MS. GORMAN:  I think the answer to that is
9    nuanced.
10             I think that what the Supreme Court has stated
11   now in dicta stems from multiple cases even before *Ramos* and
12   even before *Espinoza.*
13             But one of the Justice Sotomayor's -- one of the
14   statements she made in the *Ramos* case I think speaks to that
15   specific issue, and as I pointed out in the motion, Supreme
16   Court dicta should be entitled to great weight.
17             So *Ramos* was a Sixth Amendment case, but Justice
18   Sotomayor actually talked about it in the context of Equal
19   Protection.  So she states that,
20             "The majority vividly describes the legacy of
21        racism that generated Louisiana's and Oregon's laws.
22        Although *Ramos* does not bring an Equal Protection
23        challenge, the history is worthy of the Court's
24        attention.  That is not simply because that legacy
25        existed in the first place -- unfortunately, many
```

1      laws and policies in this country have some history

2      of racial animus -- but also because the states'

3      legislatures never truly grappled with the laws'

4      sordid history in reenacting them."

5           And she cites *United States v Fordice,*"

6      which stands for "policies that are 'traceable' to a

7      state's *de jure* racial segregation and still 'have

8      discriminatory effects' offend the Equal Protection

9      Clause."

10          So, "Where a law is otherwise untethered to

11     racial bias -- and perhaps when a legislature

12     actually confronts the law's tawdry past in

13     reenacting it -- the new law may well be free of

14     discriminatory taint.  That cannot be said of the

15     laws at issue here.  While the dissent points to the

16     'legitimate' reasons for Louisiana's

17     reenactment...Louisiana's perhaps only effort to

18     contend with the law's discriminatory purpose and

19     effects came recently, when the law was repealed

20     altogether."

21          So I think the short answer to that is no.  This

22  is essentially the same law it criminalizes, and the fact that

23  the government has continued to double down on this law I

24  think makes it worse.  I think it's contrary to the

25  government's position that it cleanses it from racial animus.

1              And this Court can see, I think, even from this

2   state -- one of the -- first of all, one of the supplements

3   that I filed was also the U.S. Attorney Bulletin from 2017,

4   and, again, nothing particularly interesting other than the

5   United States Attorney has long described this law as

6   hundred-year history, and that has always been in sort of

7   defense of this law.

8              And it is only when we do this legislative

9   probing and talk about the historical context of the law that

10  the United States wants to back away from the statement that

11  1929 was essentially the first version of this act and since

12  then it has gotten even more punitive.

13             And as this Court, of course, knows, it's far

14  easier to reenact legislation that already exists or to tweak

15  legislation that already exists.

16             But that original enactment was clearly

17  motivated by racism.  It was a compromise between eugenicists

18  and particularly agricultural sectors who wanted to maintain a

19  cheap supply of Mexican labor.

20             And I think that the Court also sees that in

21  practice this court has a discriminatory effect.  I don't

22  think that it was probably ever lost on this Court that

23  1326 cases have always been treated differently than other

24  cases.

25             I talked in one of the -- or in one of the

1   supplements that I filed I provided information, for example,

2   about Operation Streamline.

3          So under the prior administration, the United

4   States Attorneys were told you have no discretion, we're going

5   to focus on the southern border and you will take every one of

6   these cases, and Operation Streamline actually precedes that.

7   It started 2005 under the Bush administration, and it allowed

8   for these giant mass proceedings, and one of the cases I

9   provided to this Court held that that proceeding violated

10  Rule 11.

11         But I would ask this Court to imagine a kind of

12  mass proceeding with a hundred brown people shackled to each

13  other and arraigned, pled, and sentenced in the same exact

14  proceeding, and ask whether that would truly happen today if

15  racial animus was not still so very deeply a part of this law.

16         And I think that reenactment has potentially

17  given courts a way to avoid actually reckoning with the racism

18  that is at the heart of this law, that that racism is apparent

19  at every part of this.

20         Our 1326 clients -- the Bail Reform Act

21  explicitly applies to them, but it actually doesn't in

22  practice.  They don't get released.  I've had one 1326 client

23  released in ten years and that was after a trial.

24         But at the end of the day our 1326 clients

25  continue to be treated differently, and the focus of the

1    government is on the southern border.

2              And we also have neighbors to the north that are

3    treated very differently.  A, they're not prosecuted, but also

4    the law is tailored so that they won't be prosecuted.  For

5    example, if you're going to come to America from Mexico, you

6    need a visa.  You do not need a visa to come from Canada, and

7    we do not criminalize visa over-stayers.

8              So every facet of this law from its original

9    inception to the way that it is currently prosecuted and

10   treated I think displays this animus in full force.

11             And I think the great danger --

12             THE COURT:  So what you cite to, though, is -- I

13   see it as the disparate impact of the law as applied which is

14   a different -- I see it as a separate analysis from evidence

15   of discriminatory intent or purpose.

16             I know the government's argument is that there's

17   no disparate impact, that geography plays a factor.  I don't

18   agree with that, but I also think that the way the law has

19   been enforced, as I said, may show -- supports the argument

20   there's disparate impact, but I don't know that it supports

21   the discriminatory intent as evidence when the law was

22   enacted.

23             But let me -- I want to go back to something you

24   indicated earlier.  You cited to the *Ortiz-Martinez* decision

25   in the supplement, that's ECF 33, and specifically you

1    indicated that in that case the Court noted that -- and I'm

2    going to quote,

3              "An exhaustive reading of the Congressional

4         debate indicates that Congress was deeply concerned

5         with many facets of the Immigration and Nationality

6         Act of June 27, 1952, but 1325 and 1326 were not

7         among the debated actions."

8              So my question is, doesn't that imply that there

9    was no formal repudiation, condemnation, or at least concern,

10   so that's enough -- and so if that's the case, would that be

11   enough then for the discriminatory motive of the original

12   enactment if I were to find that there was discriminatory

13   motive with the original enactment applied to the later

14   reenactment?

15             In other words, what would the 1952 Congress

16   have to do to cleanse the law from its former racial animus?

17             MS. GORMAN:  I think the answer to that stems

18   largely from Supreme Court dicta, and it's not just those two

19   cases.  I also wanted to address some of the cases that the

20   government cited regarding reenactment.

21             But I think a short answer to your question is

22   yes.  If you have -- you have an obligation as a legislator,

23   as a lawmaker, to understand the laws that you are enforcing.

24             The 1929 law was clearly motivated by racial

25   animus.  A decision to reenact it silently is exactly the --

1    is the greatest danger of reenactments, and it's the greatest

2    danger of the government's position that they allow racist

3    legislation to survive while allowing courts, to the extent

4    they are willing to, to ignore the language that actually

5    makes it challengeable.

6             And, as I said before, it's easier to tweak a

7    law, it's easier to reenact a law that's already on the books

8    than to introduce brand-new legislation and to explain why the

9    brand-new legislation needs to exist.

10            But their silence I think speaks volumes because

11   that Congressional Record is not a secret, it is in there, it

12   is incumbent on them to know that legislation and to

13   understand its origins and its roots.

14            And if the Court finds that racial animus

15   pervaded and was one of the causes of the 1929 statute and

16   they kept that law in place -- 1952 essentially reorganized a

17   large amount of criminal laws, but it didn't really touch --

18   it didn't touch 1325 and 1326.

19            And so -- and I do want to address actually

20   other cases regarding reenactment, but what I also want to

21   touch on is I agree to some extent with this Court's comment

22   that the fact that 1326 has been prosecuted in ways that I

23   think we would find shocking and unacceptable if -- let's say

24   this was a white man charged with fraud, you would never see

25   this kind of hearing.

1          But it has become so deeply ingrained in our

2    culture, this anti-immigrant sentiment, that we largely do not

3    question the fact that 1326 is actually treated in different

4    ways than other statutes.

5          And while I agree that it affects disparate

6    impact, the *Arlington Heights* factors were nonexhaustive, so

7    if we are challenging legislation, and if one of the questions

8    is whether we can infer the racial animus in the 1929 law to

9    the law as it exists today, I think one of the factors that

10   would be permissible for the Court to consider is how it is

11   treated and what due process protections are afforded to

12   migrants.

13         And I don't think it can escape scrutiny that,

14   particularly in the past four years there has been an

15   obsessive and a true obsession with the criminalization of

16   migration to the extent that it is -- I think the most -- 1325

17   and 1326 are combined the most prosecuted offenses in the

18   United States.

19         And theoretically the United States Government

20   is here to actually promote public safety, but the fact that

21   we are exclusively focusing on migrants of the southern border

22   I think says something about what we as a society and culture,

23   and I think it can be inferred from the legislative silence,

24   are willing to permit.

25         It's no longer acceptable to talk about mongrels

1    and eugenics and breeding horses, all of which are actually

2    part of the legislative record, but it's very easy to replace

3    those with race neutral words like alien or criminal alien,

4    but it comes from the same place.

5                    And I don't think you can separate the racial

6    animus that resulted and the fact that this is the law, that

7    it is illegal, after you are deported and you are reentered,

8    that you are prosecuted for a felony.

9                    I don't think you can separate that from today,

10   especially when there has been an absolute refusal to

11   acknowledge it.  And that's even apparent in the government's

12   response where it wouldn't even acknowledge that this talk

13   about eugenics, which is in the Congressional Record, is

14   racist.  We can't even agree on that point.

15                   And if we can't agree that the 1929 statute was

16   motivated by racial animus, I think then there is two very

17   different ideas about what racial animus is, but I would argue

18   that eugenics certainly fits the bill.

19                   And whether you want to call it aliens or

20   criminal aliens or that we should dedicate all of our

21   enforcement efforts to the southern border, it is hard to

22   escape that racial animus continues to pervade this law.

23                   Another interesting fact was in 1952 I learned

24   that there was one Latino congressperson in total in the

25   entire congressional body that essentially recodified 1325 and

1    1326.

2            But I think under Supreme Court dicta, which

3    this Court must afford great weight, if a policy is traceable

4    to -- in that case it was segregation -- then -- and it has

5    discriminatory effect, it offends the Equal Protection clause.

6            That language applies with equal force to racism

7    as Justice Sotomayor stated so eloquently in *Ramos v*

8    *Louisiana*.

9            But with respect to the reenactments, I also do

10   want to address some of the cases the government cited to

11   argue that reenactments, even if they don't reckon with or

12   talk about the racist origin of the law, are sufficient to

13   cleanse it.

14           So one of the cases primarily relied on the

15   government was *Mobile v Bolden*, and I'll cite it as 446 U.S.

16   55, and the government cited at 74.  This is a 1980 Supreme

17   Court case.

18           And it specifically says asking whether

19   discriminatory intent has been proved as to the particular

20   enactment at issue because,

21               "...past discrimination cannot, in the manner

22       of original sin, condemn governmental action that is

23       not itself unlawful."

24           So I think what's important to note about this

25   case is that that case was first superseded by statute, by

1    Section 2 of the Voting Rights Act, but it was also rejected

2    in substance by the Supreme Court in *Rogers v Lodge* which I

3    touched upon in my reply.

4              But *Rogers v Lodge* actually went further, and it

5    went so far as to reject systems that are neutral in origin

6    but have been subverted in invidious purposes.

7              And, for context, that was a decision where the

8    Court held that an at-large system election in Burke County

9    violated Equal Protection, and the Court held that there was

10   sufficient evidence that the at-large system was operated as a

11   device to further racial discrimination, and that there was

12   extensive historical evidence that the county had impeded

13   political participation of black citizens, and it ultimately

14   upheld a system of single-member district established by the

15   district court.

16             And that was two years after *Mobile v Bolden*.

17             And probably more relevant to this case is the

18   Court said that,

19        "Evidence of historical discrimination is

20        relevant to drawing an inference of purposeful

21        discrimination, particularly in cases such as this

22        one where the evidence shows that discriminatory

23        practices were commonly utilized, that they were

24        abandoned when enjoined by courts or made illegal by

25        civil rights legislation, and that they were replaced

1          by laws and practices which, though neutral on their

2          face, serve to maintain the status quo."

3                    And the pin cite to that is 625.

4                    The Court went on to discuss *Arlington Heights*

5     and *Washington v Davis*.

6                    I think particularly that the government relied

7     so heavily on *Mobile v Bolden* that it's important to

8     understand that the Court repudiated that logic and reasoning,

9     not just because it was superceded by statute, but also in

10    substance.

11                   And I'll also say the government misrepresents

12    the holding in *Abbott v Perez* where the Court explained that

13    the presumption of legislative of good faith is not changed by

14    finding of past discrimination.

15                   But that's actually not what *Abbott v Perez* was

16    about, and it supports Mr. Carrillo-Lopez, because in that

17    case the Court ultimately -- the sort of challenged statute

18    was a 2011 predecessor statute to a 2013 one.

19                   And so the Court specifically said, well, the

20    2013 legislature didn't reenact the plan previously passed by

21    its 2011 predecessor, and it relied on that in upholding this

22    2013 law.

23                   But I don't think you can cite that case to say

24    that reenactments are sufficient to cleanse a law,

25    particularly if they fail to reckon entirely with the racial

1    animus that is responsible for this law existing in the first

2    case.

3                    THE COURT:  So --

4                    MS. GORMAN:  I'm sorry, your Honor.

5                    THE COURT:  I'm sorry, were you finished with

6    your argument relating to reenactment?

7                    MS. GORMAN:  I was, your Honor.

8                    THE COURT:  You offer in the first supplement a

9    decision -- this is ECF 31 -- from the Southern District of

10   California where that Court, well, rejected and denied the

11   motion to dismiss challenging Section 1325, and there the

12   District Court ultimately found that the subsequent

13   reenactment of the statute cleansed it of its discriminatory

14   animus.

15                    Why shouldn't I find that analysis persuasive

16   with respect to Section 1326 here?

17                    MS. GORMAN:  So I largely provided the Court

18   that to -- so, A, I don't agree with the Court's ultimate

19   conclusion, and ultimately the Ninth Circuit will have to

20   decide that issue.

21                    But the Court was able to sort of accept that

22   the racial animus pervaded it, accept, as this Court did, the

23   *Arlington* factors.

24                    But specifically that individual was charged

25   with attempt which wasn't even part of the statutory stream in

1    any way until 1990.

2              So in contrast, 1326 is substantively the same

3    making it a felony for somebody who has been previously

4    deported/removed, when they come back to this country, to then

5    be convicted of a felony.

6              And so the Court -- I don't necessarily agree

7    that the attempt gives it an out because I think 1325 is

8    similarly animated by the same racial discrimination as 1326.

9              But I do think that part of that Court's holding

10   is important, which is that *Arlington Heights* does apply

11   because the government's primary -- and so while I disagree

12   with the holding, and I don't think the fact that it's -- the

13   fact that attempt was introduced in 1990 necessarily changes

14   anything because ultimately it's an attempt to do -- to commit

15   a 1325.

16             But at the end of the day I do think what is

17   fundamentally important about that decision and why it was

18   worthy of mentioning -- so the government's main argument is

19   that when we're talking about immigration law, and the Court

20   has said that in order to enforce immigration law the

21   government may use criminal statutes.

22             It differentiates that from the argument that

23   *Arlington Heights* applies when racial animus is the motivating

24   factor, and that the fact that a law is ostensibly to regulate

25   immigration can't -- does not permit racist laws to exist

1    particularly in the context of criminal law, and so that, at

2    least, part of the holding I think is relatively important.

3                    THE COURT:  All right.  Thank you.

4                    MS. GORMAN:  But, no, I do not -- I obviously do

5    not agree with the holding that the fact that this person who

6    was prosecuted under attempt which was introduced for the

7    first time in 1990 would be enough to cleanse it.

8                    So I think this case is distinguishable both on

9    the statute itself, because the statute is essentially the

10   same statute.  We're not dealing with an attempt statute, and

11   I think that was an easy out for that Court.

12                   But with 1326 we essentially have the same

13   statute other than harsher and harsher and harsher penalties,

14   and -- I'd note.

15                   So at least I hope that clarifies why I think

16   that supplement was important even though I understand that it

17   doesn't fully support this position, I think it's

18   distinguishable both on its facts and its reasoning.

19                   THE COURT:  So if I were to agree with the

20   defendant and grant the motion, what would be the effect?  It

21   would --  because a challenge here in a way, it's kind of an

22   as-applied challenge to those who are of Mexican citizenship.

23   And so would the statute be unconstitutional as applied to

24   this defendant and perhaps maybe extends to any defendant who

25   is of Mexican citizenship?

1                     I was just thinking of what the -- the theory

2     that's being brought here and the impact if I were to grant

3     the motion, not that that's --

4                     MS. GORMAN:  So my understanding is that the --

5                     THE COURT:  -- that important.

6                     MS. GORMAN:  My understanding is that the impact

7     of this case would be that the indictment against

8     Mr. Carrillo-Lopez would be dismissed, and ultimately this --

9     the various holdings of various courts will ultimately

10    percolate up to the Ninth Circuit, ultimately to the Supreme

11    Court, and that will ultimately decide whether this statute

12    can stand notwithstanding the racial animus from 1929.

13                    But at least in terms of the direct impact, the

14    indictment against Mr. Carrillo-Lopez would be dismissed, and

15    I -- you know, I added a section about Mr. Carrillo-Lopez,

16    though this is not a challenge that is sort of particular to

17    him, because I think in some very deep ways this case sort of

18    demonstrates how untethered this hatred of migrants has become

19    from any rational public safety rationale and any rational

20    sort of immigration issue.

21                    Mr. Carrillo-Lopez is serving a life sentence

22    for a nonviolent drug offense, and yet it -- and yet the

23    decision is that if he somehow manages to, I guess, get

24    paroled before he dies, then he should still be criminally

25    prosecuted and sentenced to federal prison in spite of the

1    fact that he is already being punished so incredibly severely.

2                    And I think this case in some ways sort of

3    illustrates that animus, but while it's not part of the actual

4    underlying legal argument, A, I think it's important for his

5    name to be part of this record as he is a human being and the

6    history of this legislation has so deeply dehumanized migrants

7    that to actually say that he is a human being with a name,

8    that he is a person, was just important for both the record

9    and just out of respect and to honor Mr. Carrillo's humanity

10   at the end of the day, but I think the result of this Court's

11   decision would be the dismissal of the indictment against him.

12                   And ultimately these challenges will percolate

13   up, and whether or not that statute ultimately fails will not

14   be as a necessary result of this Court's ruling, but as this

15   country sort of grapples with the racial animus in general,

16   and as we -- I mean, this country is already grappling with

17   racial animus in the statute.

18                   One of the sections that I cited -- I don't mean

19   to be all over the map, your Honor, was that in 2019, in

20   December 2019, Congressman Garcia introduced legislation which

21   now has 44 co-sponsors recognizing that 1326 and 1325

22   prosecutions, but for the purposes of this case 1326, have a

23   racist origin, and if we truly want to eradicate racism, then

24   those laws must be repealed.

25                   And by the time you have a piece of legislation

1    and a contemporary Congressional Record openly acknowledging

2    the racial animus of a law, I honestly think the writing is on

3    the table, that I hope my children and my children's children

4    will not see this law, that the word alien or criminal alien,

5    race neutral though they may be, will be recognized for the

6    racist dog whistles that they are.

