RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
LAUREN D. GORMAN
Assistant Federal Public Defender
Nevada State Bar No. 11580
201 W. Liberty Street, Ste. 102
Reno, Nevada 89501
(775) 321-8451
Lauren_Gorman@fd.org

Attorney for Gustavo Carrillo-Lopez

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

United States of America,

       Plaintiff,

    v.

Gustavo Carrillo-Lopez,

       Defendant.

Case No. 3:20-CR-00026-MMD-WGC

## POST-HEARING BRIEFING

## I.    POINTS AND AUTHORITIES

### A.    Introduction

The McCarran-Walter Act of 1952 collected, recodified, and revised the many existing laws governing immigration and reorganized the structure of immigration law statutes. The question the Court poses is whether the absence of any repudiation of the racial animus that led to the adoption of the statute in 1929 should be construed as the defendant meeting his burden of demonstrating that the 1952 codification was motivated by racial animus. The answer to that question is yes.[1] But Mr. Carrillo-Lopez far exceeds his burden under *Arlington Heights*.

---

[1] The 1929 language: That (a) if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000 or by both such fine and imprisonment.

The 1952 congress did not just fail to repudiate racial animus. They chose to recodify and make harsher illegal reentry at the same time as they expanded grounds for deportation and limited discretionary relief from deportation. They recodified illegal reentry with knowledge of the law's disparate impact. They recodified over a presidential veto calling out the bill's racism and criticizing the expanded grounds for deportation. The same congress also passed a few months earlier a discrete piece of alien harboring legislation known as the "Wetback Bill" that exempted employers from prosecution. Exempting employers, who incentivize illegal immigration and are vastly more responsive to deterrence than impoverished and uneducated Latinx workers, in the same proverbial breath as reenacting illegal reentry, and with full knowledge of the disparate impact of illegal reentry on Latinx migrants, is among the many factors demonstrating racial animus was a motivating factor for the 1952 congress.

**B.**      **Recognizing that discriminatory intent is rarely explicit, *Arlington Heights* requires an expansive inquiry and permits courts to consider different kinds of evidence cumulatively - direct and circumstantial, statistical and anecdotal, historical and contemporaneous.**

The factors under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) support a racially "discriminatory *intent* or *purpose*" at the time of the law's passage. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: 1) the impact of the official action and whether it bears more heavily on one race than another; 2) the historical background of the decision; 3) the specific sequence of events leading to the challenged action; 4) the

---

The 1952 language: Any alien who— (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both. Act of June 27, 1952, title II, ch. 8, § 276, 66 Stat. 163, 229 (1952)

[legislature's] departures from normal procedures or substantive conclusions; and 5) the relevant legislative or administrative history. *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68). The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose"—only that it was a "'motivating factor'").

Most recently, an en banc panel of the Ninth Circuit applied *Arlington Heights* in the context of the Voting Rights Act to strike down a state law criminalizing third-party ballot collection. *See Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc). The Court looked to the law's legislative history and the events leading up to its passage, including a "racially tinged" video made by the chairman of the county's Republican party that was widely distributed on social media. *Id.* at 1009. It also considered "unfounded and often farfetched allegations" of ballot collection fraud by a state senator who was "one of the major proponents" of the law and "influential in" its passage. *Id.* at 1009, 1039 (quotations omitted). While the Court found that some lawmakers had voted in favor of the law due to a "sincere, though mistaken, non-race-based belief" in voting misconduct, it concluded that this belief was "fraudulently created" by misrepresentations and the "racially tinged" video. *Id.* at 1040. Citing the "'cat's paw' doctrine,"[2]—which holds that even the votes of "well-meaning legislators" can contain a discriminatory intent if based on "false and race-based allegations". *Id.* at 1041.

---

[2] The "cat's paw" doctrine is "based on the fable, often attributed to Aesop, in which a clever monkey induces a cat to use its paws to take chestnuts off of hot coals for the benefit of the monkey." *Id.* at 1040.

