NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar Number 13644
PETER WALKINGSHAW
Assistant United States Attorney
400 South Virginia, Suite 900
Reno, Nevada 89501
775-784-5438
Peter.Walkingshaw@usdoj.gov
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:20-cr-00026-MMD-WGC |
| Plaintiff, | **Government's Post-Hearing Brief on Defendant's Motion to Dismiss [ECF No. 26][1]** |
| v. | |
| GUSTAVO CARRILLO-LOPEZ, | |
| Defendant. | |

## I.  Introduction

Following an evidentiary hearing on Defendant's Motion to Dismiss, the Court presented the parties with two questions. First, the Court asked whether the Defendant can meet his initial burden under *Arlington Heights* to show that the passage of Section 1326 was substantially motivated by racial animus, by showing that the Congress of 1952, which passed the first version of the current law, did not affirmatively repudiate racist sentiments expressed by certain members of Congress when passing a superseded statute on the same

---

[1] Certification: This brief is timely. *See* ECF No. 48

subject matter in 1929. Every federal court to consider this question has concluded that a legislature does not need to affirmatively disclaim historical racism in order to pass an otherwise valid law without discriminatory intent. Especially where, as here, a new version of a prior law is passed in a substantively amended form—regardless of whether that amendment makes the law more or less harsh in its application—federal courts have uniformly concluded that a neutral passage is sufficient to cleanse any taint of discrimination in the law's history. Because Defendant has offered no competent evidence that the Congress of 1952—or any subsequent Congress that passed an amended version of Section 1326—was motivated by racial animus in enacting the law, he fails to carry his initial burden under *Arlington Heights*. On that basis alone, the Motion should be denied.

Second, the Court asked whether, assuming for purposes of argument that the Defendant could carry his initial burden, the Government has shown that Congress would have passed a law criminalizing illegal reentry absent any discriminatory intent. The evidence in the record clearly demonstrates that Congress would have passed this law absent any racial considerations, in at least two different ways recognized by the case law. First, in cases where "the legitimate noninvidious purposes of a law cannot be missed," courts have declined to hold that racial animus is a but-for cause of a law's passage, notwithstanding a disparate impact on a legally cognizable group. *See, e.g., Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 275 (1979). Given the economic and geopolitical factors that Defendant's experts acknowledged drove the passage of the 1952 law, and the courts' repeated recognition of the essential function of a deterrent to underpin Congress's immigration decisions, this is just such a case, and the Court should find that the law would have been passed absent any racial animus. Second, in assessing this question,

courts have repeatedly held that legislatures affirmatively and conclusively demonstrate that a law would have been passed in the absence of racial animus by later passing amended versions of the same law. In the words of the Eleventh Circuit, courts considering such a circumstance "have the luxury of not having to delve into a complex counter-factual scenario," given that subsequent revisiting of the issue by the legislature in the absence of racial animus makes the answer to the question "plain." *Johnson v. Governor of State of Fla.,* 405 F.3d 1214, 1224 (11th Cir. 2005). Here, Congress substantively amended the crime of illegal reentry when it passed Section 1326 in 1952, and it subsequently passed five amended versions of Section 1326. Defendant has provided no evidence that Congress was motivated by racial animus in passing any of them. Accordingly, it is similarly "plain" that Congress would have—and has—passed Section 1326 in the absence of any discriminatory intent.

In sum, Defendant's failure to present any competent evidence that Congress was motivated by racial animus in passing any version of Section 1326 forecloses a finding that the statute is unconstitutional. The Court should deny the Motion.

## II. ARGUMENT

**A.** **Defendant Has Failed to Meet His Burden of Showing That Discriminatory Intent Was a Substantial Motivating Factor in the Passage of Section 1326.**

Despite the bedrock judicial presumption that legislatures act deliberately and in good faith, defendant asserts that Congress cannot pass a facially neutral law, without any discriminatory intent, if previous laws on the same subject were motivated in part by racism, and Congress fails to explain and affirmatively repudiate that history. Every federal court to consider this assertion has rejected it. Recently, in *Abbott v. Perez*, the Supreme Court explained that "the presumption of legislative good faith [is] not changed by a

finding of past discrimination." 138 S. Ct. 2305, 2324-25 (2018) (noting the Court has "never suggested that past discrimination flips the evidentiary burden [of the intent test] on its head."). In so holding, the Court reiterated its almost forty-year-old statement that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id*.