7              But I think whether that starts with this Court

8    and Mr. Carrillo-Lopez, or whether it percolates into these

9    other courts, I do think that at the end of the day this

10   statute will not stand, and that the racial history has to be

11   reckoned with if we're going to have an intellectually honest

12   and morally honest jurisprudence, and I think the 2020 Supreme

13   Court --

14             THE CLERK:  Your Honor, Ms. Gorman had indicated

15   she was having problems with her Internet connection this

16   morning, and I believe that she will be joining us in just a

17   minute via her cell phone.  I'll send her a message.

18             THE COURT:  I think -- Ms. Gorman, your screen

19   froze when you referenced -- I think you ended with "I think

20   the 2020 Supreme Court," and then you cut off.

21             MS. GORMAN:  So the 20 -- those two decisions in

22   the Supreme Court --

23             THE COURT:  You are talking about *Ramos* and

24   *Espinoza*?

25             MS. GORMAN:  Yes.

1            The recognition that we have to grapple with

2    legislative histories of racially -- of racist laws is

3    important, and Supreme Court dicta has to be afforded great

4    deference just under the law.

5            And by the time the Supreme Court is openly

6    acknowledging, and we are having uncomfortable conversations

7    about the history of pieces of legislation or, in *Ramos'* case,

8    nonunanimous juries in Louisiana, that there is a broader

9    recognition that racism is intolerable, and whether it comes

10   in the form of race neutral statutes that are aggressively

11   prosecuted against migrants in the southern border without

12   discretion to the United States Attorneys, or whether we're

13   talking about nonunanimous juries in Louisiana, that we can't

14   escape that history if we are going to actually cleanse our

15   jurisprudence of racism which I think -- I hope everybody

16   agrees is wrong morally and legally and that the Equal

17   Protection clause doesn't tolerate it.

18            THE COURT:  But those two decisions don't

19   involve Equal Protection or even the *Arlington Heights*

20   analysis, do they?

21            MS. GORMAN:  They do not.

22            It was Justice Sotomayor's reference in *Ramos*

23   that specifically was the dicta that while -- A, would stand,

24   I believe, for the general proposition that when you are

25   evaluating the constitutionality of a law that you look beyond

1    its reenactments.

2            And I think that's particularly important

3    because reenactments are so incredibly effective and powerful.

4    They allow you to accept racism by your silence.  And so if we

5    were to accept the proposition that a reenactment of a law, no

6    matter how motivated it was by eugenical zeal, and just accept

7    that silence on the issue is sufficient to cleanse it, that

8    that would not honor the Constitution's commitment to racially

9    neutral law.

10           And so those two cases both stand for that

11   general principle that you have to -- that you can look and

12   you have to actually look beyond reenactments and

13   codifications, especially in this case when you're dealing

14   with a law that has essentially remained the same.

15           But specifically Justice Sotomayor actually

16   talked about the Equal Protection clause.  It wasn't an Equal

17   Protection clause challenge, but she felt it necessary to say,

18   look, if this was an Equal Protection clause challenge, this

19   would offend that, too.

20           And so when I talk about Supreme Court dicta, I

21   talk both about the general principle that when we analyze the

22   constitutionality of a statute, we can't let a reenactment

23   that never reckoned with the racist reasons for a law's

24   existence to cleanse it of that animus, but also specifically

25   Justice Sotomayor's comments and concurrence in *Ramos*.

1              THE COURT:  All right.  Thank you, Ms. Gorman.

2              Mr. Walkingshaw?

3              MR. WALKINGSHAW:  Thank you, your Honor.

4              And I'll try and keep my comments as narrowly

5    focused on the legal issues before the Court as possible, and

6    if at any point the Court has any questions, please feel free

7    to interrupt me.

8              But I think I need to begin accepting the

9    Court's premise that we'll proceed on the *Arlington Heights*

10   framework.

11             The defendant's motion is premised entirely on

12   the proposition that the portions of *Ramos* and *Espinoza* that

13   we were just discussing establish a freestanding principle

14   that a -- that reaching back into the history of subject

15   matter -- subject areas of law can be a valid basis to

16   invalidate later enactments.  That simply is not what those

17   cases stand for.

18             So in *Ramos*, the discussion of the law's history

19   falls within a repudiation of a functional analysis of the

20   Sixth Amendment right to a jury trial.

21             In a majority opinion, the -- Justice Gorsuch's

22   opinion took up the functional analysis in a precedent that it

23   was overruling, which is the *Apodaca* case, and it said that

24   basically the -- the functional analysis done in *Apodaca*

25   focused on, you know, whether or not it would reduce the

1    likelihood of hung juries.

2              And the quote from the majority opinion is who

3    can profess confidence in such a breezy functional analysis, a

4    breezy cost benefit analysis such as that.

5              And it went on to discuss that the functional

6    analysis taken up there was not only faulty in the -- in its

7    execution, and that's where the discussion of the law's

8    history comes in and says that it failed to take into account

9    the fact that it was essentially adopted originally to

10   disenfranchise African-American jurors.

11             It says that our problem with this analysis is

12   not that it's, quote, skimpy, but that it was done at all.

13             Ultimately the *Ramos* case hinged entirely upon

14   what the Sixth Amendment right to a jury trial meant, and what

15   the Court concluded was that meant at common law and at the

16   adoption of the Constitution that the Sixth Amendment right

17   included a right to a unanimous jury.

18             Now, there was a dissent by Justice Alito that

19   took issue with this analysis, but the point of agreement

20   between the majority and the dissent in that case was what

21   does that history have to do with the holding in that case?

22   Nothing.

23             THE COURT:  What about -- Ms. Gorman is pointing

24   out to Justice Alito's concurrence in *Espinoza* which suggests

25   that the original motivation of the laws do matter.

1           MR. WALKINGSHAW:  Well, your Honor --

2           THE COURT:  In fact, she quoted the statement

3    from his concurrence that, if I quote,

4                "If the original motivation for the laws

5           mattered there," i.e., in *Ramos*, "it certainly

6           matters here."

7           MR. WALKINGSHAW:  Yes, your Honor.

8                And I think it's extremely important to note

9    there that that was a solo concurrence joined by no other

10   justices.  It's crucial to note that while Justice Alito

11   objected to the discussion in *Ramos*, he brought forth a

12   similar analysis in *Espinoza*, and no other justice joined him.

13   It's just clearly not the law of the Supreme Court.  Justice

14   Sotomayor was the only one to take up that -- that argument at

15   all that's in the dicta discussed in the defendant's brief.

16                But at the end of the day the Supreme Court has

17   said time and time again, as have other federal courts, that

18   when you conduct an *Arlington Heights* analysis, you look at

19   the motives behind the government officials taking the

20   challenged action.

21                And I'll turn briefly -- well, I think perhaps

22   the most recent and definitive statement on whether or not

23   this theory holds water would actually be --

24                THE COURT:  So if -- I want to follow up on what

25   you just said.

1           If I accept that you look at the motive of the

2   challenged action, does that mean that -- in a way it seems

3   circular.  So every time there's a reenactment, the Court has

4   to ignore any legislative history relating to the prior

5   enactment?

6           MR. WALKINGSHAW:  Your Honor --

7           THE COURT:  In other words, does a reenactment

8   automatically cleanse any racial animus that animated from the

9   earlier enactment?

10          MR. WALKINGSHAW:  Well, your Honor, I think the

11  important thing is to look at the people taking the decision.

12          So the DHS provision -- I think the clearest

13  statement on this issue is that statements that are, quote,

14  remote in time and context are not probative.

15          And in the *Department of Homeland Security*

16  *versus Regents of California* decision, the Supreme Court said

17  very clearly that statements by the president, President

18  Donald Trump, before and after election, and the president

19  became the head of the executive, that his statements

20  regarding the DACA program were not probative of the issue of

21  whether or not the determination to terminate DACA was

22  motivated by racial animus, and that's -- that's a difference

23  of less than two years.

24          I think the important thing here --

25          THE COURT:  Well, isn't context important?

1    Because in the 1326 context, as Ms. Gorman argues, the

2    subsequent reenactment merely adds additional punitive --

3    really made the violation more punitive.

4                    MR. WALKINGSHAW:  So, your Honor, I wouldn't

5    agree with that characterization.

6                    THE COURT:  Why not?

7                    MR. WALKINGSHAW:  Subsequent amendments did

8    add -- subsequent amendments did add additional penalties such

9    as raising crimes, but they were part of larger immigration

10   reform bills.

11                   And the fact that they were reenacted doesn't --

12   they still go through the process of bicameralism at

13   presentment.  Again, the fact it might not have been discussed

14   extensively on the Senate or House floor doesn't mean that

15   they're not reviewed by congressional aides, that the

16   congressmen don't read the bill.

17                   There's a -- I think the Court can appreciate

18   that the process of passing a law through Congress is not a

19   simple pro forma act, and, moreover, in the subsequent

20   amendments to the legislation, the 1965 revision we discuss in

21   our papers, was concerned with racial -- was concerned with

22   nationality quotas.

23                   I believe the amendment in 1990 introduced a

24   temporary protective status which primarily benefitted

25   citizens from El Salvador allowing them to come into the

1    country and maintain a permanent status due to strife there.

2              The fact of the matter is that when these --

3    when these laws are reenacted, they go through a process, and

4    the courts have been very clear, it's not for the courts to

5    somehow create some disabling mechanism for the democratic

6    process, that if the -- if congressmen don't specifically

7    identify past instances of the law and the motives behind

8    them, that they're somehow disabled from passing them in the

9    future.

10             It's been very clear -- the Supreme Court has

11   been very clear that past discrimination does not carry

12   forward from one legislature to another in the manner of

13   original sin.

14             Ms. Gorman discussed the *Abbott versus Perez*

15   case.  I think it's very instructive in that the Supreme Court

16   upheld a voting plan that was explicitly based on a voting

17   plan that had been adopted by the Texas legislature two years

18   prior and had been found by the Supreme Court to be

19   discriminatory and a violation of the Equal Protection clause

20   and of the Voting Rights Act, and the Court said ultimately

21   you need to look at the -- you need to look at the motives

22   behind the people adopting the legislation and that good faith

23   is presumed.

24             When Americans send legislators to enact their

25   policy preferences, we have to presume that they're -- that

1    they're moving -- that they're moving forward in good faith,

2    and statements taken from 20 years removed when not a single

3    legislator from the 1929 Congress participated in the 1952

4    act, in the passage of the 1952 act, we simply can't assume

5    that any racial animus or bias was imported through time into

6    those legislators.  You have to look at their --

7                    THE COURT:  What was the difference between the

8    1929 act and the 1952 reenactment other than making the law

9    more punitive?  What were the changes?

10                   MR. WALKINGSHAW:  So with respect to 1326

11   specifically, your Honor, or generally, or the revisions to

12   the overall immigration framework?

13                   THE COURT:  With respect to 1326.

14                   MR. WALKINGSHAW:  The law is the same.

15                   And, your Honor, I think that's not terribly

16   surprising, given the fact that courts have said time and time

17   again, I think *Hernandez-Guerrero* cited in our papers, that

18   it's an essential part of any immigration framework to have a

19   deterrent to enforce the judgments and the determinations of

20   the political branches with respect to immigration.  If

21   there's no penalty for violating Congressional determinations

22   regarding immigration or executive determinations regarding

23   immigration, then it's, quote, all bark and no bite.

24                   I think the statute has been updated

25   subsequently, but there's never been, subsequent to 1929, and

1    defense points to no evidence whatsoever in the Congressional

2    Record from 1952 forward, that creating this deterrent that

3    allows for the enforcement of immigration law was motivated or

4    driven by animus even when the deterrent value was increased.

5                   THE COURT:  So it seems, as I understand it, the

6    government's position is a subsequent reenactment, and

7    specifically here, the 1952 reenactment, would essentially

8    cleanse any racial animus that stems from the 1929 enactment?

9                   MR.  WALKINGSHAW:  Yes, your Honor.

10                  You know, I'm not really sure -- I guess what I

11   would say is I'm not sure that the framing of cleansing it is

12   necessarily --

13                  THE COURT:  How would you frame it?

14                  MR. WALKINGSHAW:  Well, I'd frame it, we look to

15   the decision of the 1952 Congress in passing this law as to

16   whether or not they had a discriminatory motive, and there's

17   no evidence that they did.

18                  So, you know, there are a number of different

19   ways you can think about it, but ultimately statements from

20   more than 20 years prior don't forever taint the subject

21   matter of the law that was passed.

22                  There's no -- there's no basis in the law to

23   create the sort of disabling mechanism that will prevent

24   future generations from neutrally considering the sort of

25   political considerations of public policy that Congress needs

1    to have the power to enact.

2                    THE COURT:  Do you agree that the defendant has

3    offered sufficient evidence that the 1929 enactment was

4    motivated by discriminatory animus?

5                    MR. WALKINGSHAW:  Your Honor, I think the

6    initial -- the initial hurdle on the consideration, was it

7    motivated in part by animus, I think we go into this a little

8    bit in our papers, it's a very difficult thing to take the

9    motivation of an entire legislative body out of a few handful

10   of congressmen.

11                   Obviously, the statements that were made were --

12                   THE COURT:  Well, under *Arlington Heights* they

13   just have to show that discriminatory intent was a motivating

14   factor.

15                   MR. WALKINGSHAW:  Yes.  And, your Honor, I would

16   say that the factor -- the statements here -- I'm sorry, I'm

17   feeding back and I've lost -- your Honor, can you still hear

18   me?

19                   THE COURT:  Yes.

20                   MR. WALKINGSHAW:  I beg your pardon.  For some

21   reason the screen changed.

22                   The statements offered here are deplorable, and

23   the government certainly would not say that they don't

24   demonstrate racial animus on the part of those few

25   congressmen.

1              We would certainly dispute that the law would

2    not have been passed absent -- absent the racial animus, but

3    ultimately that consideration just isn't relevant to the

4    determination of whether or not the 1952 -- the Congressional

5    legislators that had -- that passed the 1952 Immigration and

6    Nationality Act, whether or not they had any racial animus in

7    passing the law that they passed.  There's no dispute that

8    that's the operative framework at place here, your Honor.

9              THE COURT:  So just so I'm clear, the government

10   does not concede that the evidence offered is sufficient for

11   the Court to find that the 1929 enactment demonstrates

12   discriminatory intent under the *Arlington Heights* standard?

13             MR. WALKINGSHAW:  I mean, ultimately, your

14   Honor, I think the question is so far removed from the

15   relevant one.  I would say that, yes, the statements from

16   those legislators would be sufficient were we considering the

17   1929 law, but we're not.

18             THE COURT:  I understand we're not.  I just --

19   the first step -- well, the defendant's argument stems from

20   several steps, so I first have to find -- because they're

21   relying on the 1929 enactment, the legislative history of the

22   1929 enactment of the statute, to argue that the -- to

23   demonstrate discriminatory intent.

24             So you agree that they've offered enough

25   evidence to demonstrate that the 1929 enactment stems from

1    racial animus under *Arlington Heights*.

2                    MR. WALKINGSHAW:  Yes, your Honor.

3                    THE COURT:  And I assume the argument is that

4    shouldn't carry over to the 1952 reenactment; is that right?

5                    MR. WALKINGSHAW:  Yes, your Honor.  Yes, that's

6    been -- that's been -- ultimately the *Arlington Heights*

7    analysis is not informed by those statements from more than

8    20 years prior to the law's passage.

9                    Every Court that has considered this motion, and

10   several have, that has applied the *Arlington Heights*

11   framework, has come to the same conclusion.

12                    THE COURT:  I'm sorry, what was your statement?

13   Every decision what?

14                    MR. WALKINGSHAW:  So every Court that has

15   considered -- as I believe Ms. Gorman referred to earlier,

16   these motions making this argument have been filed in several

17   courts around the country.  They're cited in our papers.

18   Ms. Gorman cited one in one of her supplements.

19                    Every Court to consider the issue of whether or

20   not the statements in 1929 were sufficient to meet the initial

21   burden for later enactments of the criminal immigration law,

22   every Court has found that the showing of those statements in

23   1929 is insufficient to show that the later enactments were

24   driven by discriminatory motive because they don't speak to

25   the motives of the people making the decisions that were

1    contested.

2                    THE COURT:  Other than the supplement -- the

3    decision from the Southern District of California that

4    Ms. Gorman offered in the first supplement, I don't recall the

5    government citing to any other decision in their response.  If

6    you can just point out the pages in the response.

7                    MR. WALKINGSHAW:  Yes, certainly, your Honor.

8                    So we attached one as an Exhibit A that's from

9    the Eastern District of Virginia, and I believe it's also

10   cited in -- it's cited in our papers --

11                   THE COURT:  Oh, I think I remember that.  I

12   remember that.  Thank you.

13                   MR. WALKINGSHAW:  And then further there were

14   other decisions from the Southern District of California, I

15   believe it's been litigated a number of times.

16                   I believe on page 22, in footnote 13, the --

17   although I believe that was like the -- like the case cited in

18   the supplement by Ms. Gorman, this was the challenge to 1325

19   and not 1326.  It similarly rejected the premise that laws

20   validly passed by the people's delegated representatives

21   decades after racist statements were made can be invalidated

22   based on a history that the country may not even be aware of.

23                   THE COURT:  If I were to find that the defendant

24   has met his burden, the burden shifts to the government on

25   *Arlington Heights*, and the government would have to show that

1    the statute would not have passed even without the

2    impermissible purpose, do you think that the government has

3    met that burden?

4              MR. WALKINGSHAW:  Yes, your Honor.  It's been

5    passed over and over and over again -- oh, dear, I'm frozen

6    again.  Your Honor, can you hear me?

7              THE COURT:  I can hear you.

8              MR. WALKINGSHAW:  Yes.  So, your Honor, we

9    think -- I apologize.  This is the most stable Internet

10   connection I'm able to (inaudible).

11              But, again, this law has been passed over and

12   over and over again.  The 1952 Congress explicitly disclaimed

13   any theory of racial superiority or Nordic superiority.

14              The 1965 Congress, which was in the throes of

15   the civil rights movement, explicitly -- they eliminated

16   nationality quotas.

17              Over and over again Congress has modified, you

18   know, altered, reconsidered, and repassed immigration

19   legislation, and in no Congress subsequent to 1929 has -- is

20   there any indication that any of those decisions were driven

21   by racial animus.

22              THE COURT:  I guess -- so what I'm struggling

23   with --

24              MR. WALKINGSHAW:  It's merely -- it's merely

25   alleged as something --

1                   THE COURT:  Mr. Walkingshaw, I'm trying to

2      process the argument that the fact of the subsequent

3      reenactment itself is sufficient for the government to meet

4      its burden that the law would have passed even without the

5      impermissible purpose, it seems to eviscerate the government's

6      burden because any subsequent reenactment would allow the

7      government to meet its burden.

8                   MR. WALKINGSHAW:  Well, your Honor, I think,

9      again, the Court needs to look at the motivations of the

10     people making the decision, and so if there's evidence of

11     racial animus in subsequent enactments, then certainly that's

12     problematic.

13                  But here there's simply no evidence of racial

14     animus from 1952 forward.  It's entirely premised on

15     statements more than two decades prior -- the defense motion

16     is entirely premised on statements made more than two decades

17     prior to the passage of the operative legislative framework.

18                  THE COURT:  Was there any testimony, any

19     legislative history showing one way or another whether or not

20     there's discriminatory animus with the 1952 enactment?

21                  MR. WALKINGSHAW:  I believe in Ms. Gorman's

22     supplement she noted -- the passage was -- the -- those

23     provisions were not discussed on the Senate floor or the House

24     floor.