1

2

   **C.    Because the 1952 Congress chose to merely continue and reenact the existing law from 1929 without debate, the presumption is that Congress's intent remained the same. Recodification does not somehow reset legislative intent.**

3

4          To presume that the intent of the 1952 congress differed from the intent of the 1929

5   congress is undermined by Supreme Court jurisprudence. *E.g., Hunter v. Underwood*, 471 U.S.

6   222, 232 (1985) (striking down portion of Alabama's constitution based on legislators' racial

7   animus despite the more blatantly discriminatory selections being already struck down by the

8   courts because its original enactment was motivated by a desire to discriminate); *cf. Abbott v.*

9   *Perez*, 138 S. Ct. 2305, 2325 (2018) (refusing to import discriminatory intent of prior

10  legislature, but only because it did "not confront a situation like the one in *Hunter*. Nor is this

11  a case in which a law originally enacted with discriminatory intent is later reenacted by a

12  different legislature . . . . Nor did [the Texas legislature] use criteria that arguably carried

13  forward the effects of any discriminatory intent on the part of the [earlier Legislature.");*United*

14  *States v. Ryder*, 110 U.S. 729 (1884) ("It will not be inferred that the legislature, in revising and

15  consolidating the laws, intended to change their policy, unless such intention be clearly

16  expressed."); *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) ("[W]e do not presume

17  that the revision worked a change in the underlying substantive law 'unless an intent to make

18  such [a] chang[e] is clearly expressed.'") (*quoting Fourco Glass Co. v. Transmirra Prods.*

19  *Corp.*, 353 U.S. 222, 227 (1957)); *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 198-99 (1912)

20  ("[I]t will not be inferred that Congress, in revising and consolidating the laws, intended to

21  change their effect unless such intention is clearly expressed.");*see also State v. Lyon*, 58 Kan.

22  App. 2d 474, 489-90 (2020) ("[R]ecodification of a criminal statute without a substantive

23  change to the definition of the crime does not amount to a repeal. . . .When construing statutes

24  to determine legislative intent, appellate courts must consider various provisions of an act in

25  pari materia with a view of reconciling and bringing the provisions into workable harmony if

26  possible."); *Allen v. State*, 402 Md. 59, 74–75 (2007) ("When we pursue the context of statutory

language, we are not limited to the words of the statute as they are printed in the Annotated

Code. We may and often must consider other 'external manifestations' or 'persuasive

4

evidence,' including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case."); *In re Special Investigation* No. 236, 295 Md. 573, 576–77 (1983) ("Hence, we turn for a possible explanation of its meaning to its form as it existed prior to recodification in 1973. Recodification of statutes is presumed to be for the purpose of clarity rather than change of meaning.").

These principles and cannons of statutory construction reflect an intuitive and common sensical understanding of legislative meaning and intent. Another way to frame the question is whether the McCarran-Walter Act of 1952 is either responsive, i.e., reverses a prior piece of legislation, or is extensive, that is, passed in the context of knowing what the existing statute means and is intended to do, and builds on that. This case is clearly the latter. When a subsequent legislature decides to carry forward a law motivated by racial animus and producing racially disparate results, even after the legislation was vetoed for its racism, it takes no mental gymnastics to find that racial animus remained a motivating factor. The opposite conclusion would defy common sense. The 1929 legislature balanced the desire to maintain America's white identity with the hunger of business interests for an exploitable and controllable source of labor. The 1952 legislature did the same.

**D.    The legislative history of both the McCarran-Walter Act and the so-called "Wetback Bill" demonstrate racial animus.**

**1.    The McCarran-Walter Act**

The legislative history of the 1952 recodification reflects the same the same desire as the 1929 legislature for a whites-preferred system for permanent immigration while accommodating continued access to an exploitable, racially identified labor force. Congress recodified illegal reentry will full knowledge of its disparate impact on Latinx people. Congress also expanded grounds for deportation and added language to make illegal reentry easier to prosecute and convict. And Congress passed the law over a presidential veto that explicitly called out the law for its racism. In short, the 1952 Act too was motivated by racial animus.