Indeed, another court in this circuit recently considering an identical challenge to Section 1325[2] asked whether "a law related to one that was stained by white supremacy can ever be cleansed without a formal condemnation of the earlier law"—the exact question the Court has asked the parties here—and concluded unequivocally that "the answer derived from a number of federal court decisions is yes." *United States v. Gallegos-Aparicio*, No. 19-CR-2637-GPC, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020). Despite an absence of legislative history debating Section 1325, the court in *Gallegos-Aparicio* found that the deliberate process Congress engages in, and the absence of "any discriminatory motive" on the part of the Congress that actually passed the law, required it to conclude that the challenging defendant had not met his burden, evidence of historical racism notwithstanding.

This approach is consistent not only with the mandate of the Supreme Court in *Abbott,* but also with the approach of every court of appeals to consider legislation that may have been historically tainted by discriminatory motives in an earlier form, but was passed in its then-current form without discriminatory intent on the part of the reenacting legislature. Three circuit courts of appeals, the Second, Fifth, and Eleventh, have all

---

[2] Both Section 1325 and Section 1326 create criminal penalties for unlawful immigration. Section 1325 makes it a misdemeanor to enter the country unlawfully, where as Section 1326 makes it a felony to reenter the country after having been previously deported.

concluded that the amendment or re-enactment of an existing law, in the absence of discriminatory intent, cleanses that law of any discriminatory aspects of its history for purposes of an equal protection analysis. *Hayden v. Paterson*, 594 F.3d 150, 164–68 (2d Cir. 2010) (holding that amended version of New York constitutional provision passed in 1894 concerning felon disenfranchisement was not tainted by racial animus, even assuming that prior enactments of the same provision were so tainted); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1223–26 (11th Cir. 2005) (*en banc*) (rejecting argument that, assuming 1868 version of felon disenfranchisement provision in Florida state constitution was motivated by racism, the reenacted version passed in 1968 without evidence of animus was invalid absent acknowledgement and repudiation of that earlier racism); *Cotton v. Fordice*, 157 F.3d 388, 391–92 (5th Cir. 1998) (felon disenfranchisement provision in Mississippi state constitution did not violate Equal Protection Clause where amended versions were twice passed in the absence of evidence of discriminatory intent, notwithstanding agreement of parties that original enactment was motivated by racial animus). Each of these decisions upheld laws challenged on the grounds that they had historically been associated with racism, relying on the deliberative process legislatures go through in passing legislation, and on the fact that the laws were substantively amended in their newer form. Each of these decisions looked to the most recently amended versions of the laws in question, as those were the operative versions of the laws being challenged, and therefore the relevant "decision" under *Arlington Heights*. Each of these decisions upheld the operative versions of the challenged law in the absence of evidence of explicit debate over the provision in the legislative history, as deliberation by the legislature is presumed.

Notably, this principle holds true regardless of whether the allegedly discriminatory law is made more lenient or harsher by amendment. In *Hayden*, the Second Circuit relied on an amendment to the New York Constitution that took discretion away from the legislature to consider not disenfranchising felons—it made felon disenfranchisement laws in the state mandatory. *Hayden*, 594 F.3d at 167.

Defendant has conceded that Congress, after taking evidence on the issue, substantively amended the law of illegal reentry to facilitate prosecutions in cases where venue was previously impossible to establish.[3] *See* ECF No. 45 (submitting the committee hearing on proposed changes to the law); ECF No. 46 (explaining that these hearings are part of Congress's deliberative process); *compare also* ECF No. 49 ("Hr'g Tr.") at 182:12-183:13 (Prof. Gonzalez O'Brien professing a need to refer to the statutes to articulate the change in law) *with* Hr'g Tr. at 184:14-185:5 (Prof. Gonzalez O'Brien adopting defense counsel's characterization of the change to the law). Nor does Defendant challenge the fact that Congress subsequently amended Section 1326 to increase its deterrent value on five separate occasions. *See* ECF No. 29 at 5:15-6:5 (summarizing amendments).