25                  But, again, your Honor, it flips the burden

1    which is -- which is a -- which is what the Court recognized

2    in *Mobile* and in *Abbott versus Perez*.

3                    THE COURT:  I thought you said that Congress

4    disclaimed any racial animus in the 1952 enactment that was

5    passed.

6                    MR. WALKINGSHAW:  Oh, I'm sorry, that is true,

7    your Honor.  I beg your pardon.

8                    So the -- there was -- there was discussion

9    of -- of -- yeah, of disclaiming any theory of racial

10   superiority.  This is actually in our papers in the discussion

11   of the legislative history of the 1952 act.

12                   But I'm not sure that that was specific to -- I

13   mean, I'm not sure that it was necessarily specific to the

14   1325 -- 1325 hadn't been enacted yet, but the illegal reentry

15   provision, but, again, your Honor, I don't think it needs to

16   be.  I mean, there's really -- there's really no evidence of

17   anything but legislative good faith in the 1952 act.

18                   THE COURT:  So it wasn't specific to 1326

19   because there's no reference to 1326.

20                   MR. WALKINGSHAW:  Yes.  But, again, your Honor,

21   the -- the overall view and goal of that Congress was to

22   disclaim any theory of racial or Nordic superiority.

23                   THE COURT:  I'm sorry, you said the overall goal

24   of the enactment of the statute was to -- for the purpose of

25   disclaiming any racial animus?

1            MR. WALKINGSHAW:  I beg your pardon, your Honor,

2    that's perhaps a bit of an overstatement.

3            But it's clear from the legislative history that

4    in the enactments, to the extent that the -- to the extent

5    that -- that race -- that Congress people that discussed the

6    issue disclaimed the theory of Nordic superiority.

7            THE COURT:  So to the extent it was discussed,

8    they disclaimed any racial animus.  It wasn't what you said

9    earlier --

10           MR. WALKINGSHAW:  Yes.

11           THE COURT:  -- that is, that the whole goal of

12   the reenactment was for the purpose of disclaiming the prior

13   discriminatory animus.

14           MR. WALKINGSHAW:  Yeah.  I beg your pardon, your

15   Honor, that was an overstatement on my part.  That was not

16   what I meant to say.

17           THE COURT:  Okay.  So repeat again what you

18   meant to say.

19           MR. WALKINGSHAW:  Yes.  Yeah.  That would not be

20   accurate.

21           Yes.  Yeah.  All I mean to say is that to the

22   extent that race was discussed, the Congress repudiated

23   theories of racial superiority and continue to do so going

24   forward.

25           In 1965, the height of the civil rights

1    movement, it eliminated quotas for -- regarding national

2    origin.

3                    Again, in 1990, Senator Kennedy, Ted Kennedy of

4    Massachusetts, introduced elements into the immigration

5    framework to offer temporary protective status that primarily

6    benefitted individuals from Latin American countries.

7                    So to say that this sort of -- it's just simply

8    not an appropriate framework to judge a law to say that in

9    1929 this sort of racist seed or taint was planted that runs

10   forever throughout unless it's specifically identified and

11   disclaimed is just alien to anything in the law in this area.

12                   THE COURT:  What's the government's position on

13   an evidentiary hearing?

14                   MR. WALKINGSHAW:  Again, your Honor, I strongly

15   believe it would be unnecessary, that the precedents we've

16   cited and some of the precedents that were cited by the

17   defendants, including *Department of Homeland Security versus*

18   *the Regents of the University of California* in which the Court

19   decided it didn't need to determine what the appropriate

20   framework was to judge the termination of DACA, even if we

21   apply *Arlington Heights*, the -- even if we apply *Arlington*

22   *Heights*, the plaintiffs can't say the claim because the

23   statements were remote in time and separate context.

24                   So even -- even assuming for purposes of

25   argument that the 1929 law was entirely driven by racial

1    animus, which we don't concede, we think there are valid

2    reasons for passing this law, as we've discussed, to establish

3    a deterrence, to prevent or to enforce Congress's immigration

4    mandates, nonetheless, the appropriate -- even when prior

5    discrimination has been found, the appropriate source of

6    inquiry is 1952, and no evidence to that effect has been

7    produced by the defense.

8                    THE COURT:  Well, but you mentioned earlier that

9    to the extent that race was discussed with the 1952

10   reenactment, that Congress repudiated any racial animus and

11   that they did that going forward with every reenactment.

12   Doesn't that warrant --

13                   MR. WALKINGSHAW:  Yes, your Honor.

14                   THE COURT:  -- some kind of evidentiary hearing

15   on that issue when the defendant's position is there was

16   no such evidence?

17                   MR. WALKINGSHAW:  I don't -- well, your Honor, I

18   think all of these things are -- all of these are subject to

19   the Congressional Record and are matters of public notice, so

20   they're the sort of things the Court can review.

21                   But, again, while we certainly agree -- while --

22   the government's position is certainly that if the Court looks

23   to subsequent enactments, it would find good faith and find

24   that would be -- that 1326 would be passed absent any --

25   absent any racial animus.

1              The fact is that it was passed initially in 1952

2    in the absence of any racial animus, and that passage is what

3    the Court should focus its inquiry on, and no evidence has

4    been put forward to suggest that the motivations of those

5    legislators were driven in any way by racial animus.

6              THE COURT:  Thank you.  Anything else,

7    Mr. Walkingshaw?

8              MR. WALKINGSHAW:  Not unless the Court has any

9    further questions, your Honor.

10             MS. GORMAN:  Your Honor, may I briefly respond?

11             THE COURT:  Yes.

12             MS. GORMAN:  Thank you.

13             So, first of all, I think the Court highlighted

14   why it is so important to have a historian come and talk about

15   this legislation, particularly as the government focuses on

16   the 1952 reenactment which it concedes contains no discussion

17   and simply adopted and reinforced the 1929 statute.

18             And one thing I read into the record was

19   Truman's veto, and why I highlight part of the reason why he

20   vetoed it is because it was a continuation of the national

21   origins quota, and it -- what it did end in terms of race, I

22   think its only acknowledgment of race, was that it ended

23   race-based exclusions of Asians and exchanged it for small

24   quotas on them, but it continued the highly restrictive and

25   very controversial national origins system and its privileged

1    entry by highly-skilled immigrants.

2                    And to the extent the government wants to rely

3    on this 1952 reenactment, which is absolutely silent as to

4    1325 and 1326, I also want to note for the record, in addition

5    to the importance of having an evidentiary hearing and having

6    a historical scholar actually testify about the context of the

7    legislative history is -- for example, in 1954, and this is

8    after the 1952 act, that was Operation Wetback, and that was

9    pursuant to this piece of legislation.

10                    I think Operation Wetback -- I don't think that

11   there's any sort of disagreement that in 1954 and today it's

12   very clear that wetback refers to Mexicans, and that was

13   following something that the government talked about in its

14   briefing, the Bercerra program, where the United States

15   essentially permitted illegal immigrants to come in and to

16   essentially do agricultural work, and then there was a

17   backlash against it where you have Operation Wetback, again in

18   1954, which decided to repatriate Mexicans, including Mexican

19   [sic] citizens.  So pursuant to that over a million Mexicans,

20   including American citizens, were deported to Mexico.

21                    So the idea that 1952 was somehow -- that we

22   were living in a postracial world, when there's one Latino

23   congressman who was even in Congress at all in 1952, I think

24   is -- it sort of exemplifies that this new law's racist

25   origin, of course, continued from 1925, and it's the silence

1   on that history that allows these racially invidious laws to

2   continue.

3            I mean, and so I think the Court sort of makes

4   or agrees with the main point that if we take the government

5   at its word that any reenactment essentially cleanses

6   legislation, no matter of how racist, no matter how eugenical,

7   no matter how despicable to at least our stated race-neutral

8   values, then we would never be able to challenge on Equal

9   Protection grounds laws as racist as this one.

10           And one important thing that the government does

11  not dispute, I would highly dispute that 1952 represented a

12  repudiation of anything racist, but I think the silence of the

13  1952 legislature and its willingness to adopt in whole a

14  statute that is clearly derivative of eugenical concerns sort

15  of makes its own point, that we can't use reenactments to

16  cleanse laws, particularly if they refuse to even acknowledge

17  that eugenics is racist.

18           And if you -- it is incumbent on every

19  legislator who passes a law to understand the legislation that

20  they are passing, and we have to infer from the fact that they

21  were willing to reenact 1326, or recodify 1326 in the same

22  form as 1929, unless -- I mean, it adopts also the reasoning

23  of the prior legislature, it doesn't cleanse it, it doubles

24  down on it, and -- pardon me, your Honor.

25           THE COURT:  Do you want to address the cases

1    that Mr. Walkingshaw cites to, including the *Regents of the*

2    *University of California* and his reference to DACA in terms of

3    reenactment in terms of what the Court can consider?

4              MS. GORMAN:  And I want to at least make sure

5    that I am addressing the right cases.

6              As I understand it, the DACA decision accepted

7    the *Arlington Heights* framework but rejected the comments of

8    Donald Trump in striking it down, but I also want to make sure

9    that I'm talking about the correct case.

10             So if the Court of would be so generous as to

11   provide a citation, I can, of course, address it.

12             THE COURT:  I think you at least summarized the

13   argument, as I understand it from Mr. Walkingshaw, the case is

14   *Department of Homeland Security versus Regents of the*

15   *University of California*, 140 Supreme Court 1891.  It was

16   issued -- the decision was issued June 18, 2020.

17             MS. GORMAN:  Court's indulgence, your Honor.  I

18   just want to make sure that -- because I know that when the

19   government initially contextualized that was with respect to

20   whether *Arlington Heights* applies at all, so that is where I

21   focused my arguments, so I want to make sure that I am

22   responding to something relevant in what the Court is saying

23   or in what the government's argument is.

24             THE COURT:  I can also have Peggie email you the

25   case if you aren't able to pull it up.

1                    MS. GORMAN:  I'm able to pull it up, your Honor.

2                    MR. WALKINGSHAW:  And, your Honor, once

3    Ms. Gorman is done reviewing the case and responding, if I

4    could have a brief bit of time to respond as well, I would

5    appreciate it.

6                         (Proceedings paused.)

7                    MS. GORMAN:  Your Honor, at least as I

8    understand it, while it was rejected on its fact, the DACA

9    decision in *Homeland Security v Regents of the University*

10   *California* partially supports this claim because it wasn't

11   distinguished on the facts.

12                    So one of the -- the Court states to plead

13   animus, the plaintiff must raise a possible inference that

14   this invidious discriminatory purpose was a motivating factor

15   in the relevant decision, which I believe that we have shown

16   in this case particularly as the 1952 legislative session

17   simply adopted the 1929 law.

18                    And so they did not have the kind of evidence

19   that we have in this case which is this lengthy history that

20   precedes the 1929 enactment, including the legislative history

21   which is in the record.

22                    So whether or not -- and this case was

23   ultimately distinguishable on its facts and whether or not

24   Donald Trump or the ultimate recission memo, or whether Donald

25   Trump's comments were relevant to the recission memo, these

1    are relatively factually nuanced distinctions.

2              But at the end of the day I think this DACA

3    decision actually does support at least the general principle

4    that if you can point to the racial animus as a motivating

5    factor in a decision, and in this case we're referring to a

6    statute, that *Arlington Heights* applies.

7              THE COURT:  If I were to -- so since the

8    government has already conceded that the 1929 enactment stems

9    from discriminatory animus, what would be the purpose of the

10   evidentiary hearing?

11             MS. GORMAN:  So if the government's contention

12   is that in 1952 that the entire purpose of the law was to

13   disclaim racial animus, I -- I think that any sort of

14   historian would happily rebut that.

15             And, in particular, one of the two historians

16   that we propose testify at an evidentiary hearing is Professor

17   Hernandez.  She's an endowed chair at UCLA and has studied the

18   topic in depth.

19             And this topic has actually been subjected to a

20   lot of academic analysis, and there are multiple academics

21   that we can bring to testify in front of this Court.

22             One thing that I think the government does not

23   dispute was that in 1952 there was -- they simply decided to

24   carry forward the 1929 law, and the 1929 legislature was

25   clearly motivated by racial animus which satisfies *Arlington*

*Heights*.

So this reliance on a reenactment that the Ninth Circuit has explicitly recognized never reckoned at all with the racial motivations for the law is simply insufficient to cleanse it.

To the extent that the Court has broader questions about this 1952 legislation and whether it could possibly cleanse the racial animus that was the reason for the passage of this law, then I think testimony from a historian is important to contextualize it.

I mean, there's a reason why President Truman vetoed this law, and it was particularly this relatively controversial national origins part of the 1929 legislation.

But in 1952 they essentially reorganized and made some modifications to a large host of immigration statutes, and the one that they chose to leave untouched was the criminalization of migration, and that was for a very specific reason, and we see that post 1952.

I mean, the idea that in 1952 we were living in a world without racism I think is ridiculous.  I pointed out before in 1954 we decided to repatriate Mexicans in Operation Wetback.

So if we really want to say that the 1952 legislature, while adopting this law in whole cloth was a repudiation of racism, I think that that is undermined by the

1    historical record, and it would be illuminating to have the

2    testimony of a historian, particularly one who is so well

3    steeped in this legislative history.

4                    THE COURT:  And so is that individual Professor

5    Hernandez?

6                    MS. GORMAN:  Yes.  There's also Professor

7    O'Brien who offered to testify.  I don't believe he submitted

8    a declaration in connection with the motion.

9                    But I have reached out to Professor Hernandez

10   and Professor O'Brien who both expressed that they would

11   happily come and speak to this Court.

12                   I believe Mr. O'Brien -- or Professor O'Brien is

13   a professor at UCSD and Professor Hernandez at UCLA, and both

14   have written extensively on this topic.

15                   This subject has actually been the subject of a

16   lot of academic debate.  I think the idea of looking at this

17   law through an Equal Protection lens was probably precipitated

18   by the 2019 introduction of the New Way Forward Act that

19   explicitly recognized that 1929 -- that the origin of 1326 and

20   1325, which I recognize is not at issue here, but the 1326 at

21   least has a racist origin that stems back from the '20s.

22                   And the United States Attorney has proudly held

23   up this hundred-year history.  That was one of the reasons why

24   I submitted the US Attorney Bulletin, that it's only when

25   subjected to an Equal Protection analysis that the United

1    States Attorney wants to walk back this sort of proud

2    endorsement of this hundred-year law.

3              But the fact is 1952 just carried it forward,

4    and it is certainly not sufficient to cleanse it of its racial

5    animus.

6              And we don't live in a race-blind world.  We

7    certainly didn't in 1952, and historically it has been the

8    courts who have the courage to actually discuss and talk about

9    these legislations and what they mean in the context of the

10   Constitution.

11             I mean, 1952 was before *Brown V Board of*

12   *Education*.  So we're talking about -- you know, a world

13   where -- you know, the segregated world where that was okay,

14   and so the idea that 1952 somehow cleansed it because they

15   didn't talk about it is, I think, ridiculous.

16             But I also think the historian might be helpful

17   to shed additional light on it, particularly as that's the

18   government's position.

19             THE COURT:  All right.  Thank you.

20             Mr. Walkingshaw?

21             MR. WALKINGSHAW:  Your Honor, just a few points

22   quickly, and I really don't know how it got to this point, but

23   it is certainly not the government's position, nor is it the

24   government's burden to prove that 1952 was free of racism.

25             It's the defendant's burden to prove that the

1    challenged action was driven by racism, and, in this case, no

2    evidence has been offered.

3              The entirety of the declaration submitted in

4    support of -- or by Professor Hernandez revolves around the

5    1929 law.  The entirety of the defendant's briefing revolves

6    around the 1929 law.

7              And Ms. Gorman's statement that there was a

8    backlash in 1954 to the 1952 law, that several -- that a large

9    number of Mexicans were repatriated as a backlash of the 1952

10   law, you know, certainly doesn't support the fact that the

11   1952 law was racist.

12             Again, the point of inquiry for this Court is

13   not whether or not the world was free of racism in 1952, it

14   certainly wasn't.  It certainly -- racism is certainly

15   something the Court should be concerned with --

16             THE COURT:  It still isn't.

17             MR. WALKINGSHAW:  -- something that anyone --

18   exactly.  It's something that anyone interested in justice

19   should be concerned with.

20             But the framework set forth by *Arlington Heights*

21   requires a serious inquiry into whether the decision that was

22   actually taken was driven by racism, and no evidence has been

23   put forward to that effect.

24             And just very quickly, your Honor --

25             THE COURT:  Well, I understand that the

1    government -- you want to start from the 1952 reenactment

2    whereas the defendant's argument is the 1929 enactment, and

3    the absence of any repudiation with the subsequent

4    reenactment, should be considered by the Court.

5              So I understand the arguments.  I think that's

6    why -- the defendant is focused on 1929, and the government is

7    focussing on all the subsequent reenactments going forward.

8    Am I right?

9              MR. WALKINGSHAW:  Although I would -- I would

10   say, your Honor, the only -- the distinction I would make is

11   it was a 1952 enactment so that it --

12             THE COURT:  Yes, 1952.

13             MR. WALKINGSHAW:  -- the immigration and

14   nationality law, yes, is that it was an entirely new set of

15   statutes, and that's the operative framework.

16             But, yes, that's the central point of our -- of

17   our disagreement, I think, is that the 1929 law is 20 years

18   removed from what this Court's point of inquiry should be.

19             THE COURT:  Thank you.  I cut you off.  I didn't

20   know if there was something else you wanted to mention,

21   Mr. Walkingshaw.

22             MR. WALKINGSHAW:  Just very briefly, your Honor,

23   with respect to *Department of Homeland Security versus*

24   *Regents,* again, that was actually a case that was cited in the

25   defendant's papers, in their moving papers, and it was cited

1    for the proposition that I believe five justices thought that

2    the Arlington Heights framework should apply.  That's actually

3    not true, your Honor.

4              If you look at the decision, it says that two

5    alternative frameworks were proposed, and this actually wasn't

6    one in which plenary deference that Congress's congressional

7    authority was -- was advocated, that the government argued

8    that -- that the claims brought forth by the plaintiffs were

9    actually in effect a defense to deportation in the vein of

10   selective prosecution.

11              When the Court cited -- and I'm quoting here,

12              "We need not solve this debate because the

13        Equal Protection claim fails on its merits."

14              And eight justices agreed on that point that the

15   plaintiffs had not stated an Equal Protection claim.

16              So it's not correct to say that *Department of*

17   *Homeland Security versus Regents* stands for the proposition

18   that the *Arlington Heights* framework applies.

19              It was assumed for purpose of argument, because

20   even taking the plaintiffs' standard of review at face value,

21   even if adopting that standard, the claims would still fail.

22              Now, I understand the Court is proceeding on the

23   assumption that the *Arlington Heights* framework applies here.

24   I don't mean -- but I just wanted to be clear on what that

25   case said.

1              THE COURT:  Thank you.

2              Ms. Gorman, I just have one question for you

3    with respect to the testimony that would be offered at the

4    evidentiary hearing should I have one.

5              And it sounds like, based on the information

6    presented in the motion, the two experts would just testify on

7    the legislative history with the 1929 enactment and not the

8    1952 enactment; is that right?

9              MS. GORMAN:  Your Honor, my understanding is

10   that both historians would trace our current system of 1326

11   and 1325 prosecutions to the 1929 -- to the 1929 law and can

12   contextualize any sort of subsequent reenactment which the

13   government has already conceded in 1952 they were absolutely

14   silent.