5

The legislative history of 1952 demonstrates a choice not to mitigate the racially disparate impact of illegal reentry, not to repudiate its eugenicist motives, but instead to make it easier to prosecute and to correlate and consolidate the provisions of illegal reentry so that "one act would suffice [to criminalize] all persons who have been deported, regardless of the reason therefor, and that *the present Act of March 4, 1929, should be reenacted to cover any and all deportations*.[3] *See* ECF No. 45 (excerpt from Report: The Immigration and Naturalization Systems of the United States, Senate Committee on the Judiciary, S. Rep. No. 1515, 81st Cong., 2d Sess., at 655-56 (1950)) (emphasis added).

The 1952 congress had the evidence of the disparate impact of illegal reentry in the 23 years since the law's passage. They heard from its enforcers. They received scathing criticism from the President. Yet there was no *debate* about whether illegal reentry should remain on the books. That supports the inference that racial animus motivated the recodification.

One important piece of context is that the McCarran-Walter Act reenacted illegal reentry while simultaneously broadening the grounds for deportation and limiting discretionary relief from deportation, making more undocumented migrants and documented migrants vulnerable to deportation and thus to prosecution upon return. The expansion of deportations and limitations on discretionary relief formed one of the major critiques from President Truman:

> The bill would sharply restrict the present opportunity of citizens and alien residents to save family members from deportation. Under the procedures of present law, the Attorney General can exercise his discretion to suspend deportation in meritorious cases. In each such case, at the present time, the exercise of administrative discretion is subject to the scrutiny and approval of the Congress. Nevertheless, the bill would prevent this discretion from being used in many cases where it is now available, and would narrow the circle of those who can obtain relief from the letter of the law. This is most unfortunate, because the bill, in its other provisions, would impose harsher restrictions and greatly increase the number of cases deserving equitable relief.

---

[3] ECF No. 45 (Report: The Immigration and Naturalization Systems of the United States, Senate Committee on the Judiciary, S. Rep. No. 1515, 81st Cong., 2d Sess., at 655-56 (1950)).

ECF No. 44, Ex. A (Truman Veto).

Moreover, about 20 years transpired between illegal reentry's enactment and reenactment. The profoundly disparate impact of the law was known by that time. The law was effective in accomplishing its design to target Latinx individuals:

> With stunning precision, the criminalization of unlawful entry caged thousands of Mexico's proverbial birds of passage. Within one year of enforcement, U.S. attorneys prosecuted 7,001 cases of unlawful entry. By 1939, they had prosecuted more than 44,000 cases.
>
> In no year did the U.S. attorneys' conviction rate fall below 93 percent of all immigration cases. Taking custody of individuals convicted on federal immigration charges, the U.S. Bureau of Prisons reported that Mexicans never comprised less than 84.6 percent of all imprisoned immigrants. Some years, Mexicans comprised 99 percent of immigration offenders. Therefore, by the end of the 1930s, tens of thousands of Mexicans had been arrested, charged, prosecuted, and imprisoned for unlawfully entering the United States. With 71 percent of all Mexican federal prisoners charged with immigration crimes, no other federal legislation—not prohibition, not drug laws, and neither laws against prostitution nor the Mann act—sent more Mexicans to federal prison during those years.

ECF No. 26, Ex. A. "Discriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

The disparate impact of this law was known. There was testimony taken regarding illegal reentry from the Immigration and Naturalization Service. *See* ECF No. 45. The testimony complained only about the difficulties of obtaining convictions and prosecutions. *Id*. There were comments solicited from Deputy Attorney General Peyton Ford that too form part of this congressional record. The only substantive change to the 1929 law was indeed at the request of Deputy Attorney General Peyton Ford, who requested that the law be amended to make being "found in" the United States a crime so as to more easily establish venue.