Defendant has nonetheless asserted that the strengthening of a challenged law cannot serve as evidence that the law is not motivated by animus. But it is hard to imagine better evidence that a law is motivated by a valid, important, nondiscriminatory purpose

---

[3] Defendant argued in a supplement that the record of discussion on this point referred "exclusively to Mexicans." ECF No. 45. For the reasons explained in the government's response, this is factually incorrect, and the commentary reveals that migrants crossing the southern border were actually *less likely* to be prosecuted than migrants entering the country illegally on the East Coast. *See* ECF No. 46. It cannot be asserted that people from Latin America were subjected to disparate treatment on the basis that they were previously less likely to be subject to prosecution than immigrants originating elsewhere, and that the law was revised to put similarly-situated defendants on equal footing.

than its repeated strengthening in the absence of any evidence of racial animus. *Hayden* makes clear that it is not the *effect* of the amendment of laws with potentially troubling histories that matters, it is the consideration that the process of amendment necessarily entails.

Defendant asks the Court to ignore this consistent presumption of legislative good faith on the part of amending and reenacting legislatures. But the consistent refusal by the courts in the decisions cited above to presume that the legislatures in question mindlessly carried forward racial animus of the past not only comports with the Ninth Circuit's repeated admonition that "Congress is presumed to act with deliberation when passing statutes," but it makes intuitive sense. *E.E.O.C. v. Karuk Tribe Hous. Auth.,* 260 F.3d 1071, 1082 (9th Cir. 2001); *see also, e.g., United States v. Motamedi,* 767 F.2d 1403, 1406 (9th Cir. 1985) ("We must presume that Congress acts with deliberation, rather than by inadvertence, when it drafts a statute."). When passing an amended version of a law, legislatures do not add words to statutory text in a vacuum. The amended provisions necessarily reflect a consideration of, and a desire to improve, the existing statutory framework. Defendant asks the Court to presume that historical discrimination is carried forward thoughtlessly by legislatures unless the legislatures affirmatively identify and disclaim any elements of discrimination that may have influenced prior legislation. But that presumption has not only been repeatedly rejected by federal courts in every context in which it has arisen, but fundamentally conflicts with how courts understand legislatures to do their work.

Even the testimony of Defendant's own expert supports the conclusion he resists—that Congress should not be presumed to either silently or thoughtlessly carry forward the intent of prior legislatures. When directed by the Court to identify an instance in which

Congress passed a statute while considering the racial implications of the law's history and its application Defendant's historian, Prof. Benjamin Gonzalez O'Brien, *identified the Congress of 1952 in its passage of the McCarran-Walter Act*. Hr'g Tr. at 179:18-181:7. There is no reason to believe that a Congress the Defendant's expert has identified as explicitly concerned with historical issues of race when passing legislation, would nonetheless condone a racially motivated provision located elsewhere in that same piece of legislation with unanimous silence. A far better explanation is that the obvious legitimate purposes animating the passage of Section 1326, conceded by Defendant's experts and discussed in more detail below, made the passage of the law uncontroversial, and therefore not subject to significant debate. The fact that no one in Congress expressed a belief that Section 1326 was racially motivated can hardly be taken as evidence that racial discrimination was a substantial motivating factor for the passage of the law.

Defendant has offered no competent evidence that racial discrimination motivated the Congress of 1952 or any subsequent Congress in the passage of Section 1326. Absent such evidence, he cannot meet his initial burden under *Arlington Heights*, as every federal court to consider this question has concluded notwithstanding evidence of discrimination in prior legislative history. The Government anticipates based on prior briefing that the Defendant will rely heavily on the Supreme Court's decision in *Hunter v. Underwood* for the propositions that the Court can adopt the opinions of its experts as a substitute for factual evidence of discrimination by Congress.[4] Defendant would be wrong to do so.