15             But my understanding is not just that they were

16   saying that the 1929 law was animated by eugenics and

17   ultimately resulted from a compromise between avowed

18   eugenicists and a desire for cheap Mexican labor but the ways

19   in which that law carried forward in subsequent reenactments.

20             So I do think that those historians would be

21   important to the extent that the Court finds that the silence

22   of the 1952 legislature is insufficient to show that it

23   essentially adopted the racial animus of 1929.

24             I mean, the 1952 -- again, the idea that you can

25   reenact something that is so clearly motivated by racial

1    animus without talking about it, and that that would be

2    sufficient to cleanse it from that animus I think is a

3    separate and independent point.

4                 But to -- to -- if the Court is concerned

5    especially regarding that 1952 reenactment, or somehow thinks

6    that the silence satisfies the burden that it would have been

7    reenacted despite this animus, I think that that testimony can

8    be helpful.

9                 But I will also say that in light of the

10   government's concession that the 19 -- which has also been

11   recognized by the Ninth Circuit, that the 1952 reenactment was

12   absolutely silent about 1925 and 1926, they --

13                THE COURT:  You mean 1325 and 1326.  You said

14   1925 and 1926.

15                MS. GORMAN:  Oh, sorry, I conflated the two.

16                But to the extent that the government's argument

17   is that their silence is sufficient should the Court find that

18   the *Arlington Heights* -- that the initial showing of *Arlington*

19   *Heights* has been made by the defense, and the burden shifts to

20   the government to show that it would have been reenacted

21   despite this animus, this silence of the 1952 legislature on

22   1326 is sort of very obviously insufficient to overcome it

23   because it was never actually discussed, and so how could

24   anybody ever prove that without racial animus this law would

25   be discussed when it was adopted and carrying forward a

1    clearly racist law with no discussion, so that standard can

2    never be met.

3             THE COURT:  I think it would be helpful for me

4    to hear from the two experts.  I'm going to set an evidentiary

5    hearing.

6             Peggie will work with counsel to find a

7    convenient time in the next couple of weeks for that

8    evidentiary hearing to be held, and I'm willing to accommodate

9    them if they would want to testify by video as well.

10            MS. GORMAN:  My understanding is that they would

11   testify by video.

12            THE COURT:  So Peggie will work with counsel to

13   find time for the evidentiary hearing, and, Ms. Gorman, how

14   much time do you think should be allocated?

15            MS. GORMAN:  Would it be all right if I emailed

16   Ms. Vannozzi after I speak with both experts?

17            THE COURT:  Yes.

18            MS. GORMAN:  Thank you, your Honor.

19            THE COURT:  All right.  Thank you, counsel.

20                        -oOo-

21

22           I certify that the foregoing is a correct
             transcript from the record of proceedings
23           in the above-entitled matter.

24           /s/Margaret E. Griener        1/27/2021
              Margaret E. Griener, CCR #3, FCRR
25            Official Reporter

1

**'**

**'20s** [1] - 54:21
**'both** [1] - 8:21
**'have** [1] - 10:7
**'legitimate'** [1] - 10:16
**'traceable'** [1] - 10:6

**/**

**/s/Margaret** [1] - 61:24

**1**

**1/27/2021** [1] - 61:24
**10:00** [1] - 2:1
**11** [1] - 12:10
**13** [1] - 40:16
**1325** [16] - 7:5, 14:6,
15:18, 16:16, 17:25,
21:11, 22:7, 22:15,
25:21, 40:18, 43:14,
48:4, 54:20, 59:11,
60:13
**1326** [33] - 4:22, 7:5,
11:23, 12:20, 12:22,
12:24, 14:6, 15:18,
15:22, 16:3, 16:17,
18:1, 21:16, 22:2,
22:8, 23:12, 25:21,
25:22, 33:1, 35:10,
35:13, 40:19, 43:18,
43:19, 46:24, 48:4,
49:21, 54:19, 54:20,
59:10, 60:13, 60:22
**140** [2] - 9:2, 50:15
**18** [1] - 50:16
**1891** [1] - 50:15
**19** [1] - 60:10
**1925** [3] - 48:25,
60:12, 60:14
**1926** [2] - 60:12, 60:14
**1929** [45] - 5:19, 5:25,
6:4, 6:7, 9:4, 11:11,
14:24, 15:15, 16:8,
17:15, 24:12, 35:3,
35:8, 35:25, 36:8,
37:3, 38:11, 38:17,
38:21, 38:22, 38:25,
39:20, 39:23, 41:19,
45:9, 45:25, 47:17,
49:22, 51:17, 51:20,
52:8, 52:24, 53:13,
54:19, 56:5, 56:6,
57:2, 57:6, 57:17,
59:7, 59:11, 59:16,
59:23
**1952** [62] - 6:4, 6:7,
6:10, 6:21, 7:5, 7:14,
14:6, 14:15, 15:16,

17:23, 35:3, 35:4,
35:8, 36:2, 36:7,
36:15, 38:4, 38:5,
39:4, 41:12, 42:14,
42:20, 43:4, 43:11,
43:17, 46:6, 46:9,
47:1, 47:16, 48:3,
48:8, 48:21, 48:23,
49:11, 49:13, 51:16,
52:12, 52:23, 53:7,
53:14, 53:18, 53:19,
53:23, 55:3, 55:7,
55:11, 55:14, 55:24,
56:8, 56:9, 56:11,
56:13, 57:1, 57:11,
57:12, 59:8, 59:13,
59:22, 59:24, 60:5,
60:11, 60:21
**1954** [5] - 48:7, 48:11,
48:18, 53:21, 56:8
**1965** [3] - 33:20,
41:14, 44:25
**1977** [1] - 6:23
**1980** [1] - 18:16
**1990** [5] - 22:1, 22:13,
23:7, 33:23, 45:3

**2**

**2** [1] - 19:1
**20** [5] - 26:21, 35:2,
36:20, 39:8, 57:17
**2005** [1] - 12:7
**2011** [2] - 20:18, 20:21
**2013** [3] - 20:18,
20:20, 20:22
**2017** [1] - 11:3
**2019** [3] - 25:19,
25:20, 54:18
**2020** [4] - 8:14, 26:12,
26:20, 50:16
**2021** [2] - 1:6, 2:1
**214** [1] - 6:24
**216** [1] - 6:25
**22** [3] - 1:6, 2:1, 40:16
**2246** [1] - 9:2
**2268** [1] - 9:2
**26** [1] - 2:15
**27** [1] - 14:6
**27th** [1] - 7:5

**3**

**3** [2] - 1:22, 61:24
**31** [1] - 21:9
**33** [1] - 13:25
**34** [1] - 4:2
**3:20-CR-26-MMD-
WGC** [1] - 2:4
**3:20-cr-26-MMD-**

**WGC** [1] - 1:5

**4**

**400** [1] - 1:23
**44** [1] - 25:21
**446** [1] - 18:15

**5**

**55** [1] - 18:16
**557** [1] - 6:24

**6**

**625** [1] - 20:3

**7**

**74** [1] - 18:16

**8**

**89501** [1] - 1:23

**A**

**A.M** [1] - 2:1
**abandoned** [1] - 19:24
**Abbott** [4] - 20:12,
20:15, 34:14, 43:2
**able** [5] - 21:21, 41:10,
49:8, 50:25, 51:1
**above-entitled** [1] -
61:23
**absence** [2] - 47:2,
57:3
**absent** [5] - 9:6, 38:2,
46:24, 46:25
**absolute** [1] - 17:10
**absolutely** [3] - 48:3,
59:13, 60:12
**academic** [2] - 52:20,
54:16
**academics** [1] - 52:20
**accept** [7] - 4:10,
21:21, 21:22, 28:4,
28:5, 28:6, 32:1
**acceptable** [1] - 16:25
**accepted** [1] - 50:6
**accepting** [1] - 29:8
**accommodate** [1] -
61:8
**account** [1] - 30:8
**accurate** [1] - 44:20
**acknowledge** [3] -
17:11, 17:12, 49:16
**acknowledging** [1] -
26:1, 27:6
**acknowledgment** [1] -

47:22
**act** [8] - 11:11, 33:19,
35:4, 35:8, 43:11,
43:17, 48:8
**Act** [7] - 7:5, 12:20,
14:6, 19:1, 34:20,
38:6, 54:18
**action** [4] - 18:22,
31:20, 32:2, 56:1
**actions** [1] - 14:7
**actual** [1] - 25:3
**add** [2] - 33:8
**added** [1] - 33:8
**addition** [2] - 7:9, 48:4
**additional** [3] - 33:2,
33:8, 55:17
**address** [6] - 3:1,
14:19, 15:19, 18:10,
49:25, 50:11
**addressing** [1] - 50:5
**adds** [1] - 33:2
**administration** [2] -
12:3, 12:7
**administrative** [1] -
7:24
**adopt** [1] - 49:13
**adopted** [7] - 8:21,
30:9, 34:17, 47:17,
51:17, 59:23, 60:25
**adopting** [3] - 34:22,
53:24, 58:21
**adoption** [1] - 30:16
**adopts** [1] - 49:22
**advocated** [1] - 58:7
**affect** [1] - 4:7
**affects** [1] - 16:5
**afford** [1] - 18:3
**afforded** [2] - 16:11,
27:3
**African** [1] - 30:10
**African-American** [1]
- 30:10
**aggressively** [1] -
27:10
**agree** [14] - 3:22,
13:18, 15:21, 16:5,
17:14, 17:15, 21:18,
22:6, 23:5, 23:19,
33:5, 37:2, 38:24,
46:21
**agreed** [1] - 58:14
**agreement** [2] - 3:24,
30:19
**agrees** [2] - 27:16,
49:4
**agricultural** [2] -
11:18, 48:16
**aides** [1] - 33:15
**alien** [6] - 7:10, 17:3,
26:4, 45:11

**aliens** [2] - 17:19,
17:20
**aliens..** [1] - 7:13
**Alito** [2] - 30:18, 31:10
**Alito's** [2] - 8:16,
30:24
**alleged** [1] - 41:25
**allocated** [1] - 61:14
**allow** [3] - 15:2, 28:4,
42:6
**allowed** [1] - 12:7
**allowing** [2] - 15:3,
33:25
**allows** [2] - 36:3, 49:1
**altered** [1] - 41:18
**alternative** [1] - 58:5
**altogether** [1] - 10:20
**ameliorative** [1] - 8:4
**amendment** [1] -
33:23
**Amendment** [4] -
9:17, 29:20, 30:14,
30:16
**amendments** [3] -
33:7, 33:8, 33:20
**AMERICA** [1] - 1:4
**America** [1] - 13:5
**American** [3] - 30:10,
45:6, 48:20
**Americans** [1] - 34:24
**amount** [1] - 15:17
**analysis** [16] - 13:14,
21:15, 27:20, 29:19,
29:22, 29:24, 30:3,
30:4, 30:6, 30:11,
30:19, 31:12, 31:18,
39:7, 52:20, 54:25
**analyze** [1] - 28:21
**animated** [3] - 22:8,
32:8, 59:16
**animus** [60] - 6:16,
10:2, 10:25, 12:15,
13:10, 14:16, 14:25,
15:14, 16:8, 17:6,
17:16, 17:17, 17:22,
21:1, 21:14, 21:22,
22:23, 24:12, 25:3,
25:15, 25:17, 26:2,
28:24, 32:8, 32:22,
35:5, 36:4, 36:8,
37:4, 37:7, 37:24,
38:2, 38:6, 39:1,
41:21, 42:11, 42:14,
42:20, 43:4, 43:25,
44:8, 44:13, 46:1,
46:10, 46:25, 47:2,
47:5, 51:13, 52:4,
52:9, 52:13, 52:25,
53:8, 55:5, 59:23,
60:1, 60:2, 60:7,

2

60:21, 60:24
**answer** [6] - 6:11, 6:20, 9:8, 10:21, 14:17, 14:21
**anti** [1] - 16:2
**anti-immigrant** [1] - 16:2
**Apodaca** [2] - 29:23, 29:24
**apologize** [1] - 41:9
**apparent** [2] - 12:18, 17:11
**appear** [2] - 3:17, 4:1
**APPEARANCES** [1] - 1:13
**applied** [5] - 13:13, 14:13, 23:22, 23:23, 39:10
**applies** [10] - 4:20, 4:24, 5:15, 12:21, 18:6, 22:23, 50:20, 52:6, 58:18, 58:23
**apply** [4] - 22:10, 45:21, 58:2
**appreciate** [2] - 33:17, 51:5
**appropriate** [5] - 5:16, 45:8, 45:19, 46:4, 46:5
**area** [1] - 45:11
**areas** [1] - 29:15
**argue** [3] - 17:17, 18:11, 38:22
**argued** [2] - 8:18, 58:7
**argues** [1] - 33:1
**argument** [19] - 4:21, 5:10, 13:16, 13:19, 21:6, 22:18, 22:22, 25:4, 31:14, 38:19, 39:3, 39:16, 42:2, 45:25, 50:13, 50:23, 57:2, 58:19, 60:16
**arguments** [6] - 4:18, 4:24, 5:1, 5:17, 50:21, 57:5
**Arlington** [29] - 4:19, 4:24, 5:15, 16:6, 20:4, 21:23, 22:10, 22:23, 27:19, 29:9, 31:18, 37:12, 38:12, 39:1, 39:6, 39:10, 40:25, 45:21, 50:7, 50:20, 52:6, 52:25, 56:20, 58:2, 58:18, 58:23, 60:18
**arraigned** [1] - 12:13
**as-applied** [1] - 23:22
**Asians** [1] - 47:23
**aspects** [1] - 7:21
**assess** [1] - 2:23

**Assistant** [2] - 1:14, 1:17
**assume** [2] - 35:4, 39:3
**assumed** [1] - 58:19
**assuming** [1] - 45:24
**assumption** [1] - 58:23
**at-large** [2] - 19:8, 19:10
**attached** [1] - 40:8
**attempt** [6] - 21:25, 22:7, 22:13, 22:14, 23:6, 23:10
**attend** [1] - 3:10
**attention** [1] - 9:24
**Attorney** [6] - 1:14, 11:3, 11:5, 54:22, 54:24, 55:1
**attorney** [2] - 3:16, 3:21
**Attorneys** [2] - 12:4, 27:12
**authorities** [1] - 8:3
**authority** [1] - 58:7
**automatically** [1] - 32:8
**avoid** [1] - 12:17
**avowed** [1] - 59:17
**aware** [1] - 40:22

# B

**backlash** [3] - 48:17, 56:8, 56:9
**Bail** [1] - 12:20
**bark** [1] - 35:23
**based** [4] - 34:16, 40:22, 47:23, 59:5
**basis** [2] - 29:15, 36:22
**bearing** [1] - 8:19
**became** [1] - 32:19
**become** [2] - 16:1, 24:18
**BEFORE** [1] - 1:2
**beg** [4] - 37:20, 43:7, 44:1, 44:14
**begin** [1] - 29:8
**beginning** [1] - 6:18
**behind** [3] - 31:19, 34:7, 34:22
**benefit** [1] - 30:4
**benefitted** [2] - 33:24, 45:6
**Bercerra** [1] - 48:14
**Berry** [1] - 2:12
**BERRY** [1] - 1:17
**between** [5] - 6:4, 11:17, 30:20, 35:7,

59:17
**beyond** [2] - 27:25, 28:12
**bias** [2] - 10:11, 35:5
**bicameralism** [1] - 33:12
**bill** [6] - 7:18, 7:21, 8:1, 8:6, 17:18, 33:16
**bills** [1] - 33:10
**bit** [3] - 37:8, 44:2, 51:4
**bite** [1] - 35:23
**black** [1] - 19:13
**blind** [1] - 55:6
**Board** [1] - 55:11
**body** [2] - 17:25, 37:9
**Bolden** [3] - 18:15, 19:16, 20:7
**books** [1] - 15:7
**border** [5] - 12:5, 13:1, 16:21, 17:21, 27:11
**branches** [1] - 35:20
**brand** [2] - 15:8, 15:9
**brand-new** [2] - 15:8, 15:9
**break** [1] - 6:4
**breeding** [1] - 17:1
**breezy** [2] - 30:3, 30:4
**brief** [3] - 7:7, 31:15, 51:4
**briefed** [1] - 6:19
**briefing** [2] - 48:14, 56:5
**briefly** [3] - 31:21, 47:10, 57:22
**bring** [2] - 9:22, 52:21
**broader** [2] - 27:8, 53:6
**brought** [3] - 24:2, 31:11, 58:8
**Brown** [1] - 55:11
**brown** [1] - 12:12
**Bulletin** [2] - 11:3, 54:24
**burden** [12] - 39:21, 40:24, 41:3, 42:4, 42:6, 42:7, 42:25, 55:24, 55:25, 60:6, 60:19
**Burke** [1] - 19:8
**Bush** [1] - 12:7

# C

**California** [8] - 21:10, 32:16, 40:3, 40:14, 45:18, 50:2, 50:15, 51:10
**Canada** [1] - 13:6

**cannot** [3] - 6:9, 10:14, 18:21
**carried** [2] - 55:3, 59:19
**CARRILLO** [1] - 1:7
**Carrillo** [13] - 2:5, 3:2, 3:5, 3:6, 3:8, 4:1, 4:11, 20:16, 24:8, 24:14, 24:15, 24:21, 26:8
**Carrillo's** [1] - 25:9
**Carrillo-Lopez** [12] - 2:5, 3:2, 3:5, 3:6, 3:8, 4:11, 20:16, 24:8, 24:14, 24:15, 24:21, 26:8
**CARRILLO-LOPEZ** [1] - 1:7
**Carrillo-Lopez's** [1] - 4:1
**carry** [3] - 34:11, 39:4, 52:24
**carrying** [1] - 60:25
**case** [45] - 2:4, 5:17, 6:13, 6:14, 6:19, 6:23, 7:15, 8:15, 8:16, 9:14, 9:17, 14:1, 14:10, 18:4, 18:17, 18:25, 19:17, 20:17, 20:23, 21:2, 23:8, 24:7, 24:17, 25:2, 25:22, 27:7, 28:13, 29:23, 30:13, 30:20, 30:21, 34:15, 40:17, 50:9, 50:13, 50:25, 51:3, 51:16, 51:19, 51:22, 52:5, 56:1, 57:24, 58:25, 58:11
**cases** [16] - 8:14, 9:11, 11:23, 11:24, 12:6, 12:8, 14:19, 15:20, 18:10, 18:14, 19:21, 28:10, 29:17, 49:25, 50:5
**causes** [1] - 15:15
**CCR** [2] - 1:22, 61:24
**cell** [1] - 26:17
**Center** [1] - 2:8
**central** [1] - 57:16
**certain** [1] - 7:12
**certainly** [16] - 8:25, 17:18, 31:5, 37:23, 38:1, 40:7, 42:11, 46:21, 46:22, 55:4, 55:7, 55:23, 56:10, 56:14
**CERTIFIED** [1] - 1:20
**certify** [1] - 61:22
**chair** [1] - 52:17
**challenge** [10] - 8:11,

8:13, 9:23, 23:21, 23:22, 24:16, 28:17, 28:18, 40:18, 49:8