7

With respect to the "found in" clause, Deputy Attorney General Peyton Ford stated, "It adds to existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States. This change would overcome the inadequacies in existing law, which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act." ECF No. 44, Ex. B. Peyton Ford referenced in the same letter "conveyers and receivers of the wetback." *Id*.

The 1952 congress heard from the prosecutor and enforcers of this law. The conclusion reached in the legislative history was that it didn't deliver up enough migrants to prosecute and imprison. The result was the broadening of grounds for deportability and the addition of "found in" to the criminalized conduct. In President Truman's words:

> In no other realm of our national life are we so hampered and stultified by the dead hand of the past, as we are in this field of immigration. We do not limit our cities to their 1920 boundaries--we do not hold our corporations to their 1920 capitalizations-we welcome progress and change to meet changing conditions in every sphere of life, except in the field of immigration.

ECF No. 44, Ex. A.

Finally, the legislative history of the McCarran Walter Act uses the racialized slur "wetback" to refer to Latino migrants. In the words of Professor Gonzalez-O'Brien:

> And that term "wetback" is one that is racially derogatory, was recognized as being racially derogatory at the time, and has roots that link back to some of the discussions around both the quotas being applied to Mexico, of discussions and debate of the Undesirable Aliens Act. And this term "wetback" is referenced in a number of pieces of legislation at the time, including a Senate Bill 1851 -- well, also known as the, uh, Act of March 20th, 1952, which is referenced in the Congressional Record as the Wetback Bill. And this was an empty harboring Bill, but regularly referred to Mexicans as wetbacks. And the term with "wetback" comes from the idea that individuals who are entering without inspection have to do so at an area where there is no bridge over the Rio Grande River and, therefore, they get wet and, therefore, the term wetback. But across the period of the 1940s and 1950s, this term has -- is

8

> associated, and almost synonymous with Mexicans. And in addition to being synonymous with Mexicans and racialized in much the same way, it also has the attribution of a lot of the negative stereotypes that were associated with Mexican immigrants in the push, or quotas to be applied to immigration from Mexico and south of the Rio Grande, as well as during debate over the Undesirable Aliens Act.

ECF No. 49 at 89:3-90:4. Though this is not the only use of the racialized slur in the congressional record, Ford was among the men who used the term "wetbacks." "And while the use of racial slurs, epithets, or other derogatory language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose." *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 395 (D. Md. 2018). Ford wasn't a lone voice or a fringe figure. It was his request alone that added "found in," ensuring venue could be established anywhere migrants were found.

### 2.    The Wetback Bill

At the same time as McCarran-Walter was being considered so too was the so-called "Wetback Bill", which passed a few months before. The bill's stated aim was "to assist in preventing aliens from entering or remaining in the United States illegally." UNITED STATES STATUTES AT LARGE, 82 Cong. Ch. 108, March 20, 1952, 66 Stat. 26 (March 20, 1952). Despite its stated aim it *excluded* employers from prosecution:

> willfully  knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly the entry into the United States of any alien, including an alien seaman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this Act or any other law relating to the immigration or expulsion of aliens, shall be guilty of a-felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for it term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: **Provided, however, That for the purposes of this section, employment (including the its usual and normal practices incidental to employment) shall not constitute harboring.**

9

*Id*. (emphasis added). The "Wetback Bill's" legislative history involved a nakedly racist debate over the "wetback problem". "[I]ndividuals, like, Senator Kilgore of West Virginia, who notes in debate over the quote, unquote, Wetback Bill, that practically every state in the Union has had the wetback problem. Some of these people cannot meet the standards of immigration. They may be criminals because they are wetbacks. They can be kept in a state of peonage." ECF No. 49 at 107:11-17.