---

[4] Defendant may also cite *Hunter* for the proposition that legislative changes made to a law over time do not reflect reconsideration of that law. But, as explained by the courts in *Hayden* and *Johnson*, the crucial distinction is that the law in *Hunter* was only amended through judicial action, and was never revised or neutrally reconsidered by the legislature. *See Johnson,* 405 F.3d at 1222; *Hayden,* 594 F.3d at 166.

First, while the Court in *Hunter* accepted the testimony of historians on the issue of discriminatory intent on the part of the delegates to a state constitutional convention, it did so on the understanding that "[t]he delegates to the all-white convention were not secretive about their purpose," and that neither the district court that upheld the law nor the appellants defending the law "seriously dispute[d] the claim that [the] zeal for white supremacy ran rampant at the convention." *Hunter v. Underwood*, 471 U.S. 222, 228-29 (1985). The Court also pointed to an explicit statement by the president of the convention in question that the purpose of the convention was "to establish white supremacy in this State." *Id.* Nothing remotely comparable exists in the record before the Court here. Indeed, while each expert offered their opinion that Section 1326 was passed with discriminatory intent, neither expert identified a single legislator who they allege supported the passage of Section 1326.[5] Professor Lytle Hernandez did not testify regarding the events surrounding the 1952 passage of Section 1326 at all. Professor Gonzalez O'Brien was unable to point to anything in the legislative history of the McCarran-Walter Act, which passed the 1952 version of Section 1326, that affirmatively demonstrated the passage of Section 1326 was driven by racial animus. *See* Hr'g Tr. 176:2-177:16 (stating in response to a question from the Court that the signifiers of racism against Mexicans he asserts were not present in the debate over McCarran-Walter, and that his "read of the Congressional debate over

---

[5] Defendant does appear to have attempted to argue in a supplement that Senator Patrick McCarran, one of the sponsors of the bill, was generally a racist. *See* ECF No. 44. Regardless of any general xenophobic views he may have held, Senator McCarran was supportive of loosening restrictions on immigration from Mexico, and of condoning illegal immigration across the southern border, as discussed in the government's response to that supplement. *See* ECF No. 46. Defendant has offered no testimony to further this point, and appears to have abandoned it.

9

McCarran-Walter is that Mexicans just didn't come up").[6] The bare opinions of these historians, absent supporting factual evidence of discrimination by the relevant decisionmakers in Congress in 1952 and later, provide no basis for the Court to conclude that the Defendant has met his burden.

Nor should the Court accept Defendant's suggestion that *dicta* in the Supreme Court's decisions last year in *Ramos v. Louisiana* and *Espinoza v. Montana Dep't of Revenue* relieve him of the burden of proving discriminatory intent once he can point to historical racism. As explained in the government's prior briefing, neither case says anything of the kind, as every court to confront this question has held. *See, e.g., United States v. Gallegos-Aparicio*, No. 19-CR-2637-GPC, 2020 WL 7318124, at *2 (S.D. Cal. Dec. 11, 2020) (describing an identical argument as "unavailing"). When it actually confronted an equal protection challenge last year, the Supreme Court reiterated its longstanding assertion that for purposes of an *Arlington Heights* analysis, statements "remote in time and made in unrelated contexts" do not "qualify as 'contemporary statements' probative of the decision

---

[6] The government further maintains its position that the testimony Prof. Gonzalez O'Brien provided in this case regarding the historical meaning of the term "wetback" is inconsistent with testimony he gave in the District of Oregon, in a hearing on an identical motion five days earlier, that the term was broadly used to refer to individuals in the country illegally without reference to national origin. *See* Hr'g Tr. at 162:18-165:12. Due to blackouts caused by freezing weather in Portland, the transcript from that hearing will not be prepared by the date this brief is due. The government is mindful of the Court's admonition that it would not change the due date for post-hearing briefs to await that transcript. Hr'g Tr. at 192:2-5. The government therefore intends to seek leave to submit the transcript if it becomes available prior to this Court's decision on Defendant's Motion. Nonetheless, testimony provided by Prof. Gonzalez-O'Brien that the term referred exclusively to individuals in the country illegally, and that the term was frequently used by Mexican-American civil rights hero Cesar Chavez to refer to individuals in the country illegally (Hr'g Tr. at 165:20-166:21) conclusively demonstrates that the general use of this outdated term in the 1950's does not meet Defendant's burden of showing that the passage of Section 1326 was motivated by animus.