**challengeable** [1] - 15:5
**challenged** [4] - 20:17, 31:20, 32:2, 56:1
**challenges** [1] - 25:12
**challenging** [2] - 16:7, 21:11
**change** [1] - 4:15
**changed** [2] - 20:13, 37:21
**changes** [3] - 8:5, 22:13, 35:9
**characterization** [1] - 33:5
**charged** [2] - 15:24, 21:24
**cheap** [2] - 11:19, 59:18
**CHIEF** [1] - 1:2
**children** [1] - 26:3
**children's** [1] - 26:3
**chose** [1] - 53:16
**Circuit** [4] - 21:19, 24:10, 53:3, 60:11
**circular** [1] - 32:3
**circumstances** [1] - 8:23
**citation** [1] - 50:11
**cite** [4] - 13:12, 18:15, 20:3, 20:23
**cited** [16] - 13:24, 14:20, 18:10, 18:16, 25:18, 35:17, 39:17, 39:18, 40:10, 40:17, 45:16, 57:24, 57:25, 58:11
**cites** [1] - 10:5, 50:1
**citing** [1] - 40:5
**citizens** [1] - 19:13, 33:25, 48:19, 48:20
**citizenship** [2] - 23:22, 23:25
**civil** [3] - 19:25, 41:15, 44:25
**claim** [4] - 45:22, 51:10, 58:13, 58:15
**claims** [2] - 58:8, 58:21
**clarifies** [1] - 23:15
**clause** [6] - 18:5, 27:17, 28:16, 28:17, 28:18, 34:19
**Clause** [1] - 10:9
**cleanse** [1] - 14:16, 18:13, 20:24, 23:7, 27:14, 28:7, 28:24,

32:8, 36:8, 49:16, 49:23, 53:5, 53:8, 55:4, 60:2
**cleansed** [2] - 21:13, 55:14
**cleanses** [2] - 10:25, 49:5
**cleansing** [1] - 36:11
**clear** [7] - 34:4, 34:10, 34:11, 38:9, 44:3, 48:12, 58:24
**clearest** [1] - 32:12
**clearly** [8] - 11:16, 14:24, 31:13, 32:17, 49:14, 52:25, 59:25, 61:1
**CLERK** [2] - 2:4, 26:14
**client** [1] - 12:22
**clients** [2] - 12:20, 12:24
**cloth** [1] - 53:24
**co** [1] - 25:21
**co-sponsors** [1] - 25:21
**codifications** [1] - 28:13
**combined** [1] - 16:17
**comment** [1] - 15:21
**comments** [5] - 7:19, 28:25, 29:4, 50:7, 51:25
**commit** [1] - 22:14
**commitment** [1] - 28:8
**common** [1] - 30:15
**commonly** [1] - 19:23
**compromise** [2] - 11:17, 59:17
**concealment** [1] - 7:12
**concede** [2] - 38:10, 46:1
**conceded** [2] - 52:8, 59:13
**concedes** [1] - 47:16
**concern** [1] - 14:9
**concerned** [7] - 7:3, 14:4, 33:21, 56:15, 56:19, 60:4
**concerns** [2] - 5:12, 49:14
**concession** [1] - 60:10
**concluded** [1] - 30:15
**conclusion** [3] - 2:25, 21:19, 39:11
**concurrence** [4] - 28:25, 30:24, 31:3, 31:9
**condemn** [1] - 18:22
**condemnation** [1] -

14:9
**conduct** [1] - 31:18
**conducted** [3] - 3:4, 3:10, 3:22
**confidence** [1] - 30:3
**conflated** [1] - 60:15
**confronts** [1] - 10:12
**Congress** [18] - 7:3, 9:7, 14:4, 14:15, 33:18, 35:3, 36:15, 36:25, 41:12, 41:14, 41:17, 41:19, 43:3, 43:21, 44:5, 44:22, 46:10, 48:23
**Congress's** [2] - 46:3, 58:6
**Congressional** [10] - 5:21, 7:14, 14:3, 15:11, 17:13, 26:1, 35:21, 36:1, 38:4, 46:19
**congressional** [4] - 7:2, 17:25, 33:15, 58:6
**congressman** [1] - 48:23
**Congressman** [1] - 25:20
**congressmen** [4] - 33:16, 34:6, 37:10, 37:25
**congressperson** [1] - 17:24
**connection** [4] - 2:22, 26:15, 41:10, 54:8
**consider** [4] - 5:5, 16:10, 39:19, 50:3
**consideration** [2] - 37:6, 38:3
**considerations** [1] - 36:25
**considered** [4] - 6:9, 39:9, 39:15, 57:4
**considering** [2] - 36:24, 38:16
**Constitution** [2] - 30:16, 55:10
**Constitution's** [1] - 28:8
**constitutionality** [3] - 8:20, 27:25, 28:22
**contains** [2] - 7:7, 47:16
**contemporary** [1] - 26:1
**contend** [1] - 10:18
**contention** [1] - 52:11
**contested** [1] - 40:1
**context** [10] - 9:18, 11:9, 19:7, 23:1,

32:14, 32:25, 33:1, 45:23, 48:6, 55:9
**contextualize** [2] - 53:10, 59:12
**contextualized** [1] - 50:19
**continuation** [1] - 47:20
**continue** [3] - 12:25, 44:23, 49:2
**continued** [3] - 10:23, 47:24, 48:25
**continues** [1] - 17:22
**contrary** [1] - 10:24
**contrast** [1] - 22:2
**controversial** [2] - 47:25, 53:13
**convenient** [1] - 61:7
**conversations** [1] - 27:6
**convicted** [1] - 22:5
**correct** [3] - 50:9, 58:16, 61:22
**Correction** [1] - 2:8
**cost** [1] - 30:4
**counsel** [6] - 3:4, 4:12, 5:1, 61:6, 61:12, 61:19
**countries** [1] - 45:6
**country** [7] - 10:1, 22:4, 25:15, 25:16, 34:1, 39:17, 40:22
**County** [1] - 19:8
**county** [1] - 19:12
**couple** [1] - 61:7
**courage** [1] - 55:8
**course** [5] - 4:15, 7:15, 11:13, 48:25, 50:11
**court** [2] - 11:21, 19:15
**Court** [91] - 5:4, 5:9, 5:14, 5:21, 5:23, 6:18, 8:4, 8:14, 9:2, 9:10, 9:16, 11:1, 11:13, 11:20, 11:22, 12:9, 12:11, 14:1, 14:18, 15:14, 16:10, 18:2, 18:3, 18:17, 19:2, 19:8, 19:9, 19:18, 20:4, 20:8, 20:12, 20:17, 20:19, 21:10, 21:12, 21:17, 21:21, 21:22, 22:6, 22:19, 23:11, 24:11, 26:7, 26:13, 26:20, 26:22, 27:3, 27:5, 28:20, 29:5, 29:6, 30:15, 31:13, 31:16, 32:3, 32:16, 33:17,

34:10, 34:15, 34:18, 34:20, 38:11, 39:9, 39:14, 39:19, 39:22, 42:9, 43:1, 45:18, 46:20, 46:22, 47:3, 47:8, 47:13, 49:3, 50:3, 50:10, 50:15, 50:22, 51:12, 52:21, 53:6, 54:11, 56:12, 56:15, 57:4, 58:11, 58:22, 59:21, 60:4, 60:17
**COURT** [69] - 1:1, 2:13, 3:16, 3:21, 3:25, 6:3, 9:3, 13:12, 21:3, 21:5, 21:8, 23:3, 23:19, 24:5, 26:18, 26:23, 27:18, 29:1, 30:23, 31:2, 31:24, 32:7, 32:25, 33:6, 35:7, 35:13, 36:5, 36:13, 37:2, 37:12, 37:19, 38:9, 38:18, 39:3, 39:12, 40:2, 40:11, 40:23, 41:7, 41:22, 42:1, 42:18, 43:3, 43:18, 43:23, 44:7, 44:11, 44:17, 45:12, 46:8, 46:14, 47:6, 47:11, 49:25, 50:12, 50:24, 52:7, 54:4, 55:19, 56:16, 56:25, 57:12, 57:19, 59:1, 60:13, 61:3, 61:12, 61:17, 61:19
**Court's** [10] - 5:12, 9:23, 15:21, 21:18, 22:9, 25:10, 25:14, 29:9, 50:17, 57:18
**courts** [12] - 8:5, 12:17, 15:3, 19:24, 24:9, 26:9, 31:17, 34:4, 35:16, 39:17, 55:8
**COVID-19** [1] - 4:6
**create** [2] - 34:5, 36:23
**creating** [1] - 36:2
**crimes** [1] - 33:9
**criminal** [8] - 7:10, 15:17, 17:3, 17:20, 22:21, 23:1, 26:4, 39:21
**criminalization** [2] - 16:15, 53:17
**criminalize** [2] - 5:24, 13:7
**criminalizes** [1] - 10:22
**criminally** [1] - 24:24

**criticized** [1] - 7:22
**crucial** [1] - 31:10
**culture** [2] - 16:2, 16:22
**current** [1] - 59:10
**custody** [1] - 2:7
**cut** [2] - 26:20, 57:19

## D

**DACA** [7] - 32:20, 32:21, 45:20, 50:2, 50:6, 51:8, 52:2
**danger** [3] - 13:11, 15:1, 15:2
**Davis** [1] - 20:5
**de** [1] - 10:7
**dealing** [2] - 23:10, 28:13
**dear** [1] - 41:5
**debate** [5] - 7:3, 7:22, 14:4, 54:16, 58:12
**debated** [2] - 7:6, 14:7
**decades** [3] - 40:21, 42:15, 42:16
**December** [1] - 25:20
**decide** [4] - 2:25, 4:16, 21:20, 24:11
**decided** [4] - 45:19, 48:18, 52:23, 53:21
**decision** [25] - 3:18, 3:22, 8:4, 13:24, 14:25, 19:7, 21:9, 22:17, 24:23, 25:11, 32:11, 32:16, 36:15, 39:13, 40:3, 40:5, 42:10, 50:6, 50:16, 51:9, 51:15, 52:3, 52:5, 56:21, 58:4
**decisions** [5] - 26:21, 27:18, 39:25, 40:14, 41:20
**declaration** [3] - 5:22, 54:8, 56:3
**dedicate** [1] - 17:20
**deep** [2] - 6:21, 24:17
**deeply** [5] - 7:3, 12:15, 14:4, 16:1, 25:6
**defendant** [10] - 2:7, 2:11, 2:17, 3:2, 23:20, 23:24, 37:2, 40:23, 57:6
**Defendant** [1] - 1:8
**DEFENDANT** [4] - 1:17, 3:15, 3:19, 3:24
**defendant's** [11] - 2:14, 2:16, 4:21, 29:11, 31:15, 38:19, 46:15, 55:25, 56:5,

4

57:2, 57:25
**defendants** [1] - 45:17
**defenders** [1] - 8:13
**Defenders** [1] - 1:17
**defense** [6] - 11:7, 36:1, 42:15, 46:7, 58:9, 60:19
**deference** [2] - 27:4, 58:6
**definitive** [1] - 31:22
**dehumanized** [1] - 25:6
**delaying** [1] - 4:8
**delegated** [1] - 40:20
**democratic** [1] - 34:5
**demonstrate** [3] - 37:24, 38:23, 38:25
**demonstrates** [2] - 24:18, 38:11
**demonstrating** [1] - 9:5
**denied** [1] - 21:10
**depart** [1] - 8:6
**Department** [6] - 9:1, 32:15, 45:17, 50:14, 57:23, 58:16
**deplorable** [2] - 8:19, 37:22
**deportation** [2] - 5:24, 58:9
**deported** [3] - 7:13, 17:7, 48:20
**deported/removed** [1] - 22:4
**depth** [1] - 52:18
**derivative** [1] - 49:14
**described** [1] - 11:5
**describes** [1] - 9:20
**description** [1] - 7:8
**desire** [1] - 59:18
**despicable** [1] - 49:7
**despite** [3] - 6:1, 60:7, 60:21
**determination** [2] - 32:21, 38:4
**determinations** [3] - 35:19, 35:21, 35:22
**determine** [1] - 45:19
**deterrence** [1] - 46:3
**deterrent** [3] - 35:19, 36:2, 36:4
**device** [1] - 19:11
**DHS** [1] - 32:12
**dicta** [9] - 8:14, 9:11, 9:16, 14:18, 18:2, 27:3, 27:23, 28:20, 31:15
**dies** [1] - 24:24
**difference** [2] - 32:22, 35:7

**different** [5] - 8:22, 13:14, 16:3, 17:17, 36:18
**differentiates** [1] - 22:22
**differently** [3] - 11:23, 12:25, 13:3
**difficult** [1] - 37:8
**direct** [1] - 24:13
**disabled** [1] - 34:8
**disabling** [2] - 34:5, 36:23
**disagree** [1] - 22:11
**disagreement** [2] - 48:11, 57:17
**disclaim** [2] - 43:22, 52:13
**disclaimed** [5] - 41:12, 43:4, 44:6, 44:8, 45:11
**disclaiming** [3] - 43:9, 43:25, 44:12
**discloses** [1] - 7:25
**discretion** [2] - 12:4, 27:12
**discrimination** [8] - 18:21, 19:11, 19:19, 19:21, 20:14, 22:8, 34:11, 46:5
**discriminatory** [25] - 6:9, 9:5, 10:8, 10:14, 10:18, 11:21, 13:15, 13:21, 14:11, 14:12, 18:5, 18:19, 19:22, 21:13, 34:19, 36:16, 37:4, 37:13, 38:12, 38:23, 39:24, 42:20, 44:13, 51:14, 52:9
**discuss** [2] - 20:4, 30:5, 33:20, 55:8
**discussed** [11] - 31:15, 33:13, 34:14, 42:23, 44:5, 44:7, 44:22, 46:2, 46:9, 60:23, 60:25
**discussing** [1] - 29:13
**discussion** [7] - 29:18, 30:7, 31:11, 43:8, 43:10, 47:16, 61:1
**disenfranchise** [1] - 30:10
**dismiss** [2] - 2:15, 21:11
**dismissal** [1] - 25:11
**dismissed** [2] - 24:8, 24:14
**disparate** [5] - 4:23, 13:13, 13:17, 13:20, 16:5

**displays** [1] - 13:10
**dispute** [5] - 38:1, 38:7, 49:11, 52:23
**dissent** [4] - 8:18, 10:15, 30:18, 30:20
**distanced** [1] - 6:7
**distinction** [1] - 57:10
**distinctions** [1] - 52:1
**distinguishable** [3] - 23:8, 23:18, 51:23
**distinguished** [1] - 51:11
**district** [3] - 4:6, 19:14, 19:15
**DISTRICT** [3] - 1:1, 1:1, 1:2
**District** [5] - 21:9, 21:12, 40:3, 40:9, 40:14
**dive** [1] - 6:21
**docket** [1] - 7:25
**dog** [1] - 26:6
**Donald** [4] - 32:18, 50:8, 51:24
**done** [3] - 29:24, 30:12, 51:3
**double** [1] - 10:23
**doubles** [1] - 49:23
**down** [3] - 10:23, 49:24, 50:8
**drawing** [1] - 19:20
**driven** [7] - 36:4, 39:24, 41:20, 45:25, 47:5, 56:1, 56:22
**drug** [1] - 24:22
**DU** [1] - 1:2
**due** [2] - 16:11, 34:1
**during** [1] - 6:13

## E

**easier** [3] - 11:14, 15:6, 15:7
**Eastern** [1] - 40:9
**easy** [2] - 17:2, 23:11
**ECF** [3] - 4:2, 13:25, 21:9
**Education** [1] - 55:12
**effect** [6] - 11:21, 18:5, 23:20, 46:6, 56:23, 58:9
**effective** [1] - 28:3
**effects** [1] - 10:19
**effects'** [1] - 10:8
**effort** [1] - 10:17
**efforts** [1] - 17:21
**eight** [1] - 58:14
**El** [1] - 33:25
**elaborations** [1] - 7:23
**election** [2] - 19:8,

32:18
**elements** [1] - 45:4
**eliminated** [2] - 41:15, 45:1
**eloquently** [1] - 18:7
**email** [1] - 50:24
**emailed** [1] - 61:15
**enact** [2] - 34:24, 37:1
**enacted** [2] - 13:22, 43:14
**enactment** [25] - 6:5, 6:10, 9:4, 9:5, 11:16, 14:12, 14:13, 18:20, 32:5, 32:9, 36:8, 37:3, 38:11, 38:21, 38:22, 38:25, 42:20, 43:4, 43:24, 51:20, 52:8, 57:2, 57:11, 59:7, 59:8
**enactments** [6] - 29:16, 39:21, 39:23, 42:11, 44:4, 46:23
**end** [8] - 4:16, 12:24, 22:16, 25:10, 26:9, 31:16, 47:21, 52:2
**ended** [2] - 26:19, 47:22
**endorsement** [1] - 55:2
**endowed** [1] - 52:17
**enforce** [3] - 22:20, 35:19, 46:3
**enforced** [1] - 13:19
**enforcement** [2] - 17:21, 36:3
**enforcing** [1] - 14:23
**enjoined** [1] - 19:24
**entire** [3] - 17:25, 37:9, 52:12
**entirely** [7] - 20:25, 29:11, 30:13, 42:14, 42:16, 45:25, 57:14
**entirety** [2] - 56:3, 56:5
**entitled** [2] - 9:16, 61:23
**entry** [2] - 7:10, 48:1
**Equal** [18] - 4:22, 8:13, 9:18, 9:22, 10:8, 18:5, 19:9, 27:16, 27:19, 28:16, 28:18, 34:19, 49:8, 54:17, 54:25, 58:13, 58:15
**equal** [1] - 18:6
**eradicate** [1] - 25:23
**escape** [4] - 16:13, 17:22, 27:14
**especially** [2] - 17:10, 28:13, 60:5
**Espinoza** [8] - 8:15,

8:17, 9:1, 9:12, 26:24, 29:12, 30:24, 31:12
**essential** [1] - 35:18
**essentially** [16] - 6:2, 6:15, 10:22, 11:11, 15:16, 17:25, 23:9, 23:12, 28:14, 30:9, 36:7, 48:15, 48:16, 49:5, 53:14, 59:23
**establish** [2] - 29:13, 46:2
**established** [1] - 19:14
**eugenical** [3] - 28:6, 49:6, 49:14
**eugenicists** [2] - 11:17, 59:18
**eugenics** [5] - 17:1, 17:13, 17:18, 49:17, 59:16
**evaluating** [1] - 27:25
**evidence** [20] - 13:14, 13:21, 19:10, 19:12, 19:19, 19:22, 36:1, 36:17, 37:3, 38:10, 38:25, 42:10, 42:13, 43:16, 46:6, 46:16, 47:3, 51:18, 56:2, 56:22
**evidentiary** [13] - 2:24, 4:13, 4:14, 4:17, 45:13, 46:14, 48:5, 52:10, 52:16, 59:4, 61:4, 61:8, 61:13
**eviscerate** [1] - 42:5
**exact** [1] - 12:13
**exactly** [2] - 14:25, 56:18
**examination** [1] - 7:25
**example** [3] - 12:1, 13:5, 48:7
**exchanged** [1] - 47:23
**exciting** [1] - 6:20
**exclusions** [1] - 47:23
**exclusively** [1] - 16:21
**execution** [1] - 30:7
**executive** [2] - 32:19, 35:22
**exemplifies** [1] - 48:24
**exhaustive** [2] - 7:2, 14:3
**Exhibit** [1] - 40:8
**exist** [2] - 15:9, 22:25
**existed** [1] - 9:25
**existence** [1] - 28:24
**existing** [4] - 7:23, 8:1, 8:7, 21:1
**exists** [4] - 5:25,

11:14, 11:15, 16:9