The "Wetback Bill" was passed by the same congress during the same time frame and with the same express aim as illegal reentry: "preventing aliens from entering or remaining in the United States illegally." But it remained a discrete piece of legislation. Its significance is more than its racialized legislative history. It imposed criminal penalties on those who "harbored" aliens but exempted employers from criminal prosecution. It did so despite the fact that employers were the main reason Latinx individuals were coming to the United States. American agricultural interests were reliant on the cheap labor provided by Latinx migrants. There is no starker evidence that deterring illegal immigration is not a true goal of illegal reentry than the express exemption of those who incentivize illegal immigration – i.e., employers. For many reasons, employers are vastly more responsive to deterrence than are impoverished and uneducated Latinx workers. By far the most effective means of deterring illegal immigration, therefore, is to punish employers who hire illegal immigrants. Yet, congress didn't.

This exemption is particularly relevant to two *Arlington Heights* factors: (1) "the specific sequence of events leading to the challenged action and (2) "the [legislature's] departures from normal procedures or substantive conclusions." *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68). In undermining its own stated purpose by exempting employers, and using a discrete piece of legislation, the "Wetback Bill" illustrates that the intent of congress was to preserve the influx of cheap and exploitable labor, while simultaneously marginalizing those workers and excluding them from full participation in American life. In instructing courts to consider the broader context surrounding the passage of legislation, the Court recognized that "[o]utright admissions of impermissible

10

racial motivation are infrequent and plaintiffs often must rely upon other evidence. *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 220–21 (4th Cir. 2016). The "Wetback Bill" illustrates that the 1952 and 1929 congresses were both balancing the hunger of the agricultural industry for exploitable labor and the desire to keep America's identity white:

> MS. GORMAN: And part of the legislative background also is the Wetback Bill that occurred two months earlier. Is that fair?
> THE WITNESS: That is fair.
> MS. GORMAN: And the Wetback Bill explicitly carved out from the harboring of aliens employers?
> THE WITNESS: That is correct.
> MS. GORMAN: And that tension between employers and the utilization of south of the border
> migrants was the same sort of tension that we see animating that debate in 1929. Is that fair?
> THE WITNESS: That's fair.

ECF No. 49 at 185:17-186:5

The 1952 congress carried forward the 1929 Act and made it easier to prosecute Latinx migrants wherever they were "found". It expanded upon its predecessor. It also expanded grounds for deportation and narrowed grounds for discretionary relief. Thus, it ensured, again, that Latinos would never gain a foothold in the U.S. Latinx migrants were maintained as a source of exploitable labor, but eternally vulnerable to deportation and prosecution. The employers who profited off their bodies and their need to make a better life were given a pass.

**E.      The historical events that bridged 1929 and 1952**

The historical lead up to a law is a key *Arlington Heights* factor. Here, the two major historical events with respect to Latinos that bridge 1929 and 1952 were the "repatriation" drives during the Great Depression and the Bracero Program. Both events demonstrate an intent to prevent permanent settlement and maintain control over a temporary, exploitable workforce.

**1.      Mexican Repatriation**

During the Great Depression, an estimated 400,000 to over 1 million Mexicans and Mexican Americans were coerced and threatened into leaving the United States. 60% of whom were U.S. Citizens. They weren't "repatriated." They were racially targeted and forced from their homes. It was a scare campaign that hit at those who looked to be Mexican. Not a drive to

11

actually check papers and target those here without permission. If you looked Mexican, you were at risk. As Professor Gonzalez O'Brien testified:

> As the U.S. headed into the Great Depression, this push to get Mexican immigrants to repatriate to Mexico. And, it was relatively successful. The numbers vary in terms of the number of immigrants -- or the number of Mexicans -- let me clarify that -- the number of Mexicans who left the United States, with, kind of, the lowest estimates being around 400,000, and some of the higher estimates being well over a million who left for Mexico. And some of the estimates of that is, you know, that around 60 percent of those who left -- who went back to the Mexico or went to Mexico were, in fact, American citizens. Now, there's a question of, well, why are Mexican -- if they're American citizens, why are they returning to Mexico?
> And I think that part of the story here is that this was a campaign that was meant to fuel voluntary re-patronization. But, that voluntary re-patronization was, in some cases, driven by a sense of the threat of deportation or the threat of additional penalties if those individuals did not return to Mexico. And in particular, there was -- there were a number of raids in Los Angeles. And along with those raids, there was publicity released announcing the raids in advance; that there would be arrests; and that these raids were coming to the area; and that, uh -- this idea that this would create kind of a psychological push to get people to leave for Mexico.

ECF No. 29 at 86:3-87:6. This constitutes overwhelming evidence of racial animus.

### 2.    Bracero Program

Following, the "repatriation" of Latinos, the Great Depression ended, and the U.S. again needed an exploitable source of labor as the U.S. engagement in World War II ramped up. In 1942, the U.S. started a Mexican Farm Labor Program, also known as Operation Bracero. After threatening and deporting hundreds of thousands of Mexicans in the 30s, the Bracero Program funneled Mexicans back into the United States on a legal, *temporary* basis in exchange for the promise of wages and humane treatment. The program never delivered on those promises and

instead spurred illegal immigration as some employers didn't like the red tape and found it more advantageous to directly recruit Mexicans to labor for their farms and factories. [4]



Mexican contract workers undergo medical inspection before being sprayed with pesticides, ca. 1942. The disinfections along the U.S.-Mexico border continued until the late 1950s.

Courtesy Carlos Marentes, Proyecto Bracero Archives, Centro de Trabajadores Agricolas Fronterizos, El Paso

Braceros were lured to the United States, and their bodies were broken and exploited. They underwent indignities reminiscent of those that precipitated the "bath riots" of 1917, when people with border crossing cards were subjected to weekly "baths" of kerosene and had their clothing sprayed with Zyklon B, the gas Nazis used to kill Jews. *See* ECF No. 49 at 69:10-70:3. Like the Latinx migrants of the early 1900s Braceros were an exploited and racialized source of labor. They were stripped naked, subjected to invasive body searches, and sprayed with poisonous DDT. The few protections offered on paper rarely materialized. Many were worked and exploited until their bodies broke or they died. ECF No. 49 at 77:3-78:19.

**F.      White Supremacy in America between 1929 and 1952**

White supremacy was alive and well between 1929 and 1952. Schools were segregated. Restaurants had signs to keep out Mexican and "Negro" patrons. Some of the most overt racism perpetuated against Latinx individuals resulted in litigation. Those cases provide a tragic snapshot of the racial animus against Latinx individuals that characterized this period of time.

In 1947, a federal lawsuit was brought alleging that the segregation of Mexican children in California schools violated the Fourteenth Amendment. It succeeded. *Westminster Sch. Dist. of Orange Cty. v. Mendez*, 161 F.2d 774, 781 (9th Cir. 1947) ("By enforcing the segregation of school children of Mexican descent against their will and contrary to the laws of California, respondents have violated the federal law as provided in the Fourteenth Amendment to the

---

[4] Operation Wetback followed Operation Bracero. Operation Wetback was based xenophobia, and resulted in sizable large-scale violations of people's rights, including the forced deportation of U.S. citizens. Like the Mexican "repatriation" drives of the 1930s, it resulted in the mass deportation of Latinos, many of whom were American citizens. ECF No. 49 at 122:3-123:10.

Federal Constitution by depriving them of liberty and property without due process of law and by denying to them the equal protection of the laws.")

In 1951, in Arizona, another federal lawsuit was brought to try to end the segregation of children of Mexican descent. The United States District Court  for the District of Arizona "held that practice of public elementary school district authorities of segregating children of Mexican descent in separate school buildings with inferior accommodations and facilities was discriminatory and illegal in that it deprived children of constitutional rights of due process of law and equal protection of the laws. *Gonzales v. Sheely*, 96 F. Supp. 1004 (D. Ariz. 1951).