1    at issue." *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020) (plurality

2    opinion). That is all Defendant has offered—in the form of statements from a handful of

3    legislators in 1929—to support his Motion.

4           Absent any evidence of discriminatory intent on the part of any Congress who has

5    passed a version of Section 1326, and in light of the obvious legitimate motivating purposes

6    for the law discussed in further detail below, Defendant cannot meet his initial burden

7    under *Arlington Heights*. The Court should deny the Motion.

8    **B.     Section 1326 Has Been Repeatedly Reconsidered and Reenacted for Obvious
            Legitimate Reasons in the Absence of Racial Animus, Thereby Satisfying the
9           Government's Burden Under the Second Prong of *Arlington Heights***

10          As discussed above, Defendant has failed to meet his burden of establishing that

11   racial discrimination motivated the passage of any version of Section 1326 from 1952

12   onwards, and that is all the Court needs to deny the Motion. Nonetheless, given (1) the

13   obvious valid reasons for attaching criminal penalties to violations of immigration law, and

14   (2) the fact that Congress has repeatedly passed amended versions of the law in the absence

15   of any evidence of discriminatory intent, the Court could forgo the first step of the *Arlington

16   Heights* analysis and conclude that the law would pass (and in fact has passed) in the

17   absence of any discriminatory motivation.

18          First, it is obvious and uncontroverted that valid, nondiscriminatory objectives

19   motivated the passage of Section 1326 in 1952 and its later amendments. Defendant's own

20   expert, Prof. Lytle Hernandez, acknowledged that support for border enforcement is driven

21   by a desire to protect American citizens from economic competition (Hr'g Tr. at 42:14-

22   44:3), by a need to maintain national security (Hr'g Tr. at 50:1-17), and by a need to

23   maintain foreign relations with international allies, including Mexico, which has

24

11

historically opposed illegal migration from Mexico to the United States (Hr'g Tr. at 44:13 -
47:23) (acknowledging threats made by Mexican government if U.S. did not curb illegal
migration). Moreover, the fact that workers without immigration status are subject to
exploitation creates concerns about working conditions for both the immigrants
themselves, and others competing with them economically. *See* Hr'g Tr. at 42:14-43:6;
60:1-61:25. The Ninth Circuit has stated that it is "plain" that Section 1326 "is a necessary
piece of the immigration-regulation framework" that addresses these interests, and that
"without the threat of criminal prosecution that [Section 1326] provides, Congress's
immigration-regulation authority would be fatally undermined—all bark and no bite."
*United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998).

In cases such as this, where valid noninvidious purposes motivating a law "cannot
be missed," courts have refused to find that a discriminatory motive was the but-for cause
of the law's passage, absent some direct evidence of discriminatory intent on the part of the
passing legislature. *See, e.g., Feeney*, 442 U.S. at 275; *Hayden*, 594 F.3d at 167-68 (upholding
felon disenfranchisement law given the "obvious alternative explanation" for its passage).
In determining that an asserted noninvidious purpose was obvious, the Second Circuit in
*Hayden* looked to jurisdictions outside New York to determine whether the challenged law
had arisen in other contexts absent discrimination, and found that it had. *Hayden*, 594 F.3d
at 167-68 (noting adoption of felon disenfranchisement laws in "virtually every state"). In
addition to the plainly noninvidious purposes for Section 1326 described above, the
conclusion that Section 1326 was not passed out of a discriminatory motive is buttressed by

12

the fact that most countries around the globe attach criminal penalties to entering their borders without permission.[7]

Second, given that Section 1326 has been passed six times in various amended versions, all in the absence of any evidence of discriminatory intent, the Court need not engage in a counterfactual analysis to conclude that the law would pass absent discriminatory intent. It has done so on multiple occasions. As the Eleventh Circuit in *Johnson* concluded, this repassage of an amended version of the statute "conclusively demonstrates that the [legislature] would enact this provision even without an impermissible motive and did enact the provision without an impermissible motive." *Johnson*, 405 F.3d at 1224 (holding that "[t]he state has met its burden as a matter of law by substantively reenacting the law for race-neutral reasons."). As discussed in the government's response to Defendant's Motion, five amended versions of Section 1326 have been passed since 1952, and Congress's repeated neutral reconsideration and repassage of the law is more than enough to establish that the law "would have" passed absent any discriminatory motive, given that it has repeatedly done so. ECF No. 29 at 20:4-22:13.