**experts** [3] - 59:6, 61:4, 61:16
**explain** [1] - 15:8
**explained** [1] - 20:12
**explicitly** [6] - 12:21, 34:16, 41:12, 41:15, 53:3, 54:19
**expressed** [1] - 54:10
**extends** [1] - 23:24
**extensive** [1] - 19:12
**extensively** [3] - 5:8, 33:14, 54:14
**extent** [12] - 15:3, 15:21, 16:16, 44:4, 44:7, 44:22, 46:9, 48:2, 53:6, 59:21, 60:16
**extremely** [2] - 5:20, 31:8

## F

**F.2d** [1] - 6:24
**face** [2] - 20:2, 58:20
**facet** [1] - 13:8
**facets** [2] - 7:4, 14:5
**fact** [24] - 7:17, 10:22, 15:22, 16:3, 16:20, 17:6, 17:23, 22:12, 22:13, 22:24, 23:5, 25:1, 30:9, 31:2, 33:11, 33:13, 34:2, 35:16, 42:2, 47:1, 49:20, 51:8, 55:3, 56:10
**factor** [6] - 13:17, 22:24, 37:14, 37:16, 51:14, 52:5
**factors** [4] - 5:15, 16:6, 16:9, 21:23
**facts** [4] - 7:12, 23:18, 51:11, 51:23
**factually** [1] - 52:1
**fail** [2] - 20:25, 58:21
**failed** [1] - 30:8
**fails** [2] - 25:13, 58:13
**faith** [5] - 20:13, 34:22, 35:1, 43:17, 46:23
**falls** [1] - 29:19
**far** [3] - 11:13, 19:5, 38:14
**faulty** [1] - 30:6
**FCRR** [2] - 1:22, 61:24
**federal** [4] - 8:5, 8:12, 24:25, 31:17
**Federal** [1] - 1:17
**feeding** [1] - 37:17
**felony** [3] - 17:8, 22:3,

22:5
**felt** [1] - 28:17
**few** [4] - 6:22, 37:9, 37:24, 55:21
**filed** [6] - 2:17, 2:20, 6:19, 11:3, 12:1, 39:16
**finished** [1] - 21:5
**first** [11] - 9:25, 11:2, 11:11, 18:25, 21:1, 21:8, 23:7, 38:19, 38:20, 40:4, 47:13
**fits** [1] - 17:18
**five** [1] - 58:1
**flips** [1] - 42:25
**floor** [3] - 33:14, 42:23, 42:24
**focus** [5] - 4:18, 4:24, 12:5, 12:25, 47:3
**focused** [4] - 29:5, 29:25, 50:21, 57:6
**focuses** [1] - 47:15
**focusing** [1] - 16:21
**focussing** [1] - 57:7
**follow** [1] - 31:24
**following** [1] - 48:13
**footnote** [1] - 40:16
**FOR** [2] - 1:14, 1:17
**force** [2] - 13:10, 18:6
**Fordice** [1] - 10:5
**foregoing** [2] - 7:9, 61:22
**forever** [2] - 36:20, 45:10
**form** [3] - 6:1, 27:10, 49:22
**forma** [1] - 33:19
**formal** [1] - 14:9
**former** [1] - 14:16
**forth** [3] - 31:11, 56:20, 58:8
**forward** [13] - 34:12, 35:1, 36:2, 42:14, 44:24, 46:11, 47:4, 52:24, 55:3, 56:23, 57:7, 59:19, 60:25
**Forward** [1] - 54:18
**four** [1] - 16:14
**frame** [2] - 36:13, 36:14
**framework** [18] - 4:20, 4:23, 5:20, 29:10, 35:12, 35:18, 38:8, 39:11, 42:17, 45:5, 45:8, 45:20, 50:7, 56:20, 57:15, 58:2, 58:18, 58:23
**frameworks** [1] - 58:5
**framing** [1] - 36:11
**fraud** [1] - 15:24

**free** [5] - 5:12, 10:13, 29:6, 55:24, 56:13
**freestanding** [1] - 29:13
**FRIDAY** [1] - 2:1
**front** [1] - 52:21
**froze** [1] - 26:19
**frozen** [1] - 41:5
**full** [1] - 13:10
**fully** [1] - 23:17
**functional** [5] - 29:19, 29:22, 29:24, 30:3, 30:5
**fundamentally** [1] - 22:17
**future** [2] - 34:9, 36:24

## G

**Garcia** [1] - 25:20
**general** [5] - 25:15, 27:24, 28:11, 28:21, 52:3
**generally** [1] - 35:11
**generated** [1] - 9:21
**generations** [1] - 36:24
**generous** [1] - 50:10
**geography** [1] - 13:17
**giant** [1] - 12:8
**given** [2] - 12:17, 35:16
**goal** [3] - 43:21, 43:23, 44:11
**Gorman** [16] - 2:12, 4:14, 5:2, 26:14, 26:18, 29:1, 30:23, 33:1, 34:14, 39:15, 39:18, 40:4, 40:18, 51:3, 59:2, 61:13
**GORMAN** [27] - 1:17, 5:3, 6:11, 9:8, 14:17, 21:4, 21:7, 21:17, 23:4, 24:4, 24:6, 26:21, 26:25, 27:21, 47:10, 47:12, 50:4, 50:17, 51:1, 51:7, 52:11, 54:6, 59:9, 60:15, 61:10, 61:15, 61:18
**Gorman's** [2] - 42:21, 56:7
**Gorsuch's** [1] - 29:21
**Government** [1] - 16:19
**GOVERNMENT** [1] - 1:14
**government** [35] - 2:10, 2:18, 4:15, 10:23, 13:1, 14:20,

18:10, 18:15, 18:16, 20:6, 20:11, 22:21, 31:19, 37:23, 38:9, 40:5, 40:24, 40:25, 41:2, 42:3, 42:7, 47:15, 48:2, 48:13, 49:4, 49:10, 50:19, 52:8, 52:22, 57:1, 57:6, 58:7, 59:13, 60:20
**government's** [19] - 2:16, 5:17, 10:25, 13:16, 15:2, 17:11, 22:11, 22:18, 36:6, 42:5, 45:12, 46:22, 50:23, 52:11, 55:18, 55:23, 55:24, 60:10, 60:16
**governmental** [1] - 18:22
**Grant** [1] - 5:7
**grant** [2] - 23:20, 24:2
**grapple** [1] - 27:1
**grappled** [1] - 10:3
**grapples** [1] - 25:15
**grappling** [1] - 25:16
**great** [4] - 9:16, 13:11, 18:3, 27:3
**greatest** [2] - 15:1
**Griener** [3] - 1:22, 61:24, 61:24
**grounds** [1] - 49:9
**Guerrero** [1] - 35:17
**guess** [3] - 24:23, 36:10, 41:22
**Gustavo** [1] - 2:5
**GUSTAVO** [1] - 1:7

## H

**handful** [1] - 37:9
**happily** [2] - 52:14, 54:11
**hard** [1] - 17:21
**harsh** [1] - 6:2
**harsher** [3] - 23:13
**hatred** [1] - 24:18
**head** [1] - 32:19
**health** [1] - 4:7
**hear** [5] - 5:1, 37:17, 41:6, 41:7, 61:4
**HEARING** [1] - 1:11
**hearing** [32] - 2:14, 2:20, 2:23, 2:24, 2:25, 3:3, 3:9, 3:11, 3:12, 3:17, 3:22, 4:2, 4:6, 4:8, 4:10, 4:13, 4:14, 4:16, 4:17, 5:5, 6:18, 15:25, 45:13, 46:14, 48:5, 52:10,

52:16, 59:4, 61:5, 61:8, 61:13
**heart** [1] - 12:18
**heavily** [1] - 20:7
**height** [1] - 44:25
**Heights** [28] - 4:20, 4:24, 5:15, 16:6, 20:4, 22:10, 22:23, 27:19, 29:9, 31:18, 37:12, 38:12, 39:1, 39:6, 39:10, 40:25, 45:21, 45:22, 50:7, 50:20, 52:6, 53:1, 56:20, 58:2, 58:18, 58:23, 60:18, 60:19
**held** [5] - 5:14, 12:9, 19:8, 19:9, 54:22, 61:8
**helpful** [3] - 55:16, 60:8, 61:3
**Hernandez** [8] - 5:6, 5:22, 35:17, 52:17, 54:5, 54:9, 54:13, 56:4
**Hernandez-Guerrero** [1] - 35:17
**highlight** [2] - 8:16, 47:19
**highlighted** [1] - 47:13
**highly** [3] - 47:24, 48:1, 49:11
**highly-skilled** [1] - 48:1
**hinged** [1] - 30:13
**historian** [6] - 5:6, 47:14, 52:14, 53:9, 54:2, 55:16
**historians** [3] - 52:15, 59:10, 59:20
**historical** [7] - 5:8, 5:20, 11:9, 19:12, 19:19, 48:6, 54:1
**historically** [1] - 55:7
**histories** [1] - 27:2
**history** [29] - 5:16, 5:23, 6:8, 9:4, 9:23, 10:1, 10:4, 11:6, 25:6, 26:10, 27:7, 27:14, 29:14, 29:18, 30:8, 30:21, 32:4, 38:21, 40:22, 42:19, 43:11, 44:3, 48:7, 49:1, 51:19, 51:20, 54:3, 54:23, 59:7
**holding** [6] - 20:12, 22:9, 22:12, 23:2, 23:5, 30:21
**holdings** [1] - 24:9
**holds** [1] - 31:23
**Homeland** [6] - 32:15,

6

45:17, 50:14, 51:9,
57:23, 58:17
**honest** [2] - 26:11,
26:12
**honestly** [1] - 26:2
**Honor** [52] - 5:3, 5:4,
6:11, 7:15, 21:4,
21:7, 25:19, 26:14,
29:3, 31:1, 31:7,
32:6, 32:10, 33:4,
35:11, 35:15, 36:9,
37:5, 37:15, 37:17,
38:8, 38:14, 39:2,
39:5, 40:7, 41:4,
41:6, 41:8, 42:8,
42:25, 43:7, 43:15,
43:20, 44:1, 44:15,
45:14, 46:13, 46:17,
47:9, 47:10, 49:24,
50:17, 51:1, 51:2,
51:7, 55:21, 56:24,
57:10, 57:22, 58:3,
59:9, 61:18
**honor** [2] - 25:9, 28:8
**HONORABLE** [1] - 1:2
**hope** [3] - 23:15, 26:3,
27:15
**horses** [1] - 17:1
**host** [1] - 53:15
**House** [3] - 7:7, 33:14,
42:23
**human** [2] - 25:5, 25:7
**humanity** [1] - 25:9
**hundred** [4] - 11:6,
12:12, 54:23, 55:2
**hundred-year** [3] -
11:6, 54:23, 55:2
**hung** [1] - 30:1
**hurdle** [1] - 37:6

### I

**i.e** [1] - 31:5
**idea** [6] - 5:23, 48:21,
53:19, 54:16, 55:14,
59:24
**ideas** [1] - 17:17
**identified** [1] - 45:10
**identify** [1] - 34:7
**ignore** [2] - 15:4, 32:4
**illegal** [4] - 17:7,
19:24, 43:14, 48:15
**illuminating** [1] - 54:1
**illustrates** [1] - 25:3
**imagine** [1] - 12:4
**immigrant** [1] - 16:2
**immigrants** [2] - 48:1,
48:15
**immigration** [18] - 8:3,
22:19, 22:20, 22:25,

24:20, 33:9, 35:12,
35:18, 35:20, 35:22,
35:23, 36:3, 39:21,
41:18, 45:4, 46:3,
53:15, 57:13
**Immigration** [3] - 7:4,
14:5, 38:5
**impact** [8] - 4:23,
13:13, 13:17, 13:20,
16:6, 24:2, 24:6,
24:13
**impeded** [1] - 19:12
**impermissible** [2] -
41:2, 42:5
**imply** [1] - 14:8
**importance** [1] - 48:5
**important** [20] - 5:20,
18:24, 20:7, 22:10,
22:17, 23:2, 23:16,
24:5, 25:4, 25:8,
27:3, 28:2, 31:8,
32:11, 32:24, 32:25,
47:14, 49:10, 53:10,
59:21
**imported** [1] - 35:5
**improper** [1] - 7:11
**inaudible** [1] - 41:10
**inception** [1] - 13:9
**included** [1] - 30:17
**including** [5] - 45:17,
48:18, 48:20, 50:1,
51:20
**increased** [1] - 36:4
**incredibly** [2] - 25:1,
28:3
**incumbent** [2] - 15:12,
49:18
**independent** [1] - 60:3
**indicated** [4] - 4:12,
13:24, 14:1, 26:14
**indicates** [3] - 6:8,
7:3, 14:4
**indication** [1] - 41:20
**indictment** [2] - 2:15,
24:7, 24:14, 25:11
**individual** [2] - 21:24,
54:4
**individuals** [1] - 45:6
**indulgence** [1] - 50:17
**infer** [2] - 16:8, 49:20
**inference** [2] - 19:20,
51:13
**inferred** [1] - 16:23
**information** [3] - 2:21,
12:1, 59:5
**informed** [1] - 39:7
**ingrained** [1] - 16:1
**initial** [5] - 5:23, 37:6,
39:20, 60:18
**inquiry** [5] - 46:6,

47:3, 56:12, 56:21,
57:18
**instances** [1] - 34:7
**instructive** [1] - 34:15
**insufficient** [4] -
39:23, 53:4, 59:22,
60:22
**intellectually** [1] -
26:11
**intended** [1] - 8:2
**intensify** [1] - 8:8
**intent** [8] - 6:9, 9:6,
13:15, 13:21, 18:19,
37:13, 38:12, 38:23
**interested** [1] - 56:18
**interesting** [3] - 7:17,
11:4, 17:23
**interests** [1] - 4:9
**Internet** [2] - 26:15,
41:9
**INTERPRETER** [1] -
1:20
**interpreter** [2] - 2:6,
2:9
**interrupt** [3] - 5:9,
5:13, 29:7
**intolerable** [1] - 27:9
**introduce** [1] - 15:8
**introduced** [5] -
22:13, 23:6, 25:20,
33:23, 45:4
**introduction** [1] -
54:18
**invalidate** [1] - 29:16
**invalidated** [1] - 40:21
**invidious** [3] - 19:6,
49:1, 51:14
**invite** [1] - 5:9
**involve** [1] - 27:19
**involved** [1] - 4:8
**issue** [14] - 3:1, 9:15,
10:15, 18:20, 21:20,
24:20, 28:7, 30:19,
32:13, 32:20, 39:19,
44:6, 46:15, 54:20
**issued** [2] - 50:16
**issues** [2] - 6:6, 29:5
**itself** [3] - 18:23, 23:9,
42:3

### J

**JANUARY** [1] - 2:1
**January** [1] - 1:6
**JENNER** [1] - 1:20
**joined** [2] - 31:9,
31:12
**joining** [1] - 26:16
**JUDGE** [1] - 1:2
**judge** [2] - 45:8, 45:20

**judgments** [1] - 35:19
**JUDY** [1] - 1:20
**June** [3] - 7:5, 14:6,
50:16
**jure** [1] - 10:7
**juries** [2] - 27:8,
27:13, 30:1
**jurisprudence** [2] -
26:12, 27:15
**jurors** [1] - 30:10
**jury** [3] - 29:20, 30:14,
30:17
**Justice** [12] - 8:16,
9:13, 9:17, 18:7,
27:22, 28:15, 28:25,
29:21, 30:18, 30:24,
31:10, 31:13
**justice** [3] - 4:9, 31:12,
56:18
**justices** [3] - 31:10,
58:1, 58:14

### K

**KATE** [1] - 1:17
**Kate** [1] - 2:12
**keep** [1] - 29:4
**Kennedy** [2] - 45:3
**kept** [1] - 15:16
**kind** [6] - 9:7, 12:11,
15:25, 23:21, 46:14,
51:18
**knowing** [1] - 4:3
**knows** [1] - 11:13

### L

**labor** [2] - 11:19,
59:18
**language** [2] - 15:4,
18:6
**large** [6] - 8:5, 15:17,
19:8, 19:10, 53:15,
56:8
**largely** [4] - 6:14,
14:18, 16:2, 21:17
**larger** [1] - 33:9
**last** [1] - 2:19
**Latin** [1] - 45:6
**Latino** [2] - 17:24,
48:22
**Lauren** [1] - 2:11
**LAUREN** [1] - 1:17
**law** [84] - 8:1, 8:7,
10:10, 10:13, 10:19,
10:22, 10:23, 11:5,
11:7, 11:9, 12:15,
12:18, 13:4, 13:8,
13:13, 13:18, 13:21,
14:16, 14:24, 15:7,

15:16, 16:8, 16:9,
17:6, 17:22, 18:12,
20:22, 20:24, 21:1,
22:19, 22:20, 22:24,
23:1, 26:2, 26:4,
27:4, 27:25, 28:5,
28:9, 28:14, 29:15,
30:15, 31:13, 33:18,
34:7, 35:8, 35:14,
36:3, 36:15, 36:21,
36:22, 38:1, 38:7,
38:17, 39:21, 41:11,
42:4, 45:8, 45:11,
45:25, 46:2, 49:19,
51:17, 52:12, 52:24,
53:4, 53:9, 53:12,
53:24, 54:17, 55:2,
56:5, 56:6, 56:8,
56:10, 56:11, 57:14,
57:17, 59:11, 59:16,
59:19, 60:24, 61:1
**law's** [8] - 8:20, 10:12,
10:18, 28:23, 29:18,
30:7, 39:8, 48:24
**lawmaker** [1] - 14:23
**laws** [18] - 8:20, 8:25,
9:21, 10:1, 10:15,
14:23, 15:17, 20:1,
22:25, 25:24, 27:2,
30:25, 31:4, 34:3,
40:19, 49:1, 49:9,
49:16
**laws'** [1] - 10:3
**learned** [1] - 17:23
**least** [11] - 2:19, 14:9,
23:2, 23:15, 24:13,
49:7, 50:4, 50:12,
51:7, 52:3, 54:21
**leave** [1] - 53:16
**legacy** [2] - 9:20, 9:24
**legal** [2] - 25:4, 29:5
**legally** [1] - 27:16
**legislation** [25] - 5:25,
6:15, 6:21, 7:1,
11:14, 11:15, 15:3,
15:8, 15:9, 15:12,
16:7, 19:25, 25:6,
25:20, 25:25, 27:7,
33:20, 34:22, 41:19,
47:15, 48:9, 49:6,
49:19, 53:7, 53:13
**legislations** [1] - 55:9
**legislative** [23] - 5:16,
5:23, 6:8, 6:13, 9:4,
11:8, 16:23, 17:2,
20:13, 27:2, 32:4,
37:9, 38:21, 42:17,
42:19, 43:11, 43:17,
44:3, 48:7, 51:16,
51:20, 54:3, 59:7

7