In 1952, the Supreme Court decided *Hernandez v. Texas*, 347 U.S. 475 (1954), the first Mexican American civil-rights case heard and decided by the United States Supreme Court during the post-World War II period. The court held that Mexican Americans have equal protection under the 14th Amendment of the U.S. Constitution. In *Hernandez*, the petitioner's initial burden in substantiating his charge of group discrimination was to prove that persons of Mexican descent constitute a separate class, distinct from 'whites. *Id*. at 479. "One method by which this may be demonstrated is by showing the attitude of the community." *Id*. The "testimony of responsible officials and citizens contained the admission that residents of the community distinguished between 'White' and 'Mexican.'" *Id*. The "participation of persons of Mexican descent in business and community groups was shown to be slight." *Id*. Until very recent times, "children of Mexican descent were required to attend a segregated school for the first four grades." *Id*. "There was 'at least one restaurant in town [that] prominently displayed a sign announcing, 'No Mexicans Served.'" *Id*. And, "on the courthouse grounds at the time of the hearing, there were two men's toilets, one unmarked, and the other marked 'Colored Men' and 'Hombres Aqui' ('Men Here')." The "petitioner succeeded in his proof that individuals of Mexican descent constituted a cognizable class. *Id.* at 479–80. The same evidence paints a devasting picture of widespread racial animus against those of Mexican descent at the time of the McCarran-Walter Act.

The period relevant to this motion was a period characterized by White supremacy driven by the same race-based ideals of the earlier eugenics' movement. The laws of many states banned interracial marriage. It was not until 1967, 15 years after the McCarran-Walter Act, that the Supreme Court finally decided, in *Loving v. Virginia*, 388 U.S. 1 (1967), that laws banning interracial marriage were unconstitutional. The Virginia miscegenation law struck down in *Loving* had been upheld by the state's supreme court in 1955. As set out in the Supreme Court's opinion, "[T]he state court concluded that the State's legitimate purposes were 'to preserve the racial integrity of its citizens,' and to prevent 'the corruption of blood,' 'a mongrel breed of citizens,' and 'the obliteration of racial pride,' obviously an endorsement of the doctrine of White Supremacy." 388 U.S. at 7. Thus, three years after the McCarran-Walter Act, the Virginia Supreme Court still openly endorsed a law against interracial marriage to prevent the corruption of blood, to preserve white supremacy, to prevent people who loved each other from marrying, lest they give birth to "mongrels," using words remarkably similar to those used to endorse the Undesirable Aliens Act of 1929.

## II.   CONCLUSION



An Operation Streamline mass trial of immigrants at the Lucius D. Bunton Federal Courthouse, Pecos, Texas. May 2018.
Public domain image courtesy of Wikipedia Commons and The Intercept.

The 1952 congress did not reenact illegal reentry despite its racist origins. It reenacted it because of them. It made Latinx individuals easier to deport, prosecute, and convict, and in the same proverbial breath exempted their employers from prosecution. This image speaks to the legacy of these choices and the continuing disparate impact of the law. Almost making the point, only two judges deemed a 1326 client worthy of hearing evidence, a request that would seem modest in another case. This court is one of the two. An analysis of the *Arlington Height* factors requires dismissal.

RENE L. VALLADARES
Federal Public Defender

By:   */s/ Lauren Gorman*
LAUREN GORMAN
Assistant Federal Public Defender
Counsel for CARRILLO-LOPEZ

15

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on February 23, 2020, she served an electronic copy of the above and foregoing **POST HEARING BRIEFING** by electronic service (ECF) to the person named below:

NICHOLAS A. TRUTANICH
United States Attorney
PETER WALKINGSHAW
Assistant United States Attorney
400 South Virginia Street, Suite 900
Reno, NV 89501

*/s/ Katrina Burden*
Employee of the Federal Public Defender

16