Perhaps the clearest example of Congress reconsidering and strengthening Section 1326 in the absence of any desire to discriminate against people of Hispanic descent is its passage of the Immigration Act of 1990. As noted in the government's response to Defendant's supplement, this law was passed following a report to the Senate Judiciary Committee that examined the history of immigration policy in the United States, including

---

[7] The Law Library of Congress, *Criminalization of Illegal Entry Around the World* 2 (Aug. 2019) *available at loc.gov/law/help/illegal-entry/illegal-entry.pdf* (noting that "162 countries that have laws criminalizing or otherwise punishing illegal entry," that "124 countries that treat illegal entry as a crime," and that "criminal sanctions may apply if aggravating circumstances are present" in countries that treat illegal entry as a civil matter).

the influence of the eugenics movement that Defendant claims taints all subsequent legislation. *See* ECF No. 46 at 2 n.1; ECF No. 46 Ex. A at 4. Provisions of the law included, among other things, more than doubling the then-existing cap on immigration, granting Temporary Protected Status to citizens of El Salvador fleeing that country's civil war, and creating a diversity visa program to increase the number of visas provided to countries that were underrepresented in admission to the United States. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. The nondiscriminatory purpose of this law could hardly be more apparent, and one court has described the legislative history behind its enactment as "about face away from the racist trope that accompanied the enactment of the 1929 immigration law" that Defendant decries. *Gallegos-Aparicio*, 2020 WL 7318124, at *3. As part of that same statute, Congress reconsidered the statutory framework of Section 1326, and decided to increase the fine provision. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. That Congress has viewed Section 1326 as an important tool to further its immigration policies, in the absence of any discriminatory motive, is plainly demonstrated by the provisions of this law.

It is further worth noting that, according to the scholarship of Defendant's own expert, Prof. Gonzalez O'Brien, the amendments strengthening the deterrent value of Section 1326 only came after an attempt by Congress to reduce illegal immigration by other, non-deterrent means in the Immigration Reform and Control Act of 1986 that was unsuccessful.[8] Hr'g Tr. at 150:13-153:2 (noting, for example, IRCA's amnesty program, which was followed by a surge in illegal immigration). Indeed, the central thesis Prof.

---

[8] Pub.L. 99–603, 100 Stat. 3359.

14

Gonzalez O'Brien's book *Handcuffs and Chain Link*, is that Congress's return in the 1980's and 1990's to reliance on deterrent criminal measures to reduce illegal immigration was a product of IRCA's failure to reduce the population of undocumented immigrants in the United States. Hr'g Tr. at 138:15-139:25. While Prof. Gonzalez O'Brien may not agree with the means through which Congress has chosen to address the problems presented by illegal immigration, that is not a basis to invalidate the law. Given that his own scholarship asserts that Congress's continued use of criminal deterrence to curb illegal immigration is a product of a judgment that other means have failed to adequately address the problem, it cannot plausibly be argued that Section 1326 has only been carried forward from 1929 through sheer inadvertence, as Defendant suggests.

In sum, given the obvious valid reasons for enacting criminal immigration law, and Congress' continued reconsideration and repassage of Section 1326 in various amended forms, the record conclusively demonstrates that the law would be passed—and has been passed—in the absence of any discriminatory intent. Even setting aside Defendant's failure to meet his initial burden under *Arlington Heights*, the Court should deny the Motion.

### III.  Conclusion

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss. Respectfully submitted this 23rd day of February, 2021.

NICHOLAS A. TRUTANICH
United States Attorney

*s/ Peter Walkingshaw*
PETER WALKINGSHAW
Assistant United States Attorney