**legislator** [3] - 14:22, 35:3, 49:19
**legislators** [5] - 34:24, 35:6, 38:5, 38:16, 47:5
**legislature** [10] - 10:11, 20:20, 34:12, 34:17, 49:13, 49:23, 52:24, 53:24, 59:22, 60:21
**legislatures** [1] - 10:3
**lengthy** [2] - 5:11, 51:19
**lens** [1] - 54:17
**less** [1] - 32:23
**life** [1] - 24:21
**light** [2] - 55:17, 60:9
**likelihood** [1] - 30:1
**listening** [1] - 3:23
**listens** [1] - 2:12
**litigated** [1] - 40:15
**live** [1] - 55:6
**living** [2] - 48:22, 53:19
**Lodge** [2] - 19:2, 19:4
**logic** [1] - 20:8
**look** [13] - 27:25, 28:11, 28:12, 28:18, 31:18, 32:1, 32:11, 34:21, 35:6, 36:14, 42:9, 58:4
**looking** [1] - 54:16
**looks** [1] - 46:22
**LOPEZ** [1] - 1:7
**Lopez** [12] - 2:5, 3:2, 3:5, 3:6, 3:8, 4:11, 20:16, 24:8, 24:14, 24:15, 24:21, 26:8
**Lopez's** [1] - 4:1
**lost** [3] - 8:23, 11:22, 37:17
**Louisiana** [3] - 18:8, 27:8, 27:13
**Louisiana's** [2] - 9:21, 10:16

## M

**MacArthur** [1] - 5:7
**main** [2] - 22:18, 49:4
**maintain** [3] - 11:18, 20:2, 34:1
**majority** [4] - 9:20, 29:21, 30:2, 30:20
**man** [1] - 15:24
**manages** [1] - 24:23
**mandates** [1] - 46:4
**manner** [2] - 18:21, 34:12
**map** [1] - 25:19

**Margaret** [2] - 1:22, 61:24
**Martinez** [2] - 6:24, 13:24
**mass** [2] - 12:8, 12:12
**Massachusetts** [1] - 45:4
**matter** [9] - 28:6, 29:15, 30:25, 34:2, 36:21, 49:6, 49:7, 61:23
**mattered** [2] - 8:25, 31:5
**matters** [4] - 8:25, 9:5, 31:6, 46:19
**mean** [17] - 25:16, 25:18, 32:2, 33:14, 38:13, 43:13, 43:16, 44:21, 49:3, 49:22, 53:11, 53:19, 55:9, 55:11, 58:24, 59:24, 60:13
**meant** [4] - 30:14, 30:15, 44:16, 44:18
**mechanism** [2] - 34:5, 36:23
**meet** [3] - 39:20, 42:3, 42:7
**member** [1] - 19:14
**memo** [1] - 51:24, 51:25
**mention** [1] - 57:20
**mentioned** [1] - 46:8
**mentioning** [1] - 22:18
**merely** [3] - 33:2, 41:24
**merits** [1] - 58:13
**message** [1] - 26:17
**met** [3] - 40:24, 41:3, 61:2
**Mexican** [5] - 11:19, 23:22, 23:25, 48:18, 59:18
**Mexicans** [5] - 48:12, 48:18, 48:19, 53:21, 56:9
**Mexico** [2] - 13:5, 48:20
**might** [2] - 33:13, 55:16
**migrants** [5] - 16:12, 16:21, 24:18, 25:6, 27:11
**migration** [2] - 16:16, 53:17
**million** [1] - 48:19
**minute** [1] - 26:17
**MIRANDA** [1] - 1:2
**misrepresentation** [1] - 7:11

**misrepresents** [1] - 20:11
**Mobile** [4] - 18:15, 19:16, 20:7, 43:2
**modifications** [1] - 53:15
**modified** [1] - 41:17
**modify** [1] - 8:3
**mongrels** [1] - 16:25
**Montana** [1] - 9:1
**morally** [2] - 26:12, 27:16
**moreover** [1] - 33:19
**morning** [2] - 2:13, 26:16
**most** [5] - 7:22, 16:16, 16:17, 31:22, 41:9
**MOTION** [1] - 1:11
**motion** [11] - 2:14, 2:22, 9:15, 21:11, 23:20, 24:3, 29:11, 39:9, 42:15, 54:8, 59:6
**motions** [1] - 39:16
**motivated** [10] - 11:17, 14:24, 17:16, 28:6, 32:22, 36:3, 37:4, 37:7, 52:25, 59:25
**motivating** [4] - 22:23, 37:13, 51:14, 52:4
**motivation** [5] - 9:19, 8:24, 30:25, 31:4, 37:9
**motivations** [3] - 42:9, 47:4, 53:4
**motive** [5] - 14:11, 14:13, 32:1, 36:16, 39:24
**motives** [4] - 31:19, 34:7, 34:21, 39:25
**movement** [2] - 41:15, 45:1
**moving** [1] - 35:1, 57:25
**MR** [41] - 29:3, 31:1, 31:7, 32:6, 32:10, 33:4, 33:7, 35:10, 35:14, 36:9, 36:14, 37:5, 37:15, 37:20, 38:13, 39:2, 39:5, 39:14, 40:7, 40:13, 41:4, 41:8, 41:24, 42:8, 42:21, 43:6, 43:20, 44:1, 44:10, 44:14, 44:19, 45:14, 46:13, 46:17, 47:8, 51:2, 55:21, 56:17, 57:5, 57:13, 57:22
**MS** [26] - 5:3, 6:11, 9:8, 14:17, 21:4,

21:7, 21:17, 23:4, 24:4, 24:6, 26:21, 26:25, 27:21, 47:10, 47:12, 50:4, 50:17, 51:1, 51:7, 52:11, 54:6, 59:9, 60:15, 61:10, 61:15, 61:18
**multiple** [3] - 8:12, 9:11, 52:20
**must** [3] - 18:3, 25:24, 51:13

## N

**name** [2] - 25:5, 25:7
**narrowly** [1] - 29:4
**national** [4] - 45:1, 47:20, 47:25, 53:13
**Nationality** [3] - 7:4, 14:5, 38:6
**nationality** [3] - 33:22, 41:16, 57:14
**necessarily** [4] - 22:6, 22:13, 36:12, 43:13
**necessary** [2] - 25:14, 28:17
**need** [7] - 13:6, 29:8, 34:21, 45:19, 58:12
**needed** [1] - 4:17
**needs** [4] - 15:9, 36:25, 42:9, 43:15
**neighbors** [1] - 13:2
**neutral** [7] - 17:3, 19:5, 20:1, 26:5, 27:10, 28:9, 49:7
**neutrally** [1] - 36:24
**NEVADA** [2] - 1:1, 2:1
**Nevada** [4] - 1:7, 1:15, 1:18, 1:23
**never** [9] - 6:13, 10:3, 15:24, 28:23, 35:25, 49:8, 53:3, 60:23, 61:2
**new** [5] - 10:13, 15:8, 15:9, 48:24, 57:14
**New** [1] - 54:18
**next** [1] - 61:7
**Ninth** [4] - 21:19, 24:10, 53:2, 60:11
**nondiscriminatory** [1] - 8:21
**nonetheless** [1] - 46:4
**nonexhaustive** [1] - 16:6
**nonunanimous** [2] - 27:8, 27:13
**nonviolent** [1] - 24:22
**Nordic** [3] - 41:13, 43:22, 44:6
**north** [1] - 13:2

**note** [5] - 18:24, 23:14, 31:8, 31:10, 48:4
**noted** [2] - 14:1, 42:22
**nothing** [3] - 6:20, 11:4, 30:22
**notice** [1] - 46:19
**notwithstanding** [1] - 24:12
**nuanced** [2] - 9:9, 52:1
**number** [5] - 2:15, 4:2, 36:18, 40:15, 56:9

## O

**O'Brien** [4] - 54:7, 54:10, 54:12
**objected** [1] - 31:11
**obligation** [1] - 14:22
**obsession** [1] - 16:15
**obsessive** [1] - 16:15
**obviously** [3] - 23:4, 37:11, 60:22
**OF** [3] - 1:1, 1:4, 1:11
**offend** [2] - 10:8, 28:19
**offends** [1] - 18:5
**offense** [1] - 24:22
**offenses** [1] - 16:17
**offer** [2] - 21:8, 45:5
**offered** [10] - 2:21, 37:3, 37:22, 38:10, 38:24, 40:4, 54:7, 56:2, 59:3
**Official** [2] - 1:22, 61:25
**officials** [1] - 31:19
**once** [1] - 51:2
**one** [42] - 6:6, 6:17, 6:23, 7:19, 9:13, 11:2, 11:25, 12:5, 12:8, 12:22, 15:15, 16:7, 16:9, 17:24, 18:14, 19:22, 20:18, 25:18, 31:14, 34:12, 38:15, 39:18, 40:8, 42:19, 47:18, 48:22, 49:9, 49:10, 51:12, 52:15, 52:22, 53:16, 54:2, 54:23, 58:6, 59:2, 59:4
**openly** [2] - 26:1, 27:5
**operated** [1] - 19:10
**Operation** [5] - 12:2, 12:6, 48:8, 48:10, 48:17, 53:21
**operative** [3] - 38:8, 42:17, 57:15
**opinion** [3] - 29:21,

8

29:22, 30:2
**opportunity** [1] - 2:18
**oral** [1] - 5:10
**order** [1] - 22:20
**Oregon's** [1] - 9:21
**origin** [7] - 18:12, 19:5, 25:23, 45:2, 48:25, 54:19, 54:21
**original** [12] - 8:18, 8:24, 9:3, 9:4, 11:16, 13:8, 14:11, 14:13, 18:22, 30:25, 31:4, 34:13
**originally** [1] - 30:9
**origins** [5] - 5:8, 15:13, 47:21, 47:25, 53:13
**Ortiz** [2] - 6:24, 13:24
**Ortiz-Martinez** [2] - 6:24, 13:24
**ostensibly** [1] - 22:24
**otherwise** [1] - 10:10
**over-stayers** [1] - 13:7
**overall** [3] - 35:12, 43:21, 43:23
**overcome** [1] - 60:22
**overridden** [1] - 7:19
**overrule** [1] - 8:3
**overruling** [1] - 29:23
**overstatement** [2] - 44:2, 44:15
**overturned** [1] - 8:9
**own** [1] - 49:15

**P**

**page** [1] - 40:16
**pages** [1] - 40:6
**papers** [8] - 33:21, 35:17, 37:8, 39:17, 40:10, 43:10, 57:25
**pardon** [5] - 37:20, 43:7, 44:1, 44:14, 49:24
**paroled** [1] - 24:24
**part** [17] - 7:15, 8:10, 12:15, 12:19, 17:2, 21:25, 22:9, 23:2, 25:3, 25:5, 33:9, 35:18, 37:7, 37:24, 44:15, 47:19, 53:13
**partially** [1] - 51:10
**participated** [1] - 35:3
**participating** [3] - 3:3, 3:13, 4:11
**participation** [1] - 19:13
**particular** [4] - 8:16, 18:19, 24:16, 52:15
**particularly** [16] - 5:5,

5:17, 11:4, 11:18, 16:14, 19:21, 20:6, 20:25, 23:1, 28:2, 47:15, 49:16, 51:16, 53:12, 54:2, 55:17
**passage** [6] - 35:4, 39:8, 42:17, 42:22, 47:2, 53:9
**passed** [14] - 5:19, 20:20, 36:21, 38:2, 38:5, 38:7, 40:20, 41:1, 41:5, 41:11, 42:4, 43:5, 46:24, 47:1
**passes** [1] - 49:19
**passing** [6] - 33:18, 34:8, 36:15, 38:7, 46:2, 49:20
**past** [6] - 10:12, 16:14, 18:21, 20:14, 34:7, 34:11
**paused** [1] - 51:6
**Peggie** [5] - 50:24, 61:6, 61:12
**penalties** [2] - 23:13, 33:8
**penalty** [1] - 35:21
**people** [6] - 12:12, 32:11, 34:22, 39:25, 42:10, 44:5
**people's** [1] - 40:20
**percolate** [2] - 24:10, 25:12
**percolates** [1] - 26:8
**Perez** [3] - 20:12, 20:15, 34:14, 43:2
**perhaps** [5] - 10:11, 10:17, 23:24, 31:21, 44:2
**permanent** [1] - 34:1
**permissible** [1] - 16:10
**permit** [2] - 16:24, 22:25
**permitted** [1] - 48:15
**person** [7] - 3:10, 3:11, 3:17, 4:2, 4:7, 23:5, 25:8
**persuasive** [1] - 21:15
**pervade** [1] - 17:22
**pervaded** [2] - 15:15, 21:22
**pervasive** [1] - 6:15
**PETER** [1] - 1:14
**Peter** [1] - 2:10
**phone** [6] - 3:3, 3:5, 3:13, 3:23, 4:11, 26:17
**piece** [2] - 25:25, 48:9
**pieces** [1] - 27:7

**pin** [1] - 20:3
**place** [6] - 5:16, 7:11, 9:25, 15:16, 17:4, 38:8
**plaintiff** [2] - 1:5, 51:13
**plaintiffs** [3] - 45:22, 58:8, 58:15
**plaintiffs'** [1] - 58:20
**plan** [3] - 20:20, 34:16, 34:17
**planted** [1] - 45:9
**plays** [1] - 13:17
**plead** [1] - 51:12
**pled** [1] - 12:13
**plenary** [1] - 58:6
**point** [13] - 17:14, 29:6, 30:19, 40:6, 49:4, 49:15, 52:4, 55:22, 56:12, 57:16, 57:18, 58:14, 60:3
**pointed** [2] - 9:15, 53:20
**pointing** [1] - 30:23
**points** [3] - 10:15, 36:1, 55:21
**policies** [2] - 10:1, 10:6
**policy** [3] - 18:3, 34:25, 36:25
**political** [3] - 19:13, 35:20, 36:25
**portions** [1] - 29:12
**pose** [1] - 3:7
**position** [10] - 4:16, 10:25, 15:2, 23:17, 36:6, 45:12, 46:15, 46:22, 55:18, 55:23
**possible** [3] - 5:12, 29:5, 51:13
**possibly** [1] - 53:8
**post** [1] - 53:18
**postracial** [1] - 48:22
**potentially** [1] - 12:16
**power** [1] - 37:1
**powerful** [1] - 28:3
**practice** [3] - 8:2, 11:21, 12:22
**practices** [2] - 19:23, 20:1
**precedent** [2] - 8:24, 29:22
**precedents** [2] - 45:15, 45:16
**precedes** [2] - 12:6, 51:20
**precipitate** [1] - 8:11
**precipitated** [1] - 54:17
**predecessor** [2] -

20:18, 20:21
**preferences** [1] - 34:25
**preliminary** [1] - 3:1
**premise** [2] - 29:9, 40:19
**premised** [3] - 29:11, 42:14, 42:16
**prepared** [1] - 5:10
**prescient** [1] - 8:10
**present** [2] - 2:10, 2:11
**presented** [1] - 59:6
**presentment** [1] - 33:13
**president** [2] - 32:17, 32:18
**President** [3] - 7:18, 32:17, 53:11
**presume** [1] - 34:25
**presumed** [1] - 34:23
**presumption** [1] - 20:13
**prevent** [2] - 36:23, 46:3
**previously** [2] - 20:20, 22:3
**primarily** [3] - 18:14, 33:24, 45:5
**primary** [1] - 22:11
**principle** [4] - 28:11, 28:21, 29:13, 52:3
**prison** [1] - 24:25
**privileged** [1] - 47:25
**pro** [1] - 33:19
**probative** [2] - 32:14, 32:20
**probing** [1] - 11:9
**problem** [1] - 30:11
**problematic** [1] - 42:12
**problems** [1] - 26:15
**procedures** [1] - 7:24
**proceed** [4] - 3:12, 4:6, 4:10, 29:9
**proceeding** [5] - 2:12, 12:9, 12:12, 12:14, 58:22
**Proceedings** [1] - 51:6
**proceedings** [2] - 12:8, 61:22
**process** [6] - 6:11, 33:12, 33:18, 34:3, 34:6, 42:2
**produced** [1] - 46:7
**profess** [1] - 30:3
**Professor** [10] - 5:6, 5:22, 52:16, 54:4, 54:6, 54:9, 54:10,

54:12, 54:13, 56:4
**professor** [1] - 54:13
**program** [2] - 32:20, 48:14
**promote** [1] - 16:20
**propose** [1] - 52:16
**proposed** [1] - 58:5
**proposition** [5] - 27:24, 28:5, 29:12, 58:1, 58:17
**prosecuted** [9] - 13:3, 13:4, 13:9, 15:22, 16:17, 17:8, 23:6, 24:25, 27:11
**prosecution** [1] - 58:10
**prosecutions** [2] - 25:22, 59:11
**Protection** [18] - 4:22, 8:13, 9:19, 9:22, 10:8, 18:5, 19:9, 27:17, 27:19, 28:16, 28:17, 28:18, 34:19, 49:9, 54:17, 54:25, 58:13, 58:15
**protections** [1] - 16:11
**protective** [2] - 33:24, 45:5
**proud** [1] - 55:1
**proudly** [1] - 54:22
**prove** [3] - 55:24, 55:25, 60:24
**proved** [1] - 18:19
**provide** [1] - 50:11
**provided** [5] - 5:23, 7:10, 12:1, 12:9, 21:17
**provision** [2] - 32:12, 43:15
**provisions** [1] - 42:23
**public** [5] - 7:22, 16:20, 24:19, 36:25, 46:19
**Public** [1] - 1:17
**pull** [2] - 50:25, 51:1
**punished** [1] - 25:1
**punitive** [5] - 6:2, 11:12, 33:2, 33:3, 35:9
**purpose** [10] - 10:18, 13:15, 41:2, 42:5, 43:24, 44:12, 51:14, 52:9, 52:12, 58:19
**purposeful** [1] - 19:20
**purposes** [3] - 19:6, 25:22, 45:24
**pursuant** [2] - 48:9, 48:19
**put** [2] - 47:4, 56:23

## Q

**questions** [6] - 3:7, 6:17, 16:7, 29:6, 47:9, 53:7
**quickly** [2] - 55:22, 56:24
**quo** [1] - 20:2
**quota** [1] - 47:21
**quotas** [4] - 33:22, 41:16, 45:1, 47:24
**quote** [7] - 7:9, 14:2, 30:2, 30:12, 31:3, 32:13, 35:23
**quoted** [1] - 31:2
**quotes** [1] - 7:14
**quoting** [2] - 6:25, 58:11

## R

**race** [11] - 17:3, 26:5, 27:10, 44:5, 44:22, 46:9, 47:21, 47:22, 47:23, 49:7, 55:6
**race-based** [1] - 47:23
**race-blind** [1] - 55:6
**race-neutral** [1] - 49:7
**racial** [57] - 6:15, 10:2, 10:7, 10:11, 10:25, 12:15, 14:16, 14:24, 15:14, 16:8, 17:5, 17:16, 17:17, 17:22, 19:11, 20:25, 21:22, 22:8, 22:23, 24:12, 25:15, 25:17, 26:2, 26:10, 32:8, 32:22, 33:21, 35:5, 36:8, 37:24, 38:2, 38:6, 39:1, 41:13, 41:21, 42:11, 42:13, 43:4, 43:9, 43:22, 43:25, 44:8, 44:23, 45:25, 46:10, 46:25, 47:2, 47:5, 52:4, 52:13, 52:25, 53:4, 53:8, 55:4, 59:23, 59:25, 60:24
**racially** [3] - 27:2, 28:8, 49:1
**racism** [16] - 9:21, 11:17, 12:17, 12:18, 18:6, 25:23, 27:9, 27:15, 28:4, 53:20, 53:25, 55:24, 56:1, 56:13, 56:14, 56:22
**racist** [18] - 15:2, 17:14, 18:12, 22:25, 25:23, 26:6, 27:2, 28:23, 40:21, 45:9,

**48:24, 49:6, 49:9, 49:12, 49:17, 54:21, 56:11, 61:1**
**raise** [1] - 51:13
**raised** [1] - 8:13
**raising** [3] - 8:11, 8:12, 33:9
**Ramos** [15] - 8:16, 8:23, 9:11, 9:14, 9:17, 9:22, 18:7, 26:23, 27:22, 28:25, 29:12, 29:18, 30:13, 31:5, 31:11
**Ramos'** [1] - 27:7
**rather** [1] - 5:11
**rational** [2] - 24:19
**rationale** [1] - 24:19
**reached** [1] - 54:9
**reaching** [1] - 29:14
**read** [4] - 5:21, 6:23, 33:16, 47:18
**reading** [2] - 7:2, 14:3
**readopted** [1] - 8:22
**reaffirmations** [1] - 7:23
**really** [7] - 15:17, 33:3, 36:10, 43:16, 53:23, 55:22
**reason** [6] - 8:10, 37:21, 47:19, 53:8, 53:11, 53:18
**reasoning** [3] - 20:8, 23:18, 49:22
**reasons** [6] - 4:9, 8:21, 10:16, 28:23, 46:2, 54:23
**rebut** [1] - 52:14
**recent** [1] - 31:22
**recently** [1] - 10:19
**recipient** [1] - 5:6
**recission** [2] - 51:24, 51:25
**reckon** [2] - 18:11, 20:25
**reckoned** [3] - 26:11, 28:23, 53:3
**reckoning** [1] - 12:17
**recodification** [1] - 6:14
**recodified** [1] - 17:25
**recodify** [1] - 49:21
**recognition** [2] - 27:1, 27:9
**recognize** [1] - 54:20
**recognized** [5] - 26:5, 43:1, 53:3, 54:19, 60:11
**recognizing** [1] - 25:21
**reconsidered** [1] -

**41:18**
**record** [11] - 2:16, 3:2, 6:24, 17:2, 25:5, 25:8, 47:18, 48:4, 51:21, 54:1, 61:22
**Record** [6] - 7:15, 15:11, 17:13, 26:1, 36:2, 46:19
**Records** [1] - 5:21
**reduce** [1] - 29:25
**reenact** [6] - 11:14, 14:25, 15:7, 20:20, 49:21, 59:25
**reenacted** [4] - 33:11, 34:3, 60:7, 60:20
**reenacting** [2] - 10:4, 10:13
**reenactment** [34] - 6:7, 6:13, 7:1, 9:6, 12:16, 14:14, 14:20, 15:20, 21:6, 21:13, 28:5, 28:22, 32:3, 32:7, 33:2, 35:8, 36:6, 36:7, 39:4, 42:3, 42:6, 44:12, 46:10, 46:11, 47:16, 48:3, 49:5, 50:3, 53:2, 57:1, 57:4, 59:12, 60:5, 60:11
**reenactment...**
**Louisiana's** [1] - 10:17
**reenactments** [12] - 5:18, 6:1, 15:1, 18:9, 18:11, 20:24, 28:1, 28:3, 28:12, 49:15, 57:7, 59:19
**reentered** [1] - 17:7
**reentering** [1] - 5:24
**reentry** [2] - 7:12, 43:14
**reference** [3] - 27:22, 43:19, 50:2
**referenced** [1] - 26:19
**referred** [1] - 39:15
**referring** [2] - 8:15, 52:5
**refers** [1] - 48:12
**Reform** [1] - 12:20
**reform** [1] - 33:10
**refusal** [1] - 17:10
**refuse** [1] - 49:16
**Regarding** [1] - 6:25
**regarding** [8] - 5:18, 14:20, 15:20, 32:20, 35:22, 45:1, 60:5
**Regents** [7] - 32:16, 45:18, 50:1, 50:14, 51:9, 57:24, 58:17
**regulate** [1] - 22:24

**reinforce** [1] - 8:8
**reinforced** [1] - 47:17
**reject** [1] - 19:5
**rejected** [5] - 19:1, 21:10, 40:19, 50:7, 51:8
**relating** [1] - 21:6, 32:4
**relatively** [3] - 23:2, 52:1, 53:12
**released** [2] - 12:22, 12:23
**relevant** [7] - 19:17, 19:20, 38:3, 38:15, 50:22, 51:15, 51:25
**reliance** [1] - 53:2
**relied** [3] - 18:14, 20:6, 20:21
**rely** [1] - 48:2
**relying** [1] - 38:21
**remained** [1] - 28:14
**remember** [2] - 40:11, 40:12
**remote** [2] - 32:14, 45:23
**removed** [3] - 35:2, 38:14, 57:18
**RENO** [1] - 2:1
**Reno** [4] - 1:7, 1:15, 1:18, 1:23
**reorganized** [2] - 15:16, 53:14
**repassed** [1] - 41:18
**repatriate** [2] - 48:18, 53:21
**repatriated** [1] - 56:9
**repealed** [2] - 10:19, 25:24
**repeat** [1] - 44:17
**replace** [1] - 17:2
**replaced** [1] - 19:25
**reply** [3] - 2:17, 2:22, 19:3
**Report** [1] - 7:7
**Reported** [1] - 1:22
**Reporter** [2] - 1:22, 61:25
**representatives** [1] - 40:20
**represented** [1] - 49:11
**repudiated** [3] - 20:8, 44:22, 46:10
**repudiation** [6] - 9:7, 14:9, 29:19, 49:12, 53:25, 57:3
**requested** [1] - 4:14
**requires** [1] - 56:21
**respect** [9] - 18:9, 21:16, 25:9, 35:10,

**35:13, 35:20, 50:19, 57:23, 59:3**
**respond** [3] - 2:19, 47:10, 51:4
**responding** [2] - 50:22, 51:3
**response** [4] - 2:16, 17:12, 40:5, 40:6
**responsible** [1] - 21:1
**responsive** [1] - 5:11
**restrictive** [3] - 8:2, 8:7, 47:24
**result** [3] - 6:15, 25:10, 25:14
**resulted** [2] - 17:6, 59:17
**Revenue** [1] - 9:2
**review** [2] - 46:20, 58:20
**reviewed** [3] - 2:16, 3:25, 33:15
**reviewing** [1] - 51:3
**revision** [1] - 33:20
**revisions** [2] - 7:25, 35:11
**revolves** [2] - 56:4, 56:5
**ridiculous** [2] - 53:20, 55:15
**rights** [5] - 3:14, 4:22, 19:25, 41:15, 44:25
**Rights** [2] - 19:1, 34:20
**Rogers** [2] - 19:2, 19:4
**roots** [1] - 15:13
**Rule** [1] - 12:10
**rules** [1] - 8:22
**ruling** [1] - 25:14
**runs** [1] - 45:9

## S

**safety** [3] - 4:7, 16:20, 24:19
**Salvador** [1] - 33:25
**sanctions** [1] - 7:10
**satisfies** [2] - 52:25, 60:6
**save** [1] - 6:14
**scholar** [1] - 48:6
**screen** [2] - 26:18, 37:21
**scrutiny** [1] - 16:13
**secret** [1] - 15:11
**section** [1] - 24:15
**Section** [4] - 4:22, 19:1, 21:11, 21:16
**sections** [4] - 7:5, 7:6, 7:8, 25:18
**sectors** [1] - 11:18

**Security** [6] - 32:15, 45:17, 50:14, 51:9, 57:23, 58:17
**see** [6] - 11:1, 13:13, 13:14, 15:24, 26:4, 53:18
**seed** [1] - 45:9
**sees** [1] - 11:20
**segregated** [1] - 55:13
**segregation** [2] - 10:7, 18:4
**selective** [1] - 58:10
**Senate** [2] - 33:14, 42:23
**Senator** [1] - 45:3
**send** [2] - 26:17, 34:24
**sentence** [1] - 24:21
**sentenced** [2] - 12:13, 24:25
**sentiment** [1] - 16:2
**separate** [5] - 13:14, 17:5, 17:9, 45:23, 60:3
**serious** [1] - 56:21
**serve** [2] - 4:8, 20:2
**serving** [1] - 24:21
**session** [1] - 51:16
**set** [4] - 2:14, 56:20, 57:14, 61:4
**several** [4] - 38:20, 39:10, 39:16, 56:8
**severely** [1] - 25:1
**shackled** [1] - 12:12
**shed** [1] - 55:17
**shifts** [2] - 40:24, 60:19
**shocking** [1] - 15:23
**short** [3] - 6:20, 10:21, 14:21
**shortly** [1] - 2:20
**show** [6] - 13:19, 37:13, 39:23, 40:25, 59:22, 60:20
**showing** [3] - 39:22, 42:19, 60:18
**shown** [1] - 51:15
**shows** [1] - 19:22
**sic** [1] - 48:19
**silence** [10] - 15:10, 16:23, 28:4, 28:7, 48:25, 49:12, 59:21, 60:6, 60:17, 60:21
**silent** [3] - 48:3, 59:14, 60:12
**silently** [1] - 14:25
**similar** [1] - 31:12
**similarly** [2] - 22:8, 40:19
**simple** [1] - 33:19
**simply** [9] - 9:24,

29:16, 35:4, 42:13, 45:7, 47:17, 51:17, 52:23, 53:4
**sin** [2] - 18:22, 34:13
**single** [2] - 19:14, 35:2
**single-member** [1] - 19:14
**Sixth** [4] - 9:17, 29:20, 30:14, 30:16
**skilled** [1] - 48:1
**skimpy** [1] - 30:12
**small** [1] - 47:23
**society** [1] - 16:22
**solidify** [1] - 8:2
**solo** [1] - 31:9
**solve** [1] - 58:12
**sordid** [1] - 10:4
**sorry** [8] - 7:1, 21:4, 21:5, 37:16, 39:12, 43:6, 43:23, 60:15
**sort** [21] - 11:6, 20:17, 21:21, 24:16, 24:17, 24:20, 25:2, 25:15, 36:23, 36:24, 45:7, 45:9, 46:20, 48:11, 48:24, 49:3, 49:14, 52:13, 55:1, 59:12, 60:22
**Sotomayor** [4] - 9:18, 18:7, 28:15, 31:14
**Sotomayor's** [3] - 9:13, 27:22, 28:25
**sounds** [1] - 59:5
**source** [1] - 46:5
**South** [1] - 1:23
**Southern** [3] - 21:9, 40:3, 40:14
**southern** [5] - 12:5, 13:1, 16:21, 17:21, 27:11
**Spanish** [1] - 2:6
**speaks** [2] - 9:14, 15:10
**specific** [6] - 9:7, 9:15, 43:12, 43:13, 43:18, 53:18
**specifically** [12] - 6:25, 13:25, 18:18, 20:19, 21:24, 27:23, 28:15, 28:24, 34:6, 35:11, 36:7, 45:10
**spirit** [1] - 8:7
**spite** [1] - 24:25
**sponsors** [1] - 25:21
**spread** [1] - 4:5
**Springs** [1] - 2:7
**stable** [1] - 41:9
**stand** [3] - 24:12, 26:10, 27:23, 28:10, 29:17

**standard** [4] - 38:12, 58:20, 58:21, 61:1
**stands** [3] - 4:14, 10:6, 58:17
**start** [3] - 5:2, 5:16, 57:1
**started** [1] - 12:7
**starts** [1] - 26:7
**state** [1] - 11:2
**state's** [1] - 10:7
**statement** [6] - 11:10, 31:2, 31:22, 32:13, 39:12, 56:7
**statements** [18] - 8:17, 9:14, 32:13, 32:17, 32:19, 35:2, 36:19, 37:11, 37:16, 37:22, 38:15, 39:7, 39:20, 39:22, 40:21, 42:15, 42:16, 45:23
**STATES** [2] - 1:1, 1:4
**states** [3] - 8:22, 9:19, 51:12
**States** [13] - 1:14, 5:24, 6:24, 10:5, 11:5, 11:10, 12:4, 16:18, 16:19, 27:12, 48:14, 54:22, 55:1
**states'** [1] - 10:2
**status** [4] - 20:2, 33:24, 34:1, 45:5
**statute** [31] - 4:21, 5:8, 5:19, 6:4, 6:5, 6:7, 15:15, 17:15, 18:25, 20:9, 20:17, 20:18, 21:13, 23:9, 23:10, 23:13, 23:23, 24:11, 25:13, 25:17, 26:10, 28:22, 35:24, 38:22, 41:1, 43:24, 47:17, 49:14, 52:6
**statutes** [6] - 7:24, 16:4, 22:21, 27:10, 53:16, 57:15
**statutory** [1] - 21:25
**stayers** [1] - 13:7
**steeped** [1] - 54:3
**stems** [7] - 9:11, 14:17, 36:8, 38:19, 38:25, 52:8, 54:21
**step** [1] - 38:19
**steps** [1] - 38:20
**still** [8] - 2:19, 10:7, 12:15, 24:24, 33:12, 37:17, 56:16, 58:21
**stream** [1] - 21:25
**Streamline** [2] - 12:2, 12:6
**Street** [1] - 1:23
**strife** [1] - 34:1

**striking** [1] - 50:8
**strongly** [1] - 45:14
**struggling** [1] - 41:22
**studied** [2] - 5:7, 52:17
**subject** [6] - 29:14, 29:15, 36:20, 46:18, 54:15
**subjected** [2] - 52:19, 54:25
**submitted** [3] - 54:7, 54:24, 56:3
**subsequent** [16] - 21:12, 33:2, 33:7, 33:8, 33:19, 35:25, 36:6, 41:19, 42:2, 42:6, 42:11, 46:23, 57:3, 57:7, 59:12, 59:19
**subsequently** [1] - 35:25
**substance** [2] - 19:2, 20:10
**substantially** [1] - 6:1
**substantively** [1] - 22:2
**subverted** [1] - 19:6
**sufficient** [13] - 6:4, 18:12, 19:10, 20:24, 28:7, 37:3, 38:10, 38:16, 39:20, 42:3, 55:4, 60:2, 60:17
**sufficiently** [1] - 6:7
**suggest** [1] - 47:4
**suggests** [1] - 30:24
**summarized** [1] - 50:12
**superceded** [1] - 20:9
**superiority** [6] - 41:13, 43:10, 43:22, 44:6, 44:23
**superseded** [1] - 18:25
**supplement** [9] - 2:19, 6:19, 13:25, 21:8, 23:16, 40:2, 40:4, 40:18, 42:22
**supplements** [5] - 2:17, 7:16, 11:2, 12:1, 39:18
**supply** [1] - 11:19
**support** [4] - 23:17, 52:3, 56:4, 56:10
**supports** [4] - 13:19, 13:20, 20:16, 51:10
**Supreme** [29] - 8:4, 8:14, 9:2, 9:10, 9:15, 14:18, 18:2, 18:16, 19:2, 24:10, 26:12, 26:20, 26:22, 27:3,

27:5, 28:20, 31:13, 31:16, 32:16, 34:10, 34:15, 34:18, 50:15
**surprising** [1] - 35:16
**survive** [1] - 15:3
**sworn** [1] - 2:6
**system** [5] - 19:8, 19:10, 19:14, 47:25, 59:10
**systems** [1] - 19:5

## T

**table** [1] - 26:3
**tailored** [1] - 13:4
**taint** [3] - 10:14, 36:20, 45:9
**tawdry** [1] - 10:12
**Ted** [1] - 45:3
**telephone** [2] - 2:8, 2:12
**temporary** [2] - 33:24, 45:5
**ten** [1] - 12:23
**terminate** [1] - 32:21
**termination** [1] - 45:20
**terms** [6] - 5:19, 9:5, 24:13, 47:21, 50:2, 50:3
**terribly** [1] - 35:15
**testify** [7] - 48:6, 52:16, 52:21, 54:7, 59:6, 61:9, 61:11
**testimony** [6] - 5:5, 42:18, 53:9, 54:2, 59:3, 60:7
**Texas** [1] - 34:17
**THE** [76] - 1:2, 1:14, 1:17, 2:4, 2:13, 3:15, 3:16, 3:19, 3:21, 3:24, 3:25, 6:3, 9:3, 13:12, 21:3, 21:5, 21:8, 23:3, 23:19, 24:5, 26:14, 26:18, 26:23, 27:18, 29:1, 30:23, 31:2, 31:24, 32:7, 32:25, 33:6, 35:7, 35:13, 36:5, 36:13, 37:2, 37:12, 37:19, 38:9, 38:18, 39:3, 39:12, 40:2, 40:11, 40:23, 41:7, 41:22, 42:1, 42:18, 43:3, 43:18, 43:23, 44:7, 44:11, 44:17, 45:12, 46:8, 46:14, 47:6, 47:11, 49:25, 50:12, 50:24, 52:7, 54:4, 55:19, 56:16,

56:25, 57:12, 57:19, 59:1, 60:13, 61:3, 61:12, 61:17, 61:19
**theoretically** [1] - 16:19
**theories** [1] - 44:23
**theory** [7] - 4:23, 24:1, 31:23, 41:13, 43:9, 43:22, 44:6
**they've** [1] - 38:24
**thinking** [1] - 24:1
**thinks** [1] - 60:5
**throes** [1] - 41:14
**throughout** [1] - 45:10
**today** [5] - 6:1, 12:14, 16:9, 17:9, 48:11
**tolerate** [1] - 27:17
**took** [2] - 29:22, 30:19
**topic** [3] - 52:18, 52:19, 54:14
**total** [1] - 17:24
**touch** [3] - 15:17, 15:18, 15:21
**touched** [1] - 19:3
**trace** [1] - 59:10
**traceable** [1] - 18:3
**TRANSCRIPT** [1] - 1:11
**transcript** [1] - 61:22
**treated** [6] - 11:23, 12:25, 13:3, 13:10, 16:3, 16:11
**trial** [3] - 12:23, 29:20, 30:14
**true** [3] - 16:15, 43:6, 58:3
**truly** [3] - 10:3, 12:14, 25:23
**Truman** [2] - 7:18, 53:11
**Truman's** [1] - 47:19
**Trump** [3] - 32:18, 50:8, 51:24
**Trump's** [1] - 51:25
**try** [1] - 29:4
**trying** [1] - 42:1
**turn** [1] - 31:21
**tweak** [2] - 11:14, 15:6
**two** [17] - 2:17, 8:14, 14:18, 17:16, 19:16, 26:21, 27:18, 28:10, 32:23, 34:17, 42:15, 42:16, 52:15, 58:4, 59:6, 60:15, 61:4

## U

**U.S** [2] - 11:3, 18:15
**UCLA** [3] - 5:6, 52:17, 54:13

**UCSD** [1] - 54:13
**ultimate** [2] - 21:18, 51:24
**ultimately** [20] - 7:19, 19:13, 20:17, 21:12, 21:19, 22:14, 24:8, 24:9, 24:10, 24:11, 25:12, 25:13, 30:13, 34:20, 36:19, 38:3, 38:13, 39:6, 51:23, 59:17
**unacceptable** [1] - 15:23
**unanimous** [1] - 30:17
**uncomfortable** [1] - 27:6
**unconstitutional** [1] - 23:23
**under** [9] - 8:22, 12:3, 12:7, 18:2, 23:6, 27:4, 37:12, 38:12, 39:1
**underlying** [1] - 25:4
**undermined** [1] - 53:25
**unfortunately** [1] - 9:25
**UNITED** [2] - 1:1, 1:4
**United** [13] - 1:14, 5:24, 6:24, 10:5, 11:5, 11:10, 12:3, 16:18, 16:19, 27:12, 48:14, 54:22, 54:25
**University** [4] - 45:18, 50:2, 50:15, 51:9
**unlawful** [1] - 18:23
**unless** [3] - 45:10, 47:8, 49:22
**unnecessary** [1] - 45:15
**untainted** [1] - 9:6
**untethered** [2] - 10:10, 24:18
**untouched** [1] - 53:16
**up** [9] - 24:10, 25:13, 29:22, 30:6, 31:14, 31:24, 50:25, 51:1, 54:23
**updated** [1] - 35:24
**upheld** [2] - 19:14, 34:16
**upholding** [1] - 20:21
**US** [1] - 54:24
**USA** [1] - 2:4
**utilized** [1] - 19:23

## V

**valid** [2] - 29:15, 46:1
**validly** [1] - 40:20

**value** [2] - 36:4, 58:20
**values** [1] - 49:8
**Vannozzi** [1] - 61:16
**various** [2] - 24:9
**vein** [1] - 58:9
**version** [2] - 6:4, 11:11
**versus** [9] - 2:4, 6:24, 32:16, 34:14, 43:2, 45:17, 50:14, 57:23, 58:17
**veto** [3] - 7:18, 8:9, 47:19
**vetoed** [3] - 7:18, 47:20, 53:12
**vetoing** [1] - 7:20
**via** [2] - 2:12, 26:17
**video** [4] - 3:4, 3:23, 61:9, 61:11
**view** [1] - 43:21
**violated** [2] - 12:9, 19:9
**violates** [1] - 4:22
**violating** [1] - 35:21
**violation** [2] - 33:3, 34:19
**Virginia** [2] - 1:23, 40:9
**virtually** [1] - 3:4
**visa** [2] - 13:6, 13:7
**vividly** [1] - 9:20
**volumes** [1] - 15:10
**voluntary** [1] - 4:4
**voting** [2] - 34:16
**Voting** [2] - 19:1, 34:20
**vs** [1] - 1:6

## W

**waive** [3] - 3:11, 3:12, 3:18
**waiver** [4] - 4:1, 4:3, 4:4, 4:10
**walk** [1] - 55:1
**Walkingshaw** [8] - 2:11, 29:2, 42:1, 47:7, 50:1, 50:13, 55:20, 57:21
**WALKINGSHAW** [42] - 1:14, 29:3, 31:1, 31:7, 32:6, 32:10, 33:4, 33:7, 35:10, 35:14, 36:9, 36:14, 37:5, 37:15, 37:20, 38:13, 39:2, 39:5, 39:14, 40:7, 40:13, 41:4, 41:8, 41:24, 42:8, 42:21, 43:6, 43:20, 44:1, 44:10,

44:14, 44:19, 45:14, 46:13, 46:17, 47:8, 51:2, 55:21, 56:17, 57:9, 57:13, 57:22
**wants** [3] - 11:10, 48:2, 55:1
**Warm** [1] - 2:7
**warrant** [1] - 46:12
**warranted** [1] - 4:13
**Washington** [1] - 20:5
**water** [1] - 31:23
**ways** [6] - 15:22, 16:4, 24:17, 25:2, 36:19, 59:18
**weeks** [1] - 61:7
**weight** [2] - 9:16, 18:3
**wetback** [1] - 48:12
**Wetback** [4] - 48:8, 48:10, 48:17, 53:22
**whatsoever** [1] - 36:1
**whereas** [1] - 57:2
**whistles** [1] - 26:6
**white** [1] - 15:24
**whole** [3] - 44:11, 49:13, 53:24
**widely** [1] - 7:22
**willing** [4] - 15:4, 16:24, 49:21, 61:8
**willingness** [1] - 49:13
**word** [2] - 26:4, 49:5
**words** [3] - 14:15, 17:3, 32:7
**world** [6] - 48:22, 53:20, 55:6, 55:12, 55:13, 56:13
**worse** [1] - 10:24
**worthy** [2] - 9:23, 22:18
**writing** [1] - 26:2
**written** [2] - 5:7, 54:14

## Y

**year** [3] - 11:6, 54:23, 55:2
**years** [10] - 8:23, 12:23, 16:14, 19:16, 32:23, 34:17, 35:2, 36:20, 39:8, 57:17

## Z

**zeal** [1] - 28:6
**Zoom** [2] - 2:10, 2